**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | |
|---|---|
| MEMPHIS A. PHILLIP RANDOLPH INSTITUTE, THE EQUITY ALLIANCE, FREE HEARTS, THE MEMPHIS AND WEST TENNESSEE AFL-CIO CENTRAL LABOR COUNCIL, THE TENNESSEE STATE CONFERENCE OF THE NAACP, SEKOU FRANKLIN, and KENDRA LEE,<br><br>Plaintiffs,<br><br>v.<br><br>TRE HARGETT, in his official capacity as Secretary of State of the State of Tennessee, MARK GOINS, in his official capacity as Coordinator of Elections for the State of Tennessee, and AMY WEIRICH, in her official capacity as the District Attorney General for Shelby County, Tennessee,<br><br>Defendants. | **AMENDED COMPLAINT**<br><br>Civil No. 3:20-cv-0374<br><br>JUDGE RICHARDSON<br>MAGISTRATE JUDGE FRENSLEY |

Plaintiffs Memphis A. Phillip Randolph Institute ("APRI"), The Equity Alliance, Free Hearts, The Memphis and West Tennessee AFL-CIO Central Labor Council a/k/a the Memphis Central Labor Council ("MCLC"), and The Tennessee State Conference of the NAACP ("Tennessee NAACP") (together, the "Organizational Plaintiffs"), together with Plaintiffs Sekou Franklin and Kendra Lee, (collectively, "Plaintiffs"), bring this action against Defendants Tre Hargett, in his official capacity as Secretary of State of the State of Tennessee; Mark Goins, in his official capacity as Coordinator of Elections for the State of Tennessee; and Amy Weirich in her official capacity as the District Attorney General for Shelby County, Tennessee, (collectively, "Defendants"), and allege the following:

1

## INTRODUCTION

1.     On March 5, 2020, the State of Tennessee (the "State") confirmed its first official case of COVID-19. Nearly two months later, the State has now reported 28,340 cases and 441 deaths from the pandemic disease. Tragically, the number of Tennesseans diagnosed with and dying from COVID-19 continues to increase daily. Social distancing guidelines have been implemented and encouraged by federal, state, and local governments in order to slow the spread of the deadly disease, and the State, echoing the Centers for Disease Control and Prevention ("CDC"), continues to advise citizens that "[t]he best way to prevent illness [from COVID-19] is to avoid being exposed to this virus."[1] This is particularly true for those who are elderly or who have underlying health conditions, regardless of age, which place them at increased risk of potentially lethal complications from the disease.

2.     In the midst of this public health crisis, Tennesseans will twice cast ballots in exercise of their fundamental right to vote: first on August 6, 2020, in the statewide primary election, and then again on November 3, 2020, in the presidential general election.

3.     In prior elections, Tennesseans have typically cast their ballots in person. In the upcoming elections, however, state and local elections officials expect that, in light of the ongoing pandemic, a significantly increased number of voters will seek to vote by mail in order to avoid exposure to this potentially lethal disease. For example, in some counties, like the State's second most populous Davidson County, officials expect a more than tenfold increase in the number of absentee voters in upcoming elections.[2]

---

[1] Tenn. Office of the Governor, *COVID-19 Health Resources*, https://www.tn.gov/governor/covid-19/health.html (last visited Apr. 28, 2020).

[2] Kathy Carlson, *Will Tennesseans Go To The Polls or the Mailbox?*, Nashville Ledger, Apr. 24, 2020, http://westviewonline.com/editorial/Article.aspx?id=128467.

4.      This makes good sense. For most voters, absentee voting—if available as an option—is a safe, socially-distanced method of exercising their fundamental right. Indeed, the CDC's first recommendation for election officials in the midst of this pandemic is to "[e]ncourage mail-in methods of voting."[3]

5.      While historic, this rapid shift towards voting by mail has also revealed Tennessee's election laws to be underprepared for the unprecedented task of holding an election during a pandemic in at least four ways: (1) the State's strict limits on eligibility for voting absentee, which do not recognize the pandemic as a valid excuse, impose an undue burden on prospective voters who must now choose between risking their health by voting in person, or forgoing their right to vote entirely; (2) criminal prohibitions on assisting voters in obtaining absentee ballot requests will have a chilling effect on the protected speech and associational activities of individuals and groups engaged in voter turnout activities during the upcoming elections, particularly considering that many voters will be navigating the absentee voting process for the first time; (3) the lack of opportunity to cure afforded to absentee voters whose ballots are rejected based on faulty signature match procedures stands to disenfranchise even those voters who are able to cast their ballot by mail; and (4) the requirement that voters who register to vote by mail must vote in person in their first election after registering, regardless of whether they are otherwise eligible to vote by mail. These restrictions severely burden Tennesseans' exercise of their right to vote and Organizational Plaintiffs' right to participate in voter engagement activity.

6.      First, in light of the ongoing public health crisis, Tennessee's failure to make the already-existing mail voting system available to all voters so that they do not have to choose

---

[3] Ctrs. for Disease Control and Prevention, Recommendations for Election Polling Locations (Mar. 27, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html.

between their right to vote and their health imposes an undue burden on Tennesseans' exercise of their right to vote.

7.      Under State law, eligible mail-in voters will be able to cast their ballots without waiting in line at their polling place, or interacting with fellow voters, poll workers, and voting equipment, thereby minimizing their risk of contracting or spreading COVID-19 while voting. Furthermore, by exercising their option to vote by mail, these voters can help reduce crowding, lines, and traffic through polling places, which can help minimize exposure for voters and poll workers, and reduce the risk of voting in person for those who are unable to vote by mail. This is particularly true for voters whose options for in-person voting are further limited due to polling place closures and consolidations, which Tennessee's most populous counties are already anticipating as a result of the ongoing pandemic.

8.      But the option to vote by mail safely is not available to most Tennessee voters, because the State limits absentee voting to only those who are eligible to do so under one of the State's few narrowly drawn excuses, none of which—in the State's view—account for voting during a public health crisis. *See* Tenn. Code § 2-6-201 (the "Eligibility Criteria").[4] If the State is permitted to continue enforcing the Eligibility Criteria, for voters like Plaintiff Kendra Lee, who is at an increased risk from COVID-19 due to an underlying health condition but is not eligible to vote by mail under the Eligibility Criteria, the only available choice will be either to vote in person at a potentially crowded in-person polling location or to not vote at all. The same will be true for Plaintiff

---

[4] On June 4, 2020, the Davidson County Chancery Court issued an injunction enjoining the enforcement of Tennessee's Eligibility Criteria for absentee voting. *See* Order Granting Temporary Injunction, *Fisher v. Hargett*, Case No. 20-453-IV(III) (Davidson Cnty. Chancery Ct. June 5, 2020). The Order requires the State to provide an absentee ballot to any voter who requests one in order to avoid exposure to COVID-19 through in person voting. The State is in the process of seeking an interlocutory appeal. Any reference to "Eligibility Criteria" contained herein is therefore intended to mean the Eligibility Criteria as they existed prior to the Chancery Court's ruling, and which will continue to apply in the event the Chancery Court's opinion is overturned.

Sekou Franklin, who is not eligible to vote by mail under the Eligibility Criteria, but also fears voting in person in the August and November elections because he does not want to catch and then bring COVID-19 back to his elderly father, who is at an increased risk from the disease.

9.      Requiring voters like individual Plaintiffs, Organizational Plaintiffs' members, and their families, to choose between risking their health and safety to vote in person or to not vote at all is not just unfair, it is also unconstitutional. Simply put, the Constitution does not permit the State to require voters to jeopardize their health and safety, and the health and safety of their loved ones, in order to exercise their fundamental right to vote. Tennessee voters must be permitted to cast their ballots without subjecting themselves to unnecessary exposure to a pandemic disease. The United States Constitution requires that Defendants must either be enjoined from enforcing, or otherwise required to expand, the Eligibility Criteria for absentee voting while pandemic conditions continue to threaten voters' health.

10.     Second, the Constitution precludes the State from imposing criminal penalties on individuals and entities, like Organizational Plaintiffs and their members, who seek to engage in protected speech and associational activity by helping their members, their members' families, and voters in their community, apply for an absentee ballot. But that is exactly what Tennessee law currently does.

11.     Even under the narrow Eligibility Criteria for absentee voting, county officials expect that thousands of voters—particularly older voters—will seek to vote by mail for the first time in this year's elections. These voters will need assistance navigating an absentee ballot application system that they have never used before, including understanding that they have a right to vote absentee and actually obtaining and completing their absentee ballot request (in advance of the impending July 30 and October 27, 2020, deadlines for the August 6 and November 3, 2020,

5

elections). As such, the Organizational Plaintiffs intend to focus more heavily on outreach to and engagement of potential absentee voters as part of their political and voter engagement work this cycle.

12.     Under Tennessee Code § 2-6-202(c)(4), however, "[a] person who is not an employee of an election commission commits a Class A misdemeanor if such person gives an unsolicited request for application for absentee ballot to any person." If convicted, they could face a sentence of up to 11 months and 29 days in prison, a fine of up to $2,500, or both.

13.     As a result of this law, the Organizational Plaintiffs will be severely hampered in their ability to assist their members and engaged voters with obtaining the absentee ballot request they need to exercise their right to vote by mail in the upcoming elections. The restriction on the unsolicited distribution of absentee ballot requests—which will be a particularly necessary voter engagement tactic in light of the COVID-19 pandemic—chills protected speech and associational activity, harms Tennessee voters, and unconstitutionally burdens the Organizational Plaintiffs' right to engage in core political speech and activity, in violation of the First and Fourteenth Amendments.

14.     Third, Tennessee must ensure that absentee ballots are counted, not discarded, by providing absentee voters with notice of problems with their mail-in-ballots, and an opportunity to cure such problems so that their votes may be counted. Because Tennessee fails to provide its absentee voters with any opportunity to cure signature verification deficiencies, its process for counting absentee ballots is unconstitutional, and deprives absentee voters of procedural due process in violation of the Fourteenth Amendment and their fundamental right to vote in violation of the First and Fourteenth Amendments to the United States Constitution.

15.     Currently, an absentee ballot must be verified by an election official by comparing the voter's signature on the ballot to the voter's signature on file with their voter registration. If the

election official subjectively believes that the signatures do not match, the voter's absentee ballot is rejected, and consequently, his or her vote is not counted. There are no uniform standards on which election officials in Tennessee's 95 counties must rely to conduct their assessment, and if the voter's ballot is rejected, the voter has no statutory right to cure the perceived deficiency by, for example, verifying their identity using a secondary method. This is the case notwithstanding the unreliability of signature matching, especially when performed by untrained non-experts, and despite the fact that a voter's signature might naturally vary between signings for reasons as innocuous as the voter's age, mental or physical condition, or the writing surface or implement the voter used to sign. Without a remedy, in the upcoming Fall elections, where the number of mail-in ballots cast is expected to increase dramatically, hundreds or thousands of Tennessee voters could be effectively disenfranchised by Tennessee's standardless and procedurally defective system for rejecting absentee ballots.

16.     Protecting the fundamental right to vote for absentee voters is particularly important in light of the anticipated increase in volume of absentee voting for the upcoming elections, and the corresponding increase in first-time absentee voters, who may be unfamiliar with the process, and thus more likely to encounter problems with their ballots. The situation is compounded by Tennessee's failure to provide for in-person drop-off of absentee ballots by voters who may receive their ballots late.

17.     Finally, Tennessee must ensure that all eligible voters, including those who register to vote by mail and will be voting this year in their first Tennessee election after registering, can cast an absentee ballot. Under Tennessee law, such voters currently must vote in person, *see* Tenn. Code § 2-2-115(b)(7) (the "First-Time Voter Restriction"), regardless of whether they are otherwise eligible to vote absentee. Particularly in the context of the pandemic, this requirement

7

unconstitutionally burdens the fundamental right to vote of absentee-eligible voters in violation of the First and Fourteenth Amendments to the United States Constitution.

18.     Tennessee's restrictions on the casting of absentee ballots, taken individually or in combination, violate Plaintiffs' right to vote. Plaintiffs respectfully request this Court declare Defendants' restrictive absentee ballot laws and practices unconstitutional, and enjoin Defendants to (1) allow all voters who wish to, to vote by absentee ballot in the August 6 and November 3, 2020 elections, and to take any necessary steps to facilitate absentee voting; (2) suspend enforcement of the statute that criminalizes the distribution of absentee ballot requests; (3) stop rejecting absentee ballots on the basis of signature-related deficiencies without first providing a procedure for voters to cure; and (4) enjoin enforcement of the First-Time Voter Restriction. Such relief is necessary in light of the May 8, 2020, opening of Tennessee's absentee ballot application window for this August's election, and considering the time and resources the State will need to dedicate to preparing for a larger share of the voting population—even without any expansion of the Eligibility Criteria—to vote by mail.

## JURISDICTION AND VENUE

19.     This action is brought under the United States Constitution. The Court, therefore, has jurisdiction to hear this case pursuant to 28 U.S.C. §§ 1331, 1343, 1357, and 42 U.S.C. § 1983. It also has jurisdiction under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, to grant the declaratory relief requested.

20.     This Court has personal jurisdiction over each Defendant because each is a citizen of Tennessee or has his or her principal place of business in the State.

8

21.     Venue in this district is proper pursuant to 28 U.S.C. § 1391(b) because some Defendants reside in this District and all Defendants reside in Tennessee, and because a substantial portion of the events giving rise to these claims occurred in the Middle District of Tennessee.

## THE PARTIES

I.     **Plaintiffs**

    *A.   The Individual Plaintiffs*

22.     Plaintiff Sekou Franklin is a qualified voter registered in Davidson County, Tennessee since 2003. Mr. Franklin has voted in most municipal, state, and federal elections in Tennessee. Mr. Franklin wants to vote in the upcoming August 6 and November 3, 2020 elections because voting is important to him. He does not qualify to vote by mail under Tennessee's Eligibility Criteria. Mr. Franklin is an Associate Professor of Political Science at the Middle Tennessee State University and is a resident of Davidson County. He is able to teach remotely as his classes have transitioned to online platforms. Each afternoon, Mr. Franklin visits and takes care of his 76-year-old father who has underlying health issues, including a neurological disease and severe diabetes. Mr. Franklin fears that his father will not be able to recover and will die if exposed to COVID-19. Mr. Franklin does not want to expose his father to COVID-19 by voting in person in the upcoming elections. Mr. Franklin will be disenfranchised if the State does not provide him the option to vote by mail.

23.     Plaintiff Kendra Lee is a qualified voter registered in Shelby County, Tennessee since 2008. Ms. Lee has regularly voted in person in Tennessee's prior state and federal elections, and would like to vote in the upcoming August 6 and November 3, 2020 elections as well. Ms. Lee does not qualify to vote by mail under Tennessee's Eligibility Criteria. However, because Ms. Lee has asthma and bronchitis, she cannot safely vote in person because in so doing, she would

potentially expose herself to the risk of serious complications from COVID-19. If forced to choose between voting in person or not at all this Fall, Ms. Lee will likely choose not voting—despite her desire to do so—in order to protect her health and safety.

### B. *The Organizational Plaintiffs*

24.     Plaintiff Memphis A. Phillip Randolph Institute ("APRI") is a Memphis, Tennessee-based non-profit political advocacy and membership organization which works to strengthen ties between the labor movement and the community, increase the political impact of black voters, and implement structural changes through the American democratic process. In support of its advocacy and engagement efforts, APRI sponsors voter education and Get-Out-The-Vote programs in the community, which include outreach to first-time registrants to vote who submit their registration forms by mail. In the upcoming elections, and in light of the challenges and health risks posed by in-person voting during the ongoing public health crisis, APRI intends to inform its more than 30 members and the labor community more broadly about safe-voting options like absentee voting, and, to the extent they are eligible, encourage voters to exercise their right to vote by mail. APRI anticipates that in order to effectively engage voters about absentee voting, its staff and volunteers will need to be able to provide eligible absentee voters with printed absentee ballot requests, sometimes without being solicited to do so. APRI further anticipates that given the procedural deficiencies in Tennessee's system for receiving and rejecting absentee ballots, at least some of its members who are already eligible to vote by mail will have their votes not counted.

25.     Plaintiff Free Hearts is a nonpartisan, nonprofit organization based in Nashville, Tennessee. Since 2015, Free Hearts has educated, organized, advocated for, and supported the families of individuals impacted by the criminal punishment system. Free Hearts works across the State and in coalition with other nonprofit groups to support approximately 426 incarcerated and

10

formerly incarcerated individuals and their families. It has 5 full-time staff and approximately 40 volunteers who engage with their community base on a regular basis. Since 2017, Free Hearts has also been working to expand the franchise to those impacted by the criminal punishment system. To that end, Free Hearts registers eligible individuals in jails, advocates for jails to become polling sites, helps restore voting rights to formerly incarcerated individuals, and advocates for reforms around automatic voter registration in Tennessee. Some voters that Free Hearts registers are first-time voters who submit by mail their voter registration forms. Free Hearts plans to undertake similar engagement efforts in advance of the August 6 and November 3, 2020 elections, but in light of the ongoing COVID-19 pandemic, will dedicate additional resources, including financial resources as well as staff and volunteer time, towards absentee voter engagement. As part of its engagement, Free Hearts will inform eligible absentee voters of their right to vote by mail and help them obtain and submit their mail-in ballots. To the extent it is permitted by law, Free Hearts also expects that it will help prospective voters request absentee ballots and that in order to reach the most voters in its base, will need to do so in an unsolicited manner.

26.     Plaintiff The Memphis and West Tennessee AFL-CIO Central Labor Council, also known as the Memphis Central Labor Council ("MCLC"), is a Memphis, Tennessee-based union that acts as an umbrella organization for 41 affiliate unions based in western Tennessee. MCLC is dedicated to representing the interests of working people at the state and local levels by advocating for social and economic justice. In support of its advocacy agenda, MCLC routinely engages in voter outreach efforts, including of its approximately 20,000 members, through voter identification, education, and mobilization drives, including of first-time voters who are registering by mail. It plans to undertake similar engagement efforts in advance of the August and November 2020 elections, but in light of the ongoing COVID-19 pandemic, will dedicate additional resources

11

towards absentee voter engagement that includes informing eligible absentee voters of their right to vote by mail and helping them obtain and submit their mail-in ballots. To the extent it is permitted by law, MCLC also expects that it will provide absentee ballot requests to potential absentee voters, including its approximately 20,000 members, as part of its engagement activity, and that in order to efficiently and effectively reach the most voters, will occasionally need to do so in an unsolicited manner.

27.     Many of MCLC's approximately 20,000 members are eligible to vote in the upcoming elections, but not as absentee voters under the State's restrictive Eligibility Criteria. Some have chronic or other underlying health conditions that put them at heightened risk of complications from COVID-19. Others live with family members who are in an at-risk population, and who could be exposed to the dangers of COVID-19 if the member is required to vote in person in the August and November 2020 elections. Under such circumstances, many of MCLC's members would, if eligible, seek to vote absentee in the August and November 2020 elections. MCLC further anticipates that given the procedural deficiencies in Tennessee's system for receiving and rejecting absentee ballots, at least some of its members who are already eligible to vote by mail will have their votes not counted.

28.     Plaintiff The Equity Alliance is a Nashville, Tennessee-based nonpartisan, non-profit organization that seeks to equip citizens with tools and strategies to engage in the civic process and empower them to take action on issues affecting their daily lives. The Equity Alliance is dedicated to expanding the electorate, educating communities of color about the political process, and engaging and empowering citizens to vote. In the upcoming elections, The Equity Alliance anticipates that it will invest considerable effort towards informing and engaging voters about absentee voting, including, if possible, providing them with tools—like the absentee ballot request

12

itself—to exercise their right. Some of The Equity Alliance's voter engagement efforts are unsolicited, and the organization expects that in order to effectively engage voters, it may need to provide them with unsolicited absentee ballot requests. The Equity Alliance also engages first-time registrants to vote, including some who submit their registration to vote by mail.

29.     Plaintiff The Tennessee State Conference of the NAACP ("Tennessee NAACP") is a nonpartisan, multi-racial, non-profit membership organization headquartered in Jackson, Tennessee. Tennessee NAACP has three regional divisions—Eastern, Middle, and Western Tennessee—as well as the 33 local branch units and 22 college chapters and youth councils. Tennessee NAACP was founded in 1946 to serve as the Tennessee arm of the National Association for the Advancement of Colored People. Its mission is to eliminate race-based discrimination through securing political, educational, social, and economic equality rights and ensuring the health and well-being of all persons. Tennessee NAACP has more than 10,000 members across the State, primarily consisting of African Americans, other people of color, and allies. Tennessee NAACP and most local branch units are primarily volunteer-run, and all officers are volunteers.

30.     In support of its advocacy agenda, Tennessee NAACP engages in voter outreach efforts, including through voter registration, education, and mobilization work in communities that have had historically low voter registration and turnout. Some of Tennessee NAACP's engaged voters are first-time registrants, including high school and college students, who submit their registration forms by mail. Tennessee NAACP plans to undertake similar engagement efforts in advance of the August and November 2020 elections, but in light of the ongoing COVID-19 pandemic, will dedicate a significant amount of financial resources and volunteer time towards absentee voter engagement. As part of this engagement, Tennessee NAACP will inform eligible absentee voters of their right to vote by mail and help eligible voters obtain and submit their mail-

13

in ballots. To the extent it is permitted by law, Tennessee NAACP expects that it will provide absentee ballot requests to potential absentee voters, including its approximately 10,000 members, as part of its engagement activity, and that in order to reach the most voters, will occasionally need to do so in an unsolicited manner.

31.     Many of Tennessee NAACP's members are eligible to vote in the upcoming elections, but not as absentee voters under the State's restrictive Eligibility Criteria. Some have chronic or other underlying health conditions that puts them at heightened risk of complications from COVID-19. Others live with family members who are in an at-risk population, and who could be exposed to the dangers of COVID-19 if the member is required to vote in person in the August and November 2020 elections. Under such circumstances, many of Tennessee NAACP's members would, if eligible, seek to vote absentee in the August and November 2020 elections. Tennessee NAACP further anticipates that given the procedural deficiencies in Tennessee's system for receiving and rejecting absentee ballots, at least some of its members who are already eligible to vote by mail will have their votes not counted.

## II.     Defendants

32.     Defendant Tre Hargett is the Secretary of State for the State of Tennessee and is sued in his official capacity. The Secretary appoints the Coordinator of Elections who serves "at the pleasure of the secretary of state" and may make regulations only as necessary to carry out the election code with "the concurrence of the secretary of state." Tenn. Code § 2-11-201(a), (c).

33.     Defendant Mark Goins is the Coordinator of Elections for the State of Tennessee and is sued in his official capacity. The Coordinator is "the chief administrative election officer of the state" charged with "obtain[ing] and maintain[ing] uniformity in the application, operation and interpretation of the election code." *Id.* § 2-11-201(b); *see also id.* §§ 2-11-202, 2-2-115. As

14

Coordinator, Goins is also authorized to investigate or direct local authorities to investigate "the administration of the election laws," and to "report violations to the district attorney general or grand jury for prosecution." *Id.* § 2-11-202(a)(5).

34. Defendant Amy Weirich is the District Attorney General for Shelby County, Tennessee, and is sued in her official capacity. Under Tennessee law, the District Attorney General is charged with "prosecut[ing] in the courts of the district all violations of the state criminal statutes and perform[ing] all prosecutorial functions attendant thereto." *See id.* § 8-7-103. Moreover, under State law, violations of the election laws may be reported to the district attorney general for prosecution. *See id.* § 2-11-202(a)(5)(A)(i).

## FACTS

### I. Background on the Effects of the COVID-19 Epidemic in Tennessee

35. The virus that causes COVID-19 is highly contagious and spreads through a variety of means, including respiratory droplets and contact between individuals. Once contracted, it can have a range of effects on the diagnosed individual, from passing without any symptoms at all, to flu-like symptoms, to causing a severe immune system response that can cause fluid to build in the person's lungs and lead to death. The disease poses a severe risk to all individuals, and particularly those who are either elderly, or, regardless of age, are immunocompromised, or have other underlying conditions like chronic lung disease, diabetes, obesity, or moderate to severe asthma.[5]

36. Because of the highly contagious and potentially deadly nature of the disease, on March 13, 2020, President Trump declared a national state of emergency as a result of the widespread outbreak of COVID-19. At least 48 states—including Tennessee—have declared local

---

[5] Ctrs. for Disease Control and Prevention, People Who Are at Higher Risk for Severe Illness, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html. (last visited Apr. 30, 2020).

15

states of emergency.[6] There is no prescribed end date to this national emergency (or, of course, the pandemic itself), and a second, potentially "more difficult" outbreak of the disease is expected later this year.[7]

37.    Under such unprecedented circumstances, COVID-19's effect on life in Tennessee, and across the country, has been dramatic. Since March 5, 2020, when the State's first case of COVID-19 was confirmed, approximately 441 Tennesseans have tragically lost their lives to the pandemic disease, and at least another 28,340 have been diagnosed with the disease.[8] The average Tennessean diagnosed with COVID-19 is under 60 years old.[9]

38.    In order to slow the spread of this lethal disease, Governor Lee ordered most Tennessee businesses to close, and non-essential workers to work from home, beginning April 2, 2020.[10] The Tennessee Supreme Court further extended its closure of most courts through June and suspended jury trial proceedings until at least July 3, 2020.[11]

39.    Even now, as the State moves towards some reopening—which some public health experts caution may cause the number of COVID-19 cases to increase[12]—it continues to echo the

---

[6] Adam Edelman et al., *Trump Declares National Emergency to Combat Coronavirus, Authorizes Waiving of Laws and Regulations*, NBC News (Mar. 13, 2020, 1:54 PM), https://www.nbcnews.com/politics/donald-trump/trump-hold-friday-afternoon-press-conference-coronavirus-n1157981; Rosie Perper et al., *Almost All US States Have Declared States of Emergency to Fight Corona Virus—Here's What It Means for Them*, Bus. Insider (Mar. 17, 2020, 1:34 AM), https://www.businessinsider.com/california-washington-state-of-emergency-coronavirus-what-it-means-2020-3.
[7] Lena H. Sun, *CDC Director Warns Second Wave of Coronavirus Is Likely to Be Even More Devastating*, Wash. Post, Apr. 21, 2020, https://www.washingtonpost.com/health/2020/04/21/coronavirus-secondwave-cdcdirector/.
[8] Tenn. Dep't of Health, *Tennessee COVID-19-May 1,2020 Epidemiology and Surveillance Data*, https://www.tn.gov/health/cedep/ncov.html (last visited May 1, 2020).
[9] *Id.*
[10] Governor Bill Lee, *Executive Order No. 23: An Order Amending Executive Order No. 22, Requiring Tennesseans to Stay At Home Unless Engaging in Essential Activity or Essential Services*, Apr. 2, 2020, https://publications.tnsosfiles.com/pub/execorders/exec-orders-lee23.pdf.
[11] Tenn. No. ADM2020-00428 (Mar. 25, 2020).
[12] Kimberlee Kruesi & Jonathan Mattise, *Tennessee Won't Enforce New Reopening Guidelines*, Associated Press, Apr. 24, 2020, https://apnews.com/c63a5946dc4fcb5e9abb1dc86a79a22c.

16

federal CDC, in recommending that "[t]he best way to prevent illness [from COVID-19] is to avoid being exposed to this virus," by, among other things, "avoid[ing] close contact with others," and "stay[ing] home as much as possible."[13] Dr. Birx, the White House coronavirus response coordinator, has affirmed that "social distancing will be with us through the summer."[14] And for older adults, the immunocompromised, and individuals with chronic medical conditions like heart or lung disease, asthma, severe obesity, or diabetes, regardless of age—who are themselves at heightened risk of developing fatal complications from COVID-19—additional precautionary steps, like staying at home and avoiding close contact with others, are strongly recommended.[15] The need for social distancing during this pandemic—particularly for vulnerable populations—does not yet have any discernible end date.

40. In light of the evident health risks posed by COVID-19, as well as the consensus that social distancing is the most effective method of preventing exposure, the disease is expected to have a significant impact on Tennessee's upcoming elections on August 6 and November 3, 2020. County officials in the State's most populous Shelby County have acknowledged that the virus is "going to be here for the remainder of the year in some capacity."[16] And recognizing that it will be impossible to keep the virus away from in-person polling locations this Summer and Fall, election officials in populous counties, like the second most populous Davidson County, have reportedly

---

[13] Tennessee Office of the Governor, *COVID-19 Health Resources*, https://www.tn.gov/governor/covid-19/health.html (last visited Apr. 30, 2020).
[14] Alexander Kacala & Ben Kamisar, *Social Distancing Will Continue Through the Summer, Dr. Birx Warns*, TODAY, Apr. 26, 2020, https://www.today.com/news/dr-deborah-birx-social-distancing-continue-over-summer-t179947.
[15] *Id.*
[16] Kelli Cook, *County Commissioners Push for Mail-In, Paper Ballots for Next Election,* WMC5, Apr. 23, 2020, https://www.wmcactionnews5.com/2020/04/23/county-commissioners-push-in-mail-in-paper-ballots-next-election/.

begun to obtain personal protective equipment for poll workers, including masks, gowns, and face shields, "so the virus doesn't come home with them at the end of the day."[17]

41. To the extent they are eligible to do so, many Tennessee voters are expected to proactively protect themselves from the virus by voting absentee. Those who will be permitted to do so must submit their request to vote absentee in the August 6, 2020 election between May 3, 2020, and July 30, 2020, and between August 5, 2020, and October 27, 2020, for the November 3, 2020 election. *See* Tenn. Code. § 2-6-202(a).

42. While Tennessee voters typically vote in person, in the upcoming August and November elections, officials expect a substantial increase in absentee voting. In Davidson County, for example, election officials anticipate that more than 120,000 absentee ballots will be cast in November, up from only about 6,000 absentee ballots cast in the 2016 presidential election.[18] A similar influx is anticipated in Shelby County.[19] As a result, election officials across Tennessee's 95 counties will need maximum time to prepare for this historic shift in the Tennessee electorate's voting method.

43. Tennessee voters' choice to eschew their typical practice of voting in person in favor of voting by mail, to the extent they are able, is a reasonable one. In jurisdictions that have proceeded with primarily in-person elections in the midst of this ongoing public health crisis, in-person voting has already demonstrated itself to unnecessarily expose voters and poll workers to the potentially lethal COVID-19.[20] For example, in Wisconsin, which proceeded with its election on April 7, 2020,

---

[17] Kathy Carlson, *Will Tennesseans Go To The Polls or the Mailbox?*, Nashville Ledger, Apr. 24, 2020, http://westviewonline.com/editorial/Article.aspx?id=128467.
[18] *Id.*
[19] Shay Arthur, *Local Election Officials Preparing for Changes in Election Process*, WREG3 (Apr. 29, 2020, 6:31 PM), https://wreg.com/news/local-election-officials-preparing-for-changes-in-election-process/.
[20] *See* Scott Bauer, *52 People Who Took Part in Wisconsin's Primary Have Tested Positive for Coronavirus*, Associated Press, Apr. 29, 2020, https://apnews.com/6428674bc2668ebd2db3c482f7f703c1.

18

more than 50 people may have contracted COVID-19 *at their polling location*.[21] In Tennessee, where as recently as the March 3, 2020 election, polling locations had to be consolidated and voters experienced long wait times before casting their ballots,[22] it can similarly be expected that COVID-19 will be transmitted at the polls to some in-person voters and poll workers during this year's elections.

## II. Overly Narrow Eligibility Criteria for Mail-In Voting in the Context of a Pandemic

44. In advance of the August 6 and November 3, 2020 elections, Tennessee maintains one of the most restrictive lists of excuses to qualify for the casting of an absentee ballot in the country. Unless Tennessee voters satisfy one of the thirteen enumerated excuses ("Eligibility Criteria"), they must either go in person to vote in the upcoming elections, or not vote at all. *See* Tenn. Code § 2-6-201.

45. The State's Eligibility Criteria are not suited for administering an election during a public health crisis because they preclude a majority of the voting population from voting safely by mail. The narrowly drawn list includes only voters who are: (1) outside their county of registration for the entire early voting period and on election day; (2) full-time students and their spouses who are enrolled at a university outside the student's county of registration; (3) added to a permanent absentee voter list because sick, hospitalized, or severely disabled, and have provided an attesting physician's statement; (4) full-time residents of a nursing home outside the county in which they are registered; (5) engaged in jury service on election day; (6) over 60 years old; (7) have a disability as defined in Tennessee Code § 2-3-109, and an inaccessible polling location; (8) hospitalized, ill or physically disabled, and consequently unable to appear at the polling location on election day;

---

[21] *See id.*

[22] Christina A. Cassidy and Adrian Sainz, *Tornadoes, Virus Fears Disrupt Voting in Some States*, Associated Press, Mar. 3, 2020, https://apnews.com/4f9548d9c0b259ee541dc17413cd1112.

(9) a caretaker of a hospitalized, ill, or disabled person; (10) a candidate for office and is on the ballot; (11) an election official or a member or employee of the election commission on election day; (12) unable to appear at the polling location during the entire early voting period and on election day because they are observing a religious holiday; and (13) working out-of-state during the entire early voting period and on election day, and possesses a valid commercial driver's license. *See id.*

46. Tennessee is one of only three states that, in the face of the pandemic, has refused to voluntarily change its requirement that voters must provide an excuse before they may vote by absentee ballot. Other states, that in normal circumstances maintain similarly limited eligibility requirements for voting absentee, have recognized that the extraordinary circumstances caused by the pandemic require loosening of those requirements. These states include Alabama, Delaware, New Hampshire, Virginia, and West Virginia, which have each agreed to permit any voter to use COVID-19 as a valid excuse for requesting to vote by mail.[23]

47. In Tennessee, however, voters who seek to exercise their fundamental right without exposing themselves to the serious health risks posed by voting in person during a pandemic are— under the State's interpretation—not encompassed by any of the Eligibility Criteria. As a result, in the midst of this public health crisis, the choice between exposure and voting poses far more than

---

[23] *See* Ala. Sec'y of State, *Absentee Voting During State of Emergency* (Mar. 18, 2020), https://www.sos.alabama.gov/sites/default/files/SOS%20Emergency%20Rule%20820-2-3-.06-.01ER.pdf; Del. Office of the Governor, *Sixth Modification to State of Emergency* (Mar. 24, 2020), https://governor.delaware.gov/wp-content/uploads/sites/24/2020/03/Sixth-Modification-to-State-of-Emergency-03242020.pdf.; N.H. Sec'y of State, *Memorandum Re Elections Operations During the State of Emergency* (Apr. 10, 2020), https://www.nhpr.org/sites/nhpr/files/202004/covid-19_elections_guidance.pdf.; Va. Office of the Governor, *Executive Order 59* (Apr. 24, 2020), https://www.governor.virginia.gov/media/governorvirginiagov/executive-actions/EO-59-Postponing-May-5,-2020-General-and-Special-Elections-to-May-19,-2020-Due-to-Novel-Coronavirus-(COVID-19).pdf; W. Va. Sec'y of State, *Eligibility for Absentee Voting in West Virginia* (Apr. 1, 2020), https://sos.wv.gov/FormSearch/Elections/Informational/Absentee%20Voting%20Eligibility%20Summary.pdf.

mere inconvenience; it imposes an undue burden on voters' exercise of their fundamental right to vote.

48.     That is the case for voters like Plaintiff Kendra Lee, whose diagnoses of asthma and bronchitis place her in a heightened at-risk group for complications from COVID-19, but nevertheless must vote in person because she does not meet the Eligibility Criteria for absentee voting. For Ms. Lee, and others like her, voting in the August and November 2020 elections will be an unduly risky enterprise. By appearing in person to vote, Ms. Lee will potentially expose herself to COVID-19, through myriad interactions with other voters, poll workers, and common voting equipment.[24] And especially because of her underlying health conditions, a diagnosis of COVID-19 could have significant health consequences for Ms. Lee, including the possibility of death. Put differently, without the option to vote by mail, in order to exercise her right to vote in the midst of the current public health crisis, Ms. Lee will have to place in serious jeopardy her own health and safety. Faced with that choice, Ms. Lee is uncertain that she will actually vote, despite her desire to do so.

49.     A similar predicament also faces voters like Plaintiff Sekou Franklin, who daily visits and helps care for his elderly father who has underlying health issues, including neurological problems and severe diabetes. Despite having regularly voted in prior elections, and notwithstanding his desire to do so in the upcoming elections, Mr. Franklin does not want to expose his father to COVID-19 by voting in person this August and November. Mr. Franklin fears that his father will not be able to recover and will die if he contracts the disease, and so is unsure whether he will actually risk voting in person this Fall. For voters like Mr. Franklin, the lack of an absentee

---

[24] According to MIT's Elections Performance Index, in 2016, *Tennessee ranked 37th among the states for length of wait times. MIT Elections Performance Index, State Profiles – Tennessee,* https://elections.mit.edu/#state-TN. The likelihood of polling place closures and consolidations due to the virus will only exacerbate lines absent an expansion of vote by mail.

voting option will force a choice between exercising their own right to vote and not exposing their at-risk loved ones, who themselves can vote absentee, to COVID-19 by doing so.

50.     Many of the Organizational Plaintiffs' members similarly face substantial risks to themselves or their loved ones from voting in person. Indeed, *all* voters will face substantial health risks by voting in person. Age or relative health are no guarantees with this disease, which can be brutal even for those who recover. But under Tennessee law, a majority of the voting population will have no option available, other than to vote in person, if they wish to exercise their right to vote.

51.     Against this background, while Tennessee law expresses a preference for in-person voting, it has an established vote by mail system. That system is already open to *all* voters over the age of 60, provided they request an absentee ballot by the deadline (which, for the August 6, 2020 election, is July 30, 2020). Tennessee does not have any substantial interest in depriving its younger voters during this health crisis of the ability to vote by mail when it extends that option liberally to older voters; nor does any election integrity interest *require* such a deprivation.

## III.    Criminal Penalties for the Dissemination of Absentee Ballot Applications

52.     Tennessee Code § 2-6-202(c)(4) states that "[a] person who is not an employee of an election commission commits a Class A misdemeanor if such person gives an unsolicited request for application for absentee ballot to any person." Any person found guilty of violating the law could face a sentence of up to 11 months and 29 days in prison, a fine of up to $2,500, or both. *See* Tenn. Code. § 40-35-111(e)(1).

53.     On its face, this section of the Tennessee Code directly regulates Organizational Plaintiffs' political speech activity, and prohibits them from fully engaging and facilitating their

22

members and other potential absentee voters' ability to obtain the absentee ballot request they must submit in order to exercise their right to vote by mail.

54.     The effect of these prohibitions will be particularly pronounced this Summer and Fall, because it is expected that the pandemic will significantly increase the number of Tennesseans who desire to vote by absentee ballot in the upcoming elections. Organizational Plaintiffs, which are each local community organizations that have programs devoted to engaging and organizing their members and communities around making their voices heard through voting, expect to activate their networks to assist such new absentee voters.

55.     In election after election, Organizational Plaintiffs have run voter engagement programs involving voter registration activities, voter education, and voter turnout. *See supra* ¶¶ 23–30. Such efforts are at the core of the Organizational Plaintiffs' political speech and advocacy activities. But in the upcoming elections, in light of the ongoing pandemic, the traditional tactics Organizational Plaintiffs use to engage voters, including in-person voter turnout activities, may not be available to them. Nonetheless, Organizational Plaintiffs are committed to continuing their voter engagement work and encouraging their eligible members and communities to vote. In order to be most effective in mobilizing voters while ensuring their safety, Organizational Plaintiffs will focus additional resources on organizing their members and communities, where they are eligible, to vote by mail. This will necessarily include providing assistance in requesting and obtaining an absentee ballot, reminding eligible absentee voters about application and ballot submission deadlines and requirements, and following up with voters to ensure their ballots were both cast and counted. As a key part of this absentee voter engagement, Organizational Plaintiffs wish to provide potential

absentee voters with blank absentee ballot requests that the prospective voter may complete and return to their county election official.

56.     In light of the criminal penalties imposed by Tennessee Code § 2-6-202(c)(4), Organizational Plaintiffs will not be able to effectively execute their absentee voter engagement strategy. As just one example, under the law, Organizational Plaintiffs cannot send their members and other engaged voters mass-mailing literature about the benefits of absentee voting that includes an unsolicited blank absentee ballot request that the voter can then complete and return to county election officials. But for groups like Organizational Plaintiff MCLC and Tennessee NAACP, which boast memberships of approximately 20,000 affiliate union members and 10,000 statewide members, respectively, such mass mailings—including an unsolicited absentee ballot request—will be crucial to actually being able to engage the maximum number of potential absentee voters in advance of the upcoming elections and absentee voting deadlines.

57.     Such efforts must begin imminently in order to have the maximum impact on voters in advance of the August 6, 2020 election. This is particularly true considering that the window for Organizational Plaintiffs' members and engaged voters to begin requesting an absentee ballot for the August 6 election opens on May 8, 2020, and will permanently close on July 30, 2020. In advance of these deadlines, Organizational Plaintiffs must prepare their voter engagement strategies and outreach, and must have certainty as to whether they can provide unsolicited absentee ballot requests to members and other voters.

58.     Tennessee Code § 2-6-202(c)(4) is chilling of Organizational Plaintiffs' absentee voter engagement efforts, and will unduly burden their ability to engage in core political speech like convincing eligible absentee voters that their fears around exposure to COVID-19 need not prevent them from voting.

## IV.    Burdens on Having an Absentee Ballot Counted, Including the Lack of an Opportunity to Cure Signature-Related Deficiencies in Absentee Ballots

59.    After voters receive their absentee ballots from county election officials, they must complete and return the ballots by postal mail and ensure that they arrive no later than the close of polls on Election Day. *See* Tenn. Code §§ 2-6-202(a), 2-6-303(b). For a voter who *timely* applies for his or her absentee ballot on or near the seventh day before Election Day, such a burdensome deadline will be extremely difficult, if not impossible to meet, especially in the context of a pandemic that has already caused delays in mail delivery, including the delivery of absentee ballots.[25]

60.    Where an absentee ballot can be timely returned to election officials, before that ballot may be counted as part of the official vote tally for an election, the county election official must verify the voter's signature. *See* Tenn. Code § 2-6-202(g). Only after such verification is confirmed may the ballot be counted.

61.    To verify the absentee voter's ballot, Tennessee law requires election officials in each of Tennessee's 95 counties to engage in a process commonly referred to as "signature matching." In the process, the election official must compare the signature accompanying the voter's ballot with the voter's signature in the "appropriate registration record." *See id.* § 2-6-202(g). If the signatures match—*i.e.*, the election official in the voter's county determines that the voter is verified—the absentee voter's ballot will be counted. *Id.* If, in the county election official's view,

---

[25] *See* Nick Corasaniti & Stephanie Saul*, Inside Wisconsin's Election Mess: Thousands of Missing or Nullfied Ballots*, N.Y. Times, Apr. 9, 2020,*t* https://www.nytimes.com/2020/04/09/us/politics/wisconsin-election-absentee-coronavirus.html; Meg Cunningham, *'More time would have been helpful': Ohio Election Officials Face Ballot Issues Due to Postal Service Delays*, ABC News (Apr. 24, 2020), https://abcnews.go.com/Politics/time-helpful-ohio-election-officials-face-ballot-issues/story?id=70333752

the signatures do not match, the official is required to reject the ballot and notify the voter, in writing, of the reason for the rejection. *See id.* § 2-6-204(b).

62. Under Tennessee law, each of the State's 95 counties' election officials have discretion whether to accept or reject an absentee voter's ballot for signature-related deficiencies. Neither the Tennessee Code nor any State-promulgated regulations guide the various election officials' examination of the absentee ballot before it is rejected.

63. But signature matching is an unreliable method of voter verification, particularly when conducted by untrained non-experts relying on at most a few comparison signatures to determine a match. This is true in part because a person's signature may vary from one signing (*i.e.*, the absentee ballot application) to another (*i.e.*, the absentee ballot), for any number of intentional *or unintentional* reasons, including factors like advancement in age, change in physical or mental condition, disability, stress, or even changes in the writing surface or implement the voter used.

64. Nevertheless, if a county election official rejects a voter's ballot on the basis of a non-matching signature, the voter is not statutorily entitled to any opportunity to cure the perceived deficiency by, for example, verifying his or her identity by an alternate method. Instead, the voter's ballot is simply not counted.

65. In the upcoming elections, where Tennesseans are expected to vote absentee in record numbers, the effects of Tennessee's standardless and unreviewable signature verification process will have serious consequences on the ability of Tennesseans to vote. Absent a judicial remedy, the ballots of hundreds, if not thousands, of Tennessee voters will not be counted simply because their county election official subjectively determined that their signatures did not match.

**V.      Requirement that First-Time Voters Who Registered to Vote by Mail Must Vote in Person**

66.     Tennessee Code § 2-2-115(b)(7) ("First-Time Voter Restriction") provides that "[e]ach person who registers by mail shall appear in person to vote in the first election the person votes in after such registration becomes effective."

67.     By requiring first-time voters to vote in person, Tennessee severely burdens the fundamental right to vote of first-time voters who submit by mail their registration to vote, but are otherwise eligible to vote absentee under the law.

68.     In 2018, there were over 128,000 such voters, and at least as many new registrations can be expected in advance of the August and November 2020 elections.

69.     For such voters, notwithstanding the fact that they meet the criteria to vote absentee, the law forces a choice between risking exposure to COVID-19 by voting in person, or not voting at all.

70.     This includes voters who, by virtue of meeting the Eligibility Criteria, are deemed by the State "likely to be most burdened by being required to cast their votes in person and those who would most likely be disenfranchised if they could not vote absentee."[26] This is also the *exact* group of voters the State is actively encouraging to vote by mail *because of the pandemic*.

---

[26] *See* Opposition to Motion for Temporary Restraining Order, *Fisher v. Hargett*, Case No. 20-0435-III, at 17 (Davidson Cnty. Chancery Ct. May 22, 2020).

## CLAIMS

### Claim 1: Vote by Mail Eligibility Criteria

### Violation of Plaintiffs' Fundamental Right to Vote
### First and Fourteenth Amendments
### 42 U.S.C. § 1983

71.     Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs as though fully set forth herein.

72.     Tennessee's eligible citizens have a fundamental right to vote under the First and Fourteenth Amendments to the Constitution of the United States. Where the operation of an election law is alleged to cause a deprivation of such a fundamental right, the court "must weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." See *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).

73.     Tennessee already guarantees *some* of its citizens the right to vote by mail in any election in which they meet the State's narrow Eligibility Criteria. *See* Tenn. Code § 2-6-201. In the context of a global pandemic that has already claimed the lives of hundreds of Tennesseans, and required social distancing of the entire population, Defendants' failure to extend that right to *all* citizens, regardless whether they meet the State's narrow Eligibility Criteria, unconstitutionally abridges absentee-ineligible Tennessee citizens' fundamental right to vote in violation of the First and Fourteenth Amendments to the Constitution.

74.     Making Plaintiffs, including those who are at increased risk of complications from COVID-19, choose between voting in person, thereby risking their health and safety, or not voting

at all because they do not meet the State's Eligibility Criteria for absentee voting, violates Plaintiffs' right to vote under the First and Fourteenth Amendments to the Constitution.

75.     In the midst of an ongoing public health crisis, there is no state interest in favor of enforcing Tennessee's prohibition against voting by absentee ballot without excuse that justifies the burden placed on Plaintiffs' constitutional right to vote. Defendants may not deprive Plaintiffs of their fundamental right to vote—secured to them by the First and Fourteenth Amendments to the United States Constitution—by either enforcing or refusing to expand the narrow Eligibility Criteria for absentee voting.

76.     The absentee ballot request window for the August 6, 2020 elections opens on May 8, 2020, and closes by July 30, 2020. *See* Tenn. Code § 2-6-202(a). In advance of that deadline, Tennessee voters will need certainty around whether they will be eligible to vote by mail in the upcoming election.

### Claim II: Absentee Ballot Dissemination

**Violation of the Organizational Plaintiffs' Rights of Free Speech and Association
First and Fourteenth Amendments to the Constitution of the United States
42 U.S.C. § 1983**

77.     Plaintiffs reallege and reincorporate by reference the allegations in the preceding paragraphs as though fully set forth herein.

78.     The First Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, prohibits an abridgment of the freedom of speech.

79.     Tennessee Code § 2-6-202(c)(4) restricts the Organizational Plaintiffs and their members' core political speech and expressive conduct—namely encouraging voting through the distribution of absentee ballot requests in an effort to engage potential voters and encourage them to vote—by criminalizing the simple act of providing to a voter an unsolicited absentee ballot

29

request. The threat of criminal sanctions for participating in such common voter engagement activity, which can be necessary to reach broad swaths of Tennessee's voting population, severely burdens the Organizational Plaintiffs' and their members' First Amendment rights, and especially does so in the context of an election where thousands of first-time absentee voters may need the Organizational Plaintiffs and their members' assistance in applying to vote by mail, including in the form of being provided an absentee ballot request.

80.     Because of the criminal sanctions imposed by Tennessee Code § 2-6-202(c)(4), the Organizational Plaintiffs and their members will not be able to effectively engage potentially eligible absentee voters, nor will they be able to effectively carry out a key aspect of their voter engagement strategy for the August and November elections: encouraging voters to vote by mail rather than not vote at all out of a fear of exposure to COVID-19 at in-person polling locations. Indeed, as written, the law makes it extremely difficult for the Organizational Plaintiffs to facilitate a key step in a potential absentee voter's ability to vote by mail, obtaining the absentee ballot request itself.

81.     Tennessee Code § 2-6-202(c)(4) chills the Organizational Plaintiffs' core political speech, and does so without being narrowly-tailored to serve a compelling state interest. The State's prohibition on the unsolicited dissemination of blank absentee ballot requests to individual voters does not relate to the prevention of fraud, and serves no purpose at all, other than making it more difficult for Tennessee voters to cast their ballots by mail. Tennessee Code § 2-6-202(c)(4) therefore unconstitutionally infringes on the Organizational Plaintiffs' First Amendment right to free speech.

82.     Moreover, because the threat of criminal sanctions imposed by Tennessee Code §§ 2-6-202(c)(4) extends to the Organizational Plaintiffs' members, who would themselves also conduct voter outreach activity like providing absentee ballot requests to potentially eligible voters,

30

the statute also unconstitutionally infringes on the Organizational Plaintiffs' First Amendment right to the freedom of association.

## Claim III: Signature Verification

**Denial of Plaintiffs' Right to Procedural Due Process**
**Fourteenth Amendment to the Constitution of the United States**
**42 U.S.C. § 1983**

83.    Plaintiffs reallege and reincorporate by reference the allegations in the preceding paragraphs as though fully set forth herein.

84.    Tennessee has conferred on its eligible citizens a liberty interest in voting by mail which is protected by the doctrine of procedural due process. *See Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) ("A liberty interest may arise from the Constitution itself . . . or it may arise from an expectation or interest created by state laws or policies."). At a minimum, procedural due process requires that the State provide the voter pre-deprivation notice *and* an opportunity to be heard before being denied their protected liberty interest. *See Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012).

85.    Tennessee's failure to provide absentee voters with any opportunity to cure perceived signature-related deficiencies with their absentee ballot—particularly given the unreliability of signature matching and election officials' unfettered discretion to reject ballots—fails to meet these minimum requirements of procedural due process and is unconstitutional.

86.    Such an opportunity to cure is particularly warranted here given that absentee voters might otherwise be deprived of their fundamental right to vote, the risk of erroneous deprivation caused by the unreliability of signature matching and election officials' unfettered discretion to reject ballots is high, and the implementation of procedures to provide absentee voters with notice

31

and an opportunity to cure would impose only a minimal burden on the State. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

87.     Absent the implementation of procedural safeguards, including an opportunity to cure perceived signature-related deficiencies in a rejected absentee ballot, absentee voters in Tennessee will continue to face a substantial risk of being deprived of their fundamental right to vote without due process.

### Claim IV: Signature Verification

**Violation of Plaintiffs' Fundamental Right to Vote**
**First and Fourteenth Amendments to the Constitution of the United States**
**42 U.S.C. § 1983**

88.     Plaintiffs reallege and reincorporate by reference the allegations in the preceding paragraphs as though fully set forth herein.

89.     This Fall, Tennessee is expected to see a historic number of voters choose, for the first time, to vote by mail. But for a significant number of these voters, Tennessee's signature-verification process will deprive them of their fundamental right to vote for benign or technical signature-related errors, including that an election official subjectively believed—without any statutory or regulatory guidance—that the signature accompanying the voter's ballot did not match the signature in his or her voter file.

90.     This deprivation will occur without the voter being given an opportunity to cure the issue by any alternative verification method.

91.     Such a system imposes a severe burden on absentee voters' fundamental right to vote, and there is no state interest justifying such burden. This is especially true considering that the rejections will occur without any reliable indication that the rejected ballots were fraudulent or improper.

## Claim V: First-Time Voter Restriction

**Violation of Plaintiffs' Fundamental Right to Vote**
**First and Fourteenth Amendments to the Constitution of the United States**
**42 U.S.C. § 1983**

92.     Plaintiffs reallege and reincorporate by reference the allegations in the preceding paragraphs as though fully set forth herein.

93.     By requiring otherwise absentee-eligible first-time voters who registered to vote by mail to nevertheless vote in person, Tennessee's First-Time Voter Restriction, Tenn. Code § 2-2-115(b)(7), severely burdens the right to vote. Voters who are absentee-eligible under Tennessee's Eligibility Criteria are, by the State's own admission, seriously burdened—and potentially disenfranchised—by an in-person voting requirement.

94.     Moreover, in the context of the pandemic, unlike all other absentee-eligible voters, absentee-eligible first-time voters in Tennessee who registered to vote by mail have no alternative but to risk exposure to COVID-19 in order vote.

95.     Making Organizational Plaintiffs' members and engaged voters, including those who otherwise meet the Eligibility Criteria, choose between voting in person, thereby risking their health and safety, or not voting at all because they registered to vote for the first time by mail, violates Plaintiffs' right to vote under the First and Fourteenth Amendments to the Constitution.

96.     In the midst of an ongoing public health crisis, there is no state interest in favor of enforcing the First-Time Voter Restriction that justifies the burden placed on Plaintiffs' constitutional right to vote. Defendants may not deprive Plaintiffs of their fundamental right to vote—secured to them by the First and Fourteenth Amendments to the United States Constitution—by enforcing the First-Time Voter Restriction.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.  Declare that Defendants' application of § 2-6-201 of the Tennessee Code in the context of the pandemic to exclude voters from casting absentee ballots in the August and November 2020 elections unless they meet the Eligibility Criteria is unconstitutional;

B.  Declare that Defendants' enforcement of § 2-6-202(c)(4) of the Tennessee Code is unconstitutional;

C.  Declare that Defendants' failure to provide an opportunity for voters to cure signature-related deficiencies in absentee ballots before they are rejected is unconstitutional;

D.  Declare that the combination of burdens Tennessee imposes on absentee voters before their absentee ballots can be counted is unconstitutional in the context of the pandemic;

E.  Declare that Defendants' enforcement of § 2-2-115(b)(7) of the Tennessee Code to exclude voters who registered to vote by mail and have not yet voted in Tennessee from casting absentee ballots is unconstitutional;

F.  Preliminarily and permanently enjoin Defendants from excluding any eligible voter from casting an absentee ballot in the August and November 2020 elections, whether or not the voter meets the Eligibility Criteria of § 2-6-201 of the Tennessee Code for the duration of the pandemic;

G.  Preliminarily and permanently enjoin Defendants from enforcing § 2-6-202(c)(4) for the unsolicited dissemination of requests for application for absentee ballots by any person;

H.  Preliminarily and permanently enjoin Defendants from rejecting absentee ballots on the basis of alleged signature-related deficiencies without first providing an opportunity to cure;

I.     Preliminarily and permanently order Defendants to establish a procedure by which voters may attempt to cure deficiencies in their absentee ballots, to include providing *timely* notice of such deficiencies and a meaningful opportunity to cure;

J.     Preliminarily and permanently enjoin Defendants from excluding otherwise absentee-eligible voters from casting an absentee ballot solely because they are first-time voters;

K.     Preliminarily and permanently order Defendants to take additional reasonable steps necessary for facilitating absentee voting in the context of a pandemic, including broadly publicizing the relief granted by this Court by all reasonable means, ensuring that county election officials abide by the relief granted by this Court, instructing and training election officials and poll workers as to the relief granted by this Court, and providing for the in-person drop-off of absentee ballots on election days in 2020;

L.     Award Plaintiffs their reasonable attorneys' fees and costs;

M.     Order such other and further relief as may be just under the circumstances.

Dated: June 12th, 2020                                 Respectfully submitted,

                                                      ___/s William L. Harbison_____
Danielle Lang*                                        William L. Harbison (No. 7012)
Ravi Doshi*                                           Lisa K. Helton (No. 23684)
Molly Danahy*                                         Christopher C. Sabis (No. 30032)
Jonathan Diaz*                                        Christina R.B. López (No. 37282)
Campaign Legal Center                                 Sherrard, Roe, Voigt & Harbison, PLC
1101 14th Street NW, Suite 400                        150 3rd Avenue South, Suite 1100
Washington, DC 20005                                  Nashville, TN 37201
Tel.: (202) 736-2200                                  Phone: (615) 742-4200
dlang@campaignlegalcenter.org                         Fax: (615) 742-4539
rdoshi@campaignlegalcenter.org                        bharbison@srvhlaw.com
mdanahy@campaignlegalcenter.org                       lhelton@srvhlaw.com
jdiaz@campaignlegalcenter.org                         csabis@srvhlaw.com
                                                      clopez@srvhlaw.com

Ezra Rosenberg*
Pooja Chaudhuri*
Lawyers' Committee for Civil Rights Under Law
1500 K Street NW Suite 900
Washington, DC 20005
Tel.: (202) 662-8600
erosenberg@lawyerscommittee.org
pchaudhuri@lawyerscommittee.org

*Admitted Pro Hac Vice

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY, pursuant to Local Rule 5.01, that on this 12th day of June, 2020, the foregoing was served via the Court's CM/ECF filing system and by electronic mail on the following:

Janet Kleinfelter
Alexander Rieger
Office of the Tennessee Attorney General
301 6th Ave. N.
Nashville, Tennessee 37243
janet.kleinfelter@ag.tn.gov
alex.rieger@ag.tn.gov

*Counsel for Defendants*

_/s William L. Harbison_