# EXHIBIT G

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| MEMPHIS A. PHILLIP RANDOLPH INSTITUTE, et al., *Plaintiffs*, v. TRE HARGETT, et al., *Defendants*. | No. 3:20-cv-0374 JUDGE RICHARDSON MAGISTRATE JUDGE FRENSLEY |

## DECLARATION OF THE EQUITY ALLIANCE IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
**(Pursuant to 28 U.S.C. § 1746)**

I, Charlane Oliver, am over the age of 18 and fully competent to make the following declaration. The facts in this declaration are based on my personal knowledge and upon information available to me through the files and records of The Equity Alliance, at which I am the Co-Founder and Co-Executive Director. If called upon as a witness, I would testify to these facts. Under penalty of perjury, I declare and state the following:

1. I am the Co-Founder and Co-Executive Director of The Equity Alliance. I founded the organization in November 2016 and have served as Co-Executive Director since September 2019.

2. In my role as Co-Executive Director, I am responsible for overseeing all facets of The Equity Alliance's operations including leadership development, voter engagement, strategy, planning, community outreach, private and public partnerships, fiscal oversight, policy advocacy, and compliance.

1

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| MEMPHIS A. PHILLIP RANDOLPH INSTITUTE, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>TRE HARGETT, et al.,<br><br>*Defendants*. | No. 3:20-cv-0374<br><br>JUDGE RICHARDSON<br>MAGISTRATE JUDGE FRENSLEY |

### DECLARATION OF THE EQUITY ALLIANCE IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
**(Pursuant to 28 U.S.C. § 1746)**

I, Charlane Oliver, am over the age of 18 and fully competent to make the following declaration. The facts in this declaration are based on my personal knowledge and upon information available to me through the files and records of The Equity Alliance, at which I am the Co-Founder and Co-Executive Director. If called upon as a witness, I would testify to these facts. Under penalty of perjury, I declare and state the following:

1. I am the Co-Founder and Co-Executive Director of The Equity Alliance. I founded the organization in November 2016 and have served as Co-Executive Director since September 2019.

2. In my role as Co-Executive Director, I am responsible for overseeing all facets of The Equity Alliance's operations including leadership development, voter engagement, strategy, planning, community outreach, private and public partnerships, fiscal oversight, policy advocacy, and compliance.

1

3. Based on my knowledge and experience as Co-Founder and Co-Executive Director, I am familiar with The Equity Alliance's voter identification, mobilization, and engagement activities.

4. The Equity Alliance is a nonprofit, nonpartisan organization, headquartered in Nashville, Tennessee.

5. Since 2016, The Equity Alliance has proactively advocated for African Americans and other communities of color to have a fair and just opportunity at realizing the American dream. The Equity Alliance is a grassroots advocacy group that seeks to equip citizens with tools and strategies to engage in the civic process and empower them to take action on issues affecting their daily lives.

6. The Equity Alliance operates throughout the State, primarily focusing on counties where there is a large African American presence such as Davidson, Shelby, and Hamilton Counties.

7. The Equity Alliance works to expand the electorate by engaging low propensity voters and disenfranchised communities to participate in the democratic process, educating communities of color about the political process and how impending legislation will impact their lives; engaging and empowering citizens to take action and make their voices heard with a particular emphasis on voting; and monitoring legislation in order to hold state and local elected officials accountable. The Equity Alliance also works to promote civic leadership by encouraging people of color to take leadership roles in shaping policy at the local, state, and national levels. The Equity Alliance also creates alliances with individuals and groups in order to present a united front against any economic barriers that seek to marginalize, disenfranchise, or discriminate against people of color and vulnerable populations.

8. The Equity Alliance is a volunteer-driven organization with a leadership staff and five paid staff members – three full-time and two part-time. The Equity Alliance relies on the work of its volunteers, staff members, and contract employees to drive the success of its activities.

9. As part of its voter engagement, The Equity Alliance coordinates activities that engage several different demographics of voters, aiming to reach them where they are in the community. The Equity Alliance hosts block parties, forums, and training sessions to educate voters about the political process and upcoming elections.

10. The Equity Alliance also conducts phone banking, text campaigns, door-to-door canvassing, and social media campaigns to engage and encourage eligible voters to vote. The Equity Alliance's social media activities include creating and circulating online petitions, participating in online townhalls on Facebook, and actively engaging Twitter users.

11. The Equity Alliance has approximately 4000 volunteers and supporters statewide, the majority of whom are between the ages of twenty-five and forty-five.

12. In past election cycles, The Equity Alliance has produced and distributed voter guides to educate voters and help them make informed decisions, organized voter registration drives, and coordinated voter mobilization efforts.

13. The Equity Alliance has closely followed the rise in COVID-19 infections in the state. The Equity Alliance has had to educate volunteers and members of the public about the health risks posed by COVID-19 and explain the absentee voting process to its volunteers and members of the public that wish to vote absentee in light of COVID-19.

14. The Equity Alliance's staff, supporters, and community know the pain of COVID-19 intimately.

15. Since March 5, 2020, when the State confirmed its first COVID-19-related death, one of The Equity Alliance's board members, a woman in her early 60s, contracted COVID-19, was in the hospital for weeks, and has since recovered.

16. My son has asthma, an underlying condition that puts him at a higher risk of suffering serious complications if he contracts COVID-19. I also have an additional young child who is a baby—I do not want to expose him to COVID-19.

17. One staff member lives with her parents who are in the at-risk age bracket for suffering serious complications from COVID-19 and another staff member recently lost her uncle to COVID-19.

18. As Co-Founder and Co-Executive Director of The Equity Alliance, I have knowledge that hundreds of the organization's volunteers and supporters are qualified to vote, registered to vote, and regularly vote in federal, state, and local elections.

19. As Co-Founder and Co-Executive Director of The Equity Alliance, I also have knowledge that hundreds of our volunteers and supporters previously planned to vote in person in the August 6, 2020, statewide election and the November 3, 2020, presidential election, as evidenced by the 425 petition signatures we've collected.

20. Many of The Equity Alliance's volunteers and supporters, the majority of whom are between the ages of twenty-five and forty-five, plan, if eligible, to vote by mail to protect their own health or the health of vulnerable family members, but do not qualify to request an absentee ballot under Tennessee's narrow eligibility criteria outlined in Tennessee Code § 2-6-201 absent the injunction entered by the Davidson County Chancery Court.

21. As Co-Executive Director I have directly spoken with volunteers who plan to vote in the August and November 2020 elections, if eligible, but will choose to stay home if they are

ultimately required to vote in person because they cannot afford to expose themselves or family members in their home to COVID-19.

22. The Equity Alliance's volunteers and supporters and the members of the public the organization engages with should not have to choose between their right to vote and their own health and well-being or that of their family members.

23. Since the pandemic began, The Equity Alliance has devoted significant resources including volunteer and staff time to educating the public about Tennessee's absentee voting eligibility criteria. The strict eligibility criteria that the Davidson County Chancery Court has now prohibited the state from implementing made it more difficult to communicate absentee voting options to the general public and help voters determine if they are eligible. There are fourteen such criteria and voters have to qualify under one of them to request an absentee ballot. We have to dedicate more resources to explaining the absentee voting process because voters have a lot of questions around what the criteria are and whether they apply to them.

24. The Equity Alliance is actively working to hire a communications manager to work specifically on absentee voting advocacy. As Co-Executive Director, I have represented The Equity Alliance in online panels advocating for mail-in ballots and absentee voters in order to keep voters safe in the midst of the COVID-19 pandemic.

25. The Equity Alliance is currently producing its election year voter guide and will dedicate at least a full page of the guide to the absentee ballot request process and the eligibility criteria for requesting an absentee ballot. Previous voter guides have not included a full page dedicated to the absentee voter process because the majority of the community members that the Equity Alliance engages vote in person.

26. The Equity Alliance is also planning to put together "safe voter kits," which will

include masks, hand sanitizer, the voting guide, and a pamphlet outlining how qualifying voters can request an absentee ballot. The Equity Alliance has never prepared these kits before and were it not for COVID-19, would not be doing so now.

27. The Equity Alliance's core activities in election years usually include hosting two block parties in Nashville when the early voting period for the August and November elections begin in order to meet community members where they are and educate them about upcoming issues, but that will not happen this year because of the COVID-19 pandemic.

28. Much of The Equity Alliance's education and voter engagement activities during the COVID-19 crisis have revolved around vote by mail, the eligibility criteria, and particularly the State's criminal penalties for assisting voters in obtaining absentee ballot applications.

29. Because only approximately 2% of all Tennesseans traditionally vote by mail, many of the people in the communities in which The Equity Alliance advocates have never voted by mail and require guidance on the multi-step vote-by-mail process.

30. However, Tennessee's strict eligibility criteria and vague criminal statutes on assisting voters obtain absentee ballot requests are hurting The Equity Alliance's efforts to engage voters in the midst of the COVID-19 pandemic.

31. As part of its education campaign, The Equity Alliance wishes to distribute absentee ballot requests to its volunteers and active constituencies, help community members write their own requests, leave applications in community members' mailboxes, and provide links to the online application form on its website, social media pages such as Twitter and Instagram, and text messages to its followers and other members of the public. The Equity Alliance also wishes to include absentee ballot requests in its safe voting kits.

32. The Equity Alliance, however, risks criminal prosecution (a sentence of up to 11

months and 29 days in prison, a fine of up to $2,500, or both) under Tennessee Code § 2-6-202(c)(4) for distributing unsolicited absentee ballot requests to the public.

33. If The Equity Alliance is not able to distribute unsolicited absentee requests as part of its voter education, many communities in which The Equity Alliance advocates will not be able to obtain a request, and consequently, an absentee ballot.

34. Many individuals The Equity Alliance helps do not have computers, internet access, printers, scanners, fax machines, postage, or envelopes to be able to mail, email, or fax their absentee requests to their respective county commissions as required by law.

35. The Equity Alliance primarily engages with lower income communities of color where the only internet access many people have is through their mobile phone. The Equity Alliance specifically publishes and distributes its voter guide in print, in addition to publishing it online, to reach these vulnerable communities.

36. Many individuals, would not, without The Equity Alliance's assistance, be able to write their own requests, scan their signatures, and submit their requests to their respective county commissions.

37. Without The Equity Alliance's help obtaining absentee ballot requests, these individuals will not be able to vote by mail despite wanting to do so.

38. The volunteers that traditionally assist The Equity Alliance with voter engagement efforts are afraid to assist this year because the State's criminal penalties have led them to believe they will be convicted of a crime for encouraging eligible citizens to vote absentee by sharing unsolicited absentee requests.

39. The Equity Alliance is extending substantial resources and time to focus on compliance with the State's criminal statutes out of the fear that volunteers will be penalized. As

a result, the organization is diverting resources away from its core activities such as voter outreach, education, and mobilization.

40. The Equity Alliance is also planning to devote considerable resources—that would otherwise not have been expended—on educating voters about the possibility of their absentee ballots being rejected for signature-related discrepancies, like non-matching signatures.

41. The Equity Alliance has not donated resources towards informing voters about the absentee ballot process and signature matching in the past. However, The Equity Alliance will have to spend money and resources that it would otherwise not spend to inform its volunteers, supporters, and community members about absentee ballot rejection due to signature mismatch.

42. The Equity Alliance anticipates that many voters it will engage as a part of its 2020 voter engagement efforts will be first-time voters. The Equity Alliance regularly hosts voter registration drives, particularly targeting younger voters and student voters. In 2018, The Equity Alliance registered approximately 91,000 voters in collaboration with the Tennessee Black Voter Project and approximately 3,000 voters through its own "Souls to the Polls" initiative for a total of 94,000 voters—all using mail-in voter registration forms. The Equity Alliance plans to continue to promote voter registration through mail-in voter registration forms.

43. However, my understanding is that anyone The Equity Alliance has registered or will register to vote via a mail-in voter registration form will be required to vote in person the first time they vote, even if they otherwise qualify for absentee voting. This restriction limits the effectiveness of The Equity Alliance's voter registration activity because it limits the means by which those voters can cast their ballots.

44. Given the ongoing COVID-19 crisis, this restriction will make some of The Equity Alliance's voter registration activity less impactful because many voters the organization has

8

registered will be unable to vote safely by mail.

45. Moreover, this restriction makes some of The Equity Alliance's voter registration activity ineffective because the voters the organization has registered cannot vote in person because they are students outside of their county or meet other eligibility criteria for absentee ballots that render them unable to vote in person.

46. The Equity Alliance also has to dedicate time and resources to ensuring that voters who registered by mail know that they will not be able to cast their ballot in person. We are concerned that voters we registered may assume they can vote by mail and have their application rejected when it is too late for them to make other plans to vote, and therefore that our voter registration efforts will be for naught.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 12th day of June, 2020.

_____
Charlane Oliver