**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

|  |  |
|---|---|
| MEMPHIS A. PHILLIP RANDOLPH INSTITUTE, et al., | |
| *Plaintiffs*, | Civil No. 3:20-cv-0374 |
| v. | JUDGE RICHARDSON MAGISTRATE JUDGE FRENSLEY |
| TRE HARGETT, et al., | |
| *Defendants*. | |

**MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

# **TABLE OF CONTENTS**

INTRODUCTION…………………………………………………………………...……………1

FACTUAL BACKGROUND………………………………………………………………..3

I.   THE DANGERS OF COVID-19...............................................................................................3

II.  VOTING IN TENNESSEE DURING COVID-19 ................................................................... 5

   A.   Absentee Voting in Tennessee..................................................................................... 7

     1.  Applying for an Absentee Ballot................................................................ 8

     2.  Ballot Receipt Deadline for Counting ....................................................... 9

     3.  Signature-Matching as a Prerequisite to Counting Absentee Ballots............................. 10

   B.   Organizational Plaintiffs' Voter Engagement Efforts....................................................... 11

LEGAL STANDARD …………………………………………………………………...12

ARGUMENT …………………………………………………………………………13

I.   PLAINTIFFS HAVE A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS OF
   EACH OF THEIR CLAIMS................................................................................................. 13

   A.   The Prohibition on the Unsolicited Dissemination of Absentee Ballot Requests Violates
     the First Amendment................................................................................................ 13

     1.  Legal Standard................................................................................... 14

     2.  The Law Restricts Organizational Plaintiffs' Expressive Speech Activities ................. 14

     3.  The Law Does Not Serve Any Compelling Government Interest................................. 188

     4.  Even if the Law Serves a Compelling Government Interest, It Is Not Narrowly Tailored
      to Serve That Interest .................................................................... 19

   B.   Plaintiffs Are Likely to Succeed on Their Claim That the First-Time Voter Restriction
     Unconstitutionally Burdens First-Time Voters' Fundamental Right to Vote during the
     COVID-19 Pandemic............................................................................................... 21

     1.  Legal Standard..................................................................................... 22

   C.   Plaintiffs are Likely to Show that the State's Signature Verification Process Violates
     Absentee Voters' Right to Procedural Due Process ........................................................ 27

     1.  Legal Standard..................................................................................... 28

     2.  Plaintiffs Have a Constitutionally Protected Interest in the Right to Vote ..................... 29

     3.  Due Process Requires Tennessee to Provide Voters with Pre-deprivation Notice and an
      Opportunity to Cure Ballot Signature Impairments ..................................... 30

   D.   Tennessee's Error-Prone Signature Verification Procedure Violates Plaintiffs'
     Fundamental Right to Vote........................................................................................ 36

1. Legal Standard ................................................................................................... 36

2. Tennessee's Error-prone Signature Verification System Severely Burdens Plaintiffs' Right to Vote ...................................................................................................... 36

3. Tennessee Has No Legitimate Interest in Depriving Voters of Their Franchise Without Notice and an Opportunity to Cure ................................................................ 37

II. PLAINTIFFS ARE AT IMMINENT RISK OF IRREPARABLE HARM. .......................... 38

A. The Signature Match Process and First-Time Voter Requirement Will Cause Irreparable Harm Because They Deny or Abridge Plaintiffs' and Their Members' Fundamental Right to Vote ....................................................................................................................... 38

B. Plaintiffs Are Suffering and Will Continue to Suffer Irreparable Harm with Respect to Their First Amendment Rights ..................................................................................... 39

III. A PRELIMINARY INJUNCTION WILL SERVE THE PUBLIC INTEREST ................... 40

IV. THE BALANCE OF THE EQUITIES FAVORS GRANTING A PRELIMINARY INJUNCTION ........................................................................................................................... 42

CONCLUSION.................................................................................................................43

## INTRODUCTION

On August 6, 2020, Tennessee will hold statewide primary and general elections. Three months later, on November 3, 2020, it will hold its general presidential election. Unlike any elections in modern memory, these elections will be held under the pall of an ongoing public health crisis that has already claimed the lives of over 112,000 Americans and forced immediate and dramatic changes to everyday life across the country—including in Tennessee. As a result of the pandemic, significantly more Tennesseans are expected to vote by mail this year than typically have in past elections. Most will do so for the first time.

The Tennessee electorate's dramatic shift towards voting by mail highlights the unconstitutionally burdensome impact of several State laws concerning absentee voting. First, Tennessee criminalizes the unsolicited distribution of absentee ballot request forms. The law unconstitutionally restricts core First Amendment speech and severely burdens the ability of voter engagement organizations, like Organizational Plaintiffs,[1] to mobilize large numbers of eligible voters to safely cast absentee ballots—an effort that the State itself is encouraging. While such a restriction is unconstitutional at any time, its burdensome effects are particularly evident this year. Organizational Plaintiffs' voter engagement and get out the vote efforts are shifting to vote by mail in light of the pandemic. Moreover, the threat of exposure to a fatal disease may cause some voters, who do not know that they can vote by mail or how to vote by mail, to simply not vote at all.

Second, first-time voters who register to vote by mail are denied the ability to cast an absentee ballot in their first election after registering, even if they are otherwise eligible to do so by law. Particularly in the context of an election held during a pandemic, where the State is already

---

[1] The Organizational Plaintiffs are the Tennessee State Conference of the NAACP ("Tennessee NAACP"), the Memphis Central Labor Council ("MCLC"), the Memphis A. Philip Randolph Institute ("APRI"), The Equity Alliance ("Equity Alliance"), and Free Hearts.

1

encouraging voters who satisfy the Eligibility Criteria to safely vote by mail, this First-Time Voter Restriction severely burdens such voters' fundamental right to vote. Simply put, unlike every other Tennessee voter who is eligible to vote absentee, the First-Time Voter Restriction unconstitutionally requires first-time voters who register to vote by mail to choose between risking exposure to COVID-19 by voting in person, or not voting at all.

Finally, once absentee voters submit their mail ballots, Tennessee relies on an error-prone system of signature matching to verify voters' identities before their ballots are counted, and denies voters the opportunity to cure alleged mismatches. In an election in which it is likely that hundreds of thousands of Tennesseans (if not more) will vote by mail, this complete failure of procedural due process threatens to deprive many Tennesseans of their right to vote.

These deficiencies in Tennessee's administration of its election system unconstitutionally violate Plaintiffs' fundamental rights to speech, to vote, and to due process.[2] Plaintiffs request that this Court preliminarily enjoin each of the challenged provisions before the August 2020 election. As explained below, Plaintiffs have a strong likelihood of success on the merits of each of their claims and are at risk of imminent and irreparable harm. Moreover, a preliminary injunction would be equitable and serve the public's interest by ensuring that *all* eligible Tennessee voters can vote safely by mail in the August and November 2020 elections, and have their votes counted.

---

[2] In their Complaint, Plaintiffs also allege that the State's Eligibility Criteria for absentee ballots place an unconstitutional burden on the right to vote as applied during the ongoing pandemic. *See* Dkt. No. 39, Am. Compl. ¶¶ 71–76. In light of the Davidson County Chancery Court's recent decision enjoining those criteria and permitting voters to seek absentee ballots because of the pandemic, *see* Ex. 1 (Davidson County Chancery Court Order dated June 4, 2020), Plaintiffs are not presently seeking a preliminary injunction on that claim. Plaintiffs agree with the Chancery Court that such Eligibility Criteria *also* violate the Tennessee State Constitution. However, in the event that the Chancery Court's order is stayed, Plaintiffs plan to immediately seek relief in this Court to ensure that the Eligibility Criteria may not be enforced to burden their right to vote under the United States Constitution.

2

## FACTUAL BACKGROUND[3]

### I. THE DANGERS OF COVID-19

Officials confirmed the first known American case of SARS-CoV-2, a novel coronavirus that causes Coronavirus Disease 2019 ("COVID-19") on January 21, 2020. Since then, the highly contagious virus has caused the death of over 441 individuals in Tennessee, and over 112,000 individuals in the United States. *See* Exs. 2 (Tennessee COVID-19 Epidemiology and Surveillance Data), 3 (CDC COVID-19 Data). Much remains unknown about the pandemic disease, and to date, no therapeutic treatments or vaccines for it have been discovered or made widely available. Reingold Decl. ¶¶ 15–16.

COVID-19 can have deleterious health effects on individuals of every age, from mild symptoms like coughing, fatigue, and body aches, to serious ones including respiratory failure and death. *See id*. ¶ 9. While older individuals are at greatest risk, the virus has caused the hospitalization and death of individuals in every age category. In Tennessee, the average COVID-19 patient is 40 years old and approximately 15 percent of deaths from COVID-19 are among individuals under 60 years old.[4] *See* Ex. 2. Moreover, regardless of their age, individuals with

---

[3] Plaintiffs here summarize the facts most relevant to their preliminary injunction motion. The facts are further presented in detail in the Declarations of Ravi Doshi ("Doshi Decl."), Dr. Arthur L. Reingold ("Reingold Decl."), Dr. Linton A. Mohammed ("Mohammed Decl."), Gloria Sweet-Love, on behalf of the Tennessee State Conference of the NAACP ("Tennessee NAACP Decl."); Jeffrey Lichtenstein, on behalf of the Memphis Central Labor Council ("MCLC Decl."); Kendra Lee, on behalf of the Memphis A. Philip Randolph Institute ("APRI Decl."), Charlane Oliver, on behalf of The Equity Alliance ("Equity Alliance Decl.") and Dawn Harrington, on behalf of Free Hearts ("Free Hearts Decl."), which are each attached to Plaintiffs' Motion for Preliminary Injunction as Exhibits A–H, respectively. Where reference is made to numbered exhibits, e.g. "Ex. 1," such documents are attached as exhibits to the Doshi Declaration.

[4] Black and Latino individuals are disproportionately affected. Around 22% of reported COVID-19 cases and 34% of deaths from COVID-19 in Tennessee occur among Black patients, while only 17.1% of Tennesseans are Black. *See* Ex. 2. Similarly, although only 5.6% of Tennesseans are Hispanic or Latino, such patients represent 25% of COVID-19 cases and 7% of deaths in Tennessee. Reingold Decl. ¶ 10.

immunologic conditions or other pre-existing conditions like hypertension, certain heart conditions, lung diseases (*e.g.*, asthma, COPD), diabetes mellitus, obesity, and chronic kidney disease, are considered at high-risk of complications from COVID-19. *See* Reingold Decl. ¶ 9. Around 32 percent of Tennesseans under 65 have been diagnosed with such underlying health conditions. *See id.*

The disease is particularly dangerous because of its high fatality rate and its ease of transmission from person to person. *See id.* ¶¶ 11, 14. COVID-19 spreads through respiratory transmission (*i.e.*, respiratory droplets) that are expelled when an infected individual speaks, coughs, or sneezes near an uninfected individual. *See id.* ¶ 11. Evidence also suggests that the virus can become aerosolized and remain in the air after being expelled by an infected individual, and that it can spread through the touching of contaminated surfaces, including, for example, pens and voting machines. *See id.* ¶¶ 10, 13. The virus can be spread by symptomatic and asymptomatic carriers—meaning that an infected individual who does not show any symptoms can pass on the virus to others close to them—and recent evidence suggests that the prevalence of asymptomatic or pre-symptomatic infections may be high. *See* Reingold Decl. ¶ 8. Medical experts have called this the "Achilles' heel" for public health strategies to control the pandemic.[5]

The ongoing public health crisis is unprecedented. *See id.* ¶ 18. There is no known or knowable end to the pandemic, or its effects on public life in Tennessee. *See id.* Experts caution that we can expect to see "resurgences of COVID-19, including significant community

---

[5] Nathan W. Furukawa et al., *Evidence Supporting Transmission of Severe Acute Respiratory Syndrome Coronavirus 2 While Presymptomatic or Asymptomatic*, 26 EMERGING INFECTIOUS DISEASES J., 7, https://wwwnc.cdc.gov/eid/article/26/7/20-1595_article (last updated May 4, 2020).

4

transmission, throughout 2020 and into 2021 across the United States." *Id.*[6] This is especially likely as states, including Tennessee, begin to reopen their economies and relax their stay-at-home orders. *See id.* Thus, throughout 2020, "transmission of the virus will continue through the population," and individuals will remain at risk from the disease. *See* Reingold Decl. ¶ 14.

## II. VOTING IN TENNESSEE DURING COVID-19

Against the backdrop of the ongoing public health crisis, on August 6, 2020, Tennessee voters will cast their ballots in state and federal primary, and state and county general, elections. Three months later, on November 3, 2020, Tennesseans will vote again in state and federal general elections, including the presidential election. In all likelihood, each of these elections will be held during this pandemic. *See* Reingold Decl. ¶¶ 14, 17. As a result, State officials—as well as Organizational Plaintiffs—expect to see an expanded use of mail-in voting this year. *See* Ex. 4 ("Election Contingency Plan") at 1; *see also, e.g.*, Tennessee NAACP Decl. ¶¶ 34, 36–37, 46; MCLC Decl. ¶ 18.

Until June 4, 2020, Tennessee—unlike most states in the country—restricted the use of absentee by mail voting to only voters who:

1. are outside their county of registration for the entire early voting period and on election day;
2. are full-time students (or their spouses) who are enrolled at a university outside the student's county of registration;
3. have been added to a permanent absentee voter list because they are sick, hospitalized, or severely disabled, and have provided an attesting physician's statement;
4. are full-time residents of a nursing home outside the county in which they are registered;
5. are engaged in jury service on election day;

---

[6] *See also* Lena H. Sun, *CDC Director Warns Second Wave of Coronavirus Is Likely to Be Even More Devastating*, WASH. POST, (Apr. 21, 2020) (quoting CDC Director Robert Redfield as stating that "[t]here's a possibility that the assault of the virus on our nation next winter will actually be even more difficult than the one we just went through"), https://www.washingtonpost.com/health/2020/04/21/coronavirus-secondwave-cdcdirector/.

6. are over 60 years old;
7. have a disability as defined in Tennessee Code § 2-3-109 and an inaccessible polling location;
8. are hospitalized, ill or physically disabled and unable to appear at the polling location on election day;
9. are a caretaker of a hospitalized, ill, or disabled person;
10. are a candidate for office and is on the ballot;
11. are an election official or a member or employee of the election commission on election day;
12. are unable to appear at the polling location during the entire early voting period and on election day because they are observing a religious holiday; or
13. are working out-of-state during the entire early voting period and on election day, and possesses a valid commercial driver's license.

*See* Tenn. Code § 2-6-201 ("Eligibility Criteria"). Under these thirteen narrowly drawn criteria, about 1.4 million Tennesseans—approximately 35 percent of the electorate—are eligible to vote by mail in a given election. *See* Election Contingency Plan at 10 (showing that about 35 percent of registered voters are eligible to vote by mail because they are over 60 years old, the largest category of absentee eligible voters).

On June 4, 2020, however, the Davidson County Chancery Court issued an order enjoining the strict Eligibility Criteria and permitting voters to seek absentee ballots based on the pandemic. *See* Ex. 1 (Chancellor's Opinion and Order dated June 4, 2020), at 5–6. As a result, potentially all[7] eligible Tennessee voters—some 3.8 million individuals—may be permitted to vote by mail in the August and November elections to avoid exposure to COVID-19.[8] *See id.* While the State has requested an interlocutory appeal of the Court's Order, it has also taken steps to implement it, including by notifying all voters through the Secretary of State's website that if they "do not wish

---

[7] It is not clear from the Court's Order whether the expansion of absentee voting includes first-time voters that register to vote by mail. As discussed further *infra,* the potential exclusion of this group from voting by mail—even if they meet the Eligibility Criteria—is unconstitutional. The unconstitutional burden of this restriction is heightened during the pandemic.

[8] As noted by the Davidson County Chancery Court, based on past election years, the number of voters that will choose to vote in August is likely to be no more than about 1.4 million. *See id.* at 15.

6

to vote in-person due to the COVID-19 situation, [they] are eligible to request an absentee ballot by mail." *See* Ex. 5.

### A. Absentee Voting in Tennessee

Even before the issuance of the Chancery Court's injunction expanding vote-by-mail eligibility to essentially all Tennesseans, because of COVID-19, Tennessee elections officials were already preparing for a surge in absentee voting by voters eligible under the State's narrow Eligibility Criteria. *See* Election Contingency Plan at 1 (noting that the State is preparing for *all* 1.4 million already absentee eligible voters over 60 to choose to vote by mail in this Fall's elections); *id.* at 20 (suggesting that 60 percent of absentee eligible voters will vote by mail because of "fears of COVID-19"). As has been the case in other jurisdictions that have given virtually all their voters the ability to vote by mail this year, many Tennesseans who are newly-eligible under the Chancery Court's Order can also be expected to request and cast mail ballots as a result of the pandemic.[9] *See, e.g.*, Tennessee NAACP Decl. ¶¶ 30–34; MCLC Decl. ¶¶ 13–14. For most of these voters, given the State's restrictive Eligibility Criteria and the historically low use of absentee voting, this year will be their first time casting a mail ballot. *See* Exs. 6–9 (showing that Tennessee's vote-by-mail turnout in the August and November 2016 and 2018 elections was under three percent).

Tennesseans who ultimately do vote by mail will need to navigate Tennessee's vote-by-mail system, including timely and properly applying for or requesting an absentee ballot, timely returning the ballot to election officials, and ensuring that the absentee ballot is counted.

---

[9] *See* Wisc. Election Comm'n, *April 7, 2020 Absentee Voting Report*, May 15, 2020, at 3–4, https://elections.wi.gov/sites/elections.wi.gov/files/2020-05/May%2020%2C%202020.Final_.pdf.

1.  <u>Applying for an Absentee Ballot</u>

In Tennessee, absentee eligible voters must request a mail-in ballot no sooner than 90 days, and no later than 7 days, before the election in which they intend to vote by mail. *See* Tenn. Code § 2-6-202(a)(1). For the August 6, 2020 election, the absentee ballot application window opened on May 8, 2020, and will close on July 30, 2020. For the November 3, 2020 general election, it will open on August 6, 2020, and close on October 27, 2020.

The State permits absentee eligible voters to apply for an absentee ballot in one of two ways. First, the voter may complete a formal application to vote by mail through the county election office. *See* Tenn. Code § 2-6-202(a)(2). The application is available at, and can be obtained only from, county election offices. *See id.* § 2-6-202(c)(3). Second, the voter may submit to the county election office a more informal "request" for an application to vote by mail. Such a request "serves as an application for a ballot" if it contains the requisite information, including the voter's name, address, date of birth, social security number, the election the voter wishes to participate in by mail, the reason the voter wishes to vote absentee, and the voter's signature. *See id.* § 2-6-202(a)(3).

Once the election office receives the written request or application for an absentee ballot, the election administrator must compare the voter's signature on the voter's application or request with "the signature on [their] registration record." *See id.* § 2-6-202(b). If, in the administrator's view, "the signatures are the same and if the required information is provided," the county elections commission mails the voter an absentee ballot. *Id.* If the election administrator finds the signatures do not match, the request is rejected, and the voter is notified, in writing, of the reason for the rejection. *See id.* §§ 2-6-202(b), 2-6-204(b). Then, the voter may either submit a new application or request correcting the error, or vote in-person.

County election offices in Tennessee make blank absentee ballot requests for applications available to voters on their websites. *See, e.g.*, Ex. 10 (Davidson County Absentee Ballot Request Form). But voter engagement organizations are prohibited under penalty of criminal law from providing blank request forms to voters unsolicited. *See* Tenn. Code § 2-6-204(c)(4) ("A person who is not an employee of an election commission commits a Class A misdemeanor if such person gives an unsolicited request for application for absentee ballot to any person."). Given the ongoing pandemic, however, efforts to disseminate ballot requests are central to Organizational Plaintiffs' voter engagement strategies for this year's upcoming elections, in particular, because many of their volunteers and members do not know whether and how to vote by mail. *See infra* at Factual Background, Part II.B.

    2.  <u>Ballot Receipt Deadline for Counting</u>

After a voter successfully submits their absentee ballot request and receives a ballot, the voter must complete the ballot, sign the return envelope, and deliver it back to the county election office by mail. *See* Tenn. Code §§ 2-6-202, 2-6-303. A voter may not personally deliver the ballot to their election office, or use any means other than the mail to timely return the ballot. *See id.* If, for whatever reason, the ballot is not *received* by the county election office before the close of polls on Election Day, the ballot is not counted. *See id.*

For some voters, that deadline will be difficult, if not impossible, to meet due to delays in mail delivery, especially considering that in Tennessee, voters may *request* an absentee ballot until 7 days before Election Day. *See* Tenn. Code § 2-6-202(d)(3). In a May 29 letter, the United States Postal Service (USPS) stressed that "the Postal Service cannot guarantee a specific delivery date or alter standards to comport with individual state election laws," and recommended that election officials "allow 1 week for delivery to voters." Ex. 11 (USPS Letter Dated May 29, 2020). It

likewise warned that "if a state law requires completed ballots to be received by election officials by a specified date (such as Election Day) in order to be counted, voters should be aware of the possibility that completed ballots mailed less than a week before that date may not, in fact, arrive by the state's deadline." *Id.* Delays in the postal service led to hundreds of ballots being discarded in Ohio's recent primary election.[10]

### 3. Signature-Matching as a Prerequisite to Counting Absentee Ballots

Assuming an absentee voter successfully returns the absentee ballot by the deadline, an election official must examine the ballot return envelope before the ballot can be counted. The election administrator must "compare the voter's signature on the [ballot return envelope] with the voter's signature on the appropriate registration record." *See* Tenn. Code § 2-6-202(g).[11] If the election administrator determines that the signatures match, the absentee ballot will be counted. *See id.* If, however, the election administrator finds, for whatever reason, that the signatures do not match, the ballot is rejected, and the voter must be notified of the rejection by mail. *See id.*; *see also* Tenn. Code § 2-6-204(b).

Under Tennessee law, it is unclear *when* an election official is supposed to notify the voter that their absentee ballot was rejected. In any event, once notified of the ballot rejection, Tennessee law does not provide any opportunity for a voter to remedy the perceived deficiency with their signature to have their ballot counted. This is the case even if the signature-related deficiency was

---

[10] Jake Ryle, *318 Primary Ballots Won't Be Counted in Butler Co. After USPS Delivers Them Days After Deadline*, WCPO9 (May 12, 2020), https://www.wcpo.com/news/election-2020/318-primary-ballots-wont-be-counted-in-butler-co-after-usps-delivers-them-days-after-deadline.

[11] Tennessee Code § 2-6-202(g) reads: "Upon receipt by mail of the absentee ballot, the administrator shall open only the outer envelope and compare the voter's signature on the application with the voter's signature on the appropriate registration record." The reference to "the application," rather than to "the ballot return envelope," appears to be a typographical error. Because Tennessee election administrators appear in fact to examine "the ballot return envelope" rather than "the application" for an absentee ballot, the substitution is made in text above.

not the voter's fault, which is often the case when comparing two signatures. *See* Mohammed Decl. ¶ 20–22. Signature matching is a flawed practice, which even experts have trouble performing with accuracy, particularly when relying on only a few samples. *See id.* ¶ 31. A person's signature may vary between signings for any number of *unintentional* reasons, including factors like advancement in age, change in physical or mental condition, disability, stress, or even changes in the writing surface or implement the voter used. *See id.* ¶¶ 35–37.

In past elections, incomplete data reported by the State confirms that absentee voters in Tennessee have had their ballots rejected for mismatching signatures without being provided any opportunity to cure and ensure their vote counts.[12] This is the case even though most Tennesseans voted in person during past elections, and only limited numbers of voters cast their ballots by mail. In 2020, of course, Tennesseans are expected to vote by mail in dramatically higher numbers, even if the restrictive Eligibility Criteria is reinstated.

## B. Organizational Plaintiffs' Voter Engagement Efforts

Organizational Plaintiffs are each community-based and membership organizations that devote significant resources towards engaging, educating, and mobilizing voters. In past election cycles, they have run voter registration drives, education events, and organized efforts to drive voters to the polls in-person on Election Day. *See* Tennessee NAACP Decl. ¶¶ 17–20; MCLC Decl. ¶¶ 8–9; APRI Decl. ¶ 8; Equity Alliance Decl. ¶¶ 9–12; Free Hearts Decl. ¶¶ 9–10. This year, however, given the widespread outbreak of COVID-19, Organizational Plaintiffs must

---

[12] The election data reported by the State to the Election Assistance Commission is incomplete. For example, in 2018, Davidson County—the State's second largest county—did not report any data related to absentee ballot rejections. *See* Ex. 12 (2018 EAVS Data for Tennessee). Similarly, while Shelby County collected 4,335 absentee ballots in 2018, and counted 3,093 absentee ballots, it only reported 212 total absentee ballot rejections, leaving over 1,000 ballots unaccounted. *See id.*; *see also* Ex. 13 (Shelby County November 2018 voting statistics).

11

reassess their voter engagement strategies. They will need to engage voters with less person-to-person contact, and, considering Tennesseans' dramatic shift towards voting by mail, will also need to engage and mobilize absentee voters. *See, e.g.*, Tennessee NAACP Decl. ¶¶ 41–46; MCLC Decl. ¶ 17–19; APRI Decl. ¶ 16–18; Free Hearts Decl. ¶ 15–17.

In furtherance of such absentee voter mobilization efforts this election cycle, Organizational Plaintiffs intend to rely more heavily on unsolicited mailings to absentee eligible voters to inform them of their right to vote by mail and to encourage them to do so. *See* Tennessee NAACP Decl. ¶¶ 48–55; MCLC Decl. ¶ 21; APRI Decl. ¶ 19–20; Equity Alliance Decl. ¶ 33; Free Hearts Decl. ¶¶ 21–26. Such mailings are necessary in order to reach the broadest swath of the electorate possible, without engaging in person-to-person contact. *See* Tennessee NAACP Decl. ¶ 47; MCLC Decl. ¶¶ 23–26; APRI Decl. ¶ 22–24; Equity Alliance Decl. ¶¶ 33–37; Free Hearts Decl. ¶ 24. Because some of these engaged voters will not have the means to obtain an absentee ballot request form themselves—for example, because they lack reliable access to a computer or printer—Organizational Plaintiffs would, if permitted, also send these voters blank absentee ballot request forms. *See* Tennessee NAACP Decl. ¶ 54; MCLC Decl. ¶¶ 23–26 APRI Decl. ¶ 23–26; Equity Alliance Decl. ¶¶ 35–36; Free Hearts Decl. ¶¶ 25–26. Organizational Plaintiffs believe that such absentee voter engagement will be critical this year to their organizational missions. *See* Tennessee NAACP Decl. ¶ 47; MCLC Decl. ¶¶ 19–21; APRI Decl. ¶ 25–26 Equity Alliance Decl. ¶ 33–37; Free Hearts Decl. ¶ 21.

## **LEGAL STANDARD**

Courts consider four factors in deciding whether to issue a preliminary injunction: whether (1) the movant has a strong likelihood of success on the merits; (2) the movant would suffer irreparable harm without the injunction; (3) issuance of the injunction would cause substantial

12

harms to others; and (4) the public interest would be served by issuance of the injunction. *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001). No single factor is a prerequisite to prevailing, and the Court should balance all four factors. *Performance Unlimited v. Questar Publishers, Inc.*, 52 F.3d 1373, 1381 (6th Cir. 1995). "When a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits often will be the determinative factor." *Obama for Am. v. Husted* (*OFA*), 697 F.3d 423, 436 (6th Cir. 2012).

**ARGUMENT**

**I. PLAINTIFFS HAVE A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS OF EACH OF THEIR CLAIMS**

    **A. The Prohibition on the Unsolicited Dissemination of Absentee Ballot Requests Violates the First Amendment**

A voter who wants to vote by mail in 2020 will first need to request an absentee ballot from their local election officials. *See* Tenn. Code § 2-6-202(a). Organizational Plaintiffs—each community groups that engage in voter registration, education, and turnout activities—plan to assist in that effort, including by educating eligible voters of their option to vote by mail, and, if possible, providing them with the forms necessary to do so. *See* Tennessee NAACP Decl. ¶¶ 42–44, 47; MCLC Decl. ¶ 21; APRI Decl. ¶ 19–20; Equity Alliance Decl. ¶ 31; Free Hearts Decl. ¶ 17, 20. To reach as many voters as possible, on some occasions, the Organizational Plaintiffs' outreach efforts will be "unsolicited."[13] *See* Tennessee NAACP Decl. ¶¶ 51–52, 55; MCLC Decl. ¶ 21; APRI Decl. ¶ 19–20; Equity Alliance Decl. ¶ 31, 33; Free Hearts Decl. ¶ 21.

---

[13] This is not to be confused with unwanted. Many of these mailings would be directed towards Organizational Plaintiffs' members, volunteers, or active constituencies who do not know the process of voting by mail. *See* Tennessee NAACP Decl. ¶ 52; MCLC Decl. ¶¶ 23–26; Equity Alliance Decl. ¶ 31; Free Hearts Decl. ¶ 21; APRI Decl. ¶ 19. However, they would not necessarily be in response to specific requests for an absentee ballot request form and thus would be "unsolicited." The legislative history confirms the shocking breadth of this criminal prohibition. During the debates, legislators confirmed that even providing an absentee ballot request form to a

13

1. Legal Standard

Tennessee's criminal prohibition on the unsolicited dissemination of absentee ballot requests obstructs Organizational Plaintiffs' voter engagement efforts, limiting their political expression and core political speech activity. The law is therefore "subject to exacting scrutiny," and may be upheld only if it is shown to be narrowly tailored to serve a compelling government interest. *See Meyer v. Grant*, 486 U.S. 414, 420 (1988) (applying "exacting scrutiny" to a challenged statute "involv[ing] a limitation on political expression"); *see also Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182, 204 (1999); *Citizens for Tax Reform v. Deters*, 518 F.3d 375 (6th Cir. 2008) (McKeague, J.) (applying *Meyer* to a law limiting compensation of signature gatherers to payment by time worked). Because Tennessee's criminalization of the unsolicited dissemination of requests for absentee ballot applications serves no government interest, nor is it narrowly tailored to serve a compelling interest were one to be found, the law violates the First Amendment.

2. The Law Restricts Organizational Plaintiffs' Expressive Speech Activities

Organizational Plaintiffs engage in year-round voter registration, education, and engagement activity. They conduct in-person voter registration drives, hold events to help mobilize voters, and provide voters with educational materials to help them make an informed choice when voting. *See* Tennessee NAACP Decl. ¶¶ 17–19; MCLC Decl. ¶¶ 7–9; APRI Decl. ¶ 8; Equity Alliance Decl. ¶¶ 7–12; Free Hearts Decl. ¶¶ 9–10. But this year, the outbreak of the COVID-19 pandemic has forced changes to Organizational Plaintiffs' voter engagement programs. Most notably, this year, Organizational Plaintiffs will focus additional resources on encouraging and

---

family member would be a criminal offense if the family member had not specifically requested it. *See* Ex. 14 at 13–16 (Tape Logs of State Legislature Proceedings).

helping eligible voters request a mail in ballot so that they can vote safely from their home. *See* Tennessee NAACP Decl. ¶¶ 41–42; MCLC Decl. ¶ 18; APRI Decl. ¶ 15–17; Equity Alliance Decl. ¶ 23–26; Free Hearts Decl. ¶¶ 13–15. Organizational Plaintiffs will undertake this activity because they understand that unless voters can vote by mail, some may not vote at all. *See* Tennessee NAACP Decl. ¶¶ 34, 39; MCLC Decl. ¶¶ 14–15; APRI Decl. ¶ 22–24; Equity Alliance Decl. ¶ 19–21; Free Hearts Decl. ¶ 19. Particularly considering that *most* Tennessee voters who vote by mail in this election will be doing so for the first time, *see supra* Factual Background, Part II.A, Organizational Plaintiffs need to inform such eligible voters that they can vote by mail, and, to facilitate their request to do so, provide voters with blank absentee ballot request forms. *See* Tennessee NAACP Decl. ¶ 51; MCLC Decl. ¶¶ 23–26; APRI Decl. ¶ 19–24; Equity Alliance Decl. ¶¶ 29–33; Free Hearts Decl. ¶ 24. To reach the greatest number of voters, Organizational Plaintiffs' efforts will include, if permitted, the unsolicited distribution of absentee ballot requests to voters and engaged community members, along with information about voting by mail. *See* Tennessee NAACP Decl. ¶ 48; MCLC Decl. ¶ 23–26; APRI Decl. ¶ 19–20; Equity Alliance Decl. ¶ 26, 29–33; Free Hearts Decl. ¶ 20.

Under Tennessee Code § 2-6-202(c)(4), however, the State can charge Organizational Plaintiffs with a misdemeanor if they try to encourage an eligible voter to vote by mail by providing the voter with an unsolicited request for an absentee ballot application. If convicted, Organizational Plaintiffs could face a sentence of up to 11 months and 29 days in prison, a fine of up to $2,500, or both. *See* Tenn. Code § 40-35-111(e)(1). The law therefore severely burdens Organizational Plaintiffs' core political speech.

Whether a voter should cast an absentee ballot is a "matter of societal concern that [Plaintiffs] have a right to discuss publicly without risking criminal sanctions," *Meyer*, 486 U.S at

421, and is also intimately intertwined with the whole of Organizational Plaintiffs' speech and associative activities. When Organizational Plaintiffs encourage Tennessee citizens to vote by mail, including by providing them with an absentee ballot request, Organizational Plaintiffs necessarily engage those citizens in conversations about the importance of voting and civic engagement, the need for political reform, and other issues of organizational importance. *See* Tennessee NAACP Decl. ¶ 41, 45; MCLC Decl. ¶ 5–9; APRI Decl. ¶ 8, 18–20; Equity Alliance Decl. ¶ 7; Free Hearts Decl. ¶ 16–17. And, of course, in encouraging voters to vote by mail, Organizational Plaintiffs—much like individuals engaged in protected voter registration activity, *see Meyer,* 486 U.S. at 422—necessarily encourage voters to vote.

Organizational Plaintiffs' efforts to encourage voting, including through the sometimes-unsolicited distribution of absentee ballot requests, are therefore core political speech and expressive conduct protected by the First Amendment. *See League of Women Voters v. Hargett*, 400 F. Supp. 3d 706, 720 (M.D. Tenn. 2019) (stating that "encouraging others to register to vote" is "pure speech," and, because that speech is political, it is a "core First Amendment activity"); *see also League of Women Voters of Fla. v. Cobb*, 447 F. Supp. 2d 1314, 1332–33 (S.D. Fla. 2006) (noting that laws restricting third-party voter engagement activity "reduce[] the total quantum of speech" because through that activity, civic organizations like plaintiffs "persuade others to vote, educate potential voters about upcoming political issues, communicate their political support for particular issues, and otherwise enlist like-minded citizens in promoting shared political, economic, and social positions").[14] Such speech activity cannot be separated from Organizational

---

[14] *See also Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 706 (N.D. Ohio 2006) (striking down restrictions on voter registration activity and noting that "[t]he interactive nature of voter registration drives is obvious: they convey the message that participation in the political process through voting is important to a democratic society"); *League of Women Voters of Fla. v. Browning* (*Browning II),* 863 F. Supp. 2d 1155, 1158–59 (N.D. Fla. 2012) (holding that laws regulating voter

Plaintiffs' other protected First Amendment activity—including explaining the importance of voting and encouraging voting by mail—to avoid "exacting scrutiny." *See Citizens for Tax Reform v. Deters*, 518 F.3d 375, 386 (6th Cir. 2008) (holding that the First Amendment protects Plaintiffs' "right not only to advocate their cause but also to select what they believe to be the most effective means for doing so" (quoting *Meyer*, 486 U.S. at 424)); *see also Cobb*, 447 F. Supp. 2d at 1332; *Am. Ass'n of People with Disabilities v. Herrera*, 690 F. Supp. 2d 1183, 1215–16 (D.N.M. 2010), *on reconsideration in part*, WL 3834049 (D.N.M. July 28, 2010) (finding the Plaintiffs' "public endeavors to assist people with voter registration" involve protected political expression).

This is for good reason: without being able to help voters vote by mail by providing them with a request for an absentee ballot, Plaintiffs' voter education and outreach communications lose their force.[15] *See* Tennessee NAACP Decl. ¶ 47–51 (explaining that the unsolicited distribution of absentee ballot requests is necessary to reach as many eligible voters as possible, especially Black voters); Free Hearts Decl. ¶ 20–21, 25 (same); Equity Alliance Decl. ¶ 33–36 (same); MCLC Decl. ¶ 24 (explaining that some members lack the computer and printer access needed to obtain their own absentee ballot request forms); APRI Decl. ¶ 22 (same). In any election year, but particularly in an election year during which many voters fear the health risks of voting in person because of

---

registration drives affect "core First Amendment Activity"); *League of Women Voters of Fla. v. Browning* (*Browning I*), 575 F. Supp. 2d 1298, 1321 (S.D. Fla. 2008) (stating that "[u]ndoubtedly, Plaintiffs' interactions with prospective voters in connection with their solicitation of voter registration applications constitutes constitutionally protected activity").

[15] Indeed, even Courts that have cabined *Meyer's* reach with respect to certain aspects of voter registration and engagement activity have recognized that the act of encouraging someone to vote by handing them a blank application constitutes core political speech. *See Voting for America v. Steen*, 732 F.3d 382, 391 (5th Cir. 2013) (recognizing that encouraging citizens to register and providing them with an application to do so are protected speech and expressive conduct, even if the collection of a completed application is not). The Sixth Circuit has, of course, taken an even more expansive view of *Meyer's* reach. *See League of Women Voters v. Hargett*, 400 F. Supp. 3d 706, 720 (M.D. Tenn. 2019) (rejecting the *Steen* majority's attempt to "slic[e] and dic[e]" the plaintiffs' protected speech and associational activity).

an ongoing public health crisis, *see supra* Factual Background, Part II.A, encouraging voters to vote by mail is tantamount to encouraging them to vote at all. Indeed, absent knowledge of their ability to vote by mail in an election held during a pandemic, and easy access to the materials needed to do so, some voters may just not vote. *See* Tennessee NAACP Decl. ¶¶ 54–55; MCLC Decl. ¶ 14–15; APRI Decl. ¶ 22–24; Equity Alliance Decl. ¶ 33–36; Free Hearts Decl. ¶¶ 24–26.

3. The Law Does Not Serve Any Compelling Government Interest

Because Tennessee Code § 2-6-202(c)(4) burdens core political speech, the burden the State "must overcome to justify this criminal law is well-nigh insurmountable." *Meyer*, 486 U.S. at 425. The restriction is "subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011) (quoting *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010)); *see also League of Women Voters v. Hargett*, 400 F. Supp. 3d at 706. Here, because the law's provisions are not meaningfully designed to serve any legitimate government interest, let alone a compelling one, its enforcement must be enjoined.

At its core, the purpose and effect of Organizational Plaintiffs' unsolicited distribution of absentee ballot requests is to engage the Tennessee electorate and to encourage eligible voters to vote by mail. *See* Tennessee NAACP Decl. ¶ 47; MCLC Decl. ¶ 18; APRI Decl. ¶ 17–20; Equity Alliance Decl. ¶ 9, 26, 28; Free Hearts Decl. ¶¶ 15–16. This is *exactly* the interest the State says that it seeks to serve right now. Indeed, the State is encouraging all absentee eligible voters to vote by mail, and Defendant Hargett has even suggested that *all* Tennesseans should engage in such an

18

effort. *See* Hargett Interview[16] at 32:30 – 33:40 (stating that with respect to voting by mail, "[i]t's not just important we advertise to [voters] over 60, . . . [but] that we talk to their children and their grandchildren to make sure that they know and they might be encouragers to get people to vote absentee"). By contrast, Tennessee Code § 2-6-202(c)(4)'s restrictions on how and by whom absentee ballot requests may be distributed will preclude eligible voters from voting by mail, simply because they lack the opportunity or means to submit a request. *See, e.g.*, MCLC Decl. ¶ 24 (explaining that some members lack the computer and printer access needed to obtain their own absentee ballot request form).

4. Even if the Law Serves a Compelling Government Interest, It Is Not Narrowly Tailored to Serve That Interest

In addition, whatever interest Tennessee Code § 2-6-202(c)(4) seeks to serve, it is not narrowly tailored to achieve that purpose. The statute criminalizes the unsolicited distribution of a blank form that voters can obtain from the website of their local election commission. *See, e.g.*, Ex. 10 (Davidson County Absentee Ballot Request).

The legislative history of this provision suggests that the primary purpose of this bill was ostensibly to prevent confusion of voters believing that they are required to submit the request in order to vote in person. *See* Ex. 14 at 1–3, 17–18.[17] To the extent this is a realistic concern, the flat criminal prohibition on disseminating unsolicited requests is wildly overbroad. A simple notice to the voter on the request form would suffice, in lieu of criminalizing core First Amendment speech.

The legislative history also suggests that the provision was designed to stifle protected speech. On the floor, legislators supporting the bill stated that they did not "want to encourage

---

[16] Jim Shulman & Tre Hargett, *A Convo w SOS Tre Hargett*, YOUTUBE (May 24, 2010) (hereinafter "Hargett Interview"), https://www.youtube.com/watch?v=AsfH1NlmUt8.

[17] Plaintiffs' counsel is presently undertaking to have the relevant portions of the tapes of the legislative sessions transcribed, and will provide certified transcripts to the Defendants' counsel and the Court upon receipt.

people to vote absentee," and that it "is bad public policy to encourage people to vote absentee." *See id.* at 5–8 (arguing additionally that "[t]he group who can vote absentee needs to be kept very small"). The Tennessee Legislature is not constitutionally permitted to criminally restrict Organizational Plaintiffs' ability to "encourage people to vote absentee" because they believe it is "bad public policy" for them to do so. *See League of Women Voters v. Hargett*, 400 F. Supp. 3d at 720 (stating that "encouraging others to register to vote" is "pure speech," and is "core First Amendment activity"). Nothing could strike more plainly at the heart of freedom of speech than a law explicitly aimed at limiting citizens' ability to encourage their fellow citizens to cast their ballot by the lawful means of their choosing.

Finally, there is no "anti-fraud" interest in prohibiting the physical distribution of publicly-available forms. That is nonsensical, especially considering that once provided to a voter, the voter would still need to complete the form under penalty of perjury, *see* Tenn. Code §§ 2-19-105; 2-19-107; 2-19-109, and thereafter submit it to election officials, who must verify the voter's identity and eligibility to vote by mail before sending them an absentee ballot, *id.* § 2-6-202(b). *See Meyer*, 486 U.S. at 426-27 (holding that the state failed to show that challenged procedures were necessary where other preexisting procedures were "adequate to the task of minimizing the risk of improper conduct"); *see also Deters,* 518 F.3d at 387 (holding that criminalization of fraudulent signatures was adequate to protect state interest without regulating methods for paying signature collectors). Indeed, the legislative history confirms that fraud was not the animating concern behind the passage of this provision. *See generally* Ex. 14.

The criminalization of providing absentee ballot requests is not narrowly tailored to serve any compelling government interest—rather, it serves no purpose other than to make it prohibitively difficult for civic organizations (like Organizational Plaintiffs) to encourage and

assist legitimate, qualified, eligible citizens to request absentee ballots. Indeed, this appears to have been the goal of the legislation. Thus, Plaintiffs are likely to succeed on their First Amendment speech and association claims.[18]

**B. Plaintiffs Are Likely to Succeed on Their Claim That the First-Time Voter Restriction Unconstitutionally Burdens First-Time Voters' Fundamental Right to Vote during the COVID-19 Pandemic**

Tennessee law requires first-time voters who register by mail to "appear in person to vote in the first election the person votes in after such registration becomes effective." Tenn. Code § 2-2-115(b)(7). In order to comply with the recent Chancery Court order, the State has updated its absentee voter policies to allow voters to seek an absentee ballot on the basis of COVID-19. *See, e.g.*, Ex. 10 (Davidson County vote by mail request form). It has *not*, however, amended its absentee ballot request form to remove the First-Time Voter Restriction. *See, e.g.*, Ex. 15 (mail-in application for voter registration stating, "[i]f you register by mail, you must vote in person the first time you vote after registering"); *see also* Ex. 5 (Tennessee Secretary of State's web site on absentee voting, stating that "unless you are on the permanent absentee voting register or enrolled in the Safe at Home program, you must appear in-person to vote in the first election after you have registered by mail"). Nor has it issued any guidance to voters that the First-Time Voter Restriction will not be enforced. This First-Time Voter Restriction imposes an unnecessary and undue burden on the right to vote for eligible absentee voters.

---

[18] Even if the Court reviews this statute under the *Anderson-Burdick* framework for regulations of the election process, there is little difference between the exacting scrutiny of *Meyer* and the close scrutiny applied under *Anderson-Burdick* when considering regulations on core political speech, which are necessarily severe. *Buckley v. Am. Constitutional Law Found.*, 525 U.S. 182, 208 (1999) (Thomas, J., concurring); *see id.* at 192 n.12; *see also infra* at Argument Part I.B.1 (describing the *Anderson-Burdick* framework).

Voters that are eligible to vote by mail are voters that Tennessee already agrees should not be required to vote in person. In the context of the pandemic, voting in person can pose a serious risk for every voter, as the Chancery Court's Order enjoining the Eligibility Criteria recognizes. *See* Ex. 1 at 19–22. Meanwhile, although the stated purpose of the First-Time Voter Restriction is to require voters to "present satisfactory proof of identity" before they cast their ballot, a more tailored requirement—like the one already imposed through the Help America Vote Act, 52 U.S.C. 21083(b)—can accomplish that goal without severely burdening the right to vote. Especially in the context of an ongoing pandemic, the law severely burdens the First and Fourteenth Amendment-protected fundamental right to vote of otherwise absentee eligible first-time voters who register by mail. And it burdens Organizational Plaintiffs' First Amendment rights by inhibiting the effectiveness of their voter registration efforts and forcing them to divert resources from other organizational priorities to educating first-time registrants of the law's requirements. *See* Tennessee NAACP Decl. ¶¶ 41–45; MCLC Decl. ¶¶ 30–34.

    1.  <u>Legal Standard</u>

When determining whether a challenged election law unconstitutionally burdens the right to vote, courts apply the *Anderson-Burdick* standard, weighing "'the character and magnitude of the asserted injury . . .' against 'the precise interests put forward by the State as justifications for the burden . . .' taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788-89 (1983)). Under this standard, the rigorousness of a court's review depends on the severity of the burden the challenged law imposes. When a law "imposes only 'reasonable, nondiscriminatory restrictions' . . . 'the State's important regulatory interests are generally sufficient to justify' the restrictions," but laws that impose severe burdens on voters'

First and Fourteenth Amendment rights are subject to strict scrutiny. *Id.*; *see also Initiative &*
*Referendum Inst. v. Jaeger*, 241 F.3d 614, 616 (8th Cir. 2001).

  2. <u>The First-Time Voter Restriction Severely Burdens the Right to Vote, Particularly During the Ongoing Pandemic</u>

  First, the First-Time Voter Restriction bars new mail-in registrants (among others) from voting absentee even if they meet the State's ordinarily strict Eligibility Criteria. These Eligibility Criteria are tailored to meet the needs of voters who would be severely burdened by voting in person. Indeed, the State has admitted that the Eligibility Criteria are geared toward those "who are likely to be most burdened by being required to cast their votes in person and those who would most likely be disenfranchised if they could not vote absentee." Ex. 16 at 17 (State's Response in Opposition to TRO in Davidson Chancery Court). And many of the Eligibility Criteria—such as age, students outside the county, residents of care facilities, and illness or disability—would equally affect voters' ability to register in person as they do their ability to vote in person. Nothing about being a first-time voter makes the right to vote any less protected. Punishing voters with additional burdens as they seek to participate in our democracy for the first time is likely to chill speech among voters that have not yet developed meaningful voting habits. Thus, even in ordinary times, the First-Time Voter Restriction poses substantial obstacles for eligible absentee voters, who, by the nature of their eligibility to vote absentee, are burdened by any requirement that they cast their ballot in person.

  But these are not ordinary times. As Defendants have acknowledged, "[t]he COVID-19 pandemic . . . has upended nearly every facet of American life" and "elections are no exception." Ex. 16 at 2. Tennessee has already determined that if possible, absentee eligible voters should vote by mail this year, because of the COVID-19 pandemic. *See* Hargett Interview at 32:30–33:40. That is not possible under Tennessee law, however, for mail registrants voting in their first election,

even if they are otherwise absentee eligible (either under the Eligibility Criteria or the Chancery Court's order).

And this is not a small population of voters. Registration by mail accounted for over 128,000 new registrations in the last election cycle,[19] over twenty percent of all new registrations. *See* Ex. 12. This population of voters includes *many* voters that Organizational Plaintiffs have registered or will register, since Organizational Plaintiffs rely heavily on the mail-in registration form for their voter registration activity. *See* Tennessee NAACP Decl. ¶¶ 28–29; MCLC Decl. ¶ 30; Equity Alliance ¶ 42; Free Hearts Decl. ¶ 19; APRI Decl. ¶¶ 32–34. Unlike other absentee eligible voters, these first-time voters who register by mail have no alternative but to risk exposure to COVID-19 in order to vote. *See Citizens for Legislative Choice v. Miller*, 144 F.3d 916, 921 (6th Cir. 1998) (noting that under the *Anderson-Burdick* balancing test, "a law severely burdens voting rights if the burdened voters have few alternate means of access to the ballot" (citing *Burdick,* 504 U.S. at 436–37)).

A state court has already determined that such a dilemma of voting in person or not voting at all violates the Tennessee state constitution, and it violates the U.S. Constitution as well. Tennessee simply cannot ensure voters' safety at the polls. *See* Ex. 1 (Davidson County Chancery Court's June 4, 2020 Order) at 19–22; *see also* Reingold Decl. ¶¶ 21–24; *see also Thomas v. Andino*, 2020 WL 2617329, at *19 (D.S.C. May 25, 2020) (enjoining enforcement of the state's absentee ballot witnessing requirement during the COVID-19 pandemic in part because of "the risk that violating social distancing protocols poses to Plaintiffs and their communities");

---

[19] The First-Time Voter Restriction applies to not only mail-in registrations but also voter registration forms collected during voter registration drives *and* voter registrations collected at offices that provide public assistance and services to persons with disabilities. *See* Tenn. Code 2-2-201(a)(2)(E).

24

*Democratic Nat'l Comm. v. Bostelmann*, No. 20-CV-249-WMC, 2020 WL 1638374, at *13 (W.D. Wis. Apr. 2, 2020) (finding "no doubt" that holding an election "in the midst of the COVID-19 pandemic means that citizens will face serious, and arguably unprecedented, burdens in exercising their right to vote in person," including risking their health), *rev'd on other grounds*, 140 S. Ct. 1205 (2020). Indeed, Secretary Hargett has admitted that he cannot require voters to wear face coverings, *see* Hargett Interview at 20:50–20:59 ("For legal reasons, we can't require people to wear a mask or face covering when they come to polls."), and is moreover encouraging voters who are already absentee eligible under the Eligibility Criteria to vote by mail *because of the pandemic*, *see id.* at 32:30–33:40. Thus, even if voters are able to take precautions for themselves, they will be at the whim of their fellow voters with respect to exposure to COVID-19. Likewise, the State cannot prevent symptomatic individuals from waiting in line to vote, and even if it could, it of course cannot detect any asymptomatic or presymptomatic individuals, even though such individuals can also spread the disease. *See* Reingold Decl. ¶ 13.

And if the State is unable to recruit enough poll workers—a problem that other states have already experienced, and which Tennessee is concerned about as well, *see* Hargett Interview at 18:53–19:00; *see also* Election Contingency Plan at 1–7—it could cause polling place closures that will lead to more voters being consolidated into fewer polling locations, heightening their risk. *See supra* Factual Background, Part II.A; *see also* Reingold Decl. ¶ 20 ("Requiring voters to wait in long lines at crowded polling places and share voting equipment would place them at substantially increased risk of exposure to and/or transmission of SARS-CoV-2."). The hours-long

lines seen in numerous states during primary elections on June 2 and June 9 all but ensure similar problems in Tennessee, particularly if vote by mail is not widely available.[20]

In *OFA*, the Sixth Circuit affirmed a lower court's decision to enjoin an Ohio statute that eliminated in-person early voting for nonmilitary voters during the three-day period preceding Election Day. Although the state argued that the burden on these voters was "slight because they have 'ample' other means to cast their ballots" the Sixth Circuit affirmed the district court's finding that a "significant number of Ohio voters will in fact be precluded from voting" absent the injunction. *OFA*, 697 F.3d at 431. Here, the burden is far more severe than in *OFA*, because first-time voters who registered by U.S. mail will have *no alternative* but to vote in person in August and November. This is true for those who meet the Eligibility Criteria—whom the State admits would face serious burdens to vote in person—and those whom the state court has already held have a state constitutional right to vote by mail during the pandemic.

Moreover, the pool of first-time voters is disproportionately composed of classes of people more likely to face higher barriers to participation in the democratic process. These groups include young voters, students, and immigrants who recently became naturalized citizens. Not only is the pool thus much larger than that in *OFA*, but the *Anderson-Burdick* standard is heightened because the restrictions fall unevenly across groups of voters. *See Burdick*, 504 U.S. at 434 (limiting lower scrutiny to nondiscriminatory restrictions).

---

[20] *See, e.g.*, Julie Zauzmer, *Voting Problems in D.C., Maryland Lead to Calls for Top Officials to Resign*, WASH. POST, June 3, 2020, https://www.washingtonpost.com/local/dc-politics/voting-problems-in-dc-maryland-lead-to-calls-for-top-officials-to-resign/2020/06/03/24b47220-a5a8-11ea-b619-3f9133bbb482_story.html; Mark Niesse, *Voting Machines and Coronavirus Force Long Lines on Georgia Voters*, ATLANTA J. CONST., June 9, 2020, https://www.ajc.com/news/state--regional-govt--politics/voting-machines-and-coronavirus-force-long-lines-georgia-voters/VajM2D3aSHALhCz7KwDrpJ/.

26

The State lacks sufficient justification to enforce the First-Time Voter Restriction, particularly during the ongoing pandemic. The stated purpose of the First-Time Voter Restriction is to ensure that new voters "present satisfactory proof of identity." Tenn. Code § 2-2-115(b)(7)(A). But a requirement of in-person voting is not necessary to satisfy this concern. Indeed, the Help America Vote Act (HAVA) has already carefully calibrated the need to verify first-time voters with accommodating the significant burdens of in-person voting on some voters. Under HAVA, first-time mail registrants also must vote in person *unless* they submit the required proof of identity with their registration or mail ballot *or* submit their driver's license number or last four digits of their social security number and the election officials can use that information to match the voter with existing identification records. 52 U.S.C. 21083(b). And Tennessee already requires a voter's social security number on all mail-in registration forms, *see* Tenn. Code § 2-2-116, "for purposes of identification." *See* Ex. 15. Under HAVA, Tennessee *must* use this information to verify voter's information where possible. 52 U.S.C. 21083(a)(5)(A). Tennessee cannot show that its flat prohibition on absentee voting—which was enacted *before* HAVA—is necessary to verify voters' identity in light of HAVA's more carefully calibrated voter verification scheme. It particularly cannot do so given the additional burdens of voting during a pandemic.

**C. Plaintiffs are Likely to Show that the State's Signature Verification Process Violates Absentee Voters' Right to Procedural Due Process**

After a voter returns the completed absentee ballot to the local election office, the voter's signature on the absentee ballot must be verified by comparing it to the signature in the voter's registration record. *See* Tenn. Code § 2-6-202(g). Only if the election administrator finds the signatures are a match may the absentee ballot be counted. *See id.* Otherwise, the ballot is rejected

27

and the voter's vote not counted. *See id.* § 2-6-204(b). While the voter is supposed to be "immediately" notified of the rejection, *see id.*, it is not clear how quickly such notice is provided, in reality, or whether it is provided before the end of the election period. In any event, this notice is futile since the voter is not given any opportunity to cure the perceived discrepancy before being disenfranchised.

Tennessee's unreliable signature verification process, which grants unfettered discretion to election officials to reject ballots, creates a substantial risk that voters will be erroneously denied their fundamental right to vote. Procedural due process requires that the government give voters effective notice *and* an opportunity to cure before depriving voters of this right. Tennessee's law fails to provide these essential constitutional protections.

1. Legal Standard

In assessing whether a challenged state action violates due process, courts engage in a "two-step analysis," inquiring (1) whether the plaintiff has a protected liberty or property interest with which the state has interfered, *i.e.*, "whether due process applies," and (2) whether the procedures attendant upon that deprivation were constitutionally sufficient, *i.e.*, "what process is due." *See Johnson v. Morales*, 946 F.3d 911, 921 (6th Cir. 2020); *Miller v. Lorain County Bd. of Elections*, 141 F.3d 252, 259 (6th Cir. 1998). To make that latter determination, courts apply the three-factor test announced by the United States Supreme Court in *Mathews v. Eldridge*, balancing: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or

substitute procedural requirements would entail." *Johnson*, 946 F.3d at 922 (quoting *Mathews*, 424 U.S. 319, 335 (1976)).

In the signature matching for absentee ballots context, courts across the country have applied these factors to consistently find the lack of notice and opportunity to cure signature verification deficiencies violates absentee voters' procedural due process rights. *See, e.g.*, *Self Advocacy Solutions v. Jaeger*, 2020 WL 2951012, at *9 (D.N.D. June 3, 2020) ("Voters are simply never notified or afforded any opportunity to respond if election officials reject their ballots for a signature discrepancy. This all but ends the inquiry."); *Saucedo v. Gardner*, 335 F. Supp. 3d 202, 206 (D.N.H. 2018) (concluding that state's lack of uniform standards for signature matching and failure to provide formal notice and opportunity to cure rejected ballots was facially unconstitutional); *Fla. Democratic Party v. Detzner*, 2016 WL 6090943, at *6 (N.D. Fla. Oct. 16, 2016) (same); *Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354 (D. Ariz. 1990) (same); *La Follette v. Padilla*, 2018 WL 3953766, at *3 (Cal. Super. Ct. Mar. 5, 2018) (same).[21] This Court should follow suit.

    2.  <u>Plaintiffs Have a Constitutionally Protected Interest in the Right to Vote</u>

The right to vote is a "precious" and "fundamental" political right that is "preservative of all rights." *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966); *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). "Other rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders,* 376 U.S. 1, 17 (1964). The Constitution therefore protects

---

[21] *See also Priorities USA v. Benson*, No. 3:19-cv-13188, Dkt. Nos. 32 & 33 (E.D. Mich. April 21, and May 8, 2020) (defendants stipulated to voluntary dismissal of plaintiffs' complaint after Secretary of State issued guidance largely tracking signature-matching relief sought in plaintiffs' motion for a preliminary injunction); *Zessar v. Helander*, 2006 WL 642646, at *9 (N.D. Ill. Mar. 13, 2006) (lack of opportunity to cure, guidance around timing of notice, and lack of post-deprivation hearing violated all absentee voters' right to due process).

both the fact of the franchise itself, and "the manner of its exercise." *League of Women Voters of Ohio v. Brunner,* 548 F.3d 463, 477 (6th Cir. 2008).

To effectuate their fundamental right to vote, Tennessee grants its eligible citizens a statutory right to vote by mail so long as they satisfy the enumerated Eligibility Criteria. *See* Tenn. Code § 2-6-201. In so doing, the State has provided its eligible citizens with a protected liberty interest of which they may not be deprived without due process. *See Zessar*, 2006 WL 642646, at *9 ("By creating an absentee voter regime, the state has enabled a qualified individual to exercise her fundamental right to vote in a way that she was previously unable to do."); *see also Am. Premier Underwriters, Inc. v. Nat'l R.R. Passenger Corp.*, 709 F.3d 584, 594 (6th Cir. 2013) ("A statute creates a protected property interest when it both confers [a] benefit and limits the discretion of the [government] to rescind the benefit." (internal quotation marks omitted)). The eligible voter's interest in voting by mail extends not only to the actual casting of an absentee ballot, but also to having it counted on equal terms with other voters. *See League of Women Voters of Ohio*, 548 F.3d at 477 ("The right to vote includes the right to have one's vote counted on equal terms with others."); *see also Reynolds v. Sims*, 377 U.S. 533, 555 n.29 (1964) ("There is more to the right to vote than the right to mark a piece of paper and drop it in a box or the right to pull a lever in a voting booth. The right to vote includes the right to have the ballot counted.").

3.  Due Process Requires Tennessee to Provide Voters with Pre-deprivation Notice and an Opportunity to Cure Ballot Signature Impairments

Having affirmatively created a vote-by-mail system that allows eligible voters to exercise their fundamental right to vote, Tennessee may not arbitrarily disenfranchise citizens who avail themselves of that process. *See Bush v. Gore*, 531 U.S. 98, 104 (2000); *see also Saucedo*, 335 F. Supp. 3d at 217 ("Having induced voters to vote by absentee ballot, the State must provide adequate process to ensure that voters' ballots are fairly considered and, if eligible, counted.").

30

Rather, the general rule is that due process "requires some kind of a hearing *before* the State deprives a person of liberty or property," and the balancing test set forth in *Eldridge* helps shape that inquiry. *See Johnson,* 946 F.3d at 922 (citing *Zinermon v. Burch*, 494 U.S. 113, 127 (1990) (collecting cases)). Here, the *Eldridge* factors demonstrate that pre-deprivation notice and an opportunity to cure are necessary given Plaintiffs' strong liberty interest in having their vote counted, the high risk of an erroneous deprivation, and the minimal Government interest in avoiding the provision of a notice and cure process.

<blockquote>a)  <i>The Private Interest at Stake—Plaintiffs' Interest in Having Their Vote Counted—Is Fundamental</i></blockquote>

The first *Eldridge* factor weighs heavily in Plaintiffs' favor. "There is no right more basic in our democracy than the right to participate in electing our political leaders." *McCutcheon v. FEC*, 572 U.S. 185, 191 (2014). Thus, courts hearing similar challenges to procedurally deficient signature-matching regimes have uniformly found that the first *Eldridge* factor strongly favors the plaintiffs because of the foundational importance of voting rights. *See, e.g.*, *Self Advocacy Solutions*, 2020 WL 2951012, at *9 ("The private interest at stake is the fundamental right to vote, so this first factor is entitled to substantial weight. North Dakota's decision to allow voting via absentee ballot requires the state to administer the system constitutionally." (internal quotation marks and citations omitted)); *Martin v. Kemp*, 341 F. Supp. 3d 1326,  1338 (N.D. Ga. 2018) (finding that "the private interest at issue implicates the individual's fundamental right to vote and is therefore entitled to substantial weight"); *Saucedo*, 335 F. Supp. 3d at 217 (according the private interest factor "great weight" given the constitutional significance of voting rights). Indeed, here, the weight of this interest is increased by the public health crisis because mail-in voting will be functionally the only means available to many voters to safely exercise their constitutional right to vote. *See supra* Factual Background; *cf. O'Brien*, 414 U.S. 524, 530 (1974).

> b) *Tennessee's Procedures Guarantee Erroneous Deprivations, and the Additional Safeguards Plaintiffs Seek Would Avoid These Errors*

The second *Eldridge* factor—the probable value of additional process in reducing the risk of erroneous deprivations—also favors Plaintiffs. By providing voters with pre-deprivation notice and opportunity to cure signature impairments, Tennessee can give eligible voters a chance to correct erroneous determinations and ensure they are not disenfranchised because of a benign signature issue, or an error by the State.

Tennessee's signature match procedures are virtually certain to lead to the erroneous rejection of valid ballots. As Plaintiff's expert Dr. Linton A. Mohammed explains, "[d]etermining whether a signature is genuine is a difficult task for even a trained [Forensic Document Examiner]," and laypeople "have a significantly higher rate of error in determining whether signatures are genuine." Mohammed Decl. ¶ 22; *see also United States v. Mallory*, 902 F.3d 584, 593 (6th Cir. 2018) (noting that "while handwriting analysis may not boast the 'empirical' support underpinning scientific disciplines, it is nevertheless 'technical' or 'specialized' knowledge that, subject to thorough gatekeeping, is a proper area of expertise"). Yet Tennessee tasks lay election officials with analyzing the signatures of mail-in voters to make one of the most constitutionally consequential decisions imaginable: whether to count a citizen's vote.

Such officials "lack the tools and training to properly account for signature variation, which leads to erroneous mismatch determinations that are particularly pronounced in populations with greater signature variability, such as the elderly, disabled, individuals suffering from poor health, young voters (ages 18 to 21), and non-native English speakers." Mohammed Decl. ¶ 23. Officials rely on impressionistic comparisons using inadequate signature samples and are not required to take the minimum of two hours necessary for even a trained examiner to accurately conduct a

32

signature analysis. *Id.* ¶ 25. Accordingly, they are "likely to make erroneous signature match determinations" and improperly reject ballots that have been properly cast. *Id.* ¶ 50.

Nevertheless, Tennessee law is unforgiving, and voters whose signature is perceived not to match—for whatever reason—will not have their vote counted. *See Fla. Democratic Party*, 2016 WL 6090943, at *6 (finding signature matching law unconstitutional and noting that "[i]f disenfranchising thousands of eligible voters does not amount to a severe burden on the right to vote, then this Court is at a loss as to what does"). Put differently, eligible voters will have their valid ballots erroneously rejected based on the untrained determination of election administrators, regardless of whether a mismatch is real or perceived. *See id.* § 2-6-204(b). Then, voters are denied the opportunity to verify their identity—the underlying purpose of signature matching—or otherwise cure the perceived deficiency with their signature, and thereby have their vote counted. Without pre-deprivation process, "[i]t cannot be emphasized enough that the consequence of a moderator's decision—disenfranchisement—is irremediable." *Saucedo*, 335 F. Supp. 3d at 218.

While Tennessee does purportedly provide notice of ballot rejection, *see* Tenn. Code § 2-6-204, such notice—with no opportunity to cure—is tantamount to post-deprivation notice, and plainly insufficient to protect voters' right to due process or their fundamental right to vote. *See Zinermon,* 494 U.S. at 127 ("[T]he Court usually has held that the Constitution requires some kind of a hearing *before* the State deprives a person of liberty or property."); *see also Johnson*, 946 F.3d at 921. Indeed, post-deprivation notice is only appropriate where the state "provides an adequate postdeprivation remedy," and "(1) the deprivation was unpredictable or 'random'; (2) the predeprivation process was impossible or impracticable; and (3) the state actor was not authorized to take the action that deprived the plaintiff of property or liberty." *Johnson,* 946 F.3d at 921 (quoting *Daily Servs., LLC v. Valentino*, 756 F.3d 893, 907 (6th Cir. 2014)). Here, the State

33

provides *no* post-deprivation remedy, and the unpredictability and randomness of Tennessee's signature verification process, only bolsters the severity of the harm it imposes. *Self Advocacy Solutions*, 2020 WL 2951012, at *9 (finding that "because there is no possibility of meaningful post-deprivation process when a voter's ballot is rejected (there is no way to vote after an election is over, after all), sufficient predeprivation process is the constitutional imperative").

Pre-deprivation notice and an opportunity to cure perceived mail-in ballot deficiencies are therefore necessary to lower the risk of erroneous disenfranchisement. *See Martin*, 341 F. Supp. 3d at 1339 (holding that "permitting an absentee voter to resolve an alleged signature discrepancy . . . has the very tangible benefit of avoiding disenfranchisement"); *Saucedo*, 335 F. Supp. 3d at 219; *Zessar*, 2006 WL 642646, at *9. Given the high risk of erroneous deprivations and the indisputable effectiveness of the simple notice-and-cure procedure Plaintiffs seek, the second *Eldridge* factor favors granting relief.

> c)    *The State's Interest in Rejecting Ballots Without Meaningful Pre-Deprivation Process Is Minimal*

The third *Eldridge* factor also favors Plaintiffs. Tennessee has no interest in depriving eligible voters, including eligible absentee voters, of the fundamental right to have their vote counted. It can avoid doing so at minimal cost, and with no negative impact on the integrity of the State's elections process.

Tennessee law already provides for formal notice and cure procedures in the context of absentee ballot vote-by-mail applications. *See* Tenn. Code § 2-6-204(a)(1) ("If a voter fails to provide required information on an absentee voting by mail application, the administrator shall mark the application 'Rejected' and return it to the voter immediately by mail with a red circle marked around the space provided for the required information."). Similarly, Tennessee's administrative regulations provide for a similar cure process for rejected voter registration

applications. The regulation requires county elections administrators to verify the registrant's information by telephoning or issuing a letter to the applicant, advising him or her of "(1) the nature of the problem with the [application] already submitted; (2) steps needed to be taken to remedy the problem; (3) where appropriate, any time limit wherein action must be taken." Tenn. Comp. R. & Regs. 1360-02-11-.07(03). These procedures already provide a blueprint for the absentee ballot rejection process, such that the State can easily adopt procedures to ensure that absentee voters can cure ballots rejected because of signature discrepancies.

To the extent the State expresses any concern that the signature verification process is necessary to prevent voter fraud, the failure to provide pre-deprivation notice and opportunity to cure is antithetical to that interest. As the Eleventh Circuit explained in a recent case considering a signature matching requirement like the one at issue here, "protecting public confidence in elections is deeply important—indeed, critical—to democracy" and "public knowledge that legitimate votes were not counted due to no fault of the voters—and with no reasonable notice to the voters that their votes would not be counted and no opportunity to correct that situation— would be harmful to the public's perception of the election's legitimacy." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1327 (11th Cir. 2019).

Moreover, such a complaint misses the point because Plaintiffs are not asking this Court to eliminate the signature verification process. Instead, Plaintiffs ask that the State (1) adopt uniform standards, training, and education for elections officials around signature matching and (2) provide voters an opportunity to cure before elections administrators reject their ballots. "[I]f anything, additional procedures further the State's interest in preventing voter fraud while ensuring that qualified voters are not wrongly disenfranchised." *Saucedo*, 335 F. Supp. 3d at 220; *see also Self Advocacy Solutions*, 2020 WL 2951012, at *10 (noting that "allowing voters to verify the validity

of their ballots demonstrable advances—rather than hinders—these goals [of preventing voter fraud and upholding the integrity of elections")"; *Fla. Democratic Party*, 2016 WL 6090943, at *7 (same).

### D. Tennessee's Error-Prone Signature Verification Procedure Violates Plaintiffs' Fundamental Right to Vote

In addition to showing that Tennessee's signature verification process violates Plaintiffs' procedural due process rights, Plaintiffs are also likely to establish that Tennessee's signature match procedures unconstitutionally burden the fundamental right to vote.

#### 1. Legal Standard

When determining whether a challenged election law unconstitutionally burdens the right to vote, courts apply the *Anderson-Burdick* standard, weighing "'the character and magnitude of the asserted injury . . .' against 'the precise interests put forward by the State as justifications for the burden . . .' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788-89 (1983)); *see supra* Argument, Part I.C.1.

#### 2. Tennessee's Error-prone Signature Verification System Severely Burdens Plaintiffs' Right to Vote

Tennessee's signature matching procedures impose a severe burden on the right to vote. Every election, Tennessee's error-prone signature match law summarily discounts eligible voters' validly cast ballots and deprives these voters of their right to vote. Troublingly, the deprivation occurs without giving the voter any opportunity to remedy the perceived deficiency. Such a system bears "[t]he hallmark of a severe burden"—"exclusion or virtual exclusion from the ballot." *Libertarian Party of Kentucky v. Grimes*, 835 F.3d 570, 574 (6th Cir. 2016); *Schmitt v. LaRose*,

933 F.3d 628, 639 (6th Cir. 2019) ("The hallmark of a severe burden is exclusion or virtual exclusion from the ballot.").

Every absentee voter is at risk of having their ballot arbitrarily rejected based on a benign signature issue under Tennessee's unreliable system. *OFA*, 697 F.3d at 428 ("Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." (quoting *Bush*, 531 U.S. at 104–05)). For voters like Organizational Plaintiffs' older members and members with underlying health conditions that make it impossible for them to produce a consistent signature, the risk of deprivation is only multiplied. *See* Mohammed Decl. ¶ 25 (describing the inconsistency in signatures produced by older voters and those with underlying health conditions). Nevertheless, there is nothing such voters can do to safeguard their ballot from such erroneous rejections. *See supra* Argument, Part I.C.3.b (describing the lack of opportunity to cure afforded absentee voters under Tennessee law). Rather, they must simply submit their ballot and hope that it will be counted. If it is not, the voter will have to accept that for all intents and purposes, they did not vote in the election.

Particularly this election year, where the State is preparing for at least 35 percent of its electorate to vote by mail in order to ensure their safety, *see supra* Factual Background, Part II, the potential for deprivation of the right to vote is extraordinary.

3. Tennessee Has No Legitimate Interest in Depriving Voters of Their Franchise Without Notice and an Opportunity to Cure

As discussed above, Tennessee's flawed signature verification process does not serve any plausible state interest in election integrity, nor does it justify the burden placed on Plaintiffs and their members. Rather, by arbitrarily rejecting eligible voters' validly cast ballots, it threatens to undermine the legitimacy of elections and public confidence in Tennessee's democratic process. *See Lee*, 915 F.3d at 1327. Providing voters with notice and an opportunity to cure not only furthers

37

the State's interests in promoting public confidence and protecting the integrity of its elections, but these procedural safeguards could be implemented at no significant cost to the State. *See supra* Argument, Part I.C.3.c.

## II. PLAINTIFFS ARE AT IMMINENT RISK OF IRREPARABLE HARM.

### A. The Signature Match Process and First-Time Voter Requirement Will Cause Irreparable Harm Because They Deny or Abridge Plaintiffs' and Their Members' Fundamental Right to Vote.

Restrictions on the right to vote constitute irreparable injury. *OFA,* 697 F.3d at 436. Indeed, because the right to vote is, by definition, fundamental, *Yick Wo*, 118 U.S. at 370, the risk of disenfranchisement practically defines irreparable harm. *See Fish v. Kobach*, 840 F.3d 710, 752 (10th Cir. 2016) ("[T]he right to vote is a constitutionally protected fundamental right. When an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." (internal quotation marks and citations omitted)); *see also Charles H. Wesley Educ. Found., Inc. v. Cox*, 324 F. Supp. 2d 1358, 1368 (N.D. Ga. 2004), *aff'd,* 408 F.3d 1349 (11th Cir. 2005) (holding that a lost opportunity to register causes irreparable harm because "no monetary award can remedy" it). Thus, irreparable injury is presumed when a restriction on the right to vote is at issue. *League of Women Voters of Fla. v. Detzner*, 314 F. Supp. 3d 1205, 1223 (N.D. Fla. 2018) (quoting *OFA*, 697 F.3d at 436).

Organizational Plaintiffs' members will suffer irreparable harm if Defendants' enforcement of the First-Time Voter provisions are not enjoined. In the context of an ongoing pandemic, the requirement to vote in person forces first-time voters, who are otherwise absentee eligible, to choose between their vote and their health. This is no choice at all and constitutes irreparable harm.

38

The same is also true for those voters who are able to cast a ballot by mail—including Organizational Plaintiffs' members who will elect to vote by mail in this year's elections—but still will have their absentee ballots rejected under Tennessee's signature verification process. For such voters, the erroneous rejection of their absentee ballots, with no opportunity to cure the perceived deficiency, is akin to having been denied the right to cast a ballot altogether. Such a harm is irreparable.

**B. Plaintiffs Are Suffering and Will Continue to Suffer Irreparable Harm with Respect to Their First Amendment Rights**

The misdemeanor provision denies Organizational Plaintiffs the right to engage in protected First Amendment activity. *See supra* at Argument, Part I.A.2. "[A] violation of First Amendment rights, even for a short time, causes irreparable harm." *Baker v. Adams Cty./Ohio Valley Sch. Bd.*, 310 F.3d 927, 930 (6th Cir. 2002); *see also Elrod v. Burns*, 427 U.S. 347, 373–74 (1976) (citing *N.Y. Times Co. v. United States*, 403 U.S. 713 (1971)). Indeed, "'[e]ven minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief.'" *Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 436 (6th Cir. 2004) (quoting *Newsom v. Norris*, 888 F.2d 371, 378 (6th Cir. 1989)). And, there are no legal remedies available to Plaintiffs that will cure the deprivation of their First Amendment rights. *See, e.g.*, *Brinkman v. Budish*, 692 F. Supp. 2d 855, 866 (S.D. Ohio 2010). Thus, Plaintiffs will suffer irreparable harm absent an injunction of the misdemeanor provision.

Furthermore, "[t]he nature of elections . . . is that time is of the essence." *League of Women Voters v. Hargett*, 400 F. Supp. 3d at 733. Although voters may "have multiple opportunities to go to the polls" each year, "when each chance is gone, it is gone." *Id.* Thus, denying organizational plaintiffs the opportunity to encourage their members and communities to apply for and vote an absentee ballot constitutes an irreparable harm because each opportunity lost is one that is "gone

39

forever." *Browning II*, 863 F. Supp. 2d at 1167 (finding in the registration context that "when a plaintiff loses an opportunity to register a voter, the opportunity is gone forever."); *see also League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014); *League of Women Voters of Mo. v. Ashcroft*, 336 F. Supp. 3d 998, 1005 (W.D. Mo. 2018); *Ind. State Conf. of the NAACP v. Lawson*, 326 F. Supp. 3d 646, 662–63 (S.D. Ind. 2018); *Action NC v. Strach*, 216 F. Supp. 3d 597, 642–43 (M.D.N.C. 2016); *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1350 (N.D. Ga. 2016); *N.C. State Conf. of the NAACP v. N.C. State Bd. Of Election*, 2016 WL 6581284, at *9 (M.D.N.C. Nov. 4, 2016).

Just like registering to vote is a prerequisite to voting generally, so too is applying for an absentee ballot a prerequisite to voting by mail in Tennessee. *See supra* Factual Background, Part II.A.1. And given the ongoing pandemic, faced with the choice between risking their health and voting, applying for an absentee ballot will be a prerequisite to voting at all for many Tennesseans in this year's elections. Thus, "[f]orcing the plaintiffs to wait . . . through litigation would mean taking away chances to participate in democracy that will never come back." *League of Women Voters v. Hargett*, 400 F. Supp. 3d at 733. This factor therefore weighs in Plaintiffs' favor.

## III. A PRELIMINARY INJUNCTION WILL SERVE THE PUBLIC INTEREST

"Generally speaking, 'the public interest is served by preventing the violation of constitutional rights.'" *League of Women Voters v. Hargett*, 400 F. Supp. 3d at 733–34 (quoting *Chabad of S. Ohio*, 363 F.3d at 436). Because each of the challenged provisions violates Plaintiffs' constitutional rights, the public interest is served by their injunction.

Even beyond this general interest in vindicating constitutional rights, courts routinely have held that granting a preliminary injunction serves the public interest when it helps permit "as many qualified voters to vote as possible." *OFA*, 697 F.3d at 437; *see also League of Women Voters of*

*U.S. v. Newby*, 838 F.3d 1, 21 (D.C. Cir. 2016). Enjoining the First-Time Voter Requirement and misdemeanor penalties on absentee ballot request distribution does just that: each would expand the pool of voters who can safely cast a ballot by mail, rather than choose between forgoing their health or their right to vote.

Moreover, by expanding the number of voters who could safely vote by mail, an injunction of these challenged provisions also reduces the risk of spreading COVID-19. As more voters safely vote from home, the possibility of compliance with federal and state public health guidelines to engage in social distancing and avoid congregating in crowds increases. The only ways to limit the spread of COVID-19 are self-isolation, social distancing, frequent handwashing, and disinfecting surfaces. *See* Reingold Decl. ¶ 13. Requiring someone to come into close proximity with someone outside their household at a polling place—whether because they could not complete an absentee ballot request or because they are a first-time voter—will place them at greater risk of infection, especially for those at heightened risk of complications and death from COVID-19. *Id.* at ¶ 21.

Voting by mail therefore reduces the health risk not only to Individual Plaintiffs and Organizational Plaintiffs' members and their communities, but also to every single Tennessean those individuals would come into contact with while voting in person and afterwards. These include poll workers, voters who cannot vote by mail because they lack reliable mail service or require assistive devices to cast a ballot, and their own family members. *See supra* at Argument, Part I.B.2 (citing cases describing the risk of harm by voting in person during the pandemic). Indeed, for this very same reason, Defendant Hargett is encouraging all currently eligible voters to vote by mail. *See* Hargett Interview at 32:30–33:40.

Finally, ensuring that eligible voters' ballots are counted rather than discarded for curable signature-related discrepancies is also within the public interest. "The public, of course, has every interest in ensuring that their peers who are eligible to vote are able to do so in every election." *Jones v. Governor of Fla.*, 950 F.3d 795, 831 (citing *OFA*, 697 F.3d at 437). Indeed, the knowledge that otherwise eligible votes are not counted "would be harmful to the public's perception of [an] elections' legitimacy" and thus "the public interest is served when constitutional rights are protected." *Id.* at 830 (citing *Lee,* 915 F.3d at 1327).

## IV. THE BALANCE OF THE EQUITIES FAVORS GRANTING A PRELIMINARY INJUNCTION

Because Plaintiffs are likely to succeed on the merits of their claims, *see supra* Argument, Part I.B, and because the injunction will serve the public interest, *see supra* Argument, Part III, the balance of the equities favors Plaintiffs. The state has no valid interest in enforcing the unconstitutional restrictions challenged herein. *Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1400 (6th Cir. 1987). And while the usual inquiry on a motion for preliminary injunction "calls for assessing the harm to the opposing party and weighing the public interest," "[t]hese factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Finally, to the extent Defendants argue that an injunction will impose administrative costs and burdens on the State, such administrative burdens and costs do not outweigh fundamental voting rights. *See OFA*, 697 F.3d at 434 (finding that the state's regulatory interests in "smooth election administration" were not so "'important,' much less 'sufficiently weighty' to justify" burdening voters' fundamental right to vote); *see, e.g.*, *United States v. Georgia*, 892 F. Supp. 2d 1367, 1377 (N.D. Ga. 2012) (describing the imposition of administrative, time, and financial burdens on Georgia as "minor when balanced against the right to vote, a right that is essential to

42

an effective democracy"). Indeed, "[a]ny potential hardship imposed" on the State "pales in comparison to that imposed by unconstitutionally depriving [Plaintiffs] of their right to vote." *Fla. Democratic Party*, 2016 WL 6090943, at *8 (holding that administrative inconvenience "cannot justify stripping . . . voters of their fundamental right to vote and to have their votes counted."). And, because "[t]he nature of elections . . . is that time is of the essence." *League of Women Voters v. Hargett*, 400 F. Supp. 3d. at 733, both the state and the public have an interest in resolving these questions expediently, with sufficient time to ensure that any administrative burdens on the state can be mitigated in advance of the upcoming elections.

## <u>CONCLUSION</u>

For the reasons articulated herein, the Court should grant Plaintiffs' Motion for a Preliminary Injunction.

Dated: June 12th, 2020                    Respectfully submitted,


                                          _/s William L. Harbison_____
Danielle Lang*                           William L. Harbison (No. 7012)
Ravi Doshi*                              Lisa K. Helton (No. 23684)
Molly Danahy*                            Christopher C. Sabis (No. 30032)
Jonathan Diaz*                           Christina R.B. López (No. 37282)
Campaign Legal Center                    Sherrard, Roe, Voigt & Harbison, PLC
1101 14th Street NW, Suite 400           150 3rd Avenue South, Suite 1100
Washington, DC 20005                     Nashville, TN 37201
Tel.: (202) 736-2200                     Phone: (615) 742-4200
dlang@campaignlegalcenter.org            Fax: (615) 742-4539
rdoshi@campaignlegalcenter.org           bharbison@srvhlaw.com
mdanahy@campaignlegalcenter.org          lhelton@srvhlaw.com
jdiaz@campaignlegalcenter.org            csabis@srvhlaw.com
                                         clopez@srvhlaw.com


                                         Ezra Rosenberg*
                                         Pooja Chaudhuri*
                                         Lawyers' Committee for Civil Rights Under Law
                                         1500 K Street NW Suite 900
                                         Washington, DC 20005
                                         Tel.: (202) 662-8600
                                         erosenberg@lawyerscommittee.org
                                         pchaudhuri@lawyerscommittee.org

                                         *Admitted Pro Hac Vice

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY, pursuant to Local Rule 5.01, that on this 12th day of June, 2020, the foregoing was served via the Court's CM/ECF filing system and by electronic mail on the following:

Janet Kleinfelter
Alexander Rieger
Office of the Tennessee Attorney General
301 6th Ave. N.
Nashville, Tennessee 37243
janet.kleinfelter@ag.tn.gov
alex.rieger@ag.tn.gov

*Counsel for Defendants*

_\_\_ /s William L. Harbison \_\_\__