**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **MEMPHIS A. PHILLIP RANDOLPH INSTITUTE, THE EQUITY ALLIANCE, FREE HEARTS, THE MEMPHIS AND WEST TENNESSEE AFL-CIO CENTRAL LABOR COUNCIL, THE TENNESSEE STATE CONFERENCE OF THE NAACP, SEKOU FRANKLIN, and KENDRA LEE,** | ) ) ) ) ) ) ) ) | **Case No. 3:20-cv-00374 Judge Richardson Magistrate Judge Frensley** |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | |
| **TRE HARGETT, in his official capacity as Secretary of State of the State of Tennessee, MARK GOINS, in his Official capacity as Coordinator of Elections for the State of Tennessee, and AMY WEIRICH, in her official capacity as the District Attorney General for Shelby County, Tennessee,** | ) ) ) ) ) ) ) ) ) | |
| **Defendants.** | ) ) | |

**DEFENDANTS' RESPONSE IN OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION**

The Attorney General, on behalf of the above-captioned defendants, in their official capacities only, hereby submits this Response in Opposition to Plaintiffs' Motion for Preliminary Injunction (DE 40).

**INTRODUCTION AND BACKGROUND**

The United States Constitution provides that States may prescribe "[t]he Times, Places and Manner of holding Elections for Senators and Representatives," Art. I, § 4, cl. 1, and the Supreme Court, therefore, has recognized that State retain the power to regulate their own elections.

*Sugarman v. Dougall*, 413 U.S. 634, 647 (1973); *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 217 (1986). Thus, States have "broad powers to determine the conditions under which the right of suffrage may be exercised." *Lassiter v. Northampton Cty. Bd. of Elections*, 360 U.S. 45, 50 (1959). Like all states, Tennessee balances its compelling interest in protecting the integrity of the election process with its citizens' right to vote. Indeed, "[a] State indisputably has a compelling interest in preserving the integrity of its election process," *Eu v. San Francisco County Democratic Central Comm.*, 489 U.S. 214, 231 (1989), and confidence in the integrity of a state's electoral processes is vital to the functioning of a participatory democracy. *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006).

But the balancing does not stop there. Tennessee must also consider the public's interest in the validity of elections, certainty of results, the sanctity of the ballot box, and saving of expense. Tennessee has historically struck this balance by providing opportunities for every Tennessean to cast their vote in person. And even though the overwhelming majority—nearly 98%—of Tennesseans choose to exercise their right to vote in this way, the State also permits certain voters—those who are ill, hospitalized, disabled, away from their homes, observing a religious holiday, or beyond a certain age —to cast their votes by mail.

But now, the State must balance yet another factor: COVID-19. To account for this new factor, Tennessee has quickly taken steps to revise its election procedures so that the coming elections may proceed safely and securely. On April 23, 2020, the Secretary of State's Division of Elections released its Tennessee Election COVID-19 Contingency Plan (the "Plan") that implements numerous safeguards for in-person voters and poll workers and also accounts for increased mail-in voting for eligible voters. *See generally* DE 40-2, Ex. 4, ID#214–314.; Exhibit A, Goins Decl., ¶¶ 3–4. This Plan is a result of "research regarding not only elections[,] but the

2

current state of healthcare." *See* DE 40-2, Ex. 4, ID#215.  In crafting this Plan, the Division of Elections worked with county, state, and federal election officials both in Tennessee and across the country. *See id.*

The Plan has been carefully designed to protect the interest of voters in having their votes count while also furthering the State's interests in the integrity and efficiency of the election process. The Plan does this in two main ways. First, it maintains the State's traditional focus on in-person voting and establishes safety guidelines for polling places. Each polling location, for example, has been instructed to: keep doors open to minimize the need to touch handles or knobs; post signs advising voters to wear masks and gloves whenever possible; comply with CDC guidelines by maintaining six feet of separation at all times; spread out voting machines to facilitate social distancing; place plexiglass barriers between poll workers and voters; regularly sanitize voting machines; and screen polling workers for symptoms before election and early voting days. *See* DE 40-2, Ex. 4, ID#244–52.

And second, the Plan accounts for a dramatic increase in absentee voting. The Plan contemplates absentee voting by every registered voter over the age of 60—a group of about 1.4 million, or approximately 36% of the State's registered voters. *See id.* at ID#224; *see also* Tennessee Secretary of State, *Election Statistics, Voter Registration December 2019*, https://sos-tn-gov-files.tnosofiles.com/RptSixMonthSumDec2019.pdf?bwg.F1B6O64zPY8baFShlOjro1wu1 OvP. In the last presidential election, by contrast, fewer than 3% of Tennessee voters cast their votes by mail. *See* DE 40-2, Ex. 4, ID#228. But the State must now account for an even more dramatic increase. Because of a June 4, 2020 Order entered by the Davidson County Chancery Court compelling the State to permit any registered voter to submit an absentee ballot, *see* DE 40-

2, Exh. 1, ID# 173–204, the State is currently facing an unprecedented surge in absentee ballot requests.

But Plaintiffs want more.  On May 1, 2020, Plaintiffs filed a complaint in which they allege that Tennessee's longstanding requirement that votes must generally be cast in person is an unconstitutional limitation on the right to vote, Complaint, DE 1, ID#2, 27–28, ¶¶ 1, 65–70, that the prohibition against providing unsolicited absentee ballots violates their rights to free speech and association, *Id.* at ¶¶ 71–76, that the process used to verify signatures violates procedural due process, *Id.* at ¶¶ 77–81, and that signature-verification process unconstitutionally burdens the right to vote, *Id.* at ¶¶ 82–85.  On June 12, 2020, Plaintiffs amended their complaint which added a challenge to the long-standing requirement that all first-time voters must vote in person.  *Id.* at ¶¶ 92–96.  That same day, six weeks after filing their complaint, Plaintiffs moved for a preliminary injunction, *see generally* Motion for Preliminary Injunction, DE 40, ID#160–62, seeking injunctive relief including enjoining the defendants from enforcing Tenn. Code Ann. §§ 2-6-202(c)(4) & 2-2-115(b)(7), rewriting the signature-verification process, printing all-new ballot application forms with a signature-verification disclaimer, and publicizing any relief ordered on the Secretary of State's webpage.  Proposed Order, DE 40-1, ID#163 – 66.

In short, Plaintiffs seek this Court's intervention at the last minute to upend the current election plans and substitute a plan of their own design.  In doing so, they impermissibly attempt to transform a *policy* issue into a *constitutional* issue.  But "federal courts should not quickly 'become entangled, as overseers and micromanagers in the minutiae of state election processes.'" *Nemes v. Bensinger*, No. 3:20-CV-407-CRS, 2020 WL 3402345, at *8 (W.D. Ky. June 18, 2020) (quoting *Ohio Dem. Party v. Husted*, 834 F.3d 620, 622 (6th Cir. 2016).  This Court, then, should decline Plaintiffs' invitation to do so and deny Plaintiffs' motion for a preliminary injunction.

4

## STANDARD OF REVIEW

When evaluating a request for preliminary injunction, a court must evaluate four factors:

(1) Whether the movant has a "strong" likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of an injunction.

*Am. Civil Liberties Union Fund of Mich. v. Livingston County*, 796 F.3d 636, 642 (6th Cir. 2015) (quoting *Bays v. City of Fairborn*, 668 F.3d 814, 818–19 (6th Cir. 2012)). "These factors are not prerequisites but are factors that are to be balanced against each other." *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) (citing *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth.*, 163 F.3d 341, 347 (6th Cir.1998).

The purpose of a prohibitory preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. *Tennessee Scrap Recyclers*, 556 F.3d 442, 447 (6th Cir. 2009). But here Plaintiffs are requesting mandatory relief which would change the status quo, not preserve it. A "mandatory injunction is a particularly extraordinary remedy that is not regarded with judicial favor," *In re Columbia Motor Exp., Inc*., 33 B.R. 389, 392 (M.D. Tenn. 1983) (citations omitted), and the plaintiff seeking such mandatory relief bears an "especially heavy burden" in convincing the Court that an injunction is appropriate. *Doughtie & Co. v. Rutherford Cty.*, No. 3-13-0209, 2013 WL 3995277, at *1 (M.D. Tenn. Aug. 5, 2013) (citations omitted); *see also In re Microsoft Corp. Antitrust Litig*., 333 F.3d 517, 525 (4th Cir. 2003) (explaining that the standard of review for granting preliminary injunction "even more searching when" relief requested is mandatory in nature) abrogated on other grounds by *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006).

5

Here, all four factors counsel against granting Plaintiffs' requested relief—especially where an injunction would have the drastic effect of judicially rewriting Tennessee's electoral procedure on the eve of two elections.

## ARGUMENT

### I.      Plaintiffs are unlikely to succeed on the merits.

Plaintiffs cannot demonstrate that they are likely to succeed on the merits of their claims: First, because all Plaintiffs' claims are barred by the doctrine of laches; second, because all Plaintiffs lack standing; third, because the Organizational Plaintiffs cannot show that the challenged laws violate their First and Fourteenth Amendment rights; and finally, because no Plaintiff can show that the challenged laws deprive them of procedural due process.

#### A.      Plaintiffs' claims are barred by laches.

The Sixth Circuit has recognized that, in the injunction context, "[t]iming is everything." *Crookston v. Johnson*, 841 F.3d. 396, 398 (6th Cir. 2016). Thus, "a party requesting a preliminary injunction must generally show reasonable diligence." *Benisek*, 138 S.Ct. at 1944. Here, Plaintiffs have failed to show such "reasonable diligence" and this Court should decline to accept Plaintiffs' invitation to rewrite Tennessee's absentee-voting protocols—particularly when absentee voting has been ongoing for almost two months.

The doctrine of laches is rooted in the principle that "equity aids the vigilant, not those who slumber on their rights." *Lucking v. Schram*, 117 F.2d 160, 162 (6th Cir. 1941). And "in election-related matters, extreme diligence and promptness are required. When a party fails to exercise diligence in seeking extraordinary relief in an election-related matter, laches may bar the claim." *McClafferty v. Portage Cty. Bd. of Elections*, 661 F.Supp.2d 826, 839 (N.D. Ohio 2009) (internal citations and quotation marks omitted). Indeed, the federal courts of appeal have long cautioned

that "any claim against a state electoral procedure must be expressed expeditiously," *see Fulani v. Hogsett*, 917 F.2d 1028, 1031 (7th Cir. 1990) (citing *Williams v. Rhodes*, 393 U.S. 23, 34–35 (1968)), and the Supreme Court has "repeatedly emphasized that lower federal courts should ordinarily not alter election rules on the eve of an election." *See, e.g.*, *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S.Ct. 1205, 1207 (2020); *Purcell v. Gonzalez*, 549 U.S. 1, 5–6 (2006) (per curiam) (vacating an injunction where an election was "imminen[t]"); *Reynolds v. Sims*, 377 U.S. 533, 585 (1964) ("[U]nder certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief. . . ."); *see also Husted v. Ohio State Conference of the NAACP*, 573 U.S. 988 (2014) (staying a district court order that required Ohio to restore portion of early voting period and was issued two months prior to the November 2014 election); *North Carolina v. League of Women Voters*, 574 U.S. 927 (2014) (staying preliminary injunction that enjoined portions of a North Carolina statute concerning early voting and counting ballots cast in the wrong precinct and was issued a month before the November 2014 election); *Frank v. Walker*, 574 U.S. 929 (2014) (vacating Seventh Circuit's stay that permitted enforcement of Wisconsin's voter identification statute and was issued two months before the November 2014 election); *Veasey v. Perry*, 135 S.Ct. 9 (2014) (affirming Fifth Circuit's stay of district court injunction that enjoined Texas's voter identification law and was issued weeks prior to early voting beginning).

Moreover, federal intervention when an election is imminent risks "a disruption in the state electoral process [which] is not to be taken lightly" as "[t]his important equitable consideration goes to the heart of our notions of federalism." *Cortes*, 218 F.Supp.3d at 405 (quoting *Page v. Bartels*, 248 F.3d 175, 195–96 (3rd Cir. 2001)). This principle is particularly pertinent where, as

here, Plaintiffs ask the Court to "impose large-scale changes to the election process." *Bryan v. Fawkes*, 61 V.I. 416, 469 (V.I. 2014) (collecting cases); *see also Perry v. Judd*, 840 F.Supp.2d 945, 950 (E.D. Va. 2012) ("The doctrine applies with particular force in the context of preliminary injunctions against governmental action where litigants try to block imminent steps by the government."). Finally, as the Sixth Circuit has explained, as an election grows closer, "the state's interest in proceeding with the election increases in importance as resources are committed and irrevocable decisions are made, and the [plaintiff's] claim to be a serious [plaintiff] who has received a serious injury becomes less credible by his having slept on his rights." *Kay v. Austin*, 621 F.2d 809, 813 (6th Cir. 1980) (barring challenge to state election-law statute filed less than two months prior to election because plaintiff had known of injury for more than two weeks prior to filing suit).

An action may be barred by laches if: (1) the plaintiff delayed unreasonably in asserting its rights and (2) the defendant is prejudiced by this delay. *United States v. City of Loveland*, 621 F.3d 465, 473 (6th Cir. 2010) (citation omitted); *Brown-Graves Co. v. Central States, Southeast and Southwest Areas Pension Fund*, 206 F.3d 680, 684 (6th Cir. 2000). Both criteria are met here, thus laches bars preliminary injunctive relief.

First, Plaintiffs did not seasonably assert their entitlement to injunctive relief. Tennessee's absentee ballot statutes are not new. The signature verification requirements have been part of Tennessee's absentee voting protocols for over half a century; the other two election laws challenged by Plaintiffs have been in effect for fifteen years or more. Why would anyone need preliminary injunctive relief to enjoin laws that have been on the books and actively enforced for decades? Plaintiffs respond by pointing to COVID-19 to justify preliminary injunctive relief.

8

COVID-19 has spawned any number of challenges to state election laws and procedures in state and federal court, most of which have been timely filed and expeditiously pursued. For example, the plaintiffs challenging Texas's absentee voting statutes in state court filed their complaint on March 7, 2020—only three days after the first case of coronavirus was reported in that state and six days before the Texas Governor declared a state of emergency. *See In re State of Texas*, No. 20-0394, 2020 WL 2759629 (Tex. May 27, 2020). And the plaintiffs in *Texas Democratic Party v. Abbott* filed suit in federal court challenging Texas's absentee voting statutes on April 7—the day after the Supreme Court issued its decision in *Republican Nat'l Comm. v. Democratic Nat'l Comm.* staying a preliminary injunction issued on the eve of the Wisconsin primary election. *See Texas Democratic Party v. Abbott*, No. SA-20-CA-438-FB, 2020 WL 2541971, at *2 (W.D. Tex., May 19, 2020).

But if Tennessee's absentee voting laws in the context of COVID-19 are so allegedly problematic, why did Plaintiffs delay six weeks before filing for preliminary injunctive relief? Plaintiffs waited until May 1 to file their complaint and then another six weeks—until June 12— before asking this Court for injunctive relief, despite full knowledge that absentee voting had been underway since May 8, and that the deadline for requesting an absentee ballot—July 30—is fast approaching. Amended Compl., DE 39, ID#127, ¶ 11, Memorandum, DE 43, ID#1666. Plaintiffs offer no legitimate explanation for the delay—nowhere in either Plaintiffs' Amended Complaint or their Motion for Preliminary Injunction do Plaintiffs explain why they were unable to file their claims sooner, or what caused them to delay for so long.

Here, Plaintiffs seek a mandatory change to established and long-standing election procedures yet provide no explanation for waiting until less than eight weeks before the election. Plaintiffs simply have not pursued their claim with any semblance of diligence. *See, e.g.*, *Kay*,

9

621 F.2d at 813; *Gelineau v. Johnson*, 896 F. Supp. 2d 680, 683–86 (W.D. Mich. 2012) *aff'd* (6th Cir. Sept. 19, 2012) (barring challenge to state election-law statute filed less than two months prior to election because plaintiffs had known of injury for more than four months prior to filing suit); *Simkins v. Gressette*, 631 F.2d 287, 295–96 (4th Cir. 1980) (refusing to enjoin election when suit was filed two days before filing deadline and preliminary hearing could not be held until 5 ½ weeks before election); *Arizona Pub. Integrity Alliance Inc. v. Bennett*, 2014 WL 3715130, at *2–3 (D. Ariz. June 23, 2014) (barring challenge to state election-law statute filed more than two months prior to election because (1) the statute was not new and (2) the plaintiffs had been considering its constitutionality for more than six months before filing suit).

Second, Plaintiffs' lack of diligence has prejudiced the Secretary of State and State Election Coordinator. Prejudice can be inferred simply as a result of the Plaintiffs' delay, and the greater the delay, the less the prejudice required to show laches. *Perry*, 840 F. Supp. 2d at 954; *Marshall v. Meadows*, 921 F. Supp. 1490, 1494 (E.D. Va. 1996). By waiting until the last minute, Plaintiffs have unjustifiably forced the parties and the Court to address their claims on an expedited basis and has prejudiced Defendants' ability to fully prepare and defend against Plaintiffs' claims, including the development of facts for the Court to assess in ruling on whether to grant Plaintiffs' request for preliminary injunctive relief and the hiring of their own experts and cross-examination of Plaintiff's experts.

Additionally, Plaintiffs' lack of diligence has clearly prejudiced the Defendants and Tennessee's 95 County Election Commissions, whose planning and preparations for the upcoming election will be thrown into far greater confusion that would have been the case with a timely legal action. Defendants and the County Election Commissions have relied on and acted according to the expectation that the signature-verification requirements of Tenn. Code Ann. § 2-6-202 and the

10

first-time voting requirements of Tenn. Code Ann. § 2-2-115(7) would apply as usual in the upcoming elections.

If, however, Plaintiffs' remedy were granted, the County Election Commissions would be required to canvass their absentee ballot applications to identify any applications that were rejected because they were first-time voters who had registered to vote by mail and then contact those voters so that they could re-submit their applications for an absentee ballot—with a looming deadline of July 30 as the last day to request an absentee ballot. And with respect to the signature verifications, the Defendants would have to develop an entirely new uniform procedure for the County Election Commissions who would then have to implement that procedure, including retraining their election officials and absentee counting boards. The time and expense to implement Plaintiffs' proposed remedy would be considerable and would have to be done while Defendants and County Election Commissions are also processing voter registration applications,[1] responding to requests for absentee ballots, and preparing for early voting which begins July 17. *See generally* Goins Decl., ¶¶ 8, 10.

Plaintiffs had every opportunity to challenge Tenn. Code Ann. § 2-6-202 and § 2-2-115(7) at a time when the challenge would not create the disruption that this last-minute request for injunction relief has. Given that Plaintiffs' legal challenges to these statutes exist regardless of whether there is an ongoing public health emergency, Plaintiffs could have filed suit well before the arrival of COVID-19. But to the extent COVID-19 is the catalyst for Plaintiffs' action, then Plaintiffs could have filed suit in March when the Governor declared a state of emergency, or in April after the litigation in state and federal court involving the Wisconsin primary. At the very

---

[1] The deadline to register to vote for the August 2020 election is July 7, 2020. *See* Tenn. Code Ann. § 2-2-102(a)(1).

least, Plaintiffs could have requested injunctive relief at the same time they filed suit on May 1, before absentee voting had begun. Plaintiffs instead waited until less than eight weeks before the election to request injunctive relief.

As the Sixth Circuit has stated,

> [a]ll of this should impress on … other would-be challengers to election protocols, the need to bring as applied (and for that matter facial) challenges sooner rather than later—first to give election officials an opportunity to make corrections where corrections are due and second to give district and appellate courts ample time to resolve the merits of the dispute long before the election. A manufactured emergency does not warrant emergency relief.

*Crookston v. Johnson*, 841 F.3d at 399. Plaintiffs' unreasonable delay has caused substantial prejudice to the Defendants and the County Elections Commissions. Laches therefore applies and bars injunctive relief.

### B. Plaintiffs lack standing to seek the requested injunctive relief.

"The first and fundamental question presented by every case brought to the federal courts is whether it has jurisdiction to hear a case." *Evans v. Allen*, No. 3:13-CV-480-TAV-CCS, 2014 WL 585392, at *1 (E.D. Tenn. Feb. 14, 2014) (quoting *Douglas v. E.G. Baldwin & Assocs.*, 150 F.3d 604, 607 (6th Cir.1998), *abrogation on other grounds recognized by Heartwood, Inc. v. Agpaoa*, 628 F.3d 261, 266 (6th Cir.2010)). "Standing goes to a court's subject matter jurisdiction." *Kepley v. Lanz*, 715 F.3d 969, 972 (6th Cir. 2013) (internal quotation and brackets omitted).

The requirement of standing is "rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1547 (2016). Plaintiffs have the burden "to allege facts demonstrating that [they are] proper part[ies] to invoke judicial resolution of the dispute." *Warth v. Seldin*, 422 U.S. 490, 518 (1975). Furthermore, standing "must affirmatively appear in the record"; it cannot be "inferred argumentatively from averments in the pleadings."

*FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990). And the inquiry into whether plaintiffs have standing should be "especially rigorous" where, as here, Plaintiffs seek to have the actions of a sovereign state declared unconstitutional. *See Crawford v. U.S. Dept. of Treasury*, 868 F.3d 438, 457 (6th Cir. 2017) (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408–10 (2013)).

The "irreducible constitutional minimum" of standing is that each plaintiff must allege an actual or imminent injury that is traceable to the defendant and redressable by the court for each claim asserted. *Lujan v. Defendants of Wildlife*, 504 U.S. 555, 560–62 (1992). An injury must be an "injury in fact," i.e., "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not "conjectural" or "hypothetical."'" *Id.* at 560 (citations omitted). In *Spokeo*, the Court held that an injury must be both "concrete *and* particularized," and for an injury to be "particularized," it "must affect the plaintiff in a personal and individual way." 136 S.Ct. at 1548 (emphasis in original) (citations omitted). For an injury to be "concrete," it must be "'de facto'; that is, it must actually exist." *Id*.

And the Supreme Court has "repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient." *Clapper*, 568 U.S. at 409 (internal quotation marks and alterations omitted). Finally, that Court has recognized that lawsuits that do not challenge "specifically identifiable Government violations of law," but instead challenge "particular programs agencies establish to carry out their legal obligations are . . . rarely if ever appropriate for federal-court adjudication." *Lujan*, 504 U.S. at 568 (citation omitted).

Even if a plaintiff alleges an actual or imminent injury that is concrete and particularized, the plaintiff must also show that the injury is "fairly traceable to the defendant's allegedly unlawful conduct." *Allen v. Wright*, 468 U.S. 737, 751 (1984). An injury is not fairly traceable to the

defendant's conduct if the plaintiffs have "inflict[ed] the harm on themselves based on their fears of hypothetical future harm." *Clapper*, 568 U.S. at 416. Finally, a plaintiff must also plead facts sufficient to establish that the court is capable of providing relief that would redress the alleged injury. *Lujan*, 504 U.S. at 561.

None of the harms alleged in the amended complaint are sufficient to demonstrate that Plaintiffs have the standing necessary to seek the requested injunctive relief.

### 1. The Individual Plaintiffs Lack Standing.

As discussed *supra*, Plaintiffs have requested a preliminary injunction enjoining the Defendants from enforcing Tenn. Code Ann. §§ 2-6-202(c)(4) and 2-2-115(b)(7) and requiring Defendants to rewrite the signature-verification process, print all-new ballot application forms with a signature-verification disclaimer, and publicize any relief ordered on the Secretary of State's webpage. However, neither of the individual Plaintiffs allege that they are first time voters who registered by mail or that, if they vote an absentee ballot, such ballot will be rejected because the signature does not match. Nor do either of the individual Plaintiffs allege that they intend to provide unsolicited requests for absentee ballots to other voters. Rather, the individual Plaintiffs' allegations center solely upon their desire to vote an absentee ballot in light of COVID-19. Accordingly, neither of the individual Plaintiffs have alleged any harm sufficient to establish standing to challenge the provisions of Tenn. Code Ann. § 2-2-115(7) and § 2-6-202 or to seek the requested injunctive relief. *Cf. McDonald v. Bd. of Election Comm'rs of Chicago*, 394 U.S. 802, 808 (1969) (upholding an Illinois law which limited absentee ballots to specific enumerated groups against a constitutional challenge because "there [was] nothing in the record to indicate that the [law] [had] an impact on appellants' ability to exercise the fundamental right to vote"); *Texas*

14

*Democratic Party v. Abbott*, 961 F.3d 389, 403 (5th Cir. 2020) (citing *McDonald* and concluding that the denial of mail-in ballots to a certain group of voters "did not restrict their right to vote").

> **2.** **The Organizational Plaintiffs Lack Standing to Challenge the First-Time Voter Requirements.**

In order to pursue their challenge to the first-time voter requirements of Tenn. Code Ann. § 2-2-115(7), Plaintiffs Memphis A. Phillip Randolph Institute, Free Hearts, The Memphis and West Tennessee AFL-CIO Central Labor Council ("MCLC"), The Equity Alliance and the Tennessee State Conference of the NAACP (the "Organizational Plaintiffs"), each as an organization, must allege facts sufficient to establish that it has either organizational standing or associational standing.

Organizational standing is the right of an organization to sue on its own behalf rather than through its members. "An organization has standing [to sue] on its own behalf if it meets the same standing test that applies to individuals." *Spann v. Colonial Village, Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990). Thus, in order to have standing, an organizational plaintiff must show (1) injury in fact, (2) a causal connection between the injury and conduct complained of, and (3) the likelihood that the injury will be redressed by a favorable decision. *See Lujan*, 504 U.S. at 560–61.

An organization may satisfy the Article III requirement of injury in fact if it can demonstrate: "(1) frustration of its organizational mission; and (2) diversion of its resources to combat the [effects of the particular law] in question." *Smith v. Pac. Properties & Dev. Corp.*, 358 F.3d 1097, 1105 (9th Cir. 2004). Here, none of the Organizational Plaintiffs allege that they have had to divert resources in educating voters how to comply with *newly enacted* election laws. Rather, the Organizational Plaintiffs allege that "*in light of the ongoing COVID-19 pandemic*, [they] will dedicate additional resources" in assisting voters with how to comply with *existing*

15

*laws.* Amended Complaint DE 39, ID#132–35; *see also* DE 40-5, ID#1561, DE 40-6, ID#1570, DE 40-7, ID#1577–78, DE 40-8, ID#1586–88 and DE 40-9, ID#1596–97.

That the Organizational Plaintiffs are diverting their resources to educating voters on *existing laws* about absentee voting because of COVID-19 is not fairly traceable to the Defendants and is therefore insufficient to establish an injury in fact. *Compare Fair Elections Ohio v. Husted*, 770 F.3d 456, 459–60 (6th Cir. 2014) (finding that allegations of diversion of resources to educate voters on existing absentee ballot procedures not sufficient to confer standing on organization) *with Northeast Ohio Coalition for the Homeless v. Husted*, 837 F.3d 612, 624 (6th Cir. 2016) (finding that organization's allegations of diverting limited resources to "overhaul" get-out-the-vote strategy in response to newly enacted laws constituted imminent, concrete and particularized injury).

And, because the Organizational Plaintiffs themselves do not have the right to vote, they have no standing to assert the loss of a right to vote. *See Johnson v. Bredesen*, No. 3:07-0372, 2007 WL 1387330, at * 1 (M.D. Tenn. May 8, 2007) (finding that since non-profit organization may not exercise a right to vote in any election, organization has no standing to assert the loss of a right to vote if injunction is not granted). Accordingly, as the Organizational Plaintiffs have not alleged a sufficient injury in fact, they cannot demonstrate that they have organizational standing to challenge the first-time voting requirement of Tenn. Code Ann. § 2-2-115(7).

The Organizational Plaintiffs also cannot demonstrate that they have associational standing to challenge this statute. In order to have associational standing, an organizational plaintiff must show that:

> (a)    its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

16

*Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977); *see also Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 294 (6th Cir. 1997).

Thus, in order to have associational standing, the Organizational Plaintiffs must establish that "at least one of [its] members would have standing to sue on his own." *Waskul v. Washtenaw County Community Mental Health*, 900 F.3d 250, 253 (6th Cir. 2018). And the Sixth Circuit has held that this requires a specific allegation of the name of the member harmed unless all members of the organization have been harmed by the defendant's conduct. *Tennessee Republican Party v. Sec. and Exch. Comm'n*, 863 F.3d 507, 520 (6th Cir. 2017) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 498–99 (2009) (noting that the "requirement of naming the affected members has never been dispensed with in light of statistical probabilities, but only where *all* the members of the organization are affected by the challenged activity") (emphasis in original)).

None of the Organizational Plaintiffs have specifically alleged the identity of a member of their organization that has or will be harmed by operation of Tenn. Code Ann. § 2-2-115(7), i.e., a first-time voter who registered by mail. Rather, the Organizational Plaintiffs allege: "In support of its advocacy and engagement efforts, APRI sponsors voter education and Get-Out-The-Vote programs in the community, which include outreach to first-time registrants to vote who submit their registration forms by mail" (Amended Complaint, DE 39, ID#132–35, ¶ 24); "Some voters that Free Heart registers are first-time voters who submit by mail their voter registration forms" (*Id*. at ¶ 25); "In support of its advocacy agenda, MCLC routinely engages in voter outreach efforts, . . . including of first-time voters who are registering by mail" (*Id*. at ¶ 26); "The Equity Alliance also engages first-time registrants to vote, including some who submit their registration to vote by mail" (*Id*. at ¶ 28); and "Some of Tennessee NAACP's engaged voters are first-time registrants, including high school and college students, who submit their registration forms by mail." (*Id*. at

¶ 30.)[2]  These allegations fall short of establishing that any of the Organizational Plaintiffs'
members have suffered or will imminently suffer a concrete, actual injury traceable to the
enforcement of the first-time voter requirements of Tenn. Code Ann. § 2-2-115(7).  *See Northeast*
*Ohio Coalition for Homeless and Service Employees Intern. Union, Local 1199 v. Blackwell*, 467
F.3d 999, 1010 (6th Cir. 2006); *Green Party of Tennessee v. Hargett*, 194 F.Supp.3d 691, 696–99
(M.D. Tenn. 2016).

As the Organizational Plaintiffs do not have either organizational or associational standing,
they cannot demonstrate a likelihood of success on the merits of their challenge to the first-time
voter requirements of Tenn. Code Ann. § 2-2-115(7).

### 3.    The Organizational Plaintiffs Lack Standing to Challenge the Ballot Solicitation Provisions.

The Organizational Plaintiffs also challenge the constitutionality of Tenn. Code Ann. § 2-
6-202(c)(4) which provides that a "person who is not an employee of an election commission
commits a Class A misdemeanor if such person gives an unsolicited request for application for
absentee ballot to any person."  The Organizational Plaintiffs allege that this "restriction on the
unsolicited distribution of absentee ballot requests . . . unconstitutionally burdens the
Organizational Plaintiffs' right to engage in core political speech and activity, in violation of the
First and Fourteenth Amendment."   Amended Complaint, DE 39, ID#128, ¶ 13.   The
Organizational Plaintiffs seek an order enjoining Defendant Weirich from enforcing this statute

---

[2] Additionally, several of Organizational Plaintiffs assert that the first-time voter requirement
"limits the effectiveness of [their] voter registration activity."  *See* DE 40-6, ID#1573, DE 40-7,
ID#1581, DE 40-8, ID#1591–92.  However, "[t]he First Amendment right to associate and to
advocate 'provides no guarantee that a speech will persuade or that advocacy will be effective.'"
*Shelby County Deputy Sheriff's Association v. Shelby County Sheriff's Office*, No. 07-2420-JPM,
2007 WL 9706716, at *3 (W.D. Tenn. Nov. 14, 2007) (quoting *Smith v. Ark. State Highway*
*Employees*, 441 U.S. 463, 465 (1979)).

18

and enjoining Defendants Hargett and Goins from "referring for prosecution or investigation, or participating in any prosecution or investigation, of any alleged violations of Tenn. Code Ann. § 2-6-202(c)(4)." Proposed Order, DE 40-1, ID#163, ¶¶ 2, 3.

The Sixth Circuit has recognized that a Plaintiff may seek injunctive relief through a "pre-enforcement challenge[, which] may be made before the actual completion of any injury." *Grendell v. Ohio Supreme Court*, 252 F.3d 828, 832 (6th Cir. 2001). "To establish standing for a free-speech claim, the Plaintiffs generally must show that 'the rule, policy of law in question has explicitly prohibited or proscribed conduct on the[ir] part.'" *Phillips v. DeWine*, 841 F.3d 405, 415 (6th Cir. 2016) (quoting *Parsons v. U.S. Dep't of Justice*, 801 F.3d 701, 711 (6th Cir. 2015)). Plaintiffs must also satisfy the "injury-in-fact' requirement of standing and may do so by alleging " 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)).

The Organizational Plaintiffs do not allege either in the Amended Complaint or in their Declarations any threat of imminent enforcement of Tenn. Code Ann. § 2-6-204(c)(4)—only that the statute chills their absentee voter engagement efforts. Amended Complaint, DE 39, ID#146, ¶ 58. The Sixth Circuit has held that in the absence of "some other indication of imminent enforcement," "mere allegations of a 'subjective chill' on protected speech are insufficient to establish an injury-in-fact for pre-enforcement standing purposes." *McKay v. Federspiel*, 823 F.3d 862, 868–69 (6th Cir. 2016) (quoting *Berry v. Schmitt*, 688 F.3d 290, 296 (6th Cir. 2012) (internal quotation marks and alterations omitted). Thus, in order to find a credible threat of prosecution

19

when there are only allegations of subjective chill, the Sixth Circuit has required the plaintiffs to "point to some combination of the following factors":

> (1) a history of past enforcement against the plaintiffs or others; (2) enforcement warning letters sent to the plaintiffs regarding their specific conduct; and/or (3) an attribute of the challenged statute that makes enforcement easier or more likely, such as a provision allowing any member of the public to initiate an enforcement action.

*Plunderbund Media, L.L.C. v. DeWine*, 753 Fed. App'x. 362, 366–67 (6th Cir. 2018) (quoting *McKay v. Federspiel*, 823 F.3d at 869 (internal citations omitted)).

As to the first and second factors, none of the Organizational Plaintiffs allege that Tenn. Code Ann. § 2-6-202(c)(4) has ever been enforced or threatened against them. Nor do the Organizational Plaintiffs point to any case where an entity or individual was prosecuted or threatened with prosecution for violation of this statute—even though it has been in effect for over 15 years. As such, Plaintiffs have not sufficiently alleged "substantial risk that the harm will occur," *SBA List*, 573 U.S. at 158 (internal quotation marks omitted) and, therefore have not established the first and second factor. The Organizational Plaintiffs also cannot establish the third factor as Tenn. Code Ann. § 2-6-202(c)(4) may only be enforced by a District Attorney General—there is no ability for a private complainant to initiate either an enforcement or administrative action under the statute. *Cf. SBA List*, 573 U.S. at 164–66 (recognizing that the "credibility" of a future-enforcement threat was "bolstered by the fact that authority to file a complaint" was not "limited to a prosecutor or an agency" and instead rested with "'any person' with knowledge of the purported violation").

Because the Organizational Plaintiffs have not established any of the factors to substantiate their allegations of subjective chill, the Organizational Plaintiffs have not established a credible

threat of prosecution[3] and, therefore, have failed to satisfy the "injury-in-fact' requirement for pre-enforcement standing purposes. *Schickel v. Dilger*, 925 F.3d 858, 865–66 (6th Cir. 2019); *Plunderbund Media L.L.C. v. DeWine*, 753 Fed. App'x. at 372. Accordingly, Plaintiffs cannot demonstrate a likelihood of success on the merits of their challenge to Tenn. Code Ann. § 2-6-202(c)(4).

### 4. The Organizational Plaintiffs Lack Standing to Challenge the Signature Verification Provisions.

The Organizational Plaintiffs also challenge Tennessee's signature verification provisions by asserting that they "anticipate[] that given the procedural deficiencies in Tennessee's system for receiving and rejecting absentee ballots, at least some of [their] members who are already eligible to vote by mail will have their votes not counted." Amended Complaint, DE 39, ID# 132, 134, 136, ¶¶ 24, 27, and 31. This allegation is insufficient to provide standing to APRI, MCLC, and NAACP to assert this procedural due process claim.

Again, organizations cannot vote. *Fair Elections Ohio v. Husted*, 770 F.3d at 461. So, in order for Organizational Plaintiffs to establish "organizational standing," they must demonstrate that they have suffered an injury in fact, that the injury is fairly traceable to the conduct of the defendant and that the injury can be remedied by a favorable decision. *Id*. at 459. Moreover, plaintiffs seeking injunctive or declaratory relief face an even higher burden. *Shelby County Advocates for Valid Elections v. Hargett*, 2:18-cv-02706-TLP-dkv, 2019 WL 4394754, at *5 (W.D. Tenn. Sept. 13, 2019) (citing *Vaduva v. City of Xenia*, 2019 WL 3714790, at *6 (6th Cir.

---

[3] The Organizational Plaintiffs' inability to establish a credible threat of prosecution is highlighted by the fact that they only seek to enjoin one District Attorney General—Defendant Weirich—from enforcing Tenn. Code Ann. § 2-6-202(c)(4), even though several of the Organizational Plaintiffs allege that they are active statewide, the statute is of statewide application and there are 31 District Attorneys General with the authority and prosecutorial discretion to enforce Tenn. Code Ann. § 2-6-202(c)(4).

Aug. 7, 2019). Indeed, "plaintiffs seeking injunctive or declaratory relief must show '*actual present* harm or a *significant* possibility of future harm.'" *Vaduva*, 2019 WL 3714790, at *6 (quoting *Grendell*, 252 F.3d at 833) (emphasis added); *see also Shelby County Advocates*, 2019 WL 4394754 at *5.

Plaintiffs fail to present any evidence that "actual present harm" has occurred, or a "*significant* possibility" that harm will occur in the future. Specifically, they have failed to establish that the signature verification process has arbitrarily disenfranchised *any* voter, let alone one of their own members. Indeed, the facts demonstrate the contrary. *Infra* at 47-50.

Further, Organizational Plaintiffs cannot establish "associational standing," because each of the three organizations fails to make "*specific* allegations establishing that at least one *identified* member had suffered or would suffer harm." *See Waskul*, 900 F.3d at 254–55 (emphasis added). For example, APRI's representative, Plaintiff Lee (who, again, is not personally eligible to vote by absentee ballot), generally states that "[t]he majority of APRI's members are over 60 most of them usually vote in person." Lee Decl., DE 40-7, ID#1577, ¶ 7. However, she has not "identified"—by name—any such members. *Id.* Further, while APRI (through Ms. Lee) expresses *its* "concern[] that the signature matching process will be used as a mechanism to disenfranchise voters," *id*. at ¶ 29, it has not "specifically" identified any particular member who shares that concern or who has been adversely impacted by the signature-verification process. The declarations from representatives of MCLC and the NAACP are similar in nature, and equally as deficient. *See* Sweet-Love Decl., DE 40-5, ID#1563–64, ¶¶ 56–67; Lichtenstein Decl., DE 40-6, ID#1568, 1572, ¶¶ 6, 25–29. For these reasons, Organizational Plaintiffs have no standing to raise this procedural due process challenge to the signature verification provisions. *See Waskul*, 900

F.3d at 253 (affirming the denial of injunctive relief sought on behalf of "166 *unnamed* members" of Washtenaw Association for Community Advocacy).

### C. Plaintiffs Cannot Demonstrate a Likelihood of Success on the Merits of Their Challenge to the First-Time Voter Requirements.

Tenn. Code Ann. § 2-2-115(7) provides that "[e]ach person who registers by mail shall appear in person to vote in the first election the person votes in after such registration becomes effective. Before voting at the appropriate polling place or election commission office, such person shall present satisfactory proof of identity." Plaintiffs assert that this "first-time voter" restriction imposes "an unnecessary and undue burden on the right to vote for eligible absentee voters." But as discussed *supra*, neither of the individual Plaintiffs are first-time voters and, therefore are not subject to this restriction. And, the Organizational Plaintiffs are just that—organizations—and cannot vote. Thus, this statute does not even apply to any of the Plaintiffs.

Even so, the provisions of Tenn. Code Ann. § 2-2-115(7) do nothing more than implement Congress's intent as reflected in both the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20505(c) and Section 303(b) of the Help America Vote Act of 2002, Pub.L. 107-252 (codified at 52 U.S.C. § 21083). The NVRA was enacted by Congress in 1993 "to establish procedures that will increase the number of eligible citizens who register to vote in elections for federal office." 52 U.S.C. § 20501. Section 20505(c) of the NVRA provides that "a State may by law require a person to vote in person if—(A) the person was registered to vote in a jurisdiction by mail; and (B) the person has not previously voted in that jurisdiction."

The Help American Vote Act ("HAVA") is bipartisan legislation enacted by Congress in response to the controversy surrounding the 2000 U.S. Presidential election. 52 U.S.C. §§ 20901–21145. The Act provides for federal funding for the replacement of outmoded voting equipment, established the Election Assistance Commission, which disburses those funds and assists in

ensuring compliance with the law, and established new minimum administration standards for federal elections. *Id.* The legislative history reflects that "[a] principal concern of Congress addressed in this bill is the abuse of mail registration cards, created by Congress as part of the National Voter Registration Act" and that "[t]o address this [concern], we created an identification requirement for first-time voters who register by mail." 148 Cong. Rec. S10488-02, S10489-89, 2002 WL 31317844. Accordingly, in addition to the provisions of Section 20505(c) of the NVRA, Section 21803(b) of HAVA requires the State, "in a uniform and nondiscriminatory manner" to require an individual who registered to vote by mail and who has not previously voted in an election for federal office in that state to meet the following requirements:

> (i)  in the case of an individual who votes in person—
> (I)  presents to the appropriate State or local election official a current and valid photo identification; or
> (II) presents to the appropriate State or local election official a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of the voter; or
>
> (ii) in the case of an individual who votes by mail, submits with the ballot—
> (I)  a copy of a current and valid photo identification; or
> (II) a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of the voter.

52 U.S.C. § 21083(b)(2).

This provision of HAVA is intended to "work alongside the National Voter Registration Act," and more importantly, it reflects "the intent of Congress that voters who register by mail show identification." 148 Cong. Rec.at S10490. The first-time voter requirements of Tenn. Code Ann. § 2-2-115(7) were enacted in order to comply with Section 20505(c) of the NVRA and Section 21083(b) of the NVRA in a "uniform and nondiscriminatory" manner.

**D.** **The Organizational Plaintiffs Cannot Demonstrate a Likelihood of Success on the Merits of Their Challenge to the Ballot Solicitation Provisions.**

Even if the Organizational Plaintiffs can demonstrate that they have the requisite standing to assert their pre-enforcement challenge to Tenn. Code Ann. § 2-6-202(c)(4), they still cannot demonstrate a likelihood of success on the merits of such challenge.

As previously discussed, Tennessee Code Ann. § 2-6-202(c)(4) provides that a "person who is not an employee of an election commission commits a Class A misdemeanor if such person gives an unsolicited request for application for absentee ballot to any person."

The Organizational Plaintiffs maintain that Tenn. Code Ann. § 2-6-202(c)(4) will severely hamper their ability to assist their members and engaged voters with obtaining the absentee ballot requests that they need to exercise their right to vote by mail in the upcoming August and November elections. Amended Complaint, DE 39, ID#127–28, ¶¶ 11–13. Specifically, the Organizational Plaintiffs claim that the traditional tactics that they use to engage voters, like in-person voter turnout activities, may not be available to them due to the ongoing COVID-19 pandemic. *Id*. at 145–46, ¶ 55. Thus, they plan to focus additional resources on organizing their members and communities by mail:

> This will necessarily include providing assistance in requesting and obtaining an absentee ballot, reminding eligible absentee voters about application and ballot submission deadlines and requirements, and following up with voters to ensure their ballots were both cast and counted. As a key part of this absentee voter engagement, Organizational Plaintiffs wish to provide potential absentee voters with blank absentee ballot requests that the prospective voter may complete and return to their county election official.

*Id*. The Organizational Plaintiffs claim that they will not be able to effectively execute their absentee vote engagement strategy because they cannot send their members and other engaged voters mass mailing literature about the benefits of absentee voting "that includes an unsolicited

blank absentee ballot request" that the voter can complete and return to county election officials. *Id*. at 146, ¶ 56.

Notably, the Organizational Plaintiffs' own allegations tacitly admit that Tenn. Code Ann. § 2-6-202(c)(4), by its terms, does not prevent them from sending literature about absentee voting to its target audience nor does it prevent them from offering their services to those desiring help with the absentee voter application process—the very things in the block quote above that the Organizational Plaintiffs say that they wish to do.[4] Tennessee Code Ann. § 2-6-202(c)(4) *only* restricts them from distributing "*unsolicited* request[s] for application for absentee ballot[s]."

Nevertheless, the Organizational Plaintiffs allege that the restriction on the unsolicited distribution of absentee ballot requests unconstitutionally burdens their right to engage in core political speech and activity in violation of the First and Fourteenth Amendments. *See id*. at 128, ¶ 13; 144–45, ¶ 52; 146, ¶ 58; 151–53, ¶¶ 77–82.

Plaintiffs' memorandum of law in support of their motion for temporary injunction essentially reiterates the Amended Complaint's allegations, *see* DE 43, ID#1671–79, and claims that Tenn. Code Ann. § 2-6-202(c)(4) is unconstitutional because it cannot withstand the "exacting scrutiny" test set forth in *Meyer v. Grant*, 486 U.S. 414 (1988). *Id*. at 1672. Plaintiffs claim that a law subject to exacting scrutiny "may be upheld *only if* it is shown to be narrowly tailored to serve a compelling interest." *Id*. (emphasis added).

As explained below, Plaintiffs' description of the "exacting scrutiny" test is incomplete. The Sixth Circuit Court of Appeals in *Citizens for Tax Reform v. Deters*—a case cited several

---

[4] In fact, Tenn. Code Ann. § 2-6-203 specifically provides that "[t]he voter may have anyone the voter chooses write the voter's request for an absentee ballot or for an absentee voting by mail application or write out the voter's absentee voting by mail application except for the voter's signature or mark."

times by Plaintiffs, *see id.* at 1672, 1675, 1678—explains that courts should employ a "sliding-scale" analysis under *Meyer*. 518 F.3d 375, 383 (6th Cir. 2008). The level of scrutiny under the "exacting scrutiny" standard depends on the severity of the burden. Only when a state law "severely burdens" speech is it subject to the scrutiny propounded by Plaintiffs. Because Tenn. Code Ann. § 2-6-202(c)(4) imposes a minimal burden on Plaintiffs' First Amendment rights, it should be subject to a lesser standard of scrutiny. Nevertheless, Tenn. Code Ann. § 2-6-202(c)(4) satisfies even the most stringent "exacting scrutiny" test that Plaintiffs urge. Legislative history concretely establishes that Tenn. Code Ann. § 2-6-202(c)(4) advances very important, compelling State interests and does so in a narrowly tailored manner to serve the State's interests.

      **1.**    **Tennessee's Absentee Voting Provisions Are Procedural Safeguards That the General Assembly Has Enacted to Secure the Purity of Elections.**

Article IV, § 4 of the United States Constitution assures the States a republican form of government. Consequently, the Tennessee Supreme Court observed over a century ago that "[n]o government can be republican that fails to secure the purity of elections." *Cook v. State*, 16 S.W. 471, 473 (1891). And the United States Supreme Court has similarly recognized that a State "indisputably has a compelling interest in preserving the integrity of its election process." *Burson v. Freeman*, 504 U.S. 191, 199 (1992) (quoting *Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989)).

The Tennessee Supreme Court has also expressly recognized that the integrity of the ballot is jeopardized upon violation of any of the "procedural safeguards" that the General Assembly has included in the election laws, which are obviously designed to (1) prevent undue influence or intimidation of the free and fair expression of the will of the electors or (2) to insure that only those who meet the statutory requirements for eligibility to vote cast ballots. *Foust v. May*, 660 S.W.2d

27

487, 489 (Tenn. 1983) (citing *Emery v. Robertson Cty. Election Comm'n*, 586 S.W.2d 103, 109 (Tenn. 1979)).

The procedural safeguards that the General Assembly has put in place for absentee voting have particular significance because voting by mail constitutes a special privilege that is granted in derogation of the common law. *See Emery*, 586 S.W.2d at 108; *cf. Mays v. LaRose*, 951 F.3d 775, 792 (6th Cir. 2020) (recognizing that "there is no constitutional right to an absentee ballot"). Further, legislative conditions imposed upon those voting by mail are necessary because "the purity of the ballot is more difficult to preserve when voting absent than when voting in person." *Emery*, 586 S.W.2d at 108; *see Foust*, 660 S.W.2d at 490. Violations of statutory safeguards in the absentee voting statutes "present[] the opportunity for fraud, whether committed or intended." *See Foust*, 660 S.W.2d at 490. *See also* Commission on Fed. Election Reform, *Building Confidence in U.S. Elections*, 46 (2005), http://www.1.american.edu/ia/cfer/report_full.pdf ("Absentee ballots remain the largest source of potential voter fraud.").

A review of Tennessee's absentee voting provisions reveals the many procedural safeguards that the General Assembly has enacted toward the goal of securing the freedom and the purity of the ballot. These provisions address the forms that are to be approved by the State's election coordinator, the procedure for a voter to apply to vote absentee, the process by which a county election commission is to determine if the voter may vote absentee, how the ballot is to be mailed to an absentee voter, the manner in which the absentee voter is to complete and return the ballot, the requirements for absentee ballot boxes, and the process by which a county election commission is to determine whether an absentee voter's ballot may be properly cast. *See* Tenn. Code Ann. §§ 2-6-201 to -207; 2-6-301 to -312.

Especially pertinent here, the General Assembly has determined that the State's election coordinator "shall adopt uniform forms for each county election commission for an application for . . . absentee voting." Tenn. Code Ann. § 2-6-308; *see* Tenn. Code Ann. § 2-6-202(c)(1) ("The coordinator of elections shall either supply to a county election commission the forms for applications for ballots or approve the usage of a county's forms."). A voter desiring to vote absentee may complete the sanctioned application form at the voter's county election commission office, Tenn. Code Ann. § 2-6-202(a)(2), or request an application:

> A voter may also request from the county election commission office an application to vote absentee. A voter may make the request or submit an application to vote by mail, facsimile transmission or e-mail with an attached document that includes a scanned signature. . . . The request shall be in writing over the voter's signature. The request serves as an application for a ballot if the request contains the following information:
> (A)  The name of the registered voter;
> (B)  The address of the voter's residence;
> (C)  The voter's date of birth;
> (D)  The voter's social security number;
> (E)  The address to mail the ballot outside the county, if applicable;
> (F)  The election the voter wishes to participate in; and
> (G)  The reason the voter wishes to vote absentee.

Tenn. Code Ann. § 2-6-202(a)(3).

Notably, the General Assembly has taken care to assure that a voter desiring to vote absentee receives just one application. A county commission may furnish only one application for absentee voting to a voter unless the voter notifies the commission that the voter has spoiled the application. Tenn. Code Ann. § 2-6-202(c)(2). In that case, the commission may furnish the voter with another application, but the commission must note on the records that a subsequent application was sent. *Id*.

Further recognizing the gravity of the absentee voter application process, the General Assembly has provided that "[a] person who is not an employee of an election commission

29

commits a Class E felony if such person gives an application for an absentee ballot to any person," Tenn. Code Ann. § 2-6-202(c)(3), and "[a] person who is not an employee of an election commission commits a Class A misdemeanor if such person gives an unsolicited request for application for absentee ballot to any person." Tenn. Code Ann. § 2-6-202(c)(4).[5]

In sum, the application process is designed so that only two entities are involved so that the "freedom and purity of the ballot" to be secured: the voter who desires to vote absentee and the county election commission that is authorized to provide the sanctioned application form to the voter. While the voter is permitted to ask others for help with the application process,[6] the decision to ask for that help must be the voter's decision, not another's.

Finally, the General Assembly's regard for the freedom and the purity of the ballot is observed again at the end of the process when the voter completes and returns the absentee ballot. Appreciating that secrecy of the ballot is a vital component of preserving the integrity of elections, *See Burson*, 504 U.S. at 201 ("the failure of the law to secure secrecy opens the door to bribery and intimidation"); *see also Mooney v. Phillips*, 118 S.W.2d. 224, 226 (1938) (in upholding the constitutionality of voting machines, the Tennessee Supreme Court stated that "the word 'ballot' is not used in a literal sense but merely by way of designating a method of conducting elections that will guarantee the secrecy and integrity of the ballot"), the General Assembly requires absentee voters to sign an affidavit that accompanies the absentee ballot, swearing that the ballot has been "marked by me in secret . . . ." Tenn. Code Ann. § 2-6-309(b).

---

[5] The specific reasons for the addition of this provision to the Election Code are addressed in the next section of this memorandum.

[6] *See* note 4, *supra*.

2.      **The General Assembly Enacted Tenn. Code Ann. § 2-6-202(c)(4) to Further the Compelling State Interests of Preventing Voter Confusion and Protecting the Integrity of the Electoral Process.**

Prior to the passage of Tenn. Code Ann. § 2-6-202(c)(4) in 2002,[7] Tenn. Code Ann. § 2-6-202(c)(3) provided (as it currently does) that "[a] person who is not an employee of an election commission commits a Class E felony if such person *gives an application* for an absentee ballot to any person." *See* Tenn. Code Ann. § 2-6-202(c)(3) (Supp. 1994) (emphasis added).

Tennessee Code Ann. § 2-6-202(c)(4), which provides that "a person who is not an employee of an election commission commits a Class A misdemeanor if such person *gives an unsolicited request for application* for absentee ballot to any person," was passed in response to the request of the State's election coordinator.[8] County election commissions had notified the State's election coordinator that various groups were creating and printing forms that were labeled "requests" for application for absentee ballots.[9] The forms were problematic for several reasons:

1)  The forms were not approved by the State's election coordinator, as required by the Election Code. As the State's election coordinator testified: "There is no such form as a request for an application."[10] "It looks like an official form, even though it's not coming from an election commission office."[11]

_____

[7] *See* 2002 Tenn. Pub Acts, ch. 698.

[8] *See* Senate State and Local Gov't Comm. (SB 2801), Tape # 1, Feb. 26, 2002 [ Exhibit B, McCormack Decl., Ex. A at 1]; House State and Local Gov't Comm. (HB 3193), Tape # 1, Feb. 26, 2002 [McCormack Decl., Ex. B at 1, 2, 3].

[9] *Ibid*.

[10] *See* Statement of Brook Thompson, then-State election coordinator, House State and Local Gov't Comm. (HB 3193), Tape # 1, Feb. 26, 2002 [McCormack Decl., Ex. B at 3].

[11] *See* Statement of Brook Thompson, then-State election coordinator, Senate State and Local Gov't Comm. (SB 2801), Tape # 1, Feb. 26, 2002 [McCormack Decl., Ex. A at 4]. *See also* Statement of Brook Thompson, then-State election coordinator, House State and Local Gov't Comm. [McCormack Decl., Ex. B at 3].

31

2) And more disturbingly, the Election Code provided then, as it does now, that a voter's "request serves as an application for a ballot" if the request is in writing, over the voter's signature, and contains the following: name of the registered voter, the address of the voter's residence, the voter's social security number, the address to mail the ballot outside the county, the election the voter wishes to participate in, and the reason the voter wishes to vote absentee. *See* Tenn. Code Ann. § 2-6-202(a)(3) (Supp. 1994).[12] Thus, the creators of the request form were "savvy enough to put all the information on there," which made the form tantamount to an application for absentee ballot.[13]

3) Recipients of the forms, often older voters, were frequently confused and thought that they had to complete the forms in order to vote. They thought it was an official form. And many of those who completed the forms and submitted them to the county election commission offices were still showing up at the polls on election day only to learn that they could not vote in-person because they had completed an application for an absentee ballot.[14] Further compounding the problem, they were also not able to vote absentee because the time to mail in their ballots had passed by the day of the election.[15]

Accordingly, the State's election coordinator asked for the passage of Tenn. Code Ann. §

2-6-202(c)(4) in order to put an end to this practice of others distributing unsolicited request forms

---

[12] *See* Statement of Brook Thompson, then-State election coordinator, Senate State and Local Gov't Comm. (SB 2801), Tape # 1, Feb. 26, 2002 (confirming that request for absentee ballot will be treated an application for an absentee ballot if it has all of the requisite information) [McCormack Decl., Ex. A at 1]; Statement of Brook Thompson, then-State election coordinator, House State and Local Gov't Comm. (HB 3193), Tape # 1, Feb. 26, 2002 (same) [McCormack Decl., Ex. B at 1, 3, 8].

[13] *See* Statement of Brook Thompson, then-State election coordinator, House State and Local Gov't Comm. (HB 3193), Tape # 1, Feb. 26, 2002 [McCormack Decl., Ex. B at 8-9].

[14] *See* Statements of Brook Thompson, then-State election coordinator, and Senator Rochelle, Senate State and Local Gov't Comm. (SB 2801), Tape # 1, Feb. 26, 2002 [McCormack Decl., Ex. A at 1, 3]; Statements of Brook Thompson, then-State election coordinator, and Representative Hargrove, House State and Local Gov't Comm. (HB 3193), Tape # 1, Feb. 26, 2002 [McCormack Decl., Ex. B at 1, 2, 3, 6-7].

[15] *See* Statement of Senator Rochelle, Senate State and Local Gov't Comm. (SB 2801), Tape # 1, Feb. 26, 2002 [McCormack Decl., Ex. A at 1]; Statement of Brook Thompson, then-State election coordinator, House State and Local Gov't Comm. (HB 3193), Tape # 1, Feb. 26, 2002 [McCormack Decl., Ex. B at 1].

for absentee ballots.[16] "It has just caused confusion and led to the disenfranchisement of voters."[17] The requested measure was passed following the General Assembly's decision to reduce the violation of Tenn. Code Ann. § 2-6-202(c)(4) from a Class E felony to a Class A misdemeanor.[18]

Clearly, the legislative history establishes that the statute was enacted to further compelling State interests. *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 197 (2008) (recognizing that safeguarding voter confidence is part of the compelling interest that a State has in protecting the integrity and reliability of the electoral process); *Burson*, 504 U.S. at 199 (observing that State has a compelling interest in protecting voters from confusion and undue influence); *Eu*, 489 U.S. at 231 (noting that the State indisputably has a compelling interest in preserving the integrity of its election process). Yet, Plaintiffs bewilderingly claim that Tenn. Code Ann. § 2-6-202(c)(4) is "not meaningfully designed to serve *any* legitimate government interest, let alone a compelling one . . . ." DE 43, ID#1676 (emphasis added). To support this assertion, Plaintiffs advance two specious arguments, neither of which acknowledges the very serious voter confusion issue that the statute was enacted to address.

---

[16] *See* Statement of Brook Thompson, then-State election coordinator, House State and Local Gov't Comm. (HB 3193), Tape # 1, Feb. 26, 2002 [McCormack Decl., Ex. B at 9].

[17] *See* Statement of Brook Thompson, then-State election coordinator, House State and Local Gov't Comm. (HB 3193), Tape # 1, Feb. 26, 2002 [McCormack Decl., Ex. B at 2].

[18] As originally introduced, the penalty for giving a request for application was to be a Class E felony because that was the penalty for "giving an application for an absentee ballot" to any person under Tenn. Code Ann. § 2-6-202(c)(3). *See* Statement of Brook Thompson, then-State election coordinator, Senate State and Local Gov't Comm. (SB 2801), Tape # 1, Feb. 26, 2002 [McCormack Decl., Ex. A at 2]. *See also* Statement of Brook Thompson, then-State election coordinator, House State and Local Gov't Comm. (HB 3193), Tape # 1, Feb. 26, 2002 (same) [McCormack Decl., Ex. B at 4].

33

Plaintiffs argue that the legislative history indicates that the statute was passed because it "is bad policy to encourage people to vote absentee." *Id*. at 1677–78. In full context, the then-State election coordinator had just explained that *non-election* commission persons were creating *unofficial* request forms for applications for absentee ballots, and the aim of the bill was to stop this practice.[19] Then he testified:

> I would suggest to you that we don't want to be encouraging people to be handing out requests for absentee ballots. I mean, the whole absentee ballot law was set up so that voters that can't otherwise vote get to vote. But we don't want half the state voting absentee. We want them voting early, and we want them voting at the polls on election day. We want people that can't vote at the polls on election day to vote absentee. But I would tell you that I think it's bad public policy for candidates to be handing out requests for absentee ballots just by the dozens. The whole process is set up to be guarded against fraud, and more absentee ballots you have, the more likely the chance for fraud there is.[20]

Plaintiffs also argue that "there is no 'anti-fraud' interest at stake in prohibiting the physical distribution of publicly available forms." *Id*. at 1678. Plaintiffs misstate the issue because "[t]here is no such form as a request for an application."[21] The fabrication of unofficial election forms is fraud. Moreover, the United States Supreme Court has pronounced that there does not have to be an ongoing fraud problem. Protection of the integrity of the election process empowers the States to enact laws to prevent voter fraud before it occurs, rather than only allowing the state to remedy fraud after it has become a problem. *See Munro v. Socialist Workers Party*, 479 U.S. 189, 195–96 (1986) ("Legislatures ... should be permitted to respond to potential deficiencies in the electoral

---

[19] *See* Statement of Brook Thompson, then-State election coordinator, House State and Local Gov't Comm. (HB 3193), Tape # 1, Feb. 26, 2002 [McCormack Decl., Ex. B at 4].

[20] *Id*.

[21] *See* Statement of Brook Thompson, then-State election coordinator, House State and Local Gov't Comm. (HB 3193), Tape # 1, Feb. 26, 2002 [McCormack Decl., Ex. B at 3].

process with foresight rather than reactively, provided that the response is reasonable and does not significantly impinge on constitutionally protected rights.").

In sum, Tenn. Code Ann. § 2-6-202(c)(4) unquestionably furthers the State's compelling interests of preventing voter confusion and protecting the integrity of the electoral process.[22]

### 3. Tennessee Code Ann. § 2-6-202(c)(4) Places a Minimal Burden on the Organizational Plaintiffs' Right to Engage in Core Political Speech and Activity.

Tennessee Code Ann. § 2-6-202(c)(4) restricts one thing and one thing only: "*giv*[*ing*] an *unsolicited* request for application for absentee ballot to any person." Thus, by its terms, this statute does not prevent the Organizational Plaintiffs from sending any and all literature that they wish to send to their target audience, nor does it prevent them from sending letters or otherwise contacting their target audience to inquire whether assistance is needed with the absentee ballot application process. If assistance is desired by members of their audience, they are free to help them with the process, including helping them obtain an application. In fact, Tenn. Code Ann. § 2-6-203 expressly permits that.[23] Thus, the statute is narrowly drawn to further the State's interest in preventing the distribution of non-election commission absentee ballot request forms that were confusing voters.[24]

---

[22] In fact, the Davidson County Chancery Court Order that Plaintiffs include as part of the support for their motion is even more blunt about the purpose of Tenn. Code Ann. § 2-6-202(c), which is "[t]o guard against 'ballot harvesting.'" DE 40-2, ID#189.

[23] *See* note 4, *supra*.

[24] Organizational Plaintiffs puzzlingly suggest that Tenn. Code Ann. § 2-6-202(c)(4) could be more narrowly tailored by the placement of a notice on the "request form" that lets voters know that they are not required to submit the request in order to vote in person. DE 43, ID#1677. This is illogical. As explained earlier, the election commission does not create a request for application for absentee ballot form.

35

### 4. Tennessee Code Ann. § 2-6-202(c)(4) Satisfies the "Exacting Scrutiny" Test.

The Sixth Circuit Court of Appeals has explained the "exacting scrutiny" test as follows:

'Exacting scrutiny,' despite the name, does not necessarily require that kind of searching analysis that is normally called strict judicial scrutiny; although it may. To withstand 'exacting scrutiny,' the Supreme Court has explained, 'the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights.'

*Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 414 (6th Cir. 2014) (quoting *John Doe No. 1 v. Reed*, 561 U.S. 186, 196 (2010) (internal quotation marks omitted).

Accordingly, a statutory provision that imposes a severe burden on speech is subject to strict scrutiny and must be narrowly tailored to serve a compelling state interest. *Id*. at 414 (citing *Buckley v. American Constitutional Law Found., Inc*., 525 U.S. 182, 192 n.12, 206 (1999)). A statutory provision that does not impose a severe burden on speech, however, is subject to lesser scrutiny. *Id*. (citing *Reed*, 561 U.S. at 199 n.2). In short, "the level of scrutiny to be applied depends on the severity of the burden." *Id*.

Hence, courts are to use a "sliding-scale" analysis when deciding whether a state election law violates First Amendment associational rights. *See Citizens for Tax Reform*, 518 F.3d at 383 (recognizing "the question is fact-intensive, given the 'sliding-scale' analysis outlined by the Supreme Court in *Meyer*, *Buckley* and other decisions"); *Libertarian Party*, 751 F.3d at 414 (noting its prior decision recognizing sliding-scale analysis); *see also*, *e.g*., *Burson*, 504 U.S. at 209 (finding that when the exercise of a First Amendment right threatens to interfere with the act of voting itself, a State's response that is reasonable and does not significantly impinge on constitutionally protected rights will be upheld).

The Sixth Circuit's decision in *Citizens for Tax Reform* provides a practical example of how the sliding-scale analysis is to be employed. In that case, the court considered an Ohio statute

that made it a felony to pay anyone for gathering signatures on election-related petitions on any basis other than time worked. *See Citizens for Tax Reform*, 518 F.3d at 377. In considering where the statute fit on the sliding scale, the court observed that the Supreme Court's *Meyer* decision lay at one end of the spectrum. *Id*. at 385. In *Meyer*, the State of Colorado had banned proponents of petitions from paying circulators, among other restrictions. *Id*. at 380–81 (citing *Meyer*, 496 U.S. at 420). On the other end of the spectrum were statutes enacted in North Dakota, Oregon, and New York that banned payments made on a per-signature basis; courts had found these types of statutes were constitutional. The court found the Ohio statute more restrictive than these latter statutes because it banned all remuneration except on a per-time basis. The less-restrictive statutes left open various other means of payment besides one based solely on the time worked. *Id*. at 385. The court also found the Ohio statute to be more restrictive because the violation for violating the North Dakota, Oregon, and New York statutes was a misdemeanor, while the penalty for violating the Ohio statute was a felony. *Id*. at 386. For these reasons, the court found that the Ohio provision created a significant burden on the petitioners' core political speech rights because it lay closer the complete ban in *Meyer* than the partial-ban statutes. *Id*. Consequently, the State had to justify the Ohio statute with a compelling interest and narrowly tailored means. The court found that the State failed to satisfy this standard. *Id*. at 388.

Tennessee Code Ann. § 2-6-202(c)(4) is like the North Dakota, Oregon, New York statutes examined in *Citizens for Tax Reform*. The penalty for violating the statute is a misdemeanor, not a felony, and the statute leaves all but one discrete avenue for Organizational Plaintiffs to execute their absentee vote engagement strategy. Moreover, the one prohibited avenue serves the State's compelling interest in preventing voter confusion and protecting the integrity of the election process.

Similarly, the *Burson* decision guides the inquiry in our case. In this case, the United States Supreme Court applied exacting scrutiny to an election law that forbid campaign-related speech within 100 feet of the entrance to a polling place. The Court recognized two compelling interests for buffer zones around polling places: (1) the State's duty to protect the right to vote freely for the candidate of one's choice; and (2) the State's interest in preserving the integrity and reliability of the electoral process itself. *Burson*, 504 U.S. at 198–99 (citations omitted). Put more pointedly, the Court recognized the State's interest in protecting voters from "confusion and undue influence" and "ensuring that an individual's right to vote in not undermined by fraud." *Id*. at 199.

The *Burson* Court then determined that a 100-foot buffer did not constitute a significant impingement on political speech. *Id*. at 210. In so finding, the Court stated that the only way to preserve the secrecy of the ballot is to limit access to the area around the voter. *Id*. at 208–209. Thus, "*some* restricted zone around the voting area is necessary to secure the State's compelling interest." *Id*. at 208 (emphasis in original).

Like the law examined in *Burson*, Tenn. Code Ann. § 2-6-202(c)(4) was enacted to serve the State's compelling interest in protecting voters from confusion and undue influence and ensuring that an individual's right to vote in not undermined by fraud. Tennessee Code Ann. § 2-6-202(c)(4) only restricts Organization Plaintiffs from giving an "*unsolicited* request for application for absentee ballot to any person." This lone, modest prohibition is equivalent to the 100-foot buffer that the *Burson* Court found was reasonable to serve the State's compelling interests in preserving the integrity of the electoral process and protecting its citizens' autonomy to vote freely in the manner that they desire.

E.      **Plaintiffs have Failed to Demonstrate a Substantial Likelihood of Success on the Merits of their Challenges to the Signature Verification Process.**

1.      **Description of the Signature Verification Process, Training, and its Effectiveness.**

a.      **Signature Verification Occurs Twice, Not Once.**

For an eligible voter who seeks to vote by absentee ballot, the voter's signature is evaluated, not once, but twice; because, prior to casting an absentee ballot, the voter must first submit a written request or application for such a ballot. *See* Tenn. Code Ann. § 2-6-202(a)(2) and (3). Such request or application may be made in-person, by mail, by facsimile, or by email. *See* Tenn. Code Ann. § 2-6-202(a)(3). Regardless of the manner of submission, the request or application must be signed by the voter, and that signature is subject to the first of two signature evaluations. *See* Tenn. Code Ann. § 2-6-202(b) and (d).

If the signature on the request or application is determined to be inconsistent (in accordance with the process described below) with the signature on the voter's registration record, the request or application is rejected, and the applicant is immediately notified. If the voter submitted their request or application by email, the administrator of elections may send notification of the rejection by email. Otherwise, the voter is notified in writing by mail. *See* Tenn. Code Ann. § 2-6-204(a); Goins Decl., ¶ 14. If, on the other hand, the signature on the request or application is determined (in accordance with the process described below) to be consistent with the signature on file, an absentee ballot—together with instructions, *see* Goins Decl., Ex. 1, a ballot envelope, and a mailing envelope—is delivered to the voter by U.S. Mail. *See* Tenn. Code Ann. § 2-6-202(b) and (d).

Pursuant to Tenn. Code Ann. § 2-6-202(a)(1), an eligible voter who seeks to vote by absentee ballot may request or apply for a ballot as early as 90 days before an election, but in no

39

event later than 7 days before the election. A request or application for an absentee ballot must be received no later than 7 days before the election. *See* Tenn. Code Ann. § 2-6-202(d)(3).

The exterior of the ballot envelope contains a "Voter's Affidavit," *see* Goins Decl., Ex. 2, which must be executed by the voter and which attests under penalty of perjury that he/she is a registered voter and that the submitted ballot has been completed by the voter him-/herself. *See* Tenn. Code Ann. §§ 2-6-202(e) and 2-6-309(b). Thereafter, voter must place the ballot in the sealed ballot envelope and mail it back to the county election commission in the pre-addressed outer envelope, so that it is received on or before Election Day. *See* Tenn. Code Ann. § 2-6-202(e).

Next, after receipt of an absentee ballot from the voter, county election officials open the outer mailing envelope, and—without opening the ballot envelope itself—the signature of the voter as it appears on the Voter's Affidavit is compared a second time to the signature of the voter on file to authenticate the validity of the ballot. *See* Tenn. Code Ann. § 2-6-202(g). If the signature on the Voter's Affidavit is determined (again, in accordance with the process described below) to be consistent with the signature on file, the ballot is accepted and placed (unopened) in the absentee ballot box to be counted on Election Day. *Id*. If, on the other hand, the signature is determined to be inconsistent with the signature on file, the ballot is rejected and notice of the rejection is mailed immediately to the voter. *See* Tenn. Code Ann. § 2-6-204(b). If time allows, a voter whose absentee ballot has been rejected can submit another absentee ballot. Alternatively, that voter could cast a provisional ballot in accordance with Tenn. Code Ann. § 2-7-112(a)(3).

**b.      Tennessee's signature verification process.**

For evaluation of both the request/application and the actual ballot, the signature verification process performed by county election officials is a painstaking process, and—as described below—is structured with the emphasis to *accept* a signature, rather than reject it. *See* Goins Decl., ¶ 26; Exhibit C, Warren Decl., ¶ 4; Exhibit D, Farley Decl., ¶ 4; Exhibit E, Phillips

40

Decl., ¶ 4.  Training in this process is mandatory, and it consists of a 45-minute video which is supplemented with additional directives from my office.  *See* Goins Decl., ¶ 19.

The video, which is entitled "Signature Verification" and which may be viewed at https://www.youtube.com/watch?v=UKiYGONnNT0&feature=youtu.be, was prepared by the Director of Elections for Oregon, and comprehensively addresses the proper manner to conduct signature comparisons.  *Id.* at ¶ 20.  The presenters are Ms. Summer Davis and Ms. Lydia Plukchi, who are Compliance Specialist 3s in the Elections Division of the Oregon Secretary of State and who have been with the Election Division for over 15 years.  *Id.*  Both Ms. Davis and Ms. Plukchi received their training from Ms. Heather Carlson, a forensic handwriting expert.[25]  *Id.*

The video explores the various components of a signature: line-forms and style (cursive or printed), unconscious variations from line-forms, intentional "personalization" of a signature, alignment, signature speed, "pen lifts," line quality (which can deteriorate with the age of the signer), elements of proportion, size, spacing, and slant.  *Id.* at ¶ 21.  Beginning at time index 23:44, viewers are instructed as to "What to Look For," "What to Examine," and "Evaluating Signatures."  At 29:04, the video begins to discuss whether to "Accept or Reject" a signature.  *Id.* at ¶ 22.

Importantly, at time index 29:54, the viewer is told "You're looking for reasons to keep the signature *in*—to *validate* the signature—rather than reasons to throw the signature *out*. . . .  We're looking for *any* reason to keep a signature."  *Id.* at ¶ 23 (emphasis in original.)  Seconds later, at time index 30:29, the viewer is presented with numerous comparative examples of actual

---

[25] A copy of Ms. Carlson's *curriculum vitae* is attached as Exhibit 3 to the Declaration of Mark Goins.

41

signatures submitted versus signatures on file, and from those examples the viewer is shown that all but the most obvious of inconsistent signatures are to be regarded as acceptable. *Id*. at ¶ 24.

At time index 29:28 the viewer is instructed that a signature should be reviewed by "at least two different county elections officials" before it is rejected. *Id*. at ¶ 25. However, the Tennessee Coordinator of Elections has instructed county election officials that a signature on the absentee Voter's Affidavit, should *not* be rejected unless it is reviewed by *three* local election officials including the administrator. *Id*. *See also* Warren Decl., at ¶ 5; Farley Decl., at ¶ 5; Phillips Decl., at ¶ 5.

Given the presumption of signature validity, very few absentee ballots are rejected in Tennessee for signature irregularity under Tenn. Code Ann. § 2-6-204(b).[26] *See* Goins Decl., at ¶ 27. For the national election in November of 2016, 73,338 absentee ballots were mailed to requesting voters, and 65,235 absentee ballots were received by county election officials statewide. *Id*. at ¶ 28. Of those absentee ballots received, only 20 were rejected for signature irregularities. *Id*. And of those 20 rejected ballots, 13 were cast under the federal Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), 52 U.S.C. § 20301, *et seq*., which permits U.S. citizens—both military and civilian—who are living abroad to vote. *Id*.

For the national election in November of 2018, 49,421 absentee ballots were sent to voters, and 44,392 absentee ballots were received by county election officials statewide. *See* Goins Decl., at ¶ 29. Of those absentee ballots received, only 42 were rejected for signature irregularities. *Id*. *See also* Warren Decl., at ¶ 7 (describing fraudulent submission of a deceased voter). Of the 42

---

[26] *See* Warren Decl. at ¶ 5 ("[M]y office takes every possible step to ensure that an eligible voter, who wants to vote by absentee ballot, may do so. This includes contacting voters by multiple means (i.e., mail, email, and/or telephone) if a defect is noted"); Farley Decl. at ¶¶ 6–7 (describing efforts to contact voters to correct deficiencies in ballot applications and ballots).

rejected ballots, 13 were cast under UOCAVA. *See* Goins Decl., at ¶ 29. *See also* Farley Decl., at ¶ 9; Phillips Decl., at ¶ 10.

Thus, for the 109,627 absentee ballots cast in the 2016 and 2018 national elections, only 36 absentee ballots cast pursuant to Tenn. Code Ann. § 2-6-201 (i.e., .03%) were rejected for signature irregularities. *See* Goins Decl., at ¶ 30.

<b>c.    Tennessee's additional safeguard.</b>

In addition, to the training discussed above, any voter who is concerned that—for whatever reason—his/her absentee ballot may not be counted, also may cast a provisional ballot in accordance with Tenn. Code Ann. § 2-7-112(a)(3). *See* Goins Decl., at ¶ 17. Under that circumstance, if a voter's absentee ballot is determined to be valid and counted, the voter's provisional ballot will be discarded. *Id*. Alternatively, if the voter's absentee ballot is rejected for a signature irregularity or any other reason, the provisional ballot will stand. *Id*.

<b>2.    Plaintiffs' Procedural Due Process Claim Fails for Lack of a Substantive Entitlement Under <i>Fowler v. Benson</i>.</b>

While "'voting is of the most fundamental significance under our constitutional structure,' . . . '[i]t does not follow . . . that the right to vote in any manner . . . [is] absolute.'" *Mays v. LaRose*, 951 F.3d 775, 783 (6th Cir. 2020) (citations omitted). "The Constitution explicitly provides State legislatures with authority to regulate the 'Times, Places and Manner of holding Elections.'" *Id*. (quoting U.S. Const. art I, § 4, cl. 1). In this regard, the State has "broad powers to determine the conditions under which the right of suffrage may be exercised." *Lassiter v. Northampton Cty. Bd. of Elections*, 360 U.S. 45, 50 (1959).

In this respect, "[t]he Due Process Clause 'does not protect procedure for procedure's sake.'" *Fowler v. Benson*, 924 F.3d 247, 259 (6th Cir. 2019). "Procedural due process is traditionally viewed as the requirement that the government provide a 'fair procedure' when

43

*depriving* someone of life, liberty, or property. . . ." *EJS Properties, LLC v. City of Toledo*, 698 F.3d 845, 855 (6th Cir. 2012) (emphasis added). Yet, this is not an instance where the State has created an entitlement and then has taken it away. To the contrary, this is a case where the entitlement claimed by Plaintiffs—the ability to vote by absentee ballot—was not created at all. As Plaintiffs readily concede in their Amended Complaint, they do not fall within the eligibility requirements of Tenn. Code Ann. § 2-6-201. When the asserted interest does not exist, a procedural due process claim does not lie. *Fowler*, 924 F.3d at 256–60.

Plaintiffs assert that "the State's strict limits on eligibility for voting absentee . . . impose an undue burden on prospective voters[27] who must now choose between risking their health by voting in person, or forgoing their right to vote entirely. . . ." Am. Compl., DE 39, ID#125, ¶ 5. But "there is nothing in the record to indicate that the [Tennessee] statutory scheme has an impact on [Plaintiffs'] ability to exercise the fundamental right to vote." *See McDonald v. Bd. of Election Comm'rs of Chicago*, 394 U.S. 802, 807 (1969); *see also Texas Democratic Party*, 961 F.3d at 403 (citing *McDonald* and concluding that the denial of mail-in ballots to a certain group of voters "did not restrict their right to vote"). Plaintiffs Franklin and Lee, and the members of APRI, MCLC, and NAACP,[28] *can* vote, and Plaintiffs do not suggest otherwise. Instead, Plaintiffs' claim is based—not on an alleged deprivation of the right to vote—but, instead, on the perceived right to vote *in a certain manner*—i.e. "a *claimed* right receive absentee ballots." *McDonald*, 394 U.S. at

---

[27] This is not a class action case. Thus, as previously discussed none of the plaintiffs have standing to assert claims on behalf of "prospective voters." *See Warth*, 422 U.S. at 498 (a party "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.").

[28] As discussed *supra*, APRI, MCLC, and NAACP do not have standing to assert a procedural due process claim on behalf of their members.

44

807 (emphasis added); *see also Texas Democratic Party*, 961 F.3d at 409.[29]  But, "there is no constitutional right to an absentee ballot."  *Mays*, 951 F.3d at 792.  That being the case, the fact that the State "make[s] it easier for some electors to vote" absentee, does not impose a "burden" or "make it *harder* to vote for electors that don't get the same benefit."  *Id.* at 783 n.4 (emphasis in original); *see also Texas Democratic Party*, 961 F.3d at 403–04 (quoting *McDonald* and holding that a "statutory scheme, which is 'designed to make voting more available to some groups who cannot easily get to the polls,' does not itself 'deny' the plaintiffs 'the exercise of the franchise'"); *id.* at *19 (Ho, J., concurring) (observing that absentee voting "increase[s] options—not restrictions").

Plaintiffs' asserted interest in voting by absentee ballot is "'not created by the Constitution.  Rather, [it is] created and [its] dimensions are defined by existing rules or understandings that stem from an independent source'"—i.e., "state law."  *Fowler*, 924 F.3d at 256 (quoting *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972)).  Accordingly, because Tenn. Code Ann. § 2-6-201 defines which citizens are eligible to vote by absentee ballot and *none* of the Plaintiffs fall within that definition,[30] Plaintiffs have no procedural due process rights that are implicated by Tenn. Code Ann. §§ 2-6-202(b), (d), and (g), and -204.

"A procedural due process claim cannot survive without the existence of a protected liberty or property interest."  *Marin-Garcia v. Holder*, 647 F.3d 666, 674 (7th Cir. 2011).  Where state

---

[29] *See also Fowler*, 924 F.3d at 256 ("Plaintiffs do not claim merely a general property interest in a driver's license; their specific claim is to a property interest, as indigent individuals, in maintaining their drivers' licenses when state law requires they be suspended due to unpaid court debt.").

[30] *See* Amended Complaint, DE 39, ID#131, ¶ 22 (Plaintiff Franklin "does not qualify to vote by mail"); *id.* at ¶ 23 (Plaintiff Lee "does not qualify to vote by mail"); DE 39, ID#132–36, ¶¶ 24–31 (organizational plaintiffs cannot vote at all; *see Fair Elections Ohio v. Husted*, 770 F.3d at 461).

law has not "establish[ed] the entitlement that Plaintiffs' claim," *Fowler*, 924 F.3d at 258, and "Plaintiffs do not claim a legal entitlement that falls within the Fourteenth Amendment's protection, . . . [the] procedural due process claim fails." *Id*. at 259.

### 3. The Current Signature Validation Process Satisfies Procedural Due Process.

Even if the Court finds that one or more of the Plaintiffs has standing to assert this procedural due process claim, the signature-verification process easily satisfies the standard established by *Mathews v. Eldridge*, 424 U.S. 319 (1976). The *Mathews* standard weighs three factors:

> [f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id*. at 335. Because procedural due process concerns are "flexible" and measured against the "demands" of a "particular situation," *id*. at 334, these factors are intended to function as a "balance," where no single factor is determinative. *Id*. at 347.

### (i) Private Interest Affected.

Plaintiffs begin their argument from a false premise: i.e., that their procedural due process claim is based on "their fundamental right to vote," *see* Plaintiffs' Brief (DE 43) at 1688, and that "pre-deprivation notice" is essential for "having their vote counted." *Id*. at 1688–89. But, again, this is not a right-to-vote case, and no one—not Plaintiffs, nor anyone else—have been deprived of the right to vote. *McDonald*, 394 U.S. at 807; *Texas Democratic Party*, 961 F.3d at 408–09. This case, instead, pertains to the particular *manner* by which Plaintiffs seek to exercise their vote, which is not a fundamental right. *Mays*, 951 F.3d at 792. Further, while every voter has an interest

46

in having his or her vote "counted," that interest is defined by the time, place and manner restrictions imposed by the State under the authority delegated by the Constitution. *Id*. at 783. Indeed, if the converse were true, the State would be obligated to "count" votes that were cast hours, days, or weeks after the close of the polls. As concisely stated by the Fifth Circuit Court of Appeals, the emergence of COVID-19 "has not suddenly obligated [the States] to do what the Constitution has never been interpreted to command, which is to give everyone the right to vote *by mail*." *Texas Democratic Party*, 961 F.3d at 409 (emphasis added).

Moreover, the every-vote-counts argument cuts both ways. As discussed below, "'[e]very voter's vote is entitled to be counted'—and that means every vote must be 'protected from the diluting effect of illegal ballots.'" *Id*. at 413 (Ho, J., concurring; quoting *Gray v. Sanders*, 372 U.S. 368, 380 (1963)). The restrictions imposed by the absentee ballot statutes, specifically the signature verification provisions, are structured to address that interest.

Thus, contrary to Plaintiffs' assertion, this factor does not "weigh[] heavily" in their favor. Plaintiffs' Brief (DE 43) at 1689.

### (ii) Risk of Erroneous Deprivation.

Plaintiffs argue that "Tennessee's signature match procedures are virtually certain to lead to the erroneous rejection of valid ballots." *Id*. at 1690. Yet, they have produced no proof that such erroneous rejections have—in fact—occurred in Tennessee. Indeed, Plaintiff APRI—in which "[t]he majority of [its] members are over 60," Lee Decl., DE 40-7, ID#1577, ¶ 7—has not proffered an affidavit from any member identifying that their absentee ballot was improperly rejected in a prior election.

The best evidence the Plaintiffs have to offer are the conclusory opinions of Dr. Linton A. Mohammed, who states that "Tennessee signature match procedures do not set forth sufficient standards for determining reasonably whether a signature on a ballot return envelope matches the

47

voter signature displayed in the voter's file." Mohammed Decl., DE 40-4, ID#1535, ¶ 20. Yet, this opinion is based on Dr. Mohammed's belief that—apart from the statute itself—Tennessee has "no further written statewide standards or procedures to guide election officials in evaluating whether the signature on the absentee ballot application matches the signature on the back of the absentee ballot envelope (the voter's affidavit)." *Id*. at ¶ 18. As demonstrated by the Declaration of the State's Coordinator of Elections, Mark Goins, this belief is incorrect. *See* Goins Decl., ¶¶ 18–26. Warren Decl., ¶¶ 4–5; Farley Decl., ¶¶ 4–5; Phillips Decl., ¶ 5.

Moreover, the lack of any significant risk of erroneous deprivation is statistically demonstrable. Again, in the 2016 national election, only *20* out of *65,235* absentee ballots were rejected for signature irregularities; i.e., *.03%* (three one-hundredths of one percent) of the absentee ballots cast statewide. *See* Goins Decl., at ¶ 20. For the 2018 national election, *42* out of *44,392* absentee ballots were rejected for signature irregularities; i.e., *.09%* (nine one-hundredths of one percent) of the absentee ballots cast statewide. *See id*. at ¶ 29. Even if some of the 62 absentee ballots were rejected erroneously, "[s]uch isolated discrepancies" would not demonstrate the existence of a constitutionally infirm process.[31] *Lemons v. Bradbury*, 538 F.3d 1098, 1106 (9th

---

[31] It also should be noted that—of the 62 absentee ballots rejected in 2016 and 2018—26 of them were cast pursuant to the federal Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), 52 U.S.C. § 20301, *et seq*., which permits U.S. citizens—both military and civilian—who are living abroad to vote.

The UOCAVA comprehensively defines the "State responsibilities" associated with these absentee ballots. *See* 52 U.S.C. § 20302. While the statute requires the State to provide "notice" if a ballot is rejected, and to provide a method for the voter to "track" his/her ballot, *see* § 20302(d) and (h), the statute does not require the State provide an opportunity to cure an inconsistent signature on either the ballot application or the ballot itself.

Plaintiffs do not challenge the constitutionality of UOCAVA, nor do they purport to be or represent UOCAVA voters. Thus, for the 109,627 absentee ballots cast in the 2016 and 2018 national elections, only *thirty-six* (36) *state law* absentee ballots (i.e., .03%) were rejected for signature irregularities. *See* Goins Decl. at ¶ 30. *See also* Farley Decl. at ¶ 9; Phillips Decl. at ¶ 10.

Cir. 2008); *see also Howard v. State of Tennessee*, No. 3:16-cv-2829, 2017 WL 4877111 at *9 (M.D. Tenn. Oct. 27, 2017), *aff'd*, 740 Fed. Appx. 837 (6th Cir. 2018) (stating that a "handful" of instances do not "suggest[]" the presence of "a systemic risk").

In many ways, this case is closely analogous to *Lemons*, in which the Ninth Circuit Court of Appeals upheld a very similar signature-comparison procedure in the State of Oregon. *See Lemons*, 538 F.3d at 1104–05. In *Lemons*, which pertained to signature-comparison in the context of a public referendum,

- the only "uniform standard" at issue was "whether a referendum petition signature matches the signature on the signer's existing voter registration card," *id*. at 1105;

- "the verification process [was] . . . weighted in favor of accepting questionable signatures," *id*.;

- "[d]uring the verification of Referendum 303, all counties subjected initially rejected signatures to a second level of review," *id*. at 1106;

- "Oregon law [did] not provide procedures by which a voter can introduce extrinsic evidence to rehabilitate a referendum signature after its rejection," *id*. at 1101; and

- "[n]o county gave notice to voters with rejected signatures." *Id*.

The Ninth Circuit upheld the signature-comparison process, finding that "[p]roviding notice and allowing individuals to contest a determination that a signature did not match would further skew the process in favor of accepting invalid signatures." *Id*. at 1105. The court further found that "[t]he value of additional procedural safeguards therefore is negligible," and that "the administrative burden of the additional process plaintiffs propose outweighs any marginal benefit that would result from additional procedures." *Id*.

As demonstrated above, Tennessee's procedures are—in some ways—more favorable to the voter than Oregon's. First, and as discussed above, the signature-verification process occurs not once—but twice: i.e., when an absentee ballot is requested, and when an absentee ballot is cast.

49

If a request or application for an absentee ballot is rejected for a signature irregularity, the voter *may re-submit the application* with a proper signature. *See* Tenn. Code Ann. § 2-6-204(a)(1).[32] *See also* Farley Decl., at ¶ 6 (describing instance in which a voter was able to correct a signature deficiency on her ballot application).

Second, similar to the procedure in Ohio, county election administrators in Tennessee are trained to look for ways to *validate* the signature, rather than reject it. *See* Goins Decl., at ¶ 26. Yet, Ohio subjects signatures only to "a second level of review" before rejection. In contrast, Tennessee requires independent review by *three* election officials who must unanimously agree that a signature should be rejected. *Id.* at ¶ 25.[33] Further, where officials in Oregon employed a process of "statistical sampling" in which only "five percent of the submitted signatures" were reviewed, *Lemons*, 538 F.3d at 1100, county officials in Tennessee review *every* signature on both the ballot request/application and on the Voter's Affidavit of the ballot itself. *See* Goins Decl., at ¶ 13-14, 17, 23, 25-26.

Lastly, any voter who is concerned that—for whatever reason—his/her absentee ballot may not be counted, also may cast a provisional ballot in accordance with Tenn. Code Ann. § 2-7-112(a)(3). *Id.* at ¶ 17. Under that circumstance, if a voter's absentee ballot is determined to be valid and counted, the voter's provisional ballot will be discarded. *Id.* Alternatively, if the voter's

---

[32] Obviously, the sooner a voter submits a request or application for an absentee ballot, the more time the voter has to correct any deficiency. Thus, if a request or application is received on or close to the statutory deadline (i.e., "seven (7) days before the election" per Tenn. Code Ann. § 2-6-202(a)(1)) a voter may not have enough time to make the necessary corrections. This, however, does not render the process constitutionally deficient. Voters who "fail to [request a ballot] early cannot blame [Tennessee] law for their inability to vote; they must blame 'their own failure to take timely steps to effect their [absentee voting ability].'" *Mays*, 951 F.3d at 792.

[33] If time allows, a voter whose absentee ballot has been rejected can submit another absentee ballot. Alternatively, such voter could cast a provisional ballot in accordance with Tenn. Code Ann. § 2-7-112(a)(3). *See* Goins Decl. at ¶ 17.

absentee ballot is rejected for a signature irregularity or any other reason, the provisional ballot will stand. *Id.*

Thus, given these various procedural safeguards, the risk of a voter being erroneously deprived of his or her ability to vote is profoundly low.

### (iii) Government's Interest.

As previously discussed, Tennessee has an interest and duty to protect the integrity of the ballot. *Foust*, 660 S.W.2d at 489; *Emery*, 586 S.W.2d at 109. And "the purity of the ballot is more difficult to preserve when voting absent than when voting in person." *Emery*, 586 S.W.2d at 108. Indeed, "[t]here should be 'no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters.'" *Texas Democratic Party*, 961 F.3d at 413 (Ho, J., concurring; quoting *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 196 (2008) (plurality op. of Stevens, J.)). "The right to vote is fundamental to our constitutional democracy. But it means nothing if your vote doesn't count. And it won't count if it's cancelled by a fraudulent vote. . . ." *Id.*

In this regard, "'the risk of voter fraud' is 'real' [and] courts have repeatedly found that mail-in ballots are particularly susceptible to fraud." *Id.* at 414 (citing *Crawford*, 553 U.S. at 195). *See also Veasey v. Abbott*, 830 F.3d 216, 263 (5th Cir. 2016) (citing evidence that "mail-in voting . . . is far more vulnerable to fraud" and that "fraudulent absentee ballots" is a "prevalent issue"); *Alabama State Conference of NAACP v. Alabama*, ___ F. Supp. 3d ___, 2020 WL 583803 at *53 n.51 (M.D. Ala. 2020) (discussing "several significant voter fraud convictions," including a case in which "two individuals forged 600 absentee ballots and were convicted on voter-fraud charges in Wilcox County [Alabama] in the wake of the 1994 election"); *Greater Birmingham Ministries v. Merrill*, 284 F. Supp. 3d 1253, (N.D. Ala. 2018), *on appeal* 18-10151 (discussing absentee voter fraud, including "ballots cast in the names of dead people," "voter brokers following mail trucks

51

and removing absentee ballots from mailboxes," and "bulk mailing of hundreds of absentee ballots by just a few individuals in some counties"). Recently, *Time* magazine reported that a West Virginia postal carrier was charged with attempted election fraud "after eight mail-in requests for absentee voter ballots had their party affiliations altered, including five from Democrat to Republican. . . ." *West Virginia Mail Carrier Charged With Altering Absentee Ballot Requests*, Time, (5/27/20) https://time.com/5843088/west-virginia-mail-carrier-fraud-absentee-ballots/.

In Tennessee, at least one district court has recognized that the "absentee ballot . . . is a documented source of voter fraud." *Green Party of Tennessee v. Hargett*, No. 2:13-cv-224, 2014 WL 11638572 at *2 (E.D. Tenn. Feb. 20, 2014). Indeed, in the 2018 national election, officials in Wilson County, Tennessee, encountered an episode of voter fraud, when they received a fraudulent absentee ballot from someone attempting to cast a ballot in the name of a deceased voter. *See* Warren Decl., ¶ 7.

In light of these "real" and "documented" problems associated with absentee balloting, the State's interest clearly outweighs the factually unsupported "concern[s]" of the Plaintiffs. Further, the signature verification process is a reasonable (and statistically sound) method of addressing those problems. Accordingly, the State's process passes the *Mathews v. Eldridge* test.

## II. Plaintiffs are unlikely to suffer irreparable injury absent an injunction.

A plaintiff seeking preliminary injunctive relief must demonstrate that irreparable harm is *likely* in the absence of the requested injunction. *City of Los Angeles v.* Lyons, 461 U.S. 95, 103 (1983); *O'Shea v. Littleton*, 414 U.S. 488, 502 (1974). Indeed, a specific finding of immediate and irreparable injury to the movant is considered the most important prerequisite that a court must examine and find when ruling upon a motion for a preliminary injunctive relief. *See* 11A C. Wright, A. Miller, & M. Kane, *Fed. Practice and Procedure* § 2948.1 (3d ed.). As a result, the

absence of irreparable injury must end the court's inquiry. *See Lyons*, 461 U.S. at 111–12, 103 (1983); *Warner v. Central Trust Co.*, *N.S.*, 715 F.2d 112, 123–24 (6th Cir. 1983); *Aluminum Workers Int'l Union v. Consolidated Aluminum Corp.*, 969 F.2d 437, 444 (6th Cir. 1982).

To demonstrate irreparable harm, each and every plaintiff must show that they "will suffer 'actual and imminent' harm rather than harm that is speculative or unsubstantiated." *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006). A preliminary injunction, then, will not be issued simply to prevent the possibility of some remote future injury—a presently existing threat must be shown. *Id.* As the Supreme Court has explained, "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). Plaintiffs here cannot make this "clear showing."

The organizational Plaintiffs cannot demonstrate that they are likely to suffer irreparable harm absent an injunction. These Plaintiffs allege that "in light of the ongoing COVID-19 pandemic, [they] will dedicate additional resources" to helping voters comply with existing laws. *See* DE 39, ID#132–35. And they further allege that they engage in voter education programs that can include outreach to first-time registrants. *See, e.g.*, DE 39, ID#132–35. But Plaintiffs' potential diversion of resources for voter education in light of COVID-19 and the possibility that Plaintiffs' voter-education programs might reach first-time voters are not immediate and irreparable injuries sufficient to warrant preliminary injunctive relief. *See Mazurek*, 520 U.S. 972 (explaining that "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief").

53

And the individual Plaintiffs fare no better.  Like the organizational Plaintiffs, they have failed to show that they are likely to suffer irreparable harm without an injunction.  Neither of the individual Plaintiffs allege that they are first-time voters who registered by mail.  Nor do they allege that, if they vote an absentee ballot, their ballot will be rejected because the signature does not match.  And finally, neither of the individual Plaintiffs allege that they intend to provide unsolicited requests for absentee ballots to other voters.  Rather, the individual Plaintiffs' allegations center solely upon their desire to vote an absentee in light of COVID-19.  In short, Plaintiffs have not alleged anything close to the "actual and imminent" injury necessary to obtain a preliminary injunction.  *See Abney*, 443 F.3d at 552 (recognizing that, to demonstrate irreparable harm, each and every plaintiff must show that they "will suffer 'actual and imminent' harm rather than harm that is speculative or unsubstantiated").

## III.   Plaintiffs' Requested Relief Will Cause Substantial Harm to the State and Will Not Further the Public Interest.

Both the Supreme Court and the Sixth Circuit have recognized that while the preliminary-injunction analysis usually entails consideration of the harm to the opposing party and a weighing the public interest, these two factors "merge when the Government is the opposing party."  *Wilson v. Williams*, No. 20-3447, 2020 WL 3056217, at *11 (6th Cir. June 9, 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  Tennessee's Supreme Court has recognized that the State and its citizens have an interest in the "validity of elections, certainty of results, the sanctity of the ballot box, and saving of expense."  *See Taylor v. Armentrout*, 632 S.W.2d 107, 114 (Tenn. 1981).  Similarly, the Sixth Circuit has observed that there is a "strong public interest" in "permitting legitimate statutory processes to operate to preclude voting by those who are not entitled to vote" and in the "smooth and effective administration of the voting laws that militates against changing the rules in the hours immediately preceding the election."  *Summit Cty. Democratic Cent. & Exec.*

54

*Comm. v. Blackwell*, 388 F.3d 547, 551 (6th Cir. 2004). Plaintiffs' requested relief would thwart these interests.

Plaintiffs requested relief will undermine the State's interest in the validity of its elections. Both the United States and Tennessee Supreme Courts have consistently observed that there is a compelling interest in the integrity of the election. *See, e.g.*, *Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989) (noting that a State "indisputably has a compelling interest in preserving the integrity of its election process"); *City of Memphis v. Hargett*, 414 S.W.3d 88, 103 (Tenn. 2013) ("[t]his Court has previously recognized the compelling nature of the state's interest in the integrity of the election process."). The "integrity of the ballot is jeopardized" by removal of the "procedural safeguards" that the General Assembly has included in the election laws. *See Foust v. May*, 660 S.W.2d 487, 489 (Tenn. 1983) (citing *Emery v. Robertson Cty. Election Comm'n*, 586 S.W.2d 103, 109 (Tenn. 1979)). These "procedural safeguards" are designed to "(1) prevent undue influence or intimidation of the free and fair expression of the will of the electors or (2) to insure that only those who meet the statutory requirements for eligibility to vote cast ballots." *Id.* The State has already been forced to remove one safeguard—the limitation on who may vote absentee—and Plaintiffs ask this Court to remove even more. Because the State's signature-verification process, ban on unsolicited distribution of absentee ballot applications, and requirement that first-time voters appear in person exist to ensure the integrity of the election process, the removal of these safeguards is not in the interest of the State or the public.

And, what is more, Plaintiffs' requested relief will add to the intense financial pressure already felt by the State and its counties. Worse, it will have this effect while the State is already facing a billion-dollar budget shortage for the coming year. (*See* Ex. B to Ex. 10, Apple-Jones Decl., 100.) In light of this looming budget crisis, every State agency has been asked to cut 12%

of its operating budget. (*See* Ex. A to Exhibit F, Apple Jones Decl., 1.) Each agency is expected to submit its proposed cuts by July 1, 2020. (*See id.*) This budget crisis is not limited to the State—it affects all levels of government. Metro Nashville, for example, is projecting a three-hundred-million-dollar budget gap for the coming year. (*See* Ex. 1 to Exhibit G, Jameson Decl., 22.) Still, Plaintiffs have asked this Court to compel the State to implement several last-minute changes to its election process. Implementing these changes will require time and effort—neither of which will be free. *See* Goins Decl., ¶ 10–11. Thus, Plaintiffs do not simply ask State and county authorities to spend money implementing unnecessary last-minute changes to their election systems—they ask them to spend money that they do not have at a time when they are being forced to make massive, unprecedented cuts to every other portion of their budgets.

Plaintiffs, however, brush aside these harms to the State and its citizens. They argue, for example, that "administrative burdens and costs do not outweigh fundamental voting rights." *See* DE 43, ID#1700. But this argument misses the mark. It is true, of course, that financial and administrative burdens are not generally sufficient to "justify stripping . . . voters of their fundamental right to vote and have their votes counted." *See Fla. Democratic Party*, 2016 WL 6090943, at *8. But the laws Plaintiffs challenge are not "stripping" Tennesseans of their right to vote. Indeed, Plaintiffs own arguments reveal that the alleged burdens stemming from these laws are a far cry from disenfranchisement. They allege, for example, that several organizational Plaintiffs will be prevented from distributing unsolicited absentee ballot requests, *see* DE 43, ID#1671–79; that first-time voters are denied the ability to cast an absentee ballot, *see* DE 43, ID#1679–85; and that Tennessee's signature-matching system threatens to deprive many Tennesseans of the right to vote, *see* DE 43, ID#1685–96. Each argument fails. The first, because the organizational Plaintiffs have no right to vote at all—much less one that is impaired by the

challenged laws. The second, because there is no constitutional right to vote absentee. *See McDonald v. Bd. of Election Comm'rs of Chicago*, 394 U.S. 802, 808 (1969). And the third, because—as discussed in Part E above—voters whose ballots are rejected do indeed have an opportunity to submit a corrected ballot and, thus, are not deprived of the right to vote.

At bottom, Plaintiffs allege only inconvenience—not loss of access to the right to vote. And there can be no doubt that the State's interests in the integrity of its election process and the fiscally responsible use of its resources are more than sufficient to outweigh any inconvenience to Plaintiffs. In other words, the harm to the State and the public interest both militate against granting Plaintiffs' requested relief.

## CONCLUSION

For these reasons, Defendants respectfully request that this Court deny Plaintiffs' request for preliminary injunctive relief in its entirety.

Respectfully submitted,

HERBERT H. SLATERY III
Attorney General and Reporter

/s/ Janet M. Kleinfelter
JANET M. KLEINFELTER (BPR #13889)
Deputy Attorney General
Janet.kleinfelter@ag.tn.gov

ANDREW B. CAMPBELL (BPR #14258)
Senior Assistant Attorney General
Andrew.campbell1@ag.tn.gov

ALEXANDER S. RIEGER (BPR 029362)
Assistant Attorney General
Alex.rieger@ag.tn.gov

MATTHEW D. CLOUTIER (BPR 036710)
Assistant Attorney General
Matt.cloutier@ag.tn.gov

57

Office of the Tennessee Attorney General
Public Interest Division
P.O. Box 20207
Nashville, TN 37202
(615) 741-7403

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing documents have been forwarded electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to the parties named below. Parties may access this filing through the Court's electronic filing system.

William L. Harbison
Lisa K. Helton
Christopher C. Sabis
Christina R.B. López
Sherrard, Roe, Voigt & Harbison, PLC
150 3rd Avenue South, Suite 1100
Nashville, TN 37201

Danielle Lang
Ravi Doshi
Molly Danahy
Jonathan Diaz
Campaign Legal Center
1101 14th Street NW, Suite 400
Washington, DC 20005

Ezra Rosenberg
Pooja Chaudhuri
Jacob Conarck
Lawyers' Committee for Civil Rights Under Law
1500 K Street NW, Suite 900
Washington, DC 20005

Date: June 25, 2020

/s/ Janet M. Kleinfelter
JANET M. KLEINFELTER
Deputy Attorney General

58