UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| MEMPHIS A. PHILLIP RANDOLPH INSTITUTE, THE EQUITY ALLIANCE, FREE HEARTS, THE MEMPHIS AND WEST TENNESSEE AFL-CIO CENTRAL LABOR COUNCIL, THE TENNESSEE STATE CONFERENCE OF THE NAACP, SEKOU FRANKLIN, and KENDRA LEE,<br><br>Plaintiffs,<br><br>v.<br><br>TRE HARGETT, in his official capacity as Secretary of State of the State of Tennessee, MARK GOINS, in his Official capacity as Coordinator of Elections for the State of Tennessee, and AMY WEIRICH, in her official capacity as the District Attorney General for Shelby County, Tennessee,<br><br>Defendants. | Case No. 3:20-cv-0374<br>Judge Eli Richardson |

## DECLARATION OF MARK GOINS, COORDINATOR OF ELECTIONS, TENNESSEE SECRETARY OF STATE, DIVISION OF ELECTIONS

I, Mark Goins, pursuant to the provisions of 28 U.S.C. § 1746, do hereby declare as follows:

1. My position is Coordinator of Elections for the Division of Elections for the Tennessee Department of State, and I am competent to testify upon personal knowledge regarding the matters set forth herein.

2. I have served as the Coordinator of Elections since February 2009. As part of my duties as Coordinator of Elections, I am statutorily charged with "[a]dvis[ing] election commissions,

**EXHIBIT A**

primary boards, and administrators of elections as to the proper methods of performing their duties" and "[a]uthoritatively interpret[ing] the election laws for all persons administering them." Tenn. Code Ann. § 2-11-202(a)(3) and (4). I am further statutorily charged with the duty of furnishing "instructions for election officials as to their duties in the conduct of elections and copies of election law manuals and updating materials to the election commissions, primary boards, and administrators." Tenn. Code Ann. § 2-11-202(a)(8).

### The Current Tennessee Election COVID-19 Contingency Plan.

3. As part of my official duties, I oversaw the Tennessee Division of Elections' preparation and issuance of the April 23, 2020 Tennessee Election COVID-19 Contingency Plan ("Plan"), which Plaintiffs have submitted to the Court at DE 40-2, Exh. 4 ID# 214-295. "This plan is drafted under *current Tennessee laws* for the purpose of preparing for and administering an election with the coronavirus disease (COVID-19) still a public health issue." (Plan at 1). The Plan is a continuing work in progress, which may evolve as more information is available about COVID-19 and appropriate public health standards. (*Id.*) The Plan was prepared based upon elections and public health information extensively gathered, including through consultation with Tennessee's county Administrators of Elections (AOEs), other state and federal election administrators, legislators, public health officials, election-related vendors and others. (*Id.*) A list acknowledging some of the participants in the development of the Plan is set forth at its page 51.

4. The Plan allows Tennessee's election officials time to prepare for and inform the public about safety procedures being taken and who is eligible to vote absentee by-mail, prior to Tennessee's next statewide election on August 6, 2020. (Plan at 1.) The Plan recognizes the difficult challenge and the "need for the intense preparation and training required to give Tennessee voters the best election experience they deserve available under these less than ideal

2

Case 3:20-cv-00374   Document 46-1   Filed 06/26/20   Page 2 of 13 PageID #: 1824

circumstances." (*Id.*) AOEs will need to master the comprehensive uniform processes and procedures set forth in the Plan for success in the August and November election cycle. (*Id.*)

5. As of the date of this declaration, Tennessee has 3,950,409 active voters and 240,201 inactive voters for a total of 4,190,610 registered voters eligible to vote in the upcoming August and November election. In the 2016 presidential election cycle, only 11,806, or 2.12%, of the 557,507 voters who participated in the August election voted absentee by-mail. The remaining 97.88% of voters voted in-person, with 272,898 votes cast during early voting and 272,803 votes cast on Election Day. In the November election, only 64,199, or 2.52%, of the 2,545,271 voters who participated voted absentee by-mail. November elections typically see our highest early voting turnout. 1,625,790 voters voted in-person early (63.87%), and another 855,282 voted in-person on Election Day (33.60%). In 2018, the percentages of absentee by-mail voting were even lower. In August, only 17,474, or 1.42%, of the 1,227,913 voters who voted in August voted absentee by-mail. The remaining 98.58% split between in-person early voting (613,624 voters) and voting in-person on Election Day (596,815 voters). In November, only 43,236, or 1.91%, of the 2,267,428 voters who participated voted absentee by-mail. Of those, 1,343,140 voters voted in-person early (59.24%), and another 881,052 voted in-person on Election Day (38.86%). As the Plan recognizes, "Tennessee election officials have designed election preparation around the habits of the 97.5% of Tennessee voters who vote in-person." (Plan at 1). "Less than 2.5% of Tennessee voters historically voted absentee by-mail." (*Id.*) The Plan includes a chart demonstrating the small percentage of voters by county who voted absentee by-mail in the last Presidential election—64,199 absentee voters out of 2,545,271 total voters, or 2.52%. (Plan at 11-14). The Plan presumes that there will be a significant increase in absentee by-mail ballots cast by those statutorily qualified to do so. (*Id.* at 1.)

6. Historically, less than 2.5% of Tennessee voters have voted using the absentee by-mail voting process. Therefore, our 95 county election commissions carefully prepare for 97.5% of Tennessee voters to vote in-person either during early voting or on Election Day. Significant increases in voters using the absentee by-mail voting process involve converting the voting in-person preparation and election commission resources to a different type of voting process.

7. The Division of Elections collected information from the Tennessee county election commissions, who all reported that converting to a substantial number of absentee by-mail voting will require a significant increase in the following:

      a. Equipment used to process the absentee by-mail ballots;

      b. Workers to process the requests and applications for absentee by-mail ballots;

      c. Workers to process and count the absentee by-mail ballots;

      d. Time to count the absentee by-mail ballots;

      e. Space needed to count absentee by-mail ballots.

8. The State is assisting counties in preparing for the anticipated increase in absentee by-mail ballots using a significant portion of the $9.578 million we received as part of the CARES Act to offset the cost of scanners, personnel, and other election supplies needed to process the absentee ballots; however, these funds do not come close to covering all of the State's and counties' costs.

9. Tennesseans are used to getting results soon after polls close on election night, and counties are required to complete the vote tabulation on election night and report unofficial results to my office. *See* Tenn. Code Ann. § 2-8-101(c). With the anticipated substantial increase in absentee by-mail ballots by qualified voters, the results will most likely be delayed. And, in some of our larger counties, this delay could be several days.

Case 3:20-cv-00374   Document 46-1   Filed 06/26/20   Page 4 of 13 PageID #: 1826

10. Implementing Plaintiffs' requested changes would necessitate new training, the acquisition of more absentee ballots and envelopes, the creation of an entirely new cure form or template, and additional processing time. These changes will require additional financial resources when all State departments have been asked to reduce their budgets by 12%. And, what is more, the new cure process may present significant logistical challenges to the smooth administration of the coming elections. For example, Plaintiffs give no consideration to the length of the timeframe to cure. The State must certify election results quickly. This concern is especially acute with respect to primaries because ballots in the general election cannot be prepared until the results of the primary election are certified. After the general election, results must be certified quickly in preparation for the meeting of the electors and submission of the results to Congress.

11. Further, Plaintiffs' requested relief could reduce the integrity of the election process. In-person voting easily facilitates the checking of voter identification and, thus, aids in the prevention of fraud. But by its nature, absentee voting deprives the State of the ability to efficiently verify a voter's identity. Further, because no proof of identity is required under Tennessee's absentee voting laws, a voter could fraudulently fill out and sign a voter registration form and an absentee application using the same information. If a voter does so, the signatures will match, and that voter will receive a ballot without the State ever having an opportunity to verify that voter's identity. Such a scenario could lead to "ghost voting."

12. I have reviewed Plaintiffs' Amended Complaint and Motion for Preliminary Injunction, and their description of the absentee ballot process—specifically the signature-verification process—is not accurate.

## Signature Verification Occurs Twice, Not Once.

13. For an eligible voter who seeks to vote by absentee ballot, the voter's signature is evaluated, not once, but twice; because, prior to casting an absentee ballot, the voter must first submit a written request or application for such a ballot. *See* Tenn. Code Ann. § 2-6-202(a)(2) and (3). Such request or application may be made in-person, by mail, by facsimile, or by email. *See* Tenn. Code Ann. § 2-6-202(a)(3). Regardless of the manner of submission, the request or application must be signed by voter, and that signature is subject to the first of two signature evaluations. *See* Tenn. Code Ann. § 2-6-202(b) and (d).

14. If the signature on the request or application is determined to be inconsistent (in accordance with the process described below) with the signature on the voter's registration record, the request or application is rejected, and the applicant is immediately notified. If the voter submitted their request or application by email, the administrator of elections may send notification of the rejection by email. Otherwise, the voter is notified in writing by mail. *See* Tenn. Code Ann. § 2-6-204(a). If, on the other hand, the signature on the request or application is determined (in accordance with the process described below) to be consistent with the signature on file, an absentee ballot—together with instructions (an exemplar of which is attached as *Exhibit 1*), a ballot envelope, and a mailing envelope—is delivered to the voter by U.S. Mail. *See* Tenn. Code Ann. § 2-6-202(b) and (d).

15. Pursuant to Tenn. Code Ann. § 2-6-202(a)(1), an eligible voter who seeks to vote by absentee ballot may request or apply for a ballot as early as ninety (90) days before an election, but in no event later than seven (7) days before the election. A request or application for an absentee ballot must be received no later than seven (7) days before the election. *See* Tenn. Code Ann. § 2-6-202(d)(3).

6

Case 3:20-cv-00374   Document 46-1   Filed 06/26/20   Page 6 of 13 PageID #: 1828

16. The exterior of the ballot envelope contains a "Voter's Affidavit," which must be executed by the voter and which attests under penalty of perjury that he/she is a registered voter and that the submitted ballot has been completed by the voter him-/herself. *See* Tenn. Code Ann. §§ 2-6-202(e) and 2-6-309(b). An exemplar of the "Voter's Affidavit" is attached hereto as *Exhibit 2*. Thereafter, voter must place the ballot in the sealed ballot envelope and mail it back to the county election commission in the pre-addressed outer envelope, so that it is received on or before Election Day. *See* Tenn. Code Ann. § 2-6-202(e).

17. Thereafter, after receipt of an absentee ballot from the voter, county election officials open the outer mailing envelope, and—without opening the ballot envelope itself—the signature of the voter as it appears on the Voter's Affidavit is compared a second time to the signature of the voter on file to authenticate the validity of the ballot. *See* Tenn. Code Ann. § 2-6-202(g). If the signature on the Voter's Affidavit is determined (in accordance with the process described below) to be consistent with the signature on file, the ballot is accepted and placed (unopened) in the absentee ballot box to be counted on Election Day. *Id.* If, on the other hand, the signature is determined to be inconsistent with the signature on file, the ballot is rejected and notice of the rejection is mailed immediately to the voter. *See* Tenn. Code Ann. § 2-6-204(b). If time allows, a voter whose absentee ballot has been rejected can submit another absentee ballot. Alternatively, such voter could cast a provisional ballot in accordance with Tenn. Code Ann. § 2-7-112(a)(3).

**Signature Verification Process in Tennessee.**

18. For evaluation of both the request/application and the actual ballot, the signature verification process performed by county election officials is a painstaking process, and—as described below—is structured with the emphasis to *accept* a signature, rather than reject it.

7

19. Training in this process is mandatory, and it consists of a 45-minute video which is supplemented with additional directives from my office.

20. The video, which is entitled "Signature Verification" and which may be viewed at https://www.youtube.com/watch?v=UKiYGONnNT0&feature=youtu.be, was prepared by the Election Division of the Oregon Secretary of State, and comprehensively addresses the proper manner to conduct signature comparisons. Based on information provided to me by the Director of Elections for Oregon, the presenters are Ms. Summer Davis and Ms. Lydia Plukchi, who are Compliance Specialist 3s in the Elections Division of the Oregon Secretary of State and who have been with the Election Division for over 15 years. I understand that both Ms. Davis and Ms. Plukchi received their training from Ms. Heather Carlson, a forensic handwriting expert, whose *curriculum vitae* (as filed in *Lemons v. Bradbury*, 07-1782-MO (D. Or.) is attached hereto as *Exhibit 3*.

21. The video explores the various components of a signature: line-forms/style (cursive or printed), unconscious variations from line-forms, intentional "personalization" of a signature, alignment, signature speed, "pen lifts," line quality (which can deteriorate with the age of the signer), elements of proportion, size, spacing, and slant.

22. Beginning at time index 23:44, viewers are instructed as to "What to Look For," "What to Examine" and "Evaluating Signatures." At 29:04, the video begins to discuss whether to "Accept or Reject" a signature.

23. Most importantly, at time index 29:54, the viewer is told "You're looking for reasons to keep the signature *in*—to *validate* the signature—rather than reasons to throw the signature *out*. . . . We're looking for *any* reason to keep a signature." [Emphasis in original.]

24. Thereafter, at time index 30:29, the viewer is presented with numerous comparative examples of actual signatures submitted versus signatures on file, and from those examples the viewer is shown that all but the most obvious of inconsistent signatures are to be regarded as acceptable.

25. At time index 29:28 the viewer is instructed that a signature should be reviewed by "at least two different county elections officials" before it is rejected. During a statewide training session, I instructed county election officials that a signature on the absentee Voter's Affidavit, should *not* be rejected unless it is reviewed by *three* local election officials including the administrator.

26. My office provides this instruction because—due to the number of absentee ballots received in any given district—the administrators often have a deputy administrator of elections participate in signature comparisons, and requiring a concurrence of three individuals (including the administrator) adds a further safeguard against an erroneous rejection. In addition, my office emphasizes that the signature comparison process always should begin with the presumption that the signature at issue is valid, and that the signature in question should be compared with as many exemplars on file as possible.

## Signature Rejections.

27. Given the presumption of signature validity, very few absentee ballots are rejected in Tennessee for signature irregularity under Tenn. Code Ann. § 2-6-204(b).

28. For the national election in November of 2016, 73,338 absentee ballots were mailed to requesting voters, and 65,235 absentee ballots were received by county election officials statewide. Of those absentee ballots received, only 20 were rejected for signature irregularities. Of the 20 rejected ballots, thirteen (13) of those ballots were cast under the federal Uniformed and

9

Overseas Citizens Absentee Voting Act ("UOCAVA"), 52 U.S.C. § 20301, *et seq.*, which permits U.S. citizens—both military and civilian—who are living abroad to vote.

29. For the national election in November of 2018, 49,421 absentee ballots were sent to voters, and 44,392 absentee ballots were received by county election officials statewide. Of those absentee ballots received, only 42 were rejected for signature irregularities. Of the 42 rejected ballots, thirteen (13) of those ballots were cast under UOCAVA.

30. Thus, for the 109,627 absentee ballots cast in the 2016 and 2018 national elections, only thirty-six (36) absentee ballots cast pursuant to Tenn. Code Ann. § 2-6-201 (i.e., .03%) were rejected for signature irregularities.

**Additional Safeguard.**

31. In addition, to the training discussed above, any voter who is concerned that—for whatever reason—his/her absentee ballot may not be counted, also may cast a provisional ballot in accordance with Tenn. Code Ann. § 2-7-112(a)(3). Under that circumstance, if a voter's absentee ballot is determined to be valid and counted, the voter's provisional ballot will be discarded. Alternatively, if the voter's absentee ballot is rejected for a signature irregularity or any other reason, the provisional ballot will be counted.

I declare under penalty of perjury that the foregoing is true and correct. Executed by me this 26th day of June 2020 at Nashville, Tennessee.

*/s/ Mark Goins*
MARK GOINS

This proof is submitted for your review and approval. It is supplied for content, layout and version review and does not reflect paper or ink match. Please review your proof carefully

# Instructions for Voting Absentee By-Mail

☐ Mark ballot.

☐ Fold ballot and seal in appropriate absentee ballot envelope.

☐ Swear to and **SIGN VOTER'S AFFIDAVIT** on each absentee ballot envelope.

☐ If assistance in completing the ballot has been given, both the person giving assistance and the person witnessing assistance must sign in the appropriate places on the ballot envelope.

☐ Seal the absentee ballot envelope(s) in the large envelope with the county election commission's return address.

☐ Place postage on the large envelope and mail ballot. **First-Class Mail postage must be applied unless the voter is a military/overseas voter.**

☐ Ballots must be received by mail in the county election commission office by the time the polls close on Election Day.

**Notice: A person who votes absentee by-mail who is not entitled to do so commits a felony punishable by not less than two (2) years nor more than twelve (12) years imprisonment or a fine of $5,000 or both.**

Questions? Call the _____ County Election Commission at _____.

SS-3011 (Rev. 05/2020)

FACE

Goins Decl. – Exhibit 1

| County | District | Precinct | Ward | Election | Date of Election |
|---|---|---|---|---|---|

**Voter's Affidavit**

**(Name of Voter - Please Print)**

I, _____, do solemnly swear/affirm that I am a registered voter and resident of the state of Tennessee in the county, district, precinct, and ward as shown above and that I am registered to vote in the above election. I further swear/affirm that this envelope contains the absentee ballot marked by me in secret and that I am not registered to vote in any other state or county for this election and that I am entitled to vote absentee by mail in this election.

It is a felony for a person to falsify any information pertaining to the absentee voting process.

X _____ Signature of Voter

*Assistance Signatures: (Required if voter cannot sign or if assistance given.)*

_____ Date
Signature of Person Assisting

_____
Address

_____ Date
Signature of Witness

_____
Address

***Do not write in this section:***

The signatures above and on the permanent registration record (are) (are not) the same.

[ ] Ballot accepted.
[ ] Ballot rejected because: _____

_____ Date
Administrator or Deputy

▲ DO NOT DETACH ▲

# ABSENTEE BY MAIL BALLOT ENVELOPE

Election _____ Date _____

District _____ Precinct _____ Ward _____

SS-3017 (Rev: 12/2011)

Goins Decl. – Exhibit 2

# CURRICULUM VITAE

**HEATHER M. CARLSON**                    **FORENSIC DOCUMENT EXAMINER**

**Contact information:**
P.O. Box 898
Chehalis, WA 98532
(360) 740-1700
heathersntbk@aol.com

**FORMAL EDUCATION:**

| | | |
|---|---|---|
| Wartburg College | 1992-1996 (BA) | Majors – Chemistry and Biology |
| Waverly, Iowa | | |
| University of Alabama | 1996-1998 (MSFS) | Forensic Science |
| Birmingham, Alabama | | |

**PROFESSIONAL EDUCATION AND TRAINING:**
Oregon State Police Document Unit, apprenticeship-style training
Washington State Patrol Crime Laboratory, apprenticeship-style training
California Criminalistics Institute, Special Topics in Questioned Documents Course
Oregon State Police Forensic Services Division - 2 weeks supplemental training
San Diego County Sheriff's Office Crime Laboratory - 2 weeks supplemental training
Southwestern Association of Forensic Document Examiners, Ink Analysis Workshop
Southwestern Association of Forensic Document Examiners, History of Writing Workshop
Federal Law Enforcement Training Center, United States Secret Service Questioned Document Course
Rochester Institute of Technology, Printing Process Identification Course
Northwest Association of Forensic Scientists, Identification Science Workshop
Oregon State Police, Questioned Document Laboratory Training Seminar

**MEMBERSHIP IN PROFESSIONAL ORGANIZATIONS:**
Southwestern Association of Forensic Document Examiners

**INTERNSHIP:**
United States Secret Service, Birmingham Field Office – six month criminal justice internship

**RESEARCH:**
*Observations on the Brain, Perception and the Critical Examination of Questioned Documents* presented at the 2003 ASQDE conference in Baltimore, MD and at the Fall 2003 SWAFDE conference in Albuquerque, NM

**WORK EXPERIENCE:**

| | |
|---|---|
| July 1997 to August 1998 | January 2001 to July 2003 |
| Laboratory Technician | Forensic Document Examiner |
| Alabama Department of Forensic Sciences | Oregon State Police |
| Birmingham, Alabama | Forensic Services Division |
| | Salem Forensic Laboratory |
| August 1998 to December 2000 | Salem, OR |
| Forensic Document Examiner | |
| Washington State Patrol | August 2003 to present |
| Forensic Laboratory Services Bureau | Forensic Document Examiner |
| Crime Laboratory | Private Practice |
| Marysville and Seattle, WA | Chehalis, WA |