# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | |
|---|---|
| MEMPHIS A. PHILLIP RANDOLPH INSTITUTE, et al., | |
| *Plaintiffs*, | Civil No. 3:20-cv-0374 |
| v. | JUDGE RICHARDSON<br>MAGISTRATE JUDGE FRENSLEY |
| TRE HARGETT, et al., | |
| *Defendants*. | |

**REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

## INTRODUCTION

In response to Plaintiffs' motion for preliminary injunction, Defendants argue that Plaintiffs should not be able to challenge their unconstitutional conduct at all (standing), that Plaintiffs do not actually possess the fundamental rights they seek to advance (merits), and that Plaintiffs should have sought to vindicate their rights sooner (laches). The Court should not countenance Defendants' arguments. As described below Organizational Plaintiffs plainly have direct standing on each of their moved-on claims, and further have associational standing on their signature verification and first-time voter claims. Plaintiffs are also likely to prove that Tennessee law violates their and their members' constitutional rights and will cause irreparable harm absent relief. And Plaintiffs did not delay filing this litigation or their motion for preliminary injunction.

For these reasons, and in order to ensure that Plaintiffs are not deprived of their fundamental rights to free speech and to vote, the Court should grant Plaintiffs' motion for preliminary injunction.

## ARGUMENT

### I. Organizational Plaintiffs Have Standing to Assert Each of Their Moved-On Claims

To demonstrate Article III standing, a plaintiff must show that "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Sandusky Cty. Democratic Party v. Blackwell*, 387 F.3d 565, 573 (6th Cir. 2004). Where the plaintiff is an association or organization, it may either (1) assert standing on its own behalf because it suffered a palpable injury as a result of the defendant's conduct, or (2) as the representative of its members, to the extent those members would otherwise have standing to sue

Case 3:20-cv-00374   Document 51-1   Filed 07/06/20   Page 3 of 57 PageID #: 2079

in their own right. *See N.E. Ohio Coalition for the Homeless v. Husted*, 837 F.3d 612, 624 (6th Cir. 2016). Where an associational theory of standing is asserted by an organization seeking prospective or injunctive relief for its members, "the individual participation of an organization's members is not normally necessary." *See id.*

Defendants contend that neither Organizational Plaintiffs' nor their members have suffered any injury in fact. *See* Dkt. No. 46, Defs.' Opp. to Pls.' Mot. Preliminary Injunction ("Opp."), at 12–23. They further argue that with respect to Plaintiffs' signature verification and first-time voter claims, Organizational Plaintiffs' injury is not fairly traceable to the State's conduct. As explained below, the arguments miss the mark. Organizational Plaintiffs have standing to pursue each of their moved-on claims.[1]

### A. Organizational Plaintiffs Have Direct Standing to Challenge Tennessee Code § 2-6-202(c)(4)

A plaintiff making a pre-enforcement challenge to a statute on free speech grounds, "generally must show that the rule, policy or law in question has explicitly prohibited or proscribed conduct on the[ir] part," and that the "threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Plunderbund Media, L.L.C. v. DeWine*, 753 Fed. App'x 362, 366 (6th Cir. 2018). Here, Defendants concede that Tennessee Code § 2-6-202(c)(4) prevents Organizational Plaintiffs from making unsolicited distributions of absentee ballot request forms. *See* Opp. at 26. They nevertheless argue that Organizational Plaintiffs lack standing because "have not established a credible threat of prosecution" for violating the criminal law. *See* Opp. at 20–21.

The premise of Defendants' argument is belied by their vigorous defense of the criminal

---

[1] To the extent Defendants argue that Individual Plaintiffs do not have standing to pursue any of the moved-on claims, the argument is a distraction. So long as one plaintiff has standing to pursue a claim, it may jointly be pursued by all plaintiffs in common. *See Crawford v. Marion County Elec. Bd.*, 553 U.S. 181, 189 n.7 (2008). As described herein, Organizational Plaintiffs plainly have standing to pursue the moved-on claims.

2

provision. Indeed, Defendants argue that this criminal provision is vital to "protecting the integrity of the voting process." *See id.* at 35. Thus, any suggestion that they will not enforce this provision is disingenuous. *See Bauer v. Shepard*, 620 F.3d 704, 708 (7th Cir. 2010) ("[T]he existence of a statute implies a threat to prosecute."); *see also League of Women Voters v. Hargett*, 400 F. Supp. 3d 706, 719 (M.D. Tenn. 2019) ("First Amendment caselaw recognizes the danger in putting faith in government representations of prosecutorial restraint . . . . The courts, accordingly, will not uphold an unconstitutional statute merely because the Government promised to use it responsibly."). Indeed, to credit Defendants' premise would be to eviscerate the maxim that a plaintiff "need not first expose himself to actual arrest or prosecution to be entitled to challenge [a criminal] statute." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974).

Defendants' faulty premise aside, several of the factors that the Sixth Circuit has relied upon to show the potential of enforcement also support Organizational Plaintiffs' standing. *See Plunderbund Media*, 753 Fed. App'x. at 366–67 (considering (1) a history of past enforcement of the statute, (2) enforcement warning letters sent to plaintiffs, (3) an attribute of the challenged statute that makes its enforcement easier or more likely, and (4) defendant's refusal to disavow enforcement of the challenged statute against a particular plaintiff). First, while Plaintiffs are not aware whether Tennessee Code § 2-6-202(c)(4) itself has been enforced against any individual or entity, the State's enforcement of other election law statutes—which are likewise intended to "protect the integrity of the voting process"—strongly suggests that it would similarly enforce Tennessee Code § 2-6-202(c)(4), if violated. *See, e.g.*, *Tennessee Election Fraud Cases*, THE HERITAGE FOUND., https://www.heritage.org/voterfraud/search?state=TN (last visited July 6, 2020) (identifying 10 election fraud prosecutions by the State of Tennessee since 2005).[2] Second,

---

[2] To be clear, the minimal number of prosecutions for election law violations is indicative of the relative lack of election fraud in Tennessee, not Defendants' lack of zealousness to prosecute it.

3

Tennessee Code § 2-6-202(c)(4) is a strict liability statute, making its violation obvious and inevitable if Organizational Plaintiffs engage in their planned conduct. *See, e.g.*, NAACP Decl. ¶¶ 48–55; MCLC Decl. ¶ 21; APRI Decl. ¶ 19–20; Equity Alliance Decl. ¶ 33; Free Hearts Decl. ¶¶ 21–26; *see also Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 302 (1979) (finding standing to challenge criminal penalty provisions that would inevitably be broken by plaintiffs despite that fact that they had "not yet been applied and may never be applied" in the relevant context). Finally, neither the State Defendants, nor Defendant Weirich—whose office has the authority to prosecute violations of the Tennessee Code § 2-6-202(c)(4) in Shelby County, where at least several Organizational Plaintiffs operate—have disavowed enforcement of the law.[3] *See id.* (finding standing where "the State ha[d] not disavowed any intention of invoking the criminal penalty provision"); *see also* Opp. at 27–35 (describing the compelling government interests purportedly served by the law). To the contrary, they vigorously defend it.

Given the foregoing, Organizational Plaintiffs have a reasonable fear of prosecution for distributing unsolicited absentee ballot request forms. Organizational Plaintiffs therefore have standing to challenge Tennessee Code § 2-6-202(c)(4).

## B. Each Organizational Plaintiff Has Direct Standing to Challenge the Signature Verification Procedures and First-Time Voter Requirement

Organizations can suffer a cognizable injury when they are required to expend or divert resources in order to counteract policies that conflict with the organization's goals. *See N.E. Ohio*

---

[3] Defendants claim that Plaintiffs cannot reasonably fear prosecution for violating the law because they only named Defendant Weirich as a Defendant, rather than naming each district attorney general in Tennessee. *See* Opp. at 21 n.3. The essential implication of Defendants' argument is that unless a plaintiff asserting a pre-enforcement challenge to a criminal statute sues each and every individual that could possibly enforce the law against them, they do not have standing to sue. Not surprisingly, Defendants provide no support for this argument, which, if accepted, would subject our courts to the taxing burden of suits naming *hundreds* of unnecessary defendants instead of simply, as here, *an* appropriate defendant. Plaintiffs have faith that district attorneys across the state will not ignore this Court's rulings in their prosecutorial actions.

4

*Coalition for the Homeless*, 837 F.3d at 624 (finding that an organization that helped homeless voters had standing to challenge a law that negatively impacted homeless voters). Organizational Plaintiffs have suffered such an injury here with respect to both their signature verification and first-time voter claims.

This year, in light of the significant increase in the number of Tennesseans expected to vote by mail, each Organizational Plaintiff has overhauled its voter engagement program to focus more directly on absentee voting. *See, e.g.*, Tennessee NAACP Decl. ¶¶ 41–46; MCLC Decl. ¶ 17–19; APRI Decl. ¶ 16–18; Free Hearts Decl. ¶ 15–17. But in making such adjustments, they have been required to divert resources to assisting voters with understanding, complying with, and negating the burdensome impact of the signature verification and first-time voter requirements. *See, e.g.*, Tennessee NAACP Decl. ¶¶ 41–45, 56–67; MCLC Decl. ¶¶ 28–34; Equity Alliance Decl. ¶¶ 40–46; APRI Decl. ¶¶ 28–35. Such diversion and additional expenditure of resources directly harms Organizational Plaintiffs. *See, e.g.*, *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1334 (N.D. Ga. 2018) (holding that an organization had direct standing to challenge Georgia's signature match procedures based on a diversion of resources theory); *see also Common Cause Indiana v. Lawson*, 937 F.3d 944, 950 (7th Cir. 2019) ("[A] voting law can injure an organization enough to give it standing by compelling [it] to devote resources to combatting the effects of that law that are harmful to the organization's mission."). Absent these complicating factors, Organizational Plaintiffs could use their resources to conduct more effective mail voting operations.

Defendants concede that Organizational Plaintiffs have shown that they have diverted significant resources to educating voters about and assisting voters with both the signature match procedures and the first-time voter requirement. *See* Opp. at 16 (acknowledging that "Organizational Plaintiffs are diverting their resources to educating voters" about the signature

5

verification procedures and first-time voter requirement). They nevertheless argue that such a diversion of resources is not sufficient to establish standing because Organizational Plaintiffs are only educating voters about existing laws rather than newly-enacted ones. *See id.* (citing *Fair Elections Ohio v. Husted*, 770 F.3d 456, 459–60 (6th Cir. 2014)). But *Fair Elections Ohio* is not fairly read to stand for the proposition that a diversion of resources theory is only available to challenge a newly-enacted law. *See* 770 F.3d at 459. Such a rule—markedly departing from precedent—would need to be clearly announced. *See, e.g.*, *OCA Greater Houston v. Texas*, 867 F.3d 604 (5th Cir. 2017) (finding that an Organizational Plaintiff had standing under a diversion of resources theory to challenge an existing law); *Common Cause/NewYork v. Brehm*, 432 F. Supp. 3d 285, 309 (S.D.N.Y. 2020) (same, citing cases); *Kemp*, 341 F. Supp. 3d at 1334 (same). Rather, the better reading of the case, and its subsequent interpretation in *N.E. Ohio Coalition for the Homeless*, is that the question of whether a law is existing or newly-enacted can help the court analyze the complained-of injury and whether it is traceable to the defendant's conduct. *See Fair Elections Ohio*, 770 F.3d at 460; *see also N.E. Ohio Coalition for the Homeless*, 837 F.3d at 624. Here, it is clear that while COVID-19 exacerbated the scope of Defendants' unconstitutional signature-matching procedure, and made the First-Time Voter Restriction unconstitutional as applied during the pandemic, it is ultimately Defendants' own statutes, and continued application of them, that is causing Organizational Plaintiffs' injury. *See Fair Elections Ohio*, 770 F.3d at 460 ("If a voter can get to the polls more easily by winning the lawsuit, or a political party can marshal its forces more effectively by winning its lawsuit, that ought to be enough for Article III."). Organizational Plaintiffs therefore have standing to assert their claims.

With respect to the signature-match requirements, the unconstitutionality of Tennessee's failure to provide fair notice and cure for signature-related defects on absentee ballots preceded

the outbreak of COVID-19. But the law's unconstitutional impact was not felt by most Tennesseans, who typically vote in person, until this year. Because many more Tennesseans will now be affected by Defendants' unconstitutional conduct, Organizational Plaintiffs have begun to re-envision their voter engagement strategies, including devoting significant resources to counteract the effect of Defendants' failure to implement notice and cure procedures and unnecessary restriction on first-time voters' access to vote by mail. *See, e.g.*, Tennessee NAACP Decl. ¶¶ 41–46; MCLC Decl. ¶ 17–19; APRI Decl. ¶ 16–18; Free Hearts Decl. ¶ 15–17. Their attempts to launch successful vote-by-mail strategies have been directly frustrated by the State's continued restriction on access to vote by mail and failure to provide voters with confidence that their absentee ballots will count.

For example, while Tennessee law does not provide mail-in voters any opportunity to cure signature-related defects on their absentee ballot, some election officials apparently do permit some voters the opportunity to cure such deficiencies. *See* Farley Decl. ¶ 7. In response to Defendants' lack of a consistent cure procedure, Organizational Plaintiffs have had to expend resources educating voters, preparing them to request a cure, and assuaging concerns that voting is futile because their absentee vote may not be counted. *See, e.g.* Tennessee NAACP Decl. ¶¶ 56–67: MCLC Decl. ¶¶ 28–29; Free Hearts Decl. ¶¶ 29–33. This expenditure of resources would not be necessary but for Defendants' failure to provide affected voters an opportunity to cure.

Similarly, Defendants' refusal to suspend the First Time Voter Requirements during an ongoing pandemic is the source of Plaintiffs' injury, not the pandemic itself. Indeed, Organizational Plaintiffs have had and will have to "dedicate time and resources to ensuring that voters who registered to vote by mail know that they will not be able to cast their ballot in person." MCLC Decl. ¶ 34. But the injury is greater than just that. Defendants' insistence on enforcing this

restriction, despite the state court's ruling holding that registered voters can vote absentee on the basis of COVID-19, is generating substantial confusion among Tennesseans—including Organizational Plaintiffs' members. *See, e.g.*, Stewart Decl. ¶¶ 6–8. Thus, Organizational Plaintiffs are having to dedicate resources to clarifying vote-by-mail eligibility for their members and others they work with. For example, Defendants advertise that "[p]ursuant to the June 4, 2020 Order of the Davidson County Chancery Court, if you are a registered voter and do not wish to vote in-person due to the COVID-19 situation, you are eligible to request an absentee ballot by mail," *see* Doshi Decl., Ex. 5 (Secretary of State's website), but their subordinate county election commission in Shelby County states that "if you registered to vote by mail *or on the on-line system* and you have not voted in Shelby County before, you must vote in person," *see* Doshi Supplemental Decl. Ex. 18 (emphasis added). Given this inconsistent messaging, Organizational Plaintiffs must take extra care to provide voters with clarity about the first-time voter exception to the new COVID-19 absentee voting rules. *See* MCLC Supplemental Decl. ¶¶ 3–4; Tennessee NAACP Supplemental Decl. ¶¶ 3–6. Such expenditure of resources would not be necessary but for Defendants' conduct.

Organizational Plaintiffs' efforts to ensure that as many of their eligible members and community members are able to vote as possible are frustrated by Defendants' continued enforcement of the first-time voter requirement because, as a result of the law, such voters may ultimately not vote at all. *See, e.g.*, Tennessee NAACP Decl. ¶¶ 41–45; MCLC Decl. ¶¶ 30–34. Thus, Plaintiffs are directly harmed by Defendants' requirement that first-time voters vote in person or not at all, despite the ongoing pandemic.

## C. Organizational Plaintiffs Tennessee NAACP, MCLC, and APRI Have Associational Standing to Bring Claims Related to the Signature Verification Procedures and the First-Time Voter Restriction on Behalf of Their Members

With respect to both Plaintiffs' signature-verification-related and first-time voter claims,

Defendants contend that because Organizational Plaintiffs have not made any "*specific* allegations establishing that at least one *identified* member had suffered or would suffer harm," they cannot establish their members' right to sue on their own behalf. *See* Opp. at 22. Relatedly, as to the signature-verification claim alone, Defendants argue contend that Plaintiffs lack standing because they have not demonstrated the requisite injury-in-fact on their signature verification claims. Each of Defendants' arguments fails.

1. *Organizational Plaintiffs Have Associational Standing to Assert the Signature-Verification Claims*

For claims involving prospective harm, like Plaintiffs' signature verification claims, an organizational plaintiff asserting claims on behalf of its members need not identify a specific member who will be harmed in the future because doing so would, of course, be impossible:

> Appellees have not identified specific voters who will seek to vote at a polling place that will be deemed wrong by election workers, but this is understandable; by their nature, mistakes cannot be specifically identified in advance. Thus, a voter cannot know in advance that his or her name will be dropped from the rolls, or listed in an incorrect precinct, or listed correctly but subject to a human error by an election worker who mistakenly believes the voter is at the wrong polling place. It is inevitable, however, that there will be such mistakes.

*Sandusky Cty. Democratic Party v. Blackwell*, 387 F.3d 565, 574 (6th Cir. 2004); *see also Florida State Conference of the N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1162–63 (11th Cir. 2008) ("When the alleged harm is prospective, we have not required that the organizational plaintiffs name names because every member faces a probability of harm in the near and definite future."). Rather, associational standing is conferred on an organizational plaintiff by the likelihood of harm befalling its members. *See Sandusky*, 387 F.3d at 574. Such harm is multifold and inevitable here.

When absentee voters in Tennessee cast their ballots, they may not know until after the election is over whether their ballots were counted. Even if they do learn of the rejection in

9

advance, they have no statutory right to cure the defects that caused their ballots to be rejected. Instead, the voters' only available remedy is to undertake the burden of voting a second time—in person, with a provisional ballot—to hedge against the possibility that their ballots may not be counted. *See* Opp. at 43.

Particularly for first-time absentee voters—as most Tennesseans, including Organizational Plaintiffs' members, will be this election cycle—the possibility that their ballots will be rejected for a signature-related discrepancy without any opportunity to cure engenders distrust in the voting system and make them less likely to vote by mail altogether. *See, e.g.*, Tennessee NAACP Decl. ¶¶ 43, 45, 66; Free Hearts Decl. ¶¶ 29–33. Such distrust is only strengthened by the non-uniform manner in which some election officials allow certain voters an opportunity to cure deficiencies with their absentee ballot. *See* Farley Decl. ¶ 7 (noting that when a voter fails to sign the affidavit on their ballot, "we contact the voter by whatever means are available, so that the voter can come to our office, sign the Affidavit, and have his/her vote counted"); *but see generally* Tenn. Code § 2-6-201, *et seq.* (providing no statutory right to cure absentee ballot deficiencies). As a result of the distrust created by Defendants' lack, or inconsistent provision, of process, Organizational Plaintiffs' members have had to undertake additional burdens of guarding against erroneous rejections of their ballots, including practicing their signatures, as well as preparing to, and eventually contacting their local election officials to determine (1) if their mail ballots were counted, and (2) whether they may be given an opportunity to cure, as some absentee voters apparently are. *See* Farley Decl. ¶ 7. Such trepidation and required proactivity are burdens imposed on Organizational Plaintiffs' members, and constitute requisite injury for standing purposes.

Beyond suffering from a fear that their ballots might not be counted, and having to take proactive steps to try to avoid such an outcome, some absentee voters will also, inevitably, have

their absentee ballots rejected. While Defendants argue that such a possibility is low,[4] *see* Opp. at 48, their assertion assumes that the absentee voting system will remain underutilized in Tennessee. But Defendants were preparing for at least 1.4 million absentee-eligible voters in Tennessee to vote by mail even before the Chancery Court expanded absentee voting to all voters. *See* Opp. at 3. At such scale, the rejection rate will likely increase. *See* Mohammed Supplemental Decl. ¶ 3. But even assuming a replication of the 2018 absentee ballot rejection rate of 0.09 percent, more than one thousand voters will be denied the franchise in August 2020 as a result of Defendants' failure to provide them with an opportunity to cure a signature-related discrepancy. Given the breadth of their membership populations—which collectively total over 30,000 Tennesseans—it is likely that at least one of Organizational Plaintiffs' members will have their validly cast absentee ballot rejected for a signature-related discrepancy. *See Florida State Conference of the N.A.A.C.P.*, 522 F.3d at 1162–63 (finding that "[g]iven that [organization plaintiffs] collectively claim around 20,000 members state-wide, it is highly unlikely—even with only a one percent chance of rejection for any given individual—that not a single member will have his or her application rejected due to a mismatch"). Thus, the denial of timely notice and an opportunity to cure a rejected ballot also constitutes requisite injury to Organizational Plaintiffs' members for standing purposes.[5]

2.  *Organizational Plaintiffs Have Associational Standing to Assert Their First-Time Voter Claim*

Organizational Plaintiffs are able to identify a specific member who is directly injured by

---

[4] As described below, the 0.09 percent rejection rate cited by Defendants undercounts the true rejection rate in Tennessee, which is likely higher. *See infra* at 19 n.10.

[5] Defendants make the specious argument that Plaintiffs have not proven that any rejection for signature-match purposes was erroneous. *See* Opp. at 47. But as Defendants' own declarants confirm, in most instances, they are. *See* Farley Decl. ¶ 7; Warren Decl. ¶ 5. Nevertheless, Defendants' argument again relies on the incorrect reading of Sixth Circuit law, that Plaintiffs must "proffer an affidavit from any member identifying that their absentee ballot was improperly rejected in a prior election." *See* Opp. at 47. As described above, that is not what the law requires. Rather, Plaintiffs have clearly demonstrated the *risk* of an erroneous deprivation. *See* Mem. at 32–34; *see infra* at 18–21.

11

the first-time voter requirement. *Cf.* Opp. at 17. Corey Stewart is a first-time voter and member of the Tennessee NAACP who registered to vote online earlier this year. Mr. Stewart is unsure whether he must vote in person or not, given the inconsistent instructions promulgated by the State and his local election commission in Shelby County. *See* Stewart Decl. ¶ 8. Indeed, according to his local election commission, Mr. Stewart may not vote by mail in the August election. *See id.* ¶ 6. Mr. Stewart does not want to vote in person, however, because he does not want to expose himself or his family members to COVID-19. *See id.* ¶¶ 6–9 (also noting that if his university resumes in-person classes, he does not have the money to travel back to the state to vote in person). Many of Organizational Plaintiffs members are similarly affected and confused. *See* MCLC Supplemental Decl. ¶¶ 3–4; NAACP Tennessee Supplemental Decl. ¶¶ 3–6. Thus, Organizational Plaintiffs have demonstrated an injury-in-fact with respect to their first-time voter claim.

## II.  Plaintiffs are Likely to Succeed on the Merits of Each of Their Claims

### A.  Plaintiffs are Likely to Succeed on Their Claim that the Prohibition on the Unsolicited Dissemination of Absentee Ballot Requests Violates the First Amendment

In support of their view that Organizational Plaintiffs have not demonstrated a likelihood of success on the merits of their challenge to Tennessee Code § 2-6-202(c)(4), Defendants first, argue that because the law imposes only a "minimal burden on Organizational Plaintiffs' First Amendment rights," it should be subject to, and survives, "a lesser standard of scrutiny." *See* Opp. at 27. They also argue that even if the law imposes a severe burden on Organizational Plaintiffs' rights, it still survives exacting scrutiny because it "advances very important, compelling State interests and does so in a narrowly tailored manner." *Id.* Neither argument is correct.

#### 1.  The Prohibition on the Distribution of Unsolicited Absentee Ballots Imposes a Severe Burden on Organizational Plaintiffs

Tennessee Code § 2-6-202(c)(4), which imposes a categorical ban on Organizational

Plaintiffs' ability to provide voters with unsolicited absentee ballot request forms, imposes a severe burden on their constitutional rights. Indeed, in any context, an absentee ballot request form— much like a voter registration form—is a necessary prerequisite to voting by mail, and its distribution is a form of political speech that aims to "creat[e] new [absentee] voters." *See League of Women Voters v. Hargett*, 400 F. Supp. 3d at 725 (applying "exacting scrutiny" to evaluate and overturn a statute that burdened plaintiffs' ability to engage in voter registration drives that aim to "creat[e] new registered voters," an activity which "involves the direct regulation of communication and political association.") (citing *Meyer v. Grant*, 486 U.S. 414 (1988)). But particularly this year, when the ability to vote by mail is, for many voters, tantamount to being able to vote at all, the burden imposed on Organizational Plaintiffs' pure political speech activity is even more severe. *See* Ex. 1 (Davidson County Chancery Court Order of June 4, 2020). Indeed, Defendants do not contest that some voters would be entirely unable to access the form but for Organizational Plaintiffs' unsolicited distribution of it, *see* Dkt. No. 41–2, Pls.' Mem. Preliminary Injunction ("Mem."), at 12 (citing declarations), or that their absentee voter engagement and registration activities will be much less effective if they are not able to provide unsolicited absentee ballot request forms as part of their communications about voting by mail, *see id.* at 17 (citing declarations).[6]

Defendants nevertheless argue that the burden imposed by Tennessee Code § 2-6-202(c)(4) on Organizational Plaintiffs' speech activity is "minimal" because the statute prohibits only one aspect of their proposed absentee voter engagement efforts. *See* Opp. at 26. The law does not countenance Defendants' attempt to slice and dice Plaintiffs' absentee voter registration activities.

---

[6] It bears mention here that just because Organizational Plaintiffs' communications will be unsolicited, that does not also mean that they are unwanted; Organizational Plaintiffs primarily plan to provide unsolicited absentee ballot request forms to their members and engaged voter constituencies. *See* Mem. at 16 n.13.

13

Much as in this case, in *Meyer*, the defendants argued that the law against paid circulators "did not place any restraint on their own expression" because the plaintiffs could speak about the initiative without collecting signatures. 486 U.S. at 418. The Supreme Court recognized that this type of interactive political speech cannot be so disaggregated without cutting it off at its knees: "[T]he circulation of a petition involves … interactive communication concerning political change." *Id.* at 421–22. The Court found that without the petition circulation activity, such interactive communication would be far less effective. *Id.* at 424; *see also Citizens for Tax Reform v. Deters*, 518 F.3d 375, 386 (6th Cir. 2008) (First Amendment protects plaintiffs' "right not only to advocate their cause but also to select what they believe to be the most effective means for doing so"). Similarly here, without the inclusion of an absentee ballot request form with their communications urging voters to request an absentee ballot, Organizational Plaintiffs' communications about absentee voter registration lose their force, and must therefore be subject to exacting scrutiny. *See* Mem. at 17 (citing declarations).

Neither *Citizens for Tax Reform* nor *Burson v. Freeman*, 504 U.S. 191 (1992), support Defendants' argument that the prohibition on distributing absentee ballot request forms imposes only a minimal burden. Quite the opposite. In *Citizens for Tax Reform*, the Sixth Circuit held that a *near*-complete ban on remuneration for signature gatherers was subject to exacting scrutiny because it imposed a "significant burden" on plaintiffs' speech by making their ability to collect signatures more difficult and more expensive. *See* 518 F.3d at 385–86 (comparing other state statutes, found constitutional, that permitted all forms of remuneration except for one). Likewise, in *Burson*, the Court agreed that a complete ban on political speech in a public forum—like the complete ban here—"must be subjected to exacting scrutiny." 504 U.S. at 198 (nevertheless

14

upholding a ban on political speech within a public forum because it survived exacting scrutiny as a narrowly tailored restriction on speech).

There is no evidence in the record, nor is there any case law to support the proposition that the State's categorical bar on making unsolicited distributions of absentee ballot request forms does not severely burden Organizational Plaintiffs' constitutional rights. Tennessee Code § 2-6-202(c)(4) therefore cannot survive unless it is demonstrated to be narrowly-tailored to serve a compelling government interest. *See Meyer*, 486 U.S. 425.

### 2. Tennessee Code § 2-6-202(c)(4) is not narrowly-tailored to serve a compelling government interest

Defendants argue that Tennessee Code § 2-6-202(c)(4) was enacted, and is narrowly tailored to serve, the government's compelling interest in "preventing the distribution of *non-election commission* absentee ballot request forms that were confusing voters." *See* Opp. at 34 (emphasis added); *see also id.* at 35 (arguing that Tennessee Code § 2-6-202(c)(4) serves the government's interest in "preventing voter confusion and protecting the integrity of the electoral process"). But the law does more than just "prevent[] the distribution of non-election commission absentee ballot request forms." Rather, Tennessee Code § 2-6-202(c)(4) sweeps more broadly, preventing the unsolicited distribution of all absentee ballot request forms, whether created by the State or not. Because such a broad sweep entirely untethers the law from the purpose it purports to serve, it is unconstitutional.

Thus, the State's defense of Tennessee Code § 2-6-202(c)(4) rests largely on their bizarre and repeated claim that "[t]here is no such form as a request for an application," and therefore the restriction only "prevents the distribution of non-election commission absentee ballot request forms." *See* Opp. at 34. This is demonstrably false. Tennessee's Secretary of State, Defendant Hargett, publishes on his official website, a form titled "Absentee Ballot By-Mail Request." *See*

15

Doshi Decl. Ex. 5 (image of Defendant Hargett's website linking to the form); Doshi Supplemental Decl. Ex. 17 (absentee request form available at Defendant Hargett's website); *see also* Phillips Decl. ¶ 6 (describing the official absentee ballot request forms voters can use to request a mail ballot). A voter may download, complete, and return that form to their county election commission in order to vote by mail. *See id*. The form requires an attestation under penalty of perjury that the voter is entitled to vote by mail, and even requires the voter to provide the basis for their request to vote by mail. *See id.* And in its lower margin, the form includes an "Election Office Use Only" section. *See id.* It is precisely this *official* form that Organizational Plaintiffs seek to distribute.

The existence of this State-created form notwithstanding, under Tennessee Code § 2-6-202(c)(4), Organizational Plaintiffs may not do their members and engaged voters the courtesy of printing the form and mailing it to them unsolicited, along with additional information encouraging them to vote by mail this year. *See* Tenn. Code § 2-6-202(c)(4). Nor may a family member, in a conversation about the importance of voting by mail in this election, provide a copy of the form, unless first specifically asked to do. *See id.*; *see also* Doshi Decl. Ex. 14 at 13–16 (Tape Logs of State Legislature Proceedings, confirming that such a circumstance would be illegal under the law). This is true regardless of the fact that the recipient of the unsolicited form would likely not be confused by its purpose, *see* Doshi Supplemental Decl. Ex. 17 (describing, in bold all-caps type, that it is an "ABSENTEE BY-MAIL REQUEST"), and might not otherwise have the means to print it out and return it themselves, *see* MCLC Decl. ¶ 24; APRI Decl. ¶ 22.

Of course, to the extent Defendants are still concerned that voters may be confused by receiving the State's official form, they may take lesser prophylactic measures, like adding an additional warning on the form, that would stop short of an outright ban of the form's unsolicited

16

distribution. What they cannot do, however, is enforce Tennessee Code § 2-6-202(c)(4), which is not remotely tailored to the purpose it was intended to serve.

**B. Plaintiffs are Likely to Succeed on Their Signature Verification Claims**

 *1. The Signature Verification Requirements Deprive Organizational Plaintiffs' Members of a Statutorily Entitled Right*

Defendants first argue that Plaintiffs' procedural due process claim fails because they—along with every other Tennessee voter—lack a legal entitlement to vote by mail. *See* Opp. at 43–44 (citing *Fowler v. Benson*, 924 F.3d 247 (6th Cir. 2019)). The proposition is, once again, false. *See* Tenn. Code §§ 2-6-201, *et seq* (outlining the circumstances under which a Tennessee voter is legally entitled to vote by mail); *see also* Doshi Decl. Ex. 5. Whether or not voters have a general *constitutional* right to vote by mail, *see* Opp. at 44–45 (citing cases), in Tennessee, the State has already created and conferred a *statutory* right to do so to at least some of its voters, *see* Tenn. Code § 2-6-201, including Organizational Plaintiffs' members.[7] The State cannot deny that right without first providing the safeguards necessary to comply with due process.[8]

 *2. The Lack of Notice and Opportunity to Cure Violates Procedural Due Process*

Defendants next argue that the existing signature verification procedure satisfies

---

[7] Defendants' citation to *Fowler* to argue otherwise is inapt. In *Fowler*, the Sixth Circuit reasoned that the state of Michigan did not create a legal entitlement to drivers' licenses for individuals who had failed to pay outstanding court debt. *Id.* at 258. Rather, the statute explicitly suspended drivers' licenses of those individuals who failed to pay court debts and the Sixth Circuit noted that the "whole point is that Michigan's statutory scheme does not create such an entitlement." *Id.* Here, unlike in *Fowler*, the State of Tennessee did create a statutory right to vote by absentee ballot. *See* Tenn. Code Ann. § 2-6-201.

[8] Defendants do not appear to directly challenge Plaintiffs' claim that the lack of a notice and cure procedure in the signature verification process also imposes a severe burden on Organizational Plaintiffs' members' right to vote by mail. *See* Mem. at 36–38. Plaintiffs should therefore succeed on that claim. However, to the extent that Defendants indirectly challenge the claim by arguing that Plaintiffs lack a substantive entitlement to vote by mail, *see* Opp. at 43–46, the challenge fails for the reasons described above. Tennessee law confers upon Plaintiffs a right to vote by mail, which for some voters is their *only* available means of voting this year, in light of the pandemic. *See See* Tennessee NAACP Decl. ¶¶ 34, 39; MCLC Decl. ¶¶ 14–15; APRI Decl. ¶ 22–24; Equity Alliance Decl. ¶ 19–21; Free Hearts Decl. ¶ 19. Defendants' imposition of a severe burden on that right to vote—by summarily rejecting absentee ballots without notice and an opportunity to cure—violates the Constitution. *See* Mem. at 39–41.

procedural due process requirements. They do not. Notwithstanding Defendants' assertions to the contrary, each of the *Mathews v. Eldridge* factors—which guide the procedural due process analysis, 424 U.S. 319 (1976)—weighs in Plaintiffs' favor. *See* Mem. at 30–36.

First, the private interest at stake is nothing less than the right to vote itself. As described above, Organizational Plaintiffs' members have a constitutional right to vote, and a statutorily-conferred right to do so by mail. *See also id.* If they choose to exercise their statutory right to vote by mail, that vote must either be counted, or due process provided before it is not. *See Self Advocacy Solutions N.D. v. Jaeger*, 2020 WL 2951012, at *9 (D.N.D. June 3, 2020) (a state's "decision to allow voting via absentee ballot requires the state to administer the system constitutionally"); *Martin*, 341 F. Supp. at 1326; *Saucedo v. Gardner*, 335 F. Supp. 3d 202, 217 (D.N.H. 2018). Tennessee's citations to cases—such as *Mays v. LaRose*, 951 F.3d 775, 792 (6th Cir. 2020) and *McDonald v. Bd. of Election Com'rs of Chicago*, 394 U.S. 802, 807 (1969)—which addressed whether voters who *do not* have a statutory right to vote by mail nevertheless have a constitutional right to do so, are inapposite.[9] Organizational Plaintiffs' members' interest in having their statutorily authorized mail ballots counted is strong.

Second, the risk of erroneous deprivation is high. Defendants argue that Plaintiffs have proffered "no proof that such erroneous rejections [based on signature match discrepancies] have—in fact—occurred in Tennessee." Opp. at 47. But the premise of Defendants' argument is flawed. Whether or not there have previously been erroneous rejections of absentee ballots—and there almost certainly have been—the *Mathews* test requires an analysis of the *risk* of such deprivation. And as Plaintiffs' expert, Dr. Mohammed explains, the risk is high, including because

---

[9] The logical and ultimately absurd implication of Defendants' argument, if correct, is that voters who exercise their statutorily-conferred right to vote by mail have no actual right to have that vote counted. *See* Opp. at 46–47.

of a reliance on lay reviewers who do not become expert after reviewing a 45-minute training video, which is itself deficient. *See* Mohammed Supplemental Decl. ¶¶ 4–6 (explaining that the trainers in the video are not themselves experts in signature verification). Indeed, the risk is high enough that Oregon—from whom Tennessee borrows the training video, and which also offers a presumption of signature validity, *see* Opp. at 41–42—offers its absentee voters the very notice and cure procedures that Tennessee argues are unnecessary, *see* Ore. Rev. Stat. § 254.431.

Moreover, a low rate of absentee ballot rejections does not indicate the absence of a risk of erroneous deprivation, as Defendants argue, especially considering the low number of absentee ballots evaluated in the first instance.[10] *See* Opp. at 43–45; *see also* Mohammed Supplemental Decl. ¶ 3 (noting that as the number of absentee ballots increases, Tennessee can expect to see a corresponding increase in the number of rejections). In *Saucedo v. Gardner*, for example, the court found that the "value of additional procedures was great" even with a low rejection rate of .35% of absentee ballots for signature mismatch (275 rejections out of 78,430 absentee ballots cast), "in light of the otherwise irremediable denial of absentee voters' right to vote." 335 F. Supp. 3d at 211. Similarly, in *Zessar v. Helander*, the court found that a 0.43% rejection rate of absentee ballots for any reason (1,100 rejected of 253,221 total returned) and presumably, an even lower rejection rate for absentee ballots for mismatched signatures, was not "tremendous" but still sufficient to warrant additional procedures. 2006 WL 642646, at *8; *see also Self Advocacy Solutions, N.D.*, 2020 WL 2951012, at *10 (finding a procedural due process error even where the rate of rejections was low, as demonstrated by the fact that in the 2018 general election, more than half of North

---

[10] As noted in Plaintiffs' opening brief, Defendants' data likely undercount the actual number of signature verification rejections. *See* Mem. at 14 n.12. That conclusion is only strengthened by the fact that some election administrators apparently proactively contact voters to resolve signature verification-related discrepancies so that their vote may be counted. *See* Farley Decl. ¶ 7. While such proactivity might be laudable, it also ensures that those ballots that would otherwise have been rejected for having errors do not get recorded as errors as part of Defendants' rate of ballot rejection.

19

Dakota's counties did not reject a single absentee ballot).

Disregarding these cases, Defendants instead rely on *Lemons v. Bradbury*, 538 F.3d 1098 (9th Cir. 2008).[11] But *Lemons* is distinguishable. In *Lemons*, the plaintiffs challenged Oregon's signature matching process for signatures on petition referenda, contending that as compared to Oregon's robust pre-deprivation and cure procedures for nonmatching signatures on vote-by-mail ballots, the state's signature verification process for petition referenda did not provide for notice or opportunity to cure, and so, erroneously deprived Plaintiffs of their right to vote. *Id.* at 1101. The Ninth Circuit rejected the challenge, holding that additional verification procedures would be of "negligible value," particularly in light of the administrative burdens associated with providing additional notice and an opportunity to cure to thousands of petition signers. *See id.* at 1104.

Here, by contrast, the value of ensuring that a vote is counted is high, while the additional administrative burden of providing additional notice and an opportunity to cure to all voters is low. Indeed, some election officials in Tennessee apparently already undertake it. *See* Farley Decl. ¶ 7. Moreover, if Defendants are right that the their signature verification process will result in only a small handful of ballots being rejected each election for signature discrepancies, then certainly, giving notice and an opportunity to cure to that small handful of voters does not severely burden the State, particularly considering that an infrastructure to provide such notice and cure is already in place for vote by mail applications. *See* Tenn. Code § 2-6-204(a)(1); *see also Self Advocacy Solutions, N.D.*, 2020 WL 2951012, at *10 (noting that state's administrative burden of contacting and providing meaningful notice to every voter whose ballot was rejected because of signature mismatch was far from an "insurmountable endeavor" given that county auditors were already

---

[11] Defendants' reliance on this single petition referenda case to rebut the *unanimous* holding of federal courts across the country that vote-by-mail ballots require notice and opportunity to cure before rejection for signature matching demonstrates the weakness of their position.

20

familiar with contacting voters who submit absentee ballots with missing information).

Finally, the government's interest in "protecting the integrity of the ballot" would actually be served by a notice and cure process, not placed at risk. Plaintiffs' claim does not seek to displace the State's signature verification procedure, only to provide voters with notice and an opportunity to cure should their ballot be rejected by it. Thus, while Defendants have an interest in ensuring that the same person that requested an absentee ballot is the person casting the ballot, *see* Opp. at 39; Goins Decl. ¶ 13, "[n]otice and cure procedures do exactly that by confirming the validity of legitimate voters' ballots, preventing voter fraud and increasing confidence in the electoral system in the process." *Self Advocacy Solutions, N.D.*, 2020 WL 2951012, at *10. Defendants' citation to generalized cases of voter fraud, Opp. at 51, are thus irrelevant to whether the government's interest is served by affording voters due process before their absentee ballot is rejected—it is.

### C. Plaintiffs are Likely to Succeed on Their First-Time Voter Claim

In moving for a preliminary injunction on their First-Time Voter claim, Plaintiffs argued that (1) the First-Time Voter Restriction "imposes an unnecessary and undue burden on the right to vote for eligible absentee voters," *see* Mem. at 21, and that (2) "the State lacks sufficient justification to enforce" it, Mem. at 27. Defendants only substantively contest the second point, arguing that the First-Time Voter Restriction was "enacted in order to comply with Section 20505(c) of the [National Voter Registration Act] and Section 21083(b) of [Help America Vote Act] in a 'uniform and nondiscriminatory' manner." Opp. at 24.

Defendants' reliance on federal law as a shield for their unconstitutional conduct is misguided. As explained in Plaintiffs' opening brief, *see* Mem. at 27—which explanation went uncontested in Defendants' opposition—compliance with the NVRA does not *require* Defendants, during a pandemic, to compel first-time voters to appear to vote in person. *See* 52 U.S.C.

§ 20505(c)(1). And under HAVA, first-time mail registrants are required to vote in person *only if* (1) they did not submit the required proof of identity with their registration or mail ballot *or* submit their driver's license number or last four digits of their social security number, and (2) the election officials cannot use that information to match the voter with existing identification records. 52 U.S.C. 21083(b). But first-time voters are already required to provide such information when registering to vote, meaning that it is unnecessary under federal law to require that Tennessee's otherwise absentee-eligible voters, who registered by mail to vote, vote in person in their first election after registering. To the extent that Tennessee argues that the First-Time Voter Restriction—although not required by federal law—prevents fraud by ensuring identification of the voter, Defendants provide no explanation as to why HAVA's provisions (enacted after the First-Time Voter Restriction) do not adequately identify voters.

Of course, in this election cycle—which is being held in the midst of an ongoing pandemic—having to vote in person is not just an inconvenience imposed on first-time voters that federal law does not require. Rather, it is an unconstitutional burden on the right to vote itself, because first-time voters, like all Tennessee voters, should not be required to choose between their health and their right to vote, *see* Mem. at 26–29, a point which Defendants do not meaningfully contest. Thus, in the context of an election held during a pandemic, requiring first-time voters—who otherwise meet federal law requirements—to vote in person, is unconstitutional.

Moreover, the State's claimed administrative burden, of having to proactively contact all first-time voters whose absentee ballot requests were rejected, *see* Opp. at 11, is a red herring. Plaintiffs have not requested, nor do they now request, such relief. Instead, it would be sufficient for Defendants to stop enforcing the unconstitutional First-Time Voter Restriction during the pendency of the pandemic, advertise such relief, and thereafter accept any new or renewed

application to vote by mail by an otherwise qualified first-time voter.

### III. Plaintiffs' Claims Are Not Barred by the Doctrine of Laches

Defendants argue that the doctrine of laches bars Plaintiffs' Motion. Courts have declined to apply laches when a plaintiff seeks prospective relief for continuing constitutional violations. *See, e.g.*, *Kuhnle Bros., Inc. v. Cty. of Geauga*, 103 F.3d 516, 522 (6th Cir. 1997) ("A law that works an ongoing violation of constitutional rights does not become immunized from legal challenge for all time"); *Garza v. Cty. of Los Angeles*, 918 F.2d 763, 772 (9th Cir. 1990) (in redistricting case, court rejected laches defense, stating that "because of the ongoing nature of the violation, plaintiffs' present claim ought not be barred by laches"); *Jeffers v. Clinton,* 730 F. Supp. 196, 202 (E.D. Ark. 1989) (rejecting laches defense in end-of-decade legislative redistricting case because "the injury alleged by the plaintiffs is continuing, suffered anew each time a State Representative election is held under the [unconstitutional] structure"); *Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enters., Int'l*, 533 F.3d 1287, 1321 (11th Cir. 2008) (finding, in a copyright case, "laches serves as a bar only to the recovery of retrospective damage, not to prospective relief"). And laches has not prevented courts from entering prospective injunctive relief in close temporal proximity to an election. *See, e.g., Bryanton v. Johnson*, 902 F. Supp. 2d 983, 997 (E.D. Mich. 2012)*; Bogaert v. Land*, 572 F. Supp. 2d 883, 896-97 (W.D. Mich. 2008)*; Ga. Coal. for the People's Agenda, Inc. v. Deal*, 214 F. Supp. 3d 1344, 1345-46 (S.D. Ga. 2016); Here Plaintiffs' injuries are ongoing, thus the doctrine of laches does not apply.

Even if laches applies—it does not—Defendants must show "(1) the plaintiff delayed unreasonably in asserting his rights and (2) the defendant was prejudiced by this delay." *Am. Civil Liberties Union of Ohio, Inc. v. Taft*, 385 F.3d 641, 647 (6th Cir. 2004). "'[L]aches is not . . . a mere matter of time; but principally a question of the inequity of permitting the claim to be

enforced.'" *Ford Motor Co. v. Catalanotte*, 342 F.3d 543, 550 (6th Cir. 2003) (quoting *Holmberg v. Armbrecht*, 327 U.S. 392, 396 (1946)). Defendants have not met this burden.

Defendants complain that Plaintiffs unreasonably delayed in filing this action because the challenged laws have been on the books for at least fifteen years. Opp. at 8. By that account, Plaintiffs would never be able to challenge existing laws that implicate continuing constitutional violations. Courts have roundly rejected this proposition. *See supra*. Next, Defendants argue that waiting until May 1 to file the complaint amounts to an unreasonable delay given that Governor Lee issued a state of emergency and stay at home order on March 12. Opp. at 11. The argument is particularly disingenuous given that on May 22, 2020—almost a month after Plaintiffs filed their Complaint in this Court—Defendants were arguing to the Davidson County Chancery Court that the plaintiffs' request in that case to expand absentee voting to all voters for the August election because of COVID-19 was premature and unripe for adjudication. *See* Doshi Decl. Ex. 16 (State's Opposition to Request for Temporary Injunction), at 10.

Nevertheless, Plaintiffs' decision to file their Complaint on May 1, 2020 for relief in the August and November 2020 elections did not amount to unreasonable delay. The Complaint was filed only 6 days after Governor Lee issued guidelines for restaurants and retail stores to reopen[12]—significantly increasing Tennesseans risk of COVID-19 exposure, and, most importantly, 7 days after the Tennessee Division of Elections issued its April 23, 2020 COVID-19 Election Contingency Plan, which confirmed that the absentee-eligibility criteria would not be expanded to all voters. Plaintiffs' Complaint was therefore timely filed in response to actions and

---

[12] Tenn. Office of Governor, *Gov. Lee Issues Guidelines for Restaurants, Retail Stores to Reopen Early Next Week in 89 Counties*, (Apr. 24, 2020), https://www.tn.gov/governor/news/2020/4/24/gov--lee-issues-guidelines-for-restaurants--retail-stores-to-reopen-early-next-week-in-89-counties.html.

24

events which caused and exacerbated the constitutional harm facing them.[13]

Defendants also assert a laches defense by arguing that Plaintiffs unreasonably delayed in filing their preliminary injunction motion. Opp. at 7. But that claim is legally deficient and factually incorrect. As an initial matter, the laches doctrine usually applies to the filing of a complaint—from the time plaintiff "knew or should have known" of the violation. *Kellogg Co. v. Exxon Corp.*, 209 F.3d 562, 569-70 (6th Cir. 2000); *see also Elvis Presley Enters., Inc. v. Capece*, 141 F. 3d 188, 205 (5th Cir. 1998). This is why laches is an affirmative defense that Defendants must assert in their Answer. *See* Fed. R. of Civil Proc. 8(c)(1). In any event, to maximize judicial efficiency, Plaintiffs waited to file their preliminary injunction motion until the resolution of injunctive relief proceedings in the Davidson County Chancery Court on a related claim. *See* Doshi Decl., Ex. 1 (expanding absentee ballot eligibility to all Tennesseans). In light of that ruling, Plaintiffs amended their Complaint and moved for a preliminary injunction on all of their claims *except* the claim concerning vote-by-mail expansion.

Defendants also do little to show they are "prejudiced by this delay." *Am. Civil Liberties Union of Ohio, Inc.,* 385 F.3d at 647. Defendants argue that they will be prejudiced by "confusion" because election officials have been relying on the signature verification requirements of Tenn. Code § 2-6-202 and the first-time voting requirements of Tenn. Code § 2-2-115(b)(7). *See* Opp. at 10–11. But Plaintiffs' requested relief does not displace the signature verification requirements, it

---

[13] Defendants cite to Texas and Wisconsin as examples of timely filed COVID-19 cases. But these cases are inapposite. The litigation in Wisconsin involved consolidated cases that, while filed shortly after the first coronavirus case was reported in the state, requested emergency relief to make voting by mail easier for an election approximately three weeks later. *See* Compl., *Democratic Nat'l Comm. v. Bostelmann*, No. 3:20-cv-249, 2020 WL 1430041 (W.D. Wis. filed Mar. 18, 2020). While litigation in Texas happened to be filed shortly after the state's first reported case of COVID-19, the plaintiffs there wanted to file in time to get relief for the Texas primary runoff on July 14, 2020. Plaintiffs here filed suit one week after Tennessee issued its Election Contingency Plan, on May 1, 2020, to request relief for an election on August 11, 2020 and for the election on November 3, 2020. Therefore, plaintiffs in this suit are well within a reasonable timeframe for the filing of COVID-19 related election litigation, contrary to Defendants' protestations.

only adds a component—constitutionally-required notice and cure—which some election officials already voluntarily undertake, *see* Farley Decl. ¶ 7. And enjoining the first-time voter requirement would only compel Defendants to now accept absentee ballots from first-time voters—which they are doing for virtually every other Tennessee voter pursuant to the Chancery Court's Order. *See* Doshi Decl. Ex. 5 (noting that the State will process absentee ballot applications for all voters). Regardless, Defendants do not address how filing this lawsuit earlier would have reduced the purported confusion.

Defendants also claim a "considerable" amount of "time and expense" would be required to bring the state's election procedures into compliance with the United States Constitution. Opp. at 10–11. But as noted above, Defendants are already undertaking—albeit inconsistently—the relief requested by Plaintiffs for some voters. Indeed, the state has already configured its election machinery to comply with the Chancery Court's order that the State expand absentee voting to all eligible, registered voters during the pandemic. Any administrative burdens—of providing pre-deprivation notice and opportunity to cure for what Defendants have already argued will be a small number of ballots, *see* Opp. at 49, expanding the ability to vote by mail to first-time voters who are otherwise similarly situated to all other Tennesseans who have been conferred such a right, and ensuring that Plaintiffs do not face prosecution for sharing unsolicited absentee ballot requests—are minimal. This Court should reject Defendants' laches arguments.[14]

## **CONCLUSION**

For the reasons articulated herein, and in Plaintiffs' opening brief, the Court should grant the preliminary injunction motion.

---

[14] To the extent the Court finds that laches, or any other doctrine of law, bars Plaintiffs from obtaining their requested relief in advance of the August 6, 2020 election, the Court should still enter an injunction providing relief for the November 3, 2020 election. For that election, there can be no argument made that Plaintiffs' claims or request for relief are untimely.

26

Dated: July 6th, 2020

Respectfully submitted,

/s William L. Harbison

Danielle Lang*
Ravi Doshi*
Molly Danahy*
Jonathan Diaz*
Campaign Legal Center
1101 14th Street NW, Suite 400
Washington, DC 20005
Tel.: (202) 736-2200
dlang@campaignlegalcenter.org
rdoshi@campaignlegalcenter.org
mdanahy@campaignlegalcenter.org
jdiaz@campaignlegalcenter.org

William L. Harbison (No. 7012)
Lisa K. Helton (No. 23684)
Christopher C. Sabis (No. 30032)
Christina R.B. López (No. 37282)
Sherrard, Roe, Voigt & Harbison, PLC
150 3rd Avenue South, Suite 1100
Nashville, TN 37201
Phone: (615) 742-4200
Fax: (615) 742-4539
bharbison@srvhlaw.com
lhelton@srvhlaw.com
csabis@srvhlaw.com
clopez@srvhlaw.com


Ezra Rosenberg*
Pooja Chaudhuri*
Lawyers' Committee for Civil Rights Under Law
1500 K Street NW Suite 900
Washington, DC 20005
Tel.: (202) 662-8600
erosenberg@lawyerscommittee.org
pchaudhuri@lawyerscommittee.org

*Admitted Pro Hac Vice

27

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY, pursuant to Local Rule 5.01, that on this 6th day of July, 2020, the foregoing was served via the Court's CM/ECF filing system and by electronic mail on the following:

Janet Kleinfelter
Andrew B. Campbell
Alexander Rieger
Matthew D. Cloutier
Office of the Tennessee Attorney General
301 6th Ave. N.
Nashville, Tennessee 37243
janet.kleinfelter@ag.tn.gov
andrew.campbell@ag.tn.gov
alex.rieger@ag.tn.gov
matt.cloutier@ag.tn.gov

*Counsel for Defendants*

/s William L. Harbison

28

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | |
|---|---|
| MEMPHIS A. PHILLIP RANDOLPH INSTITUTE, et al., | |
| *Plaintiffs*, | Civil No. 3:20-cv-0374 |
| v. | JUDGE RICHARDSON MAGISTRATE JUDGE FRENSLEY |
| TRE HARGETT, et al., | |
| *Defendants*. | |

## <u>SUPPLEMENTAL DECLARATION OF RAVI DOSHI</u>

I, Ravi Doshi, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am Senior Legal Counsel at the Campaign Legal Center ("CLC") and counsel for Plaintiffs in this case. I am over 18 years of age, and the testimony set forth in this Declaration is based on first-hand knowledge, about which I could and would testify competently in open court if called upon to do so. This Declaration is submitted in support of Plaintiffs' Motion for a Preliminary Injunction.

2. Attached as Exhibit 17 is a true and correct copy of the absentee ballot request form that is available from the Tennessee Secretary of State's website. An electronic version of the form is available at https://sos-tn-gov-files.tnsosfiles.com/2020%20Absentee%20Request%20-%20August.pdf.

3. Attached as Exhibit 18 is a true and correct printout of the Shelby County Election Commission's webpage on absentee voting, as it was found on July 6, 2020. The printout was retrieved from https://www.shelbyvote.com/voting-absentee on July 6, 2020.

*    *    *

Executed on July 6, 2020 at Washington, DC.


I declare under penalty of perjury that the foregoing is true and correct.

_____
Ravi Doshi

# EXHIBIT 17

To vote by mail you must meet one of the reasons listed below and submit a request no later than the 7th day before the election.

Note: If you have never voted before and you registered to vote by mail, then you must vote IN-PERSON the first time you vote.

**ABSENTEE BY-MAIL
BALLOT REQUEST
ELECTION: AUGUST 6, 2020**

**This form may be submitted by mail, fax or email to your county election commission. When emailing, you must attach the completed request to the email. Click here to find contact information for your election commission.**

First Day to accept a Request: **MAY 8, 2020** Last Day to accept a Request: **JULY 30, 2020**

## PROVIDE ALL OF THE INFORMATION BELOW (REQUIRED)

**PRINT FULL LEGAL NAME:**

**ADDRESS WHERE YOU LIVE:**

**CITY:**      **ZIP:**

**FULL SOCIAL SECURITY #:**      **DATE OF BIRTH:**

**PHONE:**      **EMAIL:**

**ADDRESS TO MAIL BALLOT TO (IF DIFFERENT):**

**CITY:**      **STATE:**      **ZIP:**

## INDICATE THE BALLOT YOU ARE REQUESTING (REQUIRED)

☐ **Republican Primary and August General Election**    ☐ **Democratic Primary and August General Election**    ☐ **August General Election Only**

**ONLY ONE PRIMARY MAY BE SELECTED**

## CHECK THE REASON FOR REQUESTING TO VOTE BY MAIL (REQUIRED)

☐ I am 60 years of age or older.

☐ I will be outside my county during all hours of early voting and before the polls close on Election Day.

☐ I am hospitalized, ill or physically disabled and unable to appear at my polling place to vote; and/or I have determined it is impossible or unreasonable to vote in-person due to the COVID-19 situation.

☐ I am a caretaker of a hospitalized, ill or physically disabled person, and/or I have determined it is impossible or unreasonable to vote in-person due to the COVID-19 situation.

☐ I am a full-time student or spouse of a full-time student outside my county.

☐ I reside in a licensed facility, outside my county, providing relatively permanent domiciliary care, i.e. Nursing Home.

☐ I am a candidate for office in the election for which I am applying to vote absentee by mail.

☐ I am observing a religious holiday that prevents me from voting during early voting or on Election Day.

☐ I will be serving as an election official or a member or employee of the election commission on Election Day.

☐ I will be serving on jury duty in state or federal court.

☐ I am a voter with a disability and my polling place is inaccessible.

☐ I have a CDL or TWIC or I am a spouse of a person with a CDL or TWIC and will be out of the county during early voting and Election Day and have no out of the county address to receive mail during this time. Enclosed is a copy of the CDL or TWIC (required) and the number is: _____.

☐ I am a member of the military, spouse, or dependent.
☐ I am an activated National Guard member on state orders.
☐ I am an overseas citizen and otherwise qualified to vote in TN.

➡ **You must include a mailing address outside the county, even if the ballot is emailed.**
Send military/overseas ballot by: ☐ Mail or ☐ Email
**If email, provide email address above.**

**I swear or affirm, under the penalty of perjury, that all of the information on this form is true and correct and that I am eligible to vote in the election.**

**REQUIRED
VOTER'S SIGNATURE:**
(Digital Signature Not Accepted)      **DATE:**

**ASSISTANCE SIGNATURES:** *(only required if voter cannot sign their own name)*

_____    _____    _____
SIGNATURE OF PERSON ASSISTING      ADDRESS      DATE

_____    _____    _____
SIGNATURE OF WITNESS      ADDRESS      DATE

**ELECTION OFFICE USE ONLY**

APPROVED / REJECTED DATE _____ BY _____ BALLOT SENT DATE _____ BALLOT RECEIVED DATE _____

# EXHIBIT 18



(/)

Enter text

SEARCH

# VOTING ABSENTEE

Menu

Home (/) / Voting Absentee

Please note - **if you registered to vote by mail or on the on-line system** and you have **not** voted in Shelby County before, you must vote in person.  You may vote early or on Election Day.



To vote absentee by mail, you must fall under one of these categories:

- You will be outside Shelby County during the entire early voting period and all day on Election Day
- You or your spouse is enrolled as a full-time student in an accredited college or university outside Shelby County
- You reside in a licensed nursing home outside Shelby County
- You will be unable to vote in person due to service as a juror for a Federal or State court
- You are sixty (60) years of age or older
- You have a physical disability and an inaccessible polling location
- You are hospitalized, ill, or physically disabled and cannot vote in person and/or I have determined that it is impossible or unreasonable to vote in-person due to the COVID-19 situation.
- You are a caretaker of a person who is hospitalized, ill, or disabled, and/or I have determinted that it is impossible or unreasonable to vote in person due to the COVID-19 situation.

Case 3:20-cv-00374   Document 51-1   Filed 07/06/20   Page 37 of 57 PageID #: 2113

- You are a candidate for office in the election
- You serve as an Election Day official or as an employee of the Shelby County Election Commission
- Your observance of a religious holiday prevents you from voting in person during the early voting period and on Election Day
- You or your spouse possess a valid commercial drivers' license (CDL) or you possess a valid Transportation Worker Identification Credential (TWIC) card , and certify that you will be working outside Tennessee or Shelby County during the open hours of early voting and Election Day, and have no specific out-of-county or out-of-state address to which mail may be sent or received during such time.
- You are a member of the military or are an overseas citizen. Learn more about military and overseas citizen absentee voting (https://www.fvap.gov/tennessee)

Menu

Under Tennessee law, once you have requested an absentee ballot, you cannot vote in person for that election.  Applications cannot be processed if they are received more than ninety (90) days before an election.  Applications must be received no later than seven (7) days before an election.

**Notice to voters using US mail service:** the USPS delivery standards changed in 2016 so that First Class delivery went from 1-3 days to 2-5 days and Standard delivery is now 2-9 days.   Please request your ballot as early as possible.

The first day that you can request an absentee ballot is listed on the form below.

**If you live in the Shelby County, click here (/sites/default/files/documents/Absentee%20Request%20Primary%20and%20General%20August%20'19%20Language%20v%207.pdf) for an absentee ballot application.**

Download the Military and Overseas Application Here (https://www.fvap.gov/uploads/FVAP/Forms/fpca.pdf)

**Permanent Absentee Voters**

To become a Permanent Absentee Voter and automatically have a Request for Absentee Ballot application sent to you before every election, you must:

- Complete the permanent absentee ballot form (/sites/default/files/documents/forms/Permanent%20Absentee%20Packet%20Fillable.pdf).
- Have your physician complete the physician's statement, which is included in the link above.

Questions?  Contact our Absentee Department at (901) 222-6800 or absenteevoting@shelbycountytn.gov (mailto:absenteevoting@shelbycountytn.gov)

Case 3:20-cv-00374   Document 51-1   Filed 07/06/20   Page 38 of 57 PageID #: 2114

 (/)

**SIGN UP** FOR EMAIL UPDATES

Menu

| Enter text | SUBSCRIBE |
|---|---|
| Email address | |

SEARCH



## FIND EVENTS
Elections, Early Voting, Holidays etc
(/event-created)



## REGISTER TO VOTE
(/register-vote)



## UPCOMING ELECTIONS
Want to know more?
(/upcoming-elections)

FEATURED VIDEO

Why Your Vote Matters



UPCOMING EVENTS

**07**
JUL

Voter Registration Deadline (/events/voter-registration-deadline-5)
🕐 4:30 pm
📍



**17**
JUL

Early Voting (/events/early-voting-127)

11:00 am to ... n

**18**
JUL

Early Voting (/events/early-voting-141)

10:00 am to 4:00 pm

Enter text

MORE EVENTS ▶        SEARCH

Menu

## CONTACT US

Email: voteinfo@shelbycountytn.gov (mailto:voteinfo@shelbycountytn.gov)

Phone: (901) 222-1200 (tel:901-222-1200)

## DOWNTOWN OFFICE

157 Poplar Ave, Suite 137

Memphis, TN 38103

Ph: (901) 222-1200 (tel:+1-901-222-1200)



# ELECTION OPERATIONS

980 Nixon Dr

Memphis, TN 38134

(/)

Ph: (901) 222-1200 (tel:+1-901-222-1200)



# FOLLOW US ON



(https://www.facebook.com/vote901/)

(https://twitter.com/shelbyvote)

(https://www.instagram.com/vote901/)

---

© 2017-2018 Shelby County Government. All Rights Reserved.

Select Language ⌄

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | |
|---|---|
| MEMPHIS A. PHILLIP RANDOLPH INSTITUTE, et al., <br><br> *Plaintiffs,* <br><br> v. <br><br> TRE HARGETT, et al., <br><br> *Defendants.* | NO. 3:20-cv-0374 <br><br> JUDGE RICHARDSON <br> MAGISTRATE JUDGE FRENSLEY |

**SUPPLEMENTAL DECLARATION OF COREY DEWAYNE SWEET IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
(Pursuant to 28 U.S.C. § 1746)**

I, Corey DeWayne Sweet, am over the age of 18 and fully competent to make the following declaration. If called upon as a witness, I would testify to these facts. Under penalty of perjury, I declare and state the following:

1. I am twenty years old. I was born and raised in Memphis, Tennessee. I am a rising junior at Xavier University in Louisiana. I occasionally attend events of the Tennessee State Conference of the NAACP.

2. Since the pandemic my classes have become remote starting March of this year. I do not know whether in-person classes will resume in August. If not, then I will remain at home in Shelby County and take remote classes.

3. I registered to vote online in Shelby County either late May or early June of this year. I received email confirmation that I registered to vote in Shelby County.

4. I have never voted in Shelby County or in any other election anywhere else. I

planned to vote for the first time in the upcoming August election. This election is important to me because it is a primary election for seats in the Tennessee legislature and the U.S. legislature. I want to vote in this election and make my voice heard.

5. I would prefer to vote by mail in the upcoming August election. I do not want to risk exposure to COVID-19 by going to the polls. I do not want to risk infecting anyone in my family including those who are older than sixty years like my Grandmother.

6. But I am confused about the rules around first-time voters and mail-in voting. I checked the Shelby County Election website. The Shelby County election website says on one of their pages that first-time voters who voted online and who have never voted in Shelby County must vote in person. *See* https://www.shelbyvote.com/voting-absentee.

7. Elsewhere on the same website, Shelby County instructs that first-time voters who registered to vote by mail should vote in person. This section of the website says nothing about the requirement applying to voters who registered to vote online. *See* https://www.shelbyvote.com/voter-id-requirements.

8. Given the conflicting information, I do not know whether I should request my absentee ballot.

9. Also, if campus opens up by August and I have to go back to school, I do not want to increase the risk of exposing myself to COVID-19 by having to take flights back home just to vote in person in August. I also do not have money to shoulder the expense of buying plane tickets back to Tennessee just to vote in person in the August election.

2

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 6th day of July, 2020.

_____
Corey DeWayne Sweet

3

# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

|  |  |
|---|---|
| MEMPHIS A. PHILLIP RANDOLPH INSTITUTE, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> TRE HARGETT, et al., <br><br> *Defendants*. | NO. 3:20-cv-0374 <br><br> JUDGE RICHARDSON <br> MAGISTRATE JUDGE FRENSLEY |

**SUPPLEMENTAL DECLARATION OF TENNESSEE STATE CONFERENCE OF THE
NAACP IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
(Pursuant to 28 U.S.C. § 1746)**

I, Gloria Jean Sweet-Love, am over the age of 18 and fully competent to make the following declaration. The facts in this declaration are based on my personal knowledge and upon information available to me through the files and records of the Tennessee State Conference of the NAACP ("Tennessee NAACP"), where I am president of the State Conference. If called upon as a witness, I would testify to these facts. Under penalty of perjury, I declare and state the following:

1.      I am president of Tennessee NAACP, and have served in this capacity January 1996. I described my background and role as president of Tennessee NAACP more fully in my Declaration of June 7, 2020.

2.      I make this supplemental declaration to describe more fully the expenditure of resources that Tennessee NAACP has had to undertake as a result of the State's continued enforcement of the First-Time Voter Restriction during the pandemic, and in light of the Davidson County Chancery Court's decision expanding the right to vote by mail to all voters.

1

3.      Because the State continues to enforce the First-Time Voter Restriction, Tennessee NAACP has had to expend resources, including time, helping first-time voters navigate the differences between online and mail voter registration. Some members have contacted Tennessee NAACP and its local units because they are confused about how the law is being enforced. Tennessee NAACP has had establish talking points, and respond to questions related to, the various forms of voter registration. Tennessee NAACP would not need to expend such resources if the State were not enforcing the First-Time Voter Restriction.

4.      Tennessee NAACP's local units have also faced confusion on what the law is and what the County's practices are on whether first-time voters who register online must vote in-person. For example, the Shelby County Chapter does not know what to tell its members and first-time voters who have contacted the Chapter for advice.

5.      The Shelby County election commission website includes conflicting information. The Shelby County election website says that "if you registered to vote by mail or on the on-line system and you have not voted in Shelby County before, you must vote in person." *See* https://www.shelbyvote.com/voting-absentee. But the County's voter-id site only says that "you must appear in-person to vote in the first election after you have registered by mail." *See* https://www.shelbyvote.com/voter-id-requirements. It does not say anything about registering to vote online.

6.      In the past, Tennessee NAACP and its local units conducted voter registration drives and used hard-copy registration forms to register voters. However, because of the State's insistence on enforcing the First-Time Voter Restriction during the pandemic, some Tennessee NAACP local units have continued shifting their voter registration strategy to registering more voters online so that they may vote by mail in upcoming elections. But some units like the Shelby

County Chapter does not know whether it should advise first-time voters to register to vote online if the Shelby County election commission requires online registrants to vote in person.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed this 6th day of July, 2020.

_____
Gloria Jean Sweet-Love

# EXHIBIT D

MEMPHIS A. PHILLIP RANDOLPH
INSTITUTE, et al.,

     *Plaintiffs*,

v.

TRE HARGETT, et al.,

     *Defendants*.

NO. 3:20-cv-0374

JUDGE RICHARDSON
MAGISTRATE JUDGE FRENSLEY

**SUPPLEMENTAL DECLARATION OF MEMPHIS AND WEST TENNESSEE AFL-CIO
CENTRAL LABOR COUNCIL IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
(Pursuant to 28 U.S.C. § 1746)**

I, Jeffrey Lichtenstein, am over the age of 18 and fully competent to make the following declaration. The facts in this declaration are based on my personal knowledge and upon information available to me through the files and records of the Memphis and West Tennessee AFL-CIO Central Labor Council ("MCLC"), where I am the Executive Secretary. If called upon as a witness, I would testify to these facts. Under penalty of perjury, I declare and state the following:

1.     I am the Executive Secretary of MCLC, and have served in this capacity since January 2018. I described my background and role as Executive Secretary of MCLC more fully in my Declaration of June 12, 2020.

2.     I make this supplemental declaration to describe more fully the expenditure of resources that MCLC has had to undertake as a result of the State's continued enforcement of the First-Time Voter Restriction during the pandemic, and in light of the Davidson County Chancery

1

Court's decision expanding the right to vote by mail to all voters.

3.     Because the State continues to enforce the First-Time Voter Restriction despite the Chancery Court's ruling, MCLC has had to expend resources, including time, helping first-time voters navigate voter registration and absentee ballot issues. MCLC has been contacted by numerous voters who are confused about how the law is being enforced, and respond to questions related to the various forms of voter registration. MCLC would not need to expend such resources if the State were not enforcing the First Time Voter Restriction.

4.     MCLC's effort to establish a program around engaging and registering voters, and helping them vote safely, has been frustrated by the State's inconsistent descriptions of who can vote by mail. Adding to the confusion, per the State's website, my understanding is that only first-time voters who register to vote by mail have to vote in person in their first election after registering. *See* https://sos.tn.gov/products/elections/absentee-voting. But the Shelby County Election Commission website states that "if you registered to vote by mail or on the on-line system and you have not voted in Shelby County before, you must vote in person." As a result, MCLC has had to expend even more resources trying to help voters navigate this confusion.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

                              *      *      *

Executed this 6th day of July, 2020.

_____
                              Jeffrey Lichtenstein

# EXHIBIT E

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | |
|---|---|
| MEMPHIS A. PHILLIP RANDOLPH INSTITUTE, THE EQUITY ALLIANCE, FREE HEARTS, THE MEMPHIS AND WEST TENNESSEE AFL-CIO CENTRAL LABOR COUNCIL, THE TENNESSEE STATE CONFERENCE OF THE NAACP, SEKOU FRANKLIN, AND KENDRA LEE, | Case No. 3:20-cv-0374 |
| Plaintiffs, | JUDGE RICHARDSON MAGISTRATE JUDGE FRENSLEY |
| v. | |
| TRE HARGETT, in his official capacity as Secretary of State of the State of Tennessee, MARK GOINS, in his official capacity as Coordinator of Elections for the State of Tennessee, and AMY WEIRICH, in her official capacity as the District Attorney General for Shelby County, Tennessee, | |
| Defendants. | |

**SUPPLEMENTAL DECLARATION OF DR. LINTON A. MOHAMMED**

I, Linton A. Mohammed, declare as follows:

1.      I am a Forensic Document Examiner ("FDE"), certified by the American Board of Forensic Document Examiners. I have been engaged in this matter on behalf of Plaintiffs to opine on the reliability of the procedures and techniques of the Tennessee signature verification process for absentee ballot envelopes (voter's affidavit) as set forth in Tennessee elections laws and guidance.

2.      I submit this supplement to my Declaration of June 11, 2020, in order to respond to several points raised in Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction,

and the Declarations of Mark Goins, Linda Phillips, Alan Farley, and Phillip Warren, each of which I have reviewed.

3.    I understand that Defendants report that the rejection rate for absentee ballots was about 0.03 percent in 2016 (20 out of 65,235 absentee ballots), and about 0.08 percent in 2018 (42 out of 49,421 ballots). Even accepting Defendants' reported numbers as accurate, I believe they undercount what the rejection rate would be if election officials were required to review over one million ballots, as I understand they are preparing to do for the August 2020 election. In my experience, the more signatures an election official has to review, the more likely they are to make mistakes, particularly when they lack adequate time in which to conduct a review.

4.    While I am encouraged by Election Coordinator Goins' statement that signature reviewers are told to presume the validity of a signature, I do not believe that the training Tennessee's signature reviewers receive, as described in the Goins declaration, is sufficient to protect against erroneous rejections of absentee ballots.

5.    I reviewed the 45-minute training presentation which was mentioned in Mr. Goins' declaration[1]. This training is provided to signature reviewers by Oregon election officials who are themselves not FDE's. In my opinion, this training presentation is not at all adequate to train election officials to examine signatures to determine their authenticity. For context, it takes at least 18 months to train an FDE in the examination of signatures and handwriting, as this is one of the most exacting areas of forensic document examination.

6.    Furthermore, it is not clear what the level of proficiency is of the signature reviewers before or after the training, given that there is no indication that they are tested on the subject matter.

_____

[1] https://www.youtube.com/watch?v=UKiYGONnNT0&feature=Youtu.be

\*    \*    \*

Executed on July __6__, 2020 at __San Bruno__, California

I declare under penalty of perjury the foregoing is true and correct.

Linton Mohammed, Ph.D., D-ABFDE