IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

MEMPHIS A. PHILLIP RANDOLPH )
INSTITUTE, et al. )
                                                )    NO. 3:20-cv-00374
      Plaintiffs, )
                                                )    JUDGE RICHARDSON
v. )
                                                )
TRE HARGETT, et al., )
                                                )
      Defendants.

## MEMORANDUM OPINION & ORDER

Pending before the Court is Plaintiffs' Motion for Preliminary Injunction (Doc. No. 40, "Motion"). Via the Motion, Plaintiffs seek to enjoin Defendants, pending final resolution of Plaintiffs' claims, from enforcing several provisions of Tennessee's electoral laws and procedures, namely:

(1) Tenn. Code Ann. § 2-6-204(c)(4), which provides: "A person who is not an employee of an election commission commits a Class A misdemeanor if such person gives an unsolicited request for application for absentee ballot to any person."

(2) Tenn. Code Ann. § 2-2-115(b)(7), which provides that those who registered to vote in Tennessee by mail must "appear in person to vote in the first election the person votes in after such registration becomes effective."

(3) Tennessee's process for verifying that the signature on an absentee ballot matches the signature contained in the (purported) ballot-caster's voter registration record, as required under Tenn. Code Ann. § 2-6-202(g) for the ballot to be counted.

1

According to Plaintiffs, these respective aspects of Tennessee's voting rules are unconstitutional because they violate the First Amendment right to free speech and association, the First Amendment right to vote, and Fourteenth Amendment procedural and substantive due process, respectively.[1]

PROCEDURAL BACKGROUND

Plaintiffs initiated this action by filing a complaint ("original complaint") on May 1, 2020. (Doc. No. 1). Defendants filed an answer (Doc. No. 38) to the original complaint on June 11, 2020, and the next day, Plaintiffs filed an amended complaint (Doc. No. 39, "Amended Complaint"), as well as the Motion and a memorandum in support of the Motion (Doc. No. 43, "Plaintiffs' Brief"). In the Prayer for Relief in the original complaint (and the Amended Complaint),[2] Plaintiffs requested preliminary (and permanent) injunctive relief virtually identical, for present purposes, to the relief they now request via the Motion. Plaintiffs did not actually move for preliminary injunctive relief, however, prior to filing the Motion on June 12, 2020.

---

[1] As Plaintiffs make clear, they are actually invoking the First Amendment as it is incorporated into the Fourteenth Amendment (and thereby applicable to state governments).

[2] The latter Prayer for Relief differed from the former only in that it added two paragraphs specifically requesting relief as to Tenn. Code Ann. §2-2-115(b)(7) in particular. Specifically, in the latter prayer, paragraph E requested that the Court declare unconstitutional that provision's ban on absentee voting for first-time Tennessee voters, and paragraph J requested that the Court enjoin enforcement of that ban. These paragraphs presumably were added due to developments in Davidson County Chancery Court; between the filing of the original complaint and the Amended Complaint, that court had enjoined, on state constitutional grounds not asserted by Plaintiffs in this lawsuit, enforcement of the State's general ban on absentee voting (*see* Tenn. Code Ann. §2-6-201) but not necessarily the specific ban on absentee voting by first-time Tennessee voters. That is to say, in a case filed by different plaintiffs, Davidson County Chancery Court granted a temporary injunction essentially preventing the State from enforcing (in the present COVID-19 environment) its general rule requiring in-person voting, *i.e.*, allowing absentee voting only for persons who fall into a statutorily recognized exception to that general rule. The Court's, and apparently Plaintiffs' and Defendants', understanding is that despite the broad wording of the Chancery Court's injunction, the Chancery Court does not (yet) consider the injunction to enjoin the ban on absentee voting *for first-time voters* in particular set forth in Tenn. Code Ann. § 2-2-115(b)(7). Thus, in both the Amended Complaint and the Motion, Plaintiffs focus attention on combatting the prohibition on absentee voting by first-time voters specifically. Indeed, in the Motion, Plaintiffs (prudently and helpfully) do not seek injunctive relief as to the more general prohibition (prescribed by Tenn. Code Ann. §2-6-201) on absentee voting, as that has already been enjoined (by the Chancery Court).

Defendants filed a response (Doc. No. 46, "Response") in opposition to the Motion on June 26, 2020, and Plaintiffs filed a reply (Doc. No. 54, "Reply") in support of the Motion on July 7, 2020.

In the Response, Defendants assert that the doctrine of laches should be applied to bar in its entirety the injunctive relief requested by Plaintiffs in the Motion. In their Reply, Plaintiffs unsurprisingly disagree, arguing that the Court should decline to apply laches to any relief requested via the Motion.

Plaintiffs aptly describe the context surrounding the Motion:

> On August 6, 2020, Tennessee will hold statewide primary and general elections. Three months later, on November 3, 2020, it will hold its general presidential election. Unlike any elections in modern memory, these elections will be held under the pall of an ongoing public health crisis that [had, as of the time of the filing of Plaintiffs' Brief,] already claimed the lives of over 112,000 Americans and forced immediate and dramatic changes to everyday life across the country—including in Tennessee. As a result of the pandemic, significantly more Tennesseans are expected to vote by mail this year than typically have in past elections. Most will do so for the first time.

(Plaintiffs' Brief at 4).[3]

The applicability of laches in a particular context often is, to say the least, an unpredictable matter. What the undersigned wrote decades ago about this general reality remains true today:

> [T]he law has long embraced a subjective, unpredictable and ad hoc approach to determining whether a claimant's remedy is barred by the lapse of time: laches. "Laches is an equitable doctrine which may be applied to deny relief to a party whose 'unconscionable delay in enforcing his rights has prejudiced the party against whom the claim is asserted.'" Laches generally applies only to equitable claims, although in some cases it will be applied to actions at law. Inevitably, laches has been compared to statutes of limitations, even to the point of being deemed a "quasi statute of limitations." Nevertheless, the two differ markedly in their mode of operation. Unlike statutes of limitations, laches is a flexible concept which eschews mechanical rules and instead is based on fairness.

---

[3] Herein, cited page numbers are the numbers stamped on the applicable pages by the Clerk's Office, which may differ from the page numbers placed on the document by the author/filer of the document

3

In deciding whether to apply laches, most courts consider several factors, such as the nature and cause of the plaintiff's delay in asserting a claim despite the opportunity to assert it, the nature of the relief requested, the extent of the defendant's knowledge that the claim would be asserted, and the prejudice to the defendant if the claim is allowed. Other factors include the length of the delay, the loss of evidence, the opportunity of the plaintiff to have acted sooner, and whether the defendant or the plaintiff possessed the property in dispute, if any, during the delay. In a larger sense, "'laches is principally a question of the inequity of permitting a [particular] claim to be enforced.'"

Moreover, application of laches clearly is discretionary with the trial court. To be sure, a trial court's discretion to apply laches is not limitless. Even courts that use a balancing approach recognize the requirements that the plaintiff "'unreasonably delayed in [filing suit] and that the delay harmed the defendant.'" Some courts even frame their test for laches in terms of required elements rather than flexible factors. Those elements, however, are the same requirements referenced above. Those requirements are patently subjective and flexible.

Clearly, laches provides courts with considerable flexibility to decide whether to bar equitable remedies due to a delay in commencing suit. The law permits courts to use laches notwithstanding its ad hoc, subjective and unpredictable nature.

Eli J. Richardson, *Eliminating the Limitations of Limitations Law*, 29 Ariz. St. L. J. 1015, 1065–67 (1997) (footnotes omitted). A district court thus enjoys considerable discretion to apply or decline to apply laches to a particular equitable remedy under particular case-specific circumstances; flexibility exists, albeit to a lesser extent, even in jurisdictions recognizing required elements of laches. Thus, there is no magic formula to foretell whether the court should or will apply laches.

Turning to specific applicable legal standards binding upon it, the Court notes that "[i]n this circuit, laches is 'a negligent and unintentional failure to protect one's rights.'" *United States v. City of Loveland, Ohio*, 621 F.3d 465, 473 (6th Cir. 2010) (quoting *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 894 (6th Cir. 1991)). Importantly, there is a threshold legal question, subject to *de novo* review, as to whether laches is even potentially applicable in the

4

particular context at issue. *Chirco v. Crosswinds Communities, Inc.*, 474 F.3d 227, 231 (6th Cir. 2007).[4]

The Sixth Circuit is one of those courts that does prescribe required elements of laches. Assuming that laches is potentially applicable, the "party asserting laches must show: (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting it." *City of Loveland,* 621 F.3d at 473. But even if the party can show both required elements of laches, the court is not required to apply laches; "dismissal under the laches doctrine 'is not mandatory and is appropriate only in the sound discretion of the court.'" *Stiltner v. Hart*, No. 5:13-CV-203-KKC-HAI, 2018 WL 3717209, at *1 (E.D. Ky. Jan. 24, 2018) (quoting *Towns v. Smith*, 395 F.3d 251, 256-57 (6th Cir. 2005)), *report and recommendation adopted*, No. CV 5:13-203, 2018 WL 3716314 (E.D. Ky. Aug. 3, 2018).

In other words, where laches is potentially applicable, the decision whether to apply it is within the sound discretion of the district court, inasmuch as the Sixth Circuit reviews "a district court's resolution of a laches question for an abuse of discretion." *Chirco*, 474 F.3d at 231 (quoting *City of Wyandotte v. Consol. Rail Corp.,* 262 F.3d 581, 589 (6th Cir. 2001)); s*ee also Czaplicki v. The Hoegh Silvercloud*, 351 U.S. 525, 534 (1956) ("'the [application] of laches is a question primarily addressed to the discretion of the trial court'" (quoting *Gardner v. Panama R. Co.,* 342

---

[4] To promote clarity of analysis, the Court must pause to explain its terminology, which may differ substantially from the terminology used by cited cases or the parties herein. As the term is used herein by the undersigned, laches is "applicable" when a court rules that laches bars the particular equitable relief at issue, whereas laches is only "potentially applicable" when the court is not prohibited *ab initio* from applying laches by threshold considerations—such as laches being entirely supplanted by a particular statute of limitation or the fact that the kind of requested relief at issue is not the kind of relief subject to the equitable concept of laches—but may yet determine not to apply laches. *Chirco* actually used the phrase "is even applicable," without including "potentially"; in context, however, the phrase clearly was meant to mean *potentially* applicable as that term is used herein. Notably, even where laches is "potentially applicable" as the Court uses that term, a district court cannot apply—lacks the discretion to apply—laches unless the court finds that its two required elements exist. Where the terminology of Plaintiffs or Defendants, or of a cited case, for these concepts differs from the Court's, the Court will convert such terminology into the Court's terminology.

5

U.S. 29, 30 (1951))). Notably, from a review of Sixth Circuit case law as a whole, it appears implicit that the district court is vested with discretion both as to the determination of whether the two elements of laches exist[5] and to the subsequent decision (if it is even reached) whether to apply laches.

## DISCUSSION

The Court notes summarily at the outset that based on the current record, it cannot find that both elements of laches exist with respect specifically to Plaintiffs' request for issuance of a preliminary injunction at least sometime in advance of the November 3 general election. And even if could so find, based on the current record it would decline to exercise its discretion to apply laches to that specific request. If Defendants wish to reassert, with additional evidence, their laches defense prior to the Court deciding whether to grant or deny that specific request, it may do so. But until then, the Court will consider Defendants' laches request only in connection with Plaintiffs' request for preliminary injunctive relief in advance of the August 6 primary election. As Plaintiffs themselves suggest, laches could apply separately to the request for an injunction prior to August 6 even if it does not apply to the request for an injunction prior to November 3. (Reply at 27 n.14). Accordingly, the discussion below concerns laches only with respect to the request for a preliminary injunction in advance of August 6, 2020.[6]

---

[5] Insofar as whether these elements exist is a question of fact, to say that the district court is vested with discretion as to this question is to say that the district court's answer will be upheld unless found on appeal to be clearly erroneous. *Am. Home Prod. Corp. v. Lockwood Mfg. Co.*, 483 F.2d 1120, 1124 (6th Cir. 1973) ("As an issue of fact, a finding of laches cannot be disturbed unless it has been shown to be clearly erroneous, and as a question addressed to the discretion of the District Court, it will not be disturbed unless an abuse of discretion has been shown." (citations omitted)).

[6] The Court realizes that Plaintiffs may be far less concerned about the primary election than the general election, but they have sought a preliminary injunction in advance of the primary election. Thus the Court must address the request as it relates to the primary election.

The Court first will address Plaintiffs' arguments against the application of laches. It then will set forth its own conclusions regarding the application of laches, in part by referencing points it made in response to Plaintiffs' arguments.[7]

I. PLAINTIFFS' ARGUMENTS AGAINST APPLICATION OF LACHES.

Plaintiffs first appear to argue laches is not even potentially applicable, asserting that because "Plaintiffs' [constitutional] injuries are ongoing . . . the doctrine of laches does not [even potentially] apply." (Reply at 24). But Plaintiffs here cite no case for the broad proposition that whenever a plaintiff has ongoing constitutional injuries, laches is not even potentially applicable. Instead, they cite: a Sixth Circuit case wherein laches is not even mentioned, for the unexceptional proposition that a law that works an ongoing violation of constitutional rights does not become immunized from legal challenge for all time; an Eleventh Circuit case decided in the very unique and inapplicable copyright context wherein laches potentially applies to claims for money damages;[8] a Southern District of Georgia case wherein laches is not even mentioned; and a Ninth

---

[7] The Court has structured its discussion this way not because it places any (non-existent) burden on Plaintiffs to show that laches should not be applied, but rather because it believes that: (1) analytical clarity is maximized by examining the issues primarily with reference to Plaintiffs' specific arguments rather than Defendants'; and (b) Defendants' arguments generally need not be discussed separately, because the gist of them will be adequately reflected in the Court's response to Plaintiffs' arguments and the Court's own conclusions.

[8] Laches generally is potentially applicable to requested equitable relief (including but not limited to injunctions) sought in civil actions. *See Obiukwu v. United States*, 14 F. App'x 368, 369 (6th Cir. 2001). By contrast, laches generally is not potentially applicable to claims for money damages, although there are exceptions. As explained by another district court in this circuit, "[l]aches is an equitable doctrine and, as a general rule, remains inapplicable to legal claims for damages." *United States v. Robbins*, 819 F. Supp. 672, 674 (E.D. Mich. 1993) (citations omitted). By contrast, "[c]laims in equity, of course, invite equitable defenses, including laches." *Id.* at n.2. "Claims that combine issues of law and equity often allow equitable defenses. In the trademark area, for instance, although a jury trial is required for damages under § 35 of the Lanham Act of 1946, . . . laches may be pled as a defense." *Id.* (citations omitted). "Although circuits are split as to whether laches is available as a defense under the Copyright Act, laches is [potentially applicable] as an affirmative defense in a copyright action [for damages] in the Sixth Circuit." *Broadcast Music, Inc. v. Roger Miller Music, Inc.,* 396 F.3d 762, 783 n.13 (6th Cir. 2005). *But see Lyons Partnership, L.P. v. Morris Costumes, Inc*., 243 F.3d 789, 797 (4th Cir. 2001) (holding that laches is not potentially applicable to claims for damages in copyright actions, in part because "laches is a doctrine that applies only in equity to bar equitable actions, not at law to bar legal actions."). The Court also notes that, counterintuitively, in some kinds of cases laches may not be potentially applicable as to some kinds of claimed equitable relief even though it may be applicable as to claimed money damages. *E.g.*, *Kellogg Co.*, 209 F.3d at 568-69.

7

Circuit case and two district court cases that refused to apply laches but never indicated that laches was not even potentially applicable. (*Id.*). In short, neither the cited Sixth Circuit case, nor any of the other cited cases (none of which are binding on the Court anyway), stands for the proposition that laches is not potentially applicable merely because it is invoked against a party who has an injury that is continuing or constitutional (or both) in nature.

"A party requesting a preliminary injunction must generally show reasonable diligence. That is as true in election law cases as elsewhere." *Benisek v. Lamone*, 138 S. Ct. 1942, 1944, 201 L. Ed. 2d 398 (2018) (citation omitted). *Benisek* involved constitutional challenges to Maryland's congressional redistricting law; as made clear in the underlying district court opinion, the challenge was based on the First Amendment. *Benisket v. Lamone*, 266 F. Supp. 3d 799 (D. Md. 2017). Although *Benisek* did not involve any assertion of laches, the Supreme Court's observation quoted above is plainly inconsistent with Plaintiffs' overarching suggestion here—*i.e.*, that alleged injury from alleged ongoing First Amendment (or other constitutional) violations inflicted by election laws is too consequential to be precluded from redress based on delay from lack of diligence. Significant though these alleged injuries may be, claims to redress them indeed are subject to scrutiny based on delay from lack of diligence, and so laches is potentially applicable. Indeed, in cases in which the plaintiff alleges a constitutional injury from voting laws, the Sixth Circuit seems generally to proceed as if laches is at least potentially applicable, whether or not it ultimately holds that laches is applicable. *E.g.*, *Crookston v. Johnson*, 841 F.3d 396, 398 (6th Cir. 2016); *Am. Civil Liberties Union of Ohio, Inc. v. Taft*, 385 F.3d 641, 647 (6th Cir. 2004); *Kay v. Austin*, 621 F.2d 809, 813 (6th Cir. 1980).

Plaintiffs then argue that even if laches is potentially applicable here, the Court should not apply it because neither of the two elements of laches exists. (Reply at 24-25). Regarding the first

8

element, Plaintiffs assert that if the Court were to accept Defendants' argument that Plaintiffs unreasonably delayed in filing this action because the challenged laws have been on the books for at least fifteen years, the Court would signal that a plaintiff "would never be able to challenge existing laws that implicate continuing constitutional violations." (*Id.* at 25). But this assertion is demonstrably off the mark, for two reasons. First, even if the Court accepted Defendants' argument whole cloth and embraced it in future cases, that would resolve (in favor of the future defendant(s)) only the first element of laches; the second element (prejudice to defendant(s)) still would need to be satisfied in each case, failing which laches would not bar any constitutional challenge to an existing law. Second, as noted, even in cases where the second element is satisfied, a court in its discretion could decline to apply laches.

In fact, the Sixth Circuit has made clear that the age of laws subjected to constitutional challenge is indeed relevant to the laches inquiry, in particular to the first element. *Crookston*, 841 F.3d at 398–99 ("No such [powerful] reason [to disrupt imminent elections] appears here. The challenged rules are not new. Michigan's ban on ballot exposure dates to 1891, and today's version of these laws has been on the books since 1996. . . . Yet Crookston chose to wait until September 9, 2016 [60 days before the applicable election] to challenge the rules.").

Thus, the Court can and does recognize the relevance,[9] to the first element of laches, of the age of the laws that Plaintiffs have sought to preliminarily enjoin within weeks of a primary election. These laws have been in effect for a long time—long prior, certainly, to Plaintiffs filing the Motion (or even the original complaint) and to the COVID-19 pandemic hitting Tennessee.

---

[9] The Court does not view this relevant fact as *dispositive by itself*, however. Plaintiffs seem to think that Defendants claim that it is. The Court is not so sure, but to the extent Defendants claim that the age of the challenged laws is dispositive by itself, the Court rejects such claim.

9

Plaintiffs also assert that it was justifiable to delay filing their original complaint until (only)

> 6 days after Governor Lee issued guidelines for restaurants and retail stores to reopen—significantly increasing Tennesseans risk of COVID-19 exposure, and, most importantly, 7 days after the Tennessee Division of Elections issued its April 23, 2020 COVID-19 Election Contingency Plan, which confirmed that the absentee-eligibility criteria would not be expanded to all voters.

(Reply at 25). The gist of this assertion appears to be that until the last week of April 2020, it was not sufficiently clear to Plaintiffs that: (1) the risk to Tennesseans from COVID-19 was grave enough for Plaintiffs to need to file suit to seek any relief related to absentee voting; and (2) Tennessee would enforce its absentee-eligibility criteria prescribed by Tenn. Code Ann. § 2-6-201. But the Court can ignore neither Plaintiffs' own allegations regarding the obvious seriousness and impact of COVID-19 nor the widespread consensus about its seriousness and impact (with or without "reopening") long prior to the end of April. Given these things, the Court refuses to accept that just before Governor Lee issued guidelines to reopen (part of the so-called "Tennessee Pledge") on April 25, Plaintiffs held the view that in-person voting in August and November was shaping up to be tolerably safe—but then within a week changed (and/or objectively had reason to change) their view to the stance that in-person voting was now likely to be intolerably unsafe, such that absentee-voting rights needed to be expanded. And Governor Lee's guidelines on reopening, even if "significantly increasing Tennesseans risk of COVID-19 exposure," (Reply at 25), suggested an official (and relatively informed) view that reopening was warranted based on relative good news at that time regarding the trajectory of the pandemic and the ability of persons to engage in activities (including, perhaps, voting) outside of the home with adequate (if not perfect) safety.[10] The issuance of these guidelines on April 25, while creating the possibility of

---

[10] Indeed, in the link provided by Plaintiffs with respect to these guidelines, Governor Lee in pertinent part is quoted as saying that "Tennesseans pulled together to flatten the curve, and it is time for people to begin to get back to work

10

increased risk naturally resulting from increased human activity outside the home, objectively would have supported overall optimism about the future safety of activities such as in-person voting.

In their Reply, Plaintiffs point to no data that would have supported any change of view in the six days prior to the filing of the original complaint on May 1. The Court *sua sponte* notes that Exhibit 2 to the Reply, showing data from the Tennessee Department of Health, reflects only a modest (though certainly unwelcome) rise in the daily count of new COVID-19 cases over that period. (Doc. No. 40-2 at 40). And Plaintiffs fail to explain why such rise during that period was objectively (or even subjectively to Plaintiffs) a harbinger of an unsafe future caused by reopening, given that the period: (a) arguably was too short to be particularly representational and, more importantly, (b) perhaps (given COVID-19's reported incubation period) reflected new infections that largely occurred prior to the issuance of the Tennessee Pledge and thus were not attributable to it.[11]

Moreover, the Court cannot accept the excuse that it was always possible that the State would agree to change its enforcement position regarding election laws and protocols. *Crookston* explains why not:

> Best we can tell, [the plaintiff] means only that it is always possible for the [state] to make election-protocol changes. If that reality sufficed to justify a delay of litigation, however, we would be encouraging sluggish election-procedure challenges rather than deterring them—just the opposite of the *Purcell* principle.

---

and back to their businesses" and is paraphrased as noting that these guidelines "for safe economic recovery is supported by data showing Tennessee's curve of novel coronavirus infections hitting a plateau." *Gov. Lee Issues Guidelines for Restaurants, Retail Stores to Reopen Early Next Week in 89 Counties*, Tennessee Office of The Governor, https://www.tn.gov/governor/news/2020/4/24/gov--lee-issues- guidelines-for-restaurants--retail-stores-to-reopen-early-next-week-in-89-counties.html (last accessed July 20, 2020).

[11] "The incubation period for COVID-19 is thought to extend to 14 days, with a median time of 4-5 days from exposure to symptoms onset." *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)*, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html (last accessed July 20, 2020).

*Crookston*, 841 F.3d at 399.¹² Furthermore, as far as Plaintiffs indicate, they were waiting only for a possible change in the State's position regarding absentee-eligibility criteria. The purported need to wait for this does not explain waiting to challenge alleged constitutional violations affecting those already eligible for absentee voting under the exiting criteria or those who wish to distribute requests for applications for absentee ballots. Those other challenges can be pursued separately from, and without, a challenge to the general absentee-eligibility criteria. In fact, that is exactly what Plaintiffs are now doing in this case.

Plaintiffs also attack Defendants' argument that waiting until May 1 to file the original complaint amounts to an unreasonable delay because Governor Lee issued a state of emergency order on March 12.¹³ Plaintiffs call such argument disingenuous because three weeks after May 1 (on May 22), Defendants were arguing to the Davidson County Chancery Court that the plaintiffs' request in that case to expand absentee voting to all voters for the August election because of COVID-19 was premature and unripe for adjudication. (*Id.* at 25 (citing argument in brief filed in Chancery Court found in the record in this case at Doc. No. 40-2 at 1333-35)). Since the "unripeness" argument Defendants made in Chancery Court against those plaintiffs appears largely (though not entirely) applicable to Plaintiffs,¹⁴ the Court does see how this argument may be

---

¹² *Purcell* [*v. Gonzalez*, 549 U.S. 1, 4–5 (2006)] is referenced below.

¹³ The Court takes notice that this order, Executive Order No. 14 ("An order suspending provisions of certain statutes and rules in order to facilitate the treatment and containment of COVID-19"), described the pandemic and the resulting crisis in considerable detail and suspended myriad provisions of state law in an effort to mitigate the crisis. Executive Order No. 14 also noted that particular governments and public health authorities in the United States and abroad already had been trumpeting (and heeding) warnings about COVID-19 for some period of time.

¹⁴ The ripeness issue under state law addressed in Chancery Court is similar to the ripeness aspect of the Article III standing issue raised by Defendants in this case. Indeed, aspects of Defendants' arguments made in Chancery Court are reflected in Defendants' lack-of-standing claim made in Defendants' Response. But the issue of ripeness under state law is not identical to the issue of ripeness under federal law—an issue which, in fact, the Sixth Circuit no longer sees as a stand-alone issue but rather merely an aspect of the broader constitutional issue of whether the plaintiff has standing under Article III of the U.S. Constitution. *See Kiser v. Reitz*, 765 F.3d 601, 606-607 (6th Cir. 2014). Therefore, it cannot be said that the argument in Chancery Court that those plaintiffs' claims were unripe under state

12

somewhat inconsistent with Defendants' assertion of laches against Plaintiffs. But Plaintiffs fail to explain—and the Court does not see—why Defendants cannot assert laches here as essentially an alternative argument to the unripeness argument they made (and lost, *see* Doc. No. 40-2 at 29-30) in Chancery Court. In other words, the Court sees nothing improper or disingenuous about Defendants taking the alternative position(s): (1) that Plaintiffs' claims were still premature (unripe) as of May 22; but (2) that if Plaintiffs are correct that their claims *were* ripe as of May 22, they would likewise have been ripe long before May 1 and thus should have been brought long before May 1. Under Plaintiffs' reasoning here, a defendant who previously made and lost a ripeness argument should be de facto (if not de jure) estopped from asserting laches; the Court is unwilling to accept that proposition. The Court is also unwilling to effectively estop the third Defendant (Amy Weirich, who was not a defendant in the Chancery Court action) from making an argument herein based on an argument made in Chancery Court by the two other Defendants who were defendants in the Chancery Court action.[15]

Moreover, Plaintiffs did not file the Motion until three weeks after May 22. It is this filing date (June 12), and not May 1, upon which the Court primarily focuses. Plaintiffs claim that the focus should be May 1 because "the laches doctrine usually applies to the filing of a complaint—from the time plaintiff 'knew or should have known' of the violation." (*Id.* at 26 (citing *Kellogg Co. v. Exxon Corp.*, 209 F.3d 562, 569-70 (6th Cir. 2000) and *Elvis Presley Enters., Inc. v. Capece*, 141 F. 3d 188, 205 (5th Cir. 1998))). But *Kellogg* tells us nothing about whether, when laches is asserted as to a motion for injunctive relief filed after the action is filed, courts should focus on the

---

law is identical to any argument that has been made—or would have been made had Plaintiffs filed their original complaint prior to May 1—against Plaintiffs here.

[15] One may be tempted to treat all Defendants identically, especially because they all are sued only in their official capacity and are represented by the same counsel. However, Plaintiffs chose to name Amy Weirich separately, and, consistent with Plaintiffs' choice, the Court must recognize her as a separate Defendant.

13

action-filing date or the motion-filing date; indeed, as far as the opinion indicates, any motion for a preliminary injunction was filed contemporaneously with the plaintiff's complaint. Moreover, the cited pages from *Kellogg* are more about the doctrine of acquiescence in trademark cases than about the doctrine of laches, and to the extent they are about laches they are geared to the unique laches context of trademark litigation. And *Capece*, in addition to being non-binding on this Court, is unhelpful because it likewise involved, in the cited portion, the unique trademark context and made no mention of any motion for injunctive relief filed after the action was filed.

In fact, the Sixth Circuit has looked to the filing date of a motion for injunctive relief, in addition to an earlier date the lawsuit was filed, in assessing a laches argument. *Crookston*, 841 F.3d at 399 ("Crookston chose to wait until [60 days before the election] to challenge the rules, and did not move for a preliminary injunction until [43 days before the election]."). *Cf. Benisek*, 138 S. Ct. at 1944 (affirming denial of preliminary injunction as to Maryland redistricting law, though not explicitly based on laches, in part because plaintiffs did not pursue their claims diligently in that they "did not move for a preliminary injunction in the District Court until . . . over three years after the plaintiffs' first complaint was filed.").

Plaintiffs also claim that they "waited to file their preliminary injunction motion until the resolution of [the above-referenced] injunctive relief proceedings in the Davidson County Chancery Court[.]" (Reply at 26). They note essentially that once those proceedings were concluded (with the Chancery Court generally expanding absentee-ballot eligibility to all Tennesseans via order dated June 4, 2020), they were able to file the Motion without any (now unnecessary) request for an expansion of absentee-voting rights (except for first-time voters). *Id.* Naturally, the Court appreciates any consideration of judicial efficiency, and Plaintiffs should be commended for omitting such a request from the Motion. considering when the Motion was filed.

14

But a delay in seeking a preliminary injunction conversely can hurt as well as aid judicial efficiency, especially when the delay is not for a good reason. And a good reason for waiting to seek a preliminary injunction as to absentee-voting rights generally does not constitute a good reason for waiting to file for the rest of the copious preliminary injunctive relief requested in the Motion—most of which, under Plaintiffs' own theory, should be granted to vindicate the constitutional rights of absentee voters no matter whether their numbers were expanded, and some of which is intended for persons other than absentee voters—which could easily have been pursued separately. And such separate pursuit would have been prudent, with the primary election just two months away. Moreover, it does not appear that Plaintiffs were ready to file immediately upon learning the outcome of the Chancery Court proceedings, for example by having ready two alternate versions of a motion for a preliminary injunction, one assuming that all relief must be pursued and another that merely excises the discrete portions related to absentee voting rights generally. Instead, the Motion was filed only eight days later—a not insignificant delay with a primary election bearing down.

As to the second element of laches, Plaintiffs claim that "Defendants also do little to show they are 'prejudiced by this delay." (*Id.* at 26) (internal quotation marks omitted). In this regard, Plaintiffs are not far off. The record is hardly loaded with evidence of actual prejudice. But there is at least some. The declaration of Defendant Goins, the State's Coordinator of Elections, asserts a funding gap for the additional costs the State would bear were additional absentee ballots to be required. (Doc. No. 46-1 at 4). Were injunctive relief to be granted, the State would have to find a way to somehow close this funding gap, and (according to Goins) also provide new training and resources (such as additional absentee ballots). (*Id.* at 5). Based on these averments, which the

15

Court credits,[16] the Court finds prejudice from the fact if injunctive relief were granted at this late date, the State would have to take such action much more quickly than if Plaintiffs had sought such injunctive relief as soon as they should have; quicker action tends to mean more expensive and error-prone action. The Sixth Circuit has suggested that such circumstances constitute prejudice resulting from a plaintiffs' delay. *See Crookston*, 841 F.3d at 399. Although Goins' declaration does not provide overwhelming evidence of actual prejudice, not much prejudice is required given the substantial delay here close to the primary election. *See Marshall v. Meadows*, 921 F. Supp. 1490, 1494 (E.D. Va. 1996) ("The time element is most important . . . . Under the delay/prejudice ratio, prejudice need not be so severe where, as here, delay is conscious and substantial.").[17]

In addition, the Court believes that at this late stage, a certain amount of prejudice can be presumed. To be sure, the Sixth Circuit has not always appeared willing to presume any prejudice. *Taft*, 385 F.3d at 647 (finding a lack of prejudice based on insufficient evidence of prejudice, even though "each day that passed may have made it more difficult to hold a special election"). At other times, though, the Sixth Circuit has spoken as if a court properly may assume that prejudice naturally results from a delay contributing to a potential preliminary injunction being issued (if at all) very close to an election. *See Kay*, 621 F.2d at 813 ("As time passes, the state's interest in proceeding with the election increases in importance as resources are committed and irrevocable decisions are made."); *Crookston,* 841 F.3d at 399 (appearing to presume that preliminarily enjoining a state law against exposing ballots to others "would require nuanced policy decisions" and implying that this would prejudice the state inasmuch as "no one should be making [these

---

[16] Given his official position, Defendant Goins evidently makes these averments from an informed perspective. Moreover, while realizing that the declaration is self-serving, the Court does not otherwise perceive any credibility issues with these averments. For these reasons, the Court accepts them as true.

[17] Regarding "consciousness" of delay, the Court perceives it as existing here, since Plaintiffs have indicated that there were particular reasons (which the Court has found do not render their delay any less unreasonable) that prompted them to intentionally delay filing suit and seeking a preliminary injunction.

16

decisions] at the eleventh hour"). And the Court believes that it may presume that granting an injunction here would "change[ ] the State's careful scheduling into a chaotic attempt to get absentee ballots out on time [and that] [t]his alone amounts to damage that satisfies the laches requirements." *Perry v. Judd*, 840 F. Supp. 2d 945, 954 (E.D. Va. 2012), *aff'd,* 471 F. App'x 219 (4th Cir. 2012). Moreover, the Supreme Court has indicated that any court order that affects an election—meaning here the grant of a preliminary injunction but not the denial of one—can be presumed to cause prejudice to the extent the court order is issued close to an election. *See Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006) ("Court orders affecting elections . . . can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase.").

## II. THE COURT'S CONCLUSIONS REGARDING LACHES.

Via its deconstruction of Plaintiffs' arguments, the Court suspects that it has telegraphed its views regarding the applicability of laches. Although, as suggested above, the undersigned recognizes the relative subjectivity and ambiguity of the elements, the Court finds decisively that the elements of laches do exist in this case. First, the Court finds unreasonable delay by Plaintiffs in waiting, after Governor Lee's March 12 state of emergency order, seven weeks to file the original complaint and two months to file the Motion. As parties allegedly facing severe violations of their constitutional rights as a result of the implicated election laws, especially considering the existing COVID-19 pandemic, Plaintiffs should have been on the proverbial red alert by the time the Governor's order was issued on March 12. With the primary election already less than five months away by that time, Plaintiffs should not have waited as long as they did to file either the original complaint or the Motion. That is not necessarily to say that they were lazy or that their counsel were derelict in their duty. It is to say that plaintiffs seeking the very extraordinary remedy

17

of enjoining state procedures governing an approaching primary election needed to move more quickly than they did, and the Court has not been satisfied by the various explanations for the delay.

And contrary to Plaintiffs' assertion, the delay *is* made more inexcusable by the fact that all challenged election laws have long been on the books. The Court understands Plaintiffs' position—*i.e.*, that although these laws were always unconstitutional and injurious, their especial significance and menace arose only in the context of COVID-19, where absentee voting became much more relevant than before. But although Plaintiffs are newly motivated to challenge these laws, the Court believes that one or more Plaintiffs should have been motivated to challenge—and should have challenged—them long before they did, and even prior to the pandemic, if these laws are unconstitutional and injurious to them as alleged.

The question of prejudice arguably is closer. As indicated, Defendants have not submitted much in the way of sworn averments or data explaining in detail the State has been prejudiced, with respect to the August 6 primary, by Plaintiffs' delay. But as further indicated above, what they have submitted is sufficient, especially when considering what the Court may reasonably presume regarding the chaotic impact of such a late change in voting protocols.

The Court further finds that it should exercise its discretion to apply laches. Admittedly, as suggested above, a court generally cannot claim to know the "right" answer to the question of whether to apply laches in a particular context; indeed, this generally is a question that does not have a "right" answer. With respect to the request for a preliminary injunction in advance of the August 6 primary, however, the Court is convinced that the substantially more persuasive decision is to exercise its discretion to apply laches. What the Sixth Circuit said about an election one week away applies almost equally to the upcoming primary election three weeks away: "When an

18

election is 'imminen[t]' and when there is 'inadequate time to resolve [ ] factual disputes' and legal disputes, courts will generally decline to grant an injunction to alter a State's established election procedures." *Crookston*, 841 F.3d at 398 (quoting *Purcell*, 549 U.S. at 5–6).

CONCLUSION

"Call it what you will—laches, the *Purcell* principle, or common sense—the idea is that courts will not disrupt imminent elections absent a powerful reason for doing so." *Id.* Given the imminence of the August 6 primary, the Court will not do so here.

"All of this should impress on [Plaintiffs], and other would-be challengers to election protocols, the need to bring as-applied (and for that matter facial) challenges sooner rather than later—first to give election officials an opportunity to make corrections where corrections are due and second to give district and appellate courts ample time to resolve the merits of the dispute long before the election." *Id.* at 399. However, "[this] opinion, it bears adding, will not render this case moot. [Plaintiffs] seek[] to vindicate th[eir] right[s] in this year's election and future elections. That means [they] will be able to pursue [their] claim[s] after the [primary] election, when there will be time for due deliberation in the district court and [the Sixth Circuit]." *Id.* at 401.

Accordingly, the Motion (Doc. No. 40) is DENIED to the extent that it seeks a preliminary injunction prior to the August 6 primary election and remains pending to the extent that it seeks a preliminary injunction prior to the November 3 general election.[18]

---

[18] The Court notes that although Defendants have not moved to dismiss for lack of subject-matter jurisdiction, they assert in their Response that the Court lacks subject-matter jurisdiction (because, Defendants claim, all Plaintiffs lack standing as to all claims). This may understandably raise in observers' minds the question of whether the Court should even be deciding the limited applicability of laches at this time, prior to resolving the issue of whether it has subject-matter jurisdiction. The short answer is that the Court may do so because when faced with multiple assertions that it should not take any merits-based action on a case, the Court may choose among them and need not address an assertion of lack of subject-matter jurisdiction before the other assertion(s). *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.,* 549 U.S. 422, 431 (2007) ("[A] federal court has leeway to choose among threshold grounds for denying audience to a case on the merits [including alleged lack of subject-matter jurisdiction]." (citations and internal quotation marks omitted)). That is, in part, because there is no mandatory sequencing of jurisdictional issues, and indeed a waivable jurisdiction challenge like personal jurisdiction can be decided before a non-waivable one like

IT IS SO ORDERED.

*Eli Richardson*
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE

---

subject-matter jurisdiction. *Id.* This means, among other things, that the Court can decide the applicability of laches before deciding whether it has subject-matter jurisdiction. *See Singh v. Joshi*, 152 F. Supp. 3d 112 (E.D.N.Y. 2016) ("Before turning to the merits of plaintiffs' preliminary injunction request, the Court must address three threshold matters [*i.e.*, requested transfer of venue, alleged lack of standing, and alleged applicability of laches]. Since each is distinct from the merits, the Court may address them in any order." (citing *Sinochem Int'l Co*., 549 U.S. at 431)).