IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| MEMPHIS A. PHILLIP RANDOLPH INSTITUTE, et al. | ) )  ) NO. 3:20-cv-00374 ) ) JUDGE RICHARDSON |
| Plaintiffs, | |
| v. | |
| TRE HARGETT, et al., | |
| Defendants. | |

## **MEMORANDUM OPINION & ORDER**

Pending before the Court is Plaintiffs' Motion for Preliminary Injunction (Doc. No. 40, "Motion"). Via the Motion, Plaintiffs seek to enjoin Defendants, pending final resolution of Plaintiffs' claims, from enforcing several provisions of Tennessee's electoral laws and procedures, namely:

(1) Tenn. Code Ann. § 2-6-202(c)(4), which provides: "A person who is not an employee of an election commission commits a Class A misdemeanor if such person gives an unsolicited request for application for absentee ballot to any person."

(2) Tenn. Code Ann. § 2-2-115(b)(7), which provides that those who registered to vote in Tennessee by mail must "appear in person to vote in the first election the person votes in after such registration becomes effective."

(3) Tennessee's process for verifying that the signature on an absentee ballot matches the signature contained in the (purported) ballot-caster's voter registration record, as required under Tenn. Code Ann. § 2-6-202(g) for the ballot to be counted.

According to Plaintiffs, these respective aspects of Tennessee's voting rules are unconstitutional because they violate the First Amendment right to free speech and association, the First Amendment right to vote, and Fourteenth Amendment procedural and substantive due process, respectively.[1]

The Court is aware that the clock is ticking on the Motion, as the November 3 general election is less than three months away. Time is surely of the essence to each side. The Court therefore intends to issue partial rulings on the Motion to the extent so doing is practicable and appropriate, considering the balance between the drawbacks of piecemeal orders and the benefits to the parties of knowing as soon as possible, in order to begin preparing for a likely upcoming appeal,[2] the Court's view on particular issues likely to be the subject of appellate briefing.

Herein, the Court will address Plaintiffs' request to preliminarily enjoin Tenn. Code Ann. § 2-6-202(c)(4). For the reasons set forth herein, the Motion is denied with respect to this request.

PROCEDURAL BACKGROUND

Plaintiffs initiated this action by filing a complaint ("original complaint") on May 1, 2020. (Doc. No. 1). Defendants filed an answer (Doc. No. 38) to the original complaint on June 11, 2020, and the next day, Plaintiffs filed an amended complaint (Doc. No. 39, "Amended Complaint"), as well as the Motion and a memorandum in support of the Motion (Doc. No. 43, "Plaintiffs' Brief"). In the Prayer for Relief in both the original complaint and the Amended Complaint, Plaintiffs requested preliminary (and permanent) injunctive relief virtually identical, for present purposes,

---

[1] As Plaintiffs make clear, they are actually invoking the First Amendment as it is incorporated into the Fourteenth Amendment (and thereby applicable to state governments).

[2] The Court is under no illusion that both sides will be satisfied with the Court's ruling; just as Plaintiffs presumably will be disappointed with the Court's ruling herein, one side or the other naturally is likely to be disappointed by the Court's rulings on the additional requests for relief made in the Motion.

to the relief they now request via the Motion. Plaintiffs did not actually move for preliminary injunctive relief, however, prior to filing the Motion on June 12, 2020.

Plaintiffs aptly describe the context surrounding the Motion:

On August 6, 2020, Tennessee will hold statewide primary and general elections. Three months later, on November 3, 2020, it will hold its general presidential election. Unlike any elections in modern memory, these elections will be held under the pall of an ongoing public health crisis that [had, as of the time of the filing of Plaintiffs' Brief,] already claimed the lives of over 112,000 Americans and forced immediate and dramatic changes to everyday life across the country—including in Tennessee. As a result of the pandemic, significantly more Tennesseans are expected to vote by mail this year than typically have in past elections. Most will do so for the first time.

(Plaintiffs' Brief at 4).[3]

Defendants filed a response (Doc. No. 46, "Response") in opposition to the Motion on June 26, 2020, and Plaintiffs filed a reply (Doc. No. 54, "Reply") in support of the Motion on July 7, 2020.

In the Response, Defendants asserted in pertinent part that the doctrine of laches should be applied to bar in its entirety the injunctive relief requested by Plaintiffs in the Motion. Agreeing in part, the Court issued an order denying the Motion (based on laches) to the extent that it sought a preliminary injunction prior to the August 6 primary election, but not to the extent that it seeks a preliminary injunction prior to the November 3 general election. Thus, the request for preliminary injunctive relief in advance of and in connection with the general election remains pending and is ripe for decision.

PRELIMINARY INJUNCTION STANDARD

Preliminary injunctions are considered preventive, prohibitory, or protective measures taken pending resolution on the merits, *see Clemons v. Board of Educ. of Hillsboro, Ohio*, 228

---

[3] Herein, cited page numbers are the numbers stamped on the applicable pages by the Clerk's Office, which may differ from the page numbers placed on the document by the author/filer of the document.

F.2d 853, 856 (6th Cir. 1956), and are considered extraordinary relief. *See Detroit Newspaper Publishers Ass'n v. Detroit Typographical Union No. 18, Int'l Typographical Union*, 471 F.2d 872, 876 (6th Cir. 1972). A preliminary injunction should be granted only if the movant carries its burden of proving that the circumstances clearly demand it. *Overstreet v. Lexington–Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). In determining whether to afford such relief, the court must consider and balance four factors: (1) the likelihood of the plaintiff's success on the merits; (2) whether the plaintiff will suffer irreparable injury without the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the injunction's impact on the public interest. *Nat'l Viatical, Inc. v. Universal Settlements, Int'l, Inc.*, 716 F.3d 952, 956 (6th Cir. 2013).

Although these four factors are "factors to be balanced, not prerequisites that must be met," *Michael v. Futhey*, No. 08-3922, 2009 WL 4981688, at *17 (6th Cir. Dec. 22, 2009) (quoting *Six Clinic Holding Corp., II v. Cafcomp Sys.*, 119 F.3d 393, 400 (6th Cir. 1997)), they do not carry equal weight. Regarding the third factor, irreparable harm, "even the strongest showing on the other three factors cannot eliminate the irreparable harm requirement. That factor is indispensable: If the plaintiff isn't facing imminent and irreparable injury, there's no need to grant relief *now* as opposed to at the end of the lawsuit." *D.T. v. Sumner Cty. Sch.*, 942 F.3d 324, 326-27 (6th Cir. 2019) (citation and internal quotation marks omitted); *see also Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964, 967 (6th Cir. 2002) ("The demonstration of some irreparable injury is a sine qua non for issuance of an injunction."). In other words, "although the *extent* of an injury may be balanced against other factors, the *existence* of an irreparable injury is mandatory." *Sumner Cty. Sch.*, 942 F.3d at 327. Thus, a district court abuses its discretion if it grants a preliminary injunction

without making specific findings of irreparable injury. *Id.*[4] And to merit a preliminary injunction, an injury must be both certain and immediate, not speculative or theoretical. *Id.*

DISCUSSION

The Court begins by noting that the restriction it is addressing herein is unique. As noted above, Tenn. Code Ann. § 2-6-202(c)(4) provides: "A person who is not an employee of an election commission commits a Class A misdemeanor if such person gives an unsolicited request for application for absentee ballot to any person." Thus, this particular paragraph of Tenn. Code Ann. § 2-6-202 ("Paragraph (c)(4)") sets forth a criminal prohibition against "giv[ing] . . . to an[other] person [hereinafter sometimes "distribution of" or "distributing"]" something quite specific: "an unsolicited request for application for absentee ballot." The Court has not found, and the parties do not cite, any case involving a restriction like the one set forth in Paragraph (c)(4). But to repeat, Paragraph (c)(4) prohibits distribution of an a *"unsolicited request"* for an application for an absentee ballot.

Crucially, Paragraph (c)(4) does *not* prohibit distribution of an *application* for an absentee ballot. A different provision of the same code section ("Paragraph (c)(3)") does that. *See* Tenn. Code Ann. § 2-6-202(c)(3) ("A person who is not an employee of an election commission commits a Class E felony if such person gives an application for an absentee ballot to any person."). The prohibitions are not the same. There is a difference between a *request for an application* for an absentee ballot and a request (*i.e.*, an application) for the absentee ballot itself; there is likewise a difference between prohibiting the distribution of the former and prohibiting the distribution of the latter. And the distinction is not one of mere semantics. Vis-à-vis one another, Paragraph (c)(3)

---

[4] While the absence of irreparable injury is always fatal to a motion for a preliminary injunction, "[a] finding that there is simply no likelihood of success on the merits is *usually* fatal." *Gonzalez v. Nat'l Bd. of Medical Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000) (emphasis added).

and Paragraph (c)(4) prohibit different acts, carry different maximum punishments (as the former prescribes a misdemeanor and the latter a felony), were passed at different times (as the former was passed years before the latter), and are based on different concerns. Defendants describe the intertwined history of the two statutes as follows:

> Prior to the passage of Tenn. Code Ann. § 2-6-202(c)(4) in 2002, Tenn. Code Ann. § 2-6-202(c)(3) provided (as it currently does) that "[a] person who is not an employee of an election commission commits a Class E felony if such person *gives an application* for an absentee ballot to any person." *See* Tenn. Code Ann. § 2-6-202(c)(3) (Supp. 1994) (emphasis added).
>
> Tennessee Code Ann. § 2-6-202(c)(4), which provides that "a person who is not an employee of an election commission commits a Class A misdemeanor if such person *gives an unsolicited request for application* for absentee ballot to any person," was passed in response to the request of the State's election coordinator. County election commissions had notified the State's election coordinator that various groups were creating and printing forms that were labeled "requests" for application for absentee ballots. The forms were problematic for several reasons:
>
> 1) The forms were not approved by the State's election coordinator, as required by the Election Code. As the State's election coordinator testified: "There is no such form as a request for an application." "It looks like an official form, even though it's not coming from an election commission office."
>
> 2) And more disturbingly, the Election Code provided then, as it does now, that a voter's "request serves as an application for a ballot" if the request is in writing, over the voter's signature, and contains the following: name of the registered voter, the address of the voter's residence, the voter's social security number, the address to mail the ballot outside the county, the election the voter wishes to participate in, and the reason the voter wishes to vote absentee. *See* Tenn. Code Ann. § 2-6-202(a)(3) (Supp. 1994). Thus, the creators of the request form were "savvy enough to put all the information on there," which made the form tantamount to an application for absentee ballot.
>
> 2) Recipients of the forms, often older voters, were frequently confused and thought that they had to complete the forms in order to vote. They thought it was an official form. And many of those who completed the forms and submitted them to the county election commission offices were still showing up at the polls on election day only to learn that they could not vote in-

> person because they had completed an application for an absentee ballot. Further compounding the problem, they were also not able to vote absentee because the time to mail in their ballots had passed by the day of the election.
>
> Accordingly, the State's election coordinator asked for the passage of Tenn. Code Ann. § 2-6-202(c)(4) in order to put an end to this practice of others distributing unsolicited request forms for absentee ballots. "It has just caused confusion and led to the disenfranchisement of voters." The requested measure was passed following the General Assembly's decision to reduce the violation of Tenn. Code Ann. § 2-6-202(c)(4) from a Class E felony to a Class A misdemeanor.

(Doc. No. 46 at 31-33) (footnotes omitted). The Court adopts Defendants' summary here because it is suitably concise and, based on the Court's review of materials submitted by Defendants to support this summary, accurate in all material respects. And to recap what the summary reveals, Paragraph (c)(4): (i) relates to *requests for* an application for an absentee ballot (whereas Paragraph (c)(3) relates to applications for absentee ballots); (ii) was enacted well after Paragraph (c)(3) had been in effect; (iii) prescribes a misdemeanor rather than a felony and thus authorizes maximum criminal penalties lower than those authorized by Paragraph (c)(3); and (iv) was passed due to concerns unique to *requests for* an application for an absentee ballot.

As to those concerns, the Court perceives four of them, each one quite specific and inapplicable to applications for an absentee ballot. The first was that there was (and is) no official form for requests for an application for an absentee ballot, and election officials perceived that there was a prevailing practice of distributing such "requests" that looked like official state forms. Obviously such circumstances can create mischief by confusing the recipient of such a request as to what he or she has been given and why the request should or should not be submitted to an election commission. The second concern was over a particular kind of confusion, *i.e.*, election officials perceived that registered voters receiving such a request sometimes believed incorrectly that they had to complete the form in order to vote. The third concern likewise was over a particular

but different kind of confusion: election officials perceived that some voters submitting such a "request" (if it contained enough information, as some did, to be treated as an application for an absentee ballot pursuant to Tenn. Code Ann. § 2-6-202(a)(3))[5] might unwittingly become locked into absentee voting to the exclusion of in-person voting[6] and also might not realize as much until arriving to vote in-person.[7] And the Court infers from the above a fourth concern: given that election officials treated such a "request" (if it contained the information listed in Tenn. Code Ann. § 2-6-202(a)(3), as some did) as an application for absentee ballot,[8] such a request could effectively serve as an end-run around Paragraph (c)(3)'s prohibition against distributing applications for absentee ballots.

In short, Paragraph (c)(4) is unmistakably different from Paragraph (c)(3). Each is a separate law of a sovereign state, and a party constitutionally challenging one or the other needs to keep them straight. It should come as no surprise that if a party fails to do so, it may have difficulty obtaining the extraordinary remedy of preliminarily enjoining enforcement of the law it is targeting (but cannot keep straight from the other law).

Here, it is entirely clear that Plaintiffs are claiming to challenge only Paragraph (c)(4). It (and in some cases its language) is cited repeatedly in Plaintiffs' Amended Complaint, as well as in Plaintiffs' Brief and Plaintiffs' Reply in support of the Motion. (Doc. No. 39 at ¶¶ 12, 52, 56,

---

[5] To be sure, such treatment is the result of a state law that theoretically could be changed to eliminate or mitigate this particular concern. But that possibility does not change in any way the fact that Paragraph (c)(4) is entirely different from Paragraph (c)(3) in origin, purpose, substance, and possible effects.

[6] As noted in a page on the website of the Shelby County Election Commission that was filed by Plaintiffs, "Under Tennessee law, once you have requested an absentee ballot, you cannot vote in person for that election." (Doc. No. 54-3 at 3).

[7] By that time, as Defendants note, it would be too late for the voter to vote absentee; an absentee ballot must be submitted by mail (or its apparent equivalent, a commercial interstate carrier such as FedEx), Tenn. Code Ann. § 2-6-202(e), and it is not counted unless it is mailed in time to be received by election day.

[8] Again, the Court acknowledges that such treatment is the specific result of state law and theoretically could be eliminated by a change to state law. But again, this possibility is irrelevant to the Court's point here.

58, and 79-82; *id.,* Prayer for Relief at ¶¶ B, G; Doc. No. 43 at 12; Doc No. 54 at 3-5, 13, 14, 16-18). By contrast, except for one place where it is erroneously cited,[9] Paragraph (c)(3) is never mentioned by Plaintiffs.

Unfortunately for Plaintiffs, even though they have challenged only Paragraph (c)(4), their focus actually is entirely on conduct prohibited by Paragraph (c)(3). Even more to the point, Plaintiffs have specifically stated that the conduct in which they seek to engage is the conduct prohibited by Paragraph (c)(3), not Paragraph (c)(4). So if the Court were to decline to preliminarily enjoin the enforcement of Paragraph (c)(4), it is clear that Plaintiffs would not thereby suffer any injury, because the acts that they themselves have insisted they are being dissuaded from undertaking: (a) are not subject to prosecution under Paragraph (c)(4) anyway, and (b) would still be subject to prosecution under Paragraph (c)(3) completely irrespective of Paragraph (c)(4).

Despite the fact that they are expressly challenging only Paragraph (c)(4), Plaintiffs repeatedly characterize their complaint as one against the prohibition on giving someone a request

---

[9] In this place, Plaintiffs write, "The application is available at, and can be obtained only from, county election offices. *See id.* § 2-6-202(c)(3)." (Doc. No. 43 at 11). The citation here clearly was intended to be to § 2-6-202(a)(3). The Court realizes that naturally this sort of error occasionally is made even by careful attorneys, and it notes this error only to point out that Plaintiffs have made no intentional references anywhere to Paragraph (c)(3). On the other hand, Plaintiffs and the Court would both do well to redouble their efforts to always cite the correct statute. The Court itself has incorrectly referred to Tenn. Code Ann. § 2-6-202(c)(4) as Tenn. Code Ann. § 2-6-204(c)(4), (Doc. No. 55 at 1), perhaps unwittingly incorporating the same mistake made previously by Plaintiffs. (Doc. No. 43 at 12).

But there also appears to be a substantive error in the above-quoted language written by Plaintiffs. It is actually not true that by statute an absentee-ballot application can be obtained *only* from county election offices. What the relevant provision states is that "[a] voter may request from the county election commission office an application to vote absentee." Tenn. Code Ann. § 2-6-202(a)(3). This statutory language does not preclude the possibility that a voter properly can obtain an application from elsewhere, provided that it is not obtained from someone who is not an employee of "an election commission" (and thus prohibited by § 2-6-202(c)(3) from providing applications for an absentee ballot to voters). In particular, neither this statutory language nor § 2-6-202(c)(3) prohibits obtaining an application from the *State* Election Commission, and presumably to obtain the below-referenced form absentee-ballot application off the Internet is to obtain it from the State Election Commission. With the application now being available online, one may reasonably wonder why it is still a felony (even absent nefarious surrounding circumstances) for persons not with an election commission to give an application to someone else. There arguably is a valid reason, but in any event that question is not presented at the present time.

(that is to say, an application) for an absentee ballot.[10]  For example, the Amended Complaint states that the challenged paragraph criminalizes "providing to a voter an unsolicited absentee ballot request." (Doc. No. 39 at ¶ 79). The Amended Complaint likewise notes that "Organizational Plaintiffs wish to provide potential absentee voters with blank absentee ballot requests that the prospective voter may complete and return to their county election official." (*Id*. at ¶ 55).  It similarly claims that this restriction on the "unsolicited distribution of absentee ballot requests" chills Plaintiffs' speech. (*Id.* at ¶ 13). The Amended Complaint also asserts that the organizational Plaintiffs need to be able to provide eligible absentee voters with "printed absentee ballot requests" and "the absentee ballot request itself." (Doc. No. 39 at ¶¶ 24, 28). It may be that Plaintiffs incorrectly identify Paragraph (c)(4) as the cause of their grievance, but it is clear that their grievance is with the prohibition of distributing applications for an absentee ballot; such prohibited distribution would violate Paragraph (c)(3) and not Paragraph (c)(4), which applies uniquely and specially to the distribution of requests for an application for an absentee ballot.[11]

Plaintiffs plainly are confused to an extent about the difference between an application and a request for an application. Plaintiffs upbraid Defendants for claiming that there is no official state form for requesting an application for an absentee ballot. Specifically, Plaintiffs assert that Defendants' "defense of Tennessee Code § 2-6-202(c)(4) rests largely on their bizarre and repeated claim that '[t]here is no such form as a request for an application,' and therefore the restriction only 'prevents the distribution of non-election commission absentee ballot request forms.' *See* Opp. at 34. This is demonstrably false." (Doc. No. 54 at 15). To show the alleged "bizarre" and

---

[11] In fairness to Plaintiffs, the Court notes that Defendants, for all of their efforts to appropriately distinguish between a request for an absentee-ballot application and an absentee-ballot application, also make the mistake (at least once) of describing the challenged statute as prohibiting the distribution of "absentee ballot request forms." (*See* Doc. No. 46 at 25-26).

"demonstrabl[e]" falsity, Plaintiffs point to a document marked, in the Supplemental Declaration of Ravi Doshi (Doc. No. 54-1) filed by Plaintiffs, as Exhibit 17. (*Id.* at 15-16). But Exhibit 17 is plainly a *request*—an application—for an absentee ballot, not a *request for an application* for an absentee ballot. (Doc. No. 54-2). Plaintiffs also point to a printout, filed as Exhibit 5 to the Declaration of Ravi Doshi, of Defendant Hargett's website linking to the form; but the link clearly identifies the form as an "absentee ballot request form" and as one way to "request an absentee by-mail ballot." (Doc. No. 40-2 at 133). Plaintiffs then state with no ambiguity, "It is precisely this *official* form that Organizational Plaintiffs seek to distribute." (Doc. No. 54 at 17).

As additional support for the proposition that there actually is an official request-for-an-application form, Plaintiffs cite paragraph 6 of the declaration of Linda Phillips, filed by Defendants, which Plaintiffs characterize as "describing the official absentee ballot request forms voters can use to request a mail ballot." (*Id*. at 16). And this is indeed what paragraph 6 of the Phillips declaration describes: an official "Absentee Ballot request form," rather than any (official or unofficial) form to request an application for an absentee ballot. (Doc. No. 46-5 at 2).

The Court must confront the disconnect between what Plaintiffs ostensibly claim—via their challenge to Paragraph (c)(4) in particular—they are complaining about and what, by all indications, they are actually complaining about. One of two things is occurring here. One possibility is that Plaintiffs' counsel truly are concerned about—and have clearly in their minds—requests for an application for an absent ballot, and nevertheless accuse Defendants of a "bizarre" and "demonstrabl[e]" falsity when Defendants note, with a correctness that is obvious based on the current record,[12] that there is no official form for such a thing. The undersigned is loath to

---

[12] The current record is utterly devoid of a form request for an application for an absentee ballot. Moreover, in a challenge like this one, the Court is authorized to accept as true certain representations of election officials, including ones the Court views as far more speculative than the instant factual representation—easily debunked if false—that the State does not have a form for requesting an application for an absentee ballot. *See Voting for Am., Inc. v. Andrade*,

believe that Plaintiffs' counsel would do this, as that would suggest either: (a) intentional disingenuousness; or (b) an inexplicable inability to see that an official form for an *application* for an absentee ballot is not an official form for what they have in mind, *i.e.*, a *request for* an application for an absentee ballot. The other possibility is that Plaintiffs' counsel (a) truly is concerned with—has clearly in mind—*applications f*or absentee ballots, but (b) on a few occasions happens to refer incorrectly to what they have in mind as *requests for* applications for absentee ballots, as for example when they insist that it was false for Defendants to say that what plainly is a form *application* for an absentee ballot is not a form *request for* an application for an absentee ballot. This interpretation accords much better with the Court's strong disinclination to view Plaintiffs' counsel as either brazenly disingenuous or obtuse. This interpretation also squares with what Plaintiffs are saying over and over in their Amended Complaint and briefs: that they will be harmed if they are *not permitted to distribute requests (applications) for an absentee ballot.*

The Court has few qualms adopting the latter interpretation. Plaintiffs' claimed irreparable injury, absent an injunction, is the inability to (lawfully) distribute *applications* for an absentee ballot. And if hypothetically Plaintiffs were to insist that the Court has this wrong, the blame for that would fall squarely on Plaintiffs. If they desire the extraordinary remedy of a preliminary injunction to prevent alleged irreparable injury from the inability to distribute *requests for* an application for an absentee ballot, they need to handle things much differently—starting with not insisting that something (Doc. No. 54-2) that is *not* a request for an application for an absentee ballot is precisely what they would distribute if only they were not legally barred from doing so.

---

488 F. App'x 890, 897 (5th Cir. 2012) (following the district court in accepting as true the applicable election official's representations that she will not enforce a particular election law in a particular way).

As it is, however, the Court is confident that it has it right: the request for an injunction here is intended to prevent irreparable harm from the (possible) enforcement of the prohibition against distributing applications for absentee ballots.

But this prohibition is not set forth in Paragraph (c)(4). As discussed above, it is set forth in Paragraph (c)(3), a provision that is materially different. Due to consequential differences between the two, the Court cannot conclude that enjoining the enforcement of Paragraph (c)(4) would somehow functionally serve the purpose of preventing the alleged threatened irreparable injury, even if such purpose would be served more directly by enjoining enforcement of Paragraph (c)(3). The Court cannot conclude, for example, that there would be some sort of "spillover" effect whereby enjoining enforcement of Paragraph (c)(4) would remove the chill from conducting the acts prohibited by Paragraph (c)(3), thus preventing irreparable injury that otherwise would occur from that particular chill. Preliminarily enjoining enforcement of Paragraph (c)(4) simply would not serve to prevent the particular irreparable injury that Plaintiffs themselves have repeatedly asserted. It is only enjoining the enforcement of Paragraph (c)(3) that would serve this purpose.

But as noted above, Plaintiffs have not challenged Paragraph (c)(3), and the Court cannot grant a preliminary injunction against the enforcement of a statute not challenged in the Amended Complaint. "[A] party moving for a preliminary injunction must necessarily establish a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint." *Colvin v. Caruso*, 605 F.3d 282, 300 (6th Cir. 2010) (alteration in original) (quoting *Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994)). And a plaintiff has "no grounds to seek an injunction pertaining to allegedly impermissible conduct not mentioned in his complaint." *Id.*; *see also Annabel v. Frost*, No. 17-2263, 2018 WL 5295887, at *2 (6th Cir. Aug. 10, 2018); *Taylor v. United States*, No. 1:10-cv-01195, 2020 WL 587650, at *4 (W.D. Tenn. Feb. 6, 2020).

As explained in *Christian v. Michigan Dept. of Corr.– Health Servs.*, No. 12-12936, 2013 WL 607783 (E.D. Mich. Jan. 28, 2013):

> A court issues a preliminary injunction in a lawsuit to preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the lawsuit's merits. Thus, a party moving for a preliminary injunction must necessarily establish a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint. . . . . Although . . . new assertions [raised in a motion for preliminary injunction but not in the plaintiff's complaint] might support additional claims against the same [defendant] officials, they cannot provide the basis for a preliminary injunction in this lawsuit.

*Id.* at *3 (quoting *Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994) (internal citations omitted)). Here, any preliminary injunction as to Paragraph (c)(3) would be unrelated to the allegations in the Amended Complaint, which does not even mention Paragraph (c)(3), let alone complain that Defendants are acting unconstitutionally by enforcing (or threatening to enforce) it.[13]

In short, Plaintiffs here cannot make the necessary showing of irreparable injury for purposes of their claim challenging Paragraph (c)(4). That being the case, the Court can and does cease its analysis here. As the Sixth Circuit has noted:

> [A] district court [is not] wrong to stop the inquiry after finding no irreparable injury. . . . When one factor is dispositive, a district court need not consider the others. *Id.* And, as discussed above, this factor *is* dispositive; a plaintiff *must* present the existence of an irreparable injury to get a preliminary injunction.. Thus, a district court is "well within its province" when it denies a preliminary injunction based solely on the lack of an irreparable injury.

*Sumner Cty. Sch.*, 942 F.3d at 327.

One final and overarching point needs to be made. The decision of whether to grant a motion for a preliminary injunction is "left to the sound discretion of the district court." *Int'l Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 635 (6th Cir. 2010). This means, among other things, that

---

[13] The Court leaves for another day the issue of the extent to which the analysis here would apply to Plaintiffs' request for a permanent injunction to the same extent that it applies to their request for a preliminary injunction.

even if the district court could strain to find grounds to grant a preliminary injunction, it does not have to do so. Here, the Court will assume for a moment that in deciding whether to grant preliminary injunctive relief here, it could overlook the fact that Plaintiffs have sought to address their concerns by challenging the wrong statute. And the Court will go further and assume for a moment that Plaintiffs should be treated not as actually challenging the wrong statute, but rather as merely fostering substantial confusion as to whether they had done so.

Even assuming these things *arguendo* (contrary to the Court's findings above), however, the Court still would exercise its discretion to deny injunctive relief. As Plaintiffs themselves well understand, their claims are important, and a preliminary injunction would be a major victory for them. With the stakes so high, the issues must be teed up clearly, not least because the constitutional analysis of Plaintiffs' claim turns on the identity of the particular statute Plaintiffs are challenging; the burden on Plaintiffs' rights, and the State's justification for imposing such burden, differs substantially depending on whether it is Paragraph (c)(4) or Paragraph (c)(3) that is under scrutiny. Plaintiffs' failure to (at the very least) clearly tie the complained-of conduct (and the relief sought) to the applicable statute by itself would counsel strongly against granting Plaintiffs this extraordinary relief.

## CONCLUSION

Once the Plaintiffs' actual claimed irreparable injury is properly identified, it is clear that it would not be prevented by the preliminary enjoining of Tenn. Code. Ann. § 2-6-202(c)(4). And this, and not the preliminary enjoining of Tenn. Code. Ann. § 2-6-202(c)(3), is the relief Plaintiffs have requested in this part of the Motion. Accordingly, Plaintiffs cannot make the showing of irreparable injury absolutely required for them to obtain this relief. Accordingly, the Motion is

denied insofar as it seeks a preliminary injunction as to Tenn. Code. Ann. § 2-6-202(c)(4), but otherwise remains pending.[14]

IT IS SO ORDERED.

*Eli Richardson*
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE

---

[14] As it has before, the Court notes that Defendants assert in their Response that the Court lacks subject-matter jurisdiction (because, Defendants claim, all Plaintiffs lack standing as to all claims). And very recently they likewise moved to dismiss the Amended Complaint for lack of subject-matter jurisdiction. (Doc. No. 61; Doc No. 62 at 1-16). This may understandably raise in observers' minds the question of whether, at this juncture, the Court should even be deciding (in part) a motion for a preliminary injunction, prior to resolving the issue of whether it has subject-matter jurisdiction. The short answer is that the Court may do so, provided that the Court's decision is to deny rather than grant preliminary injunctive relief. The Court realizes that it cannot *grant* a preliminary injunction prior to resolving a colorable challenge to subject-matter jurisdiction. *See*, *e.g.*, *Vis Vires Grp., Inc. v. Endonovo Therapeutics, Inc.*, 149 F. Supp. 3d 376, 384 (E.D.N.Y. 2016) (collecting authorities). Obviously, a court should not exercise judicial authority to compel a defendant, via an injunction, to do or not to do something if the court lacks authority to exercise affirmative judicial power. And a lack of subject-matter jurisdiction is a lack of precisely this kind of affirmative authority. But a *refusal* to exercise affirmative judicial power is another matter entirely; if the court's decision is to deny a request for a preliminary injunction, the concerns about unauthorized use of judicial power are not present in the same way. For this reason, it appears that the Sixth Circuit permits a district court to first deny a motion for a preliminary injunction and then resolve a challenge to subject-matter jurisdiction. *See Freeman v. Helldoerfer*, 208 F.3d 213 (6th Cir. 2000) (affirming district court's denial, in a case removed from state court, of a motion for preliminary injunction prior to the court's remand to state court based on the district court's lack of subject matter jurisdiction). This principle is consistent with the fact that, as noted previously in this case, a district court may make various other kinds of non-merits based decisions before addressing a colorable challenge to subject-matter jurisdiction. (Doc. No. 55 at 19 n.18). Thus, the Court does not hesitate to issue this order denying the Motion in part, especially since the denial is based not on the Court's perception of the merits of Plaintiff's claim but rather on the absence of irreparable injury. The Court advises the parties, however, that it has been actively looking into the issue of subject-matter jurisdiction and intends to opine on the issue in a timely manner, and certainly would do so before granting Plaintiffs any affirmative relief.