IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

MEMPHIS A. PHILLIP RANDOLPH    )
INSTITUTE, et al.    )
    )    NO. 3:20-cv-00374
    Plaintiffs,    )
    )    JUDGE RICHARDSON
v.    )
    )
TRE HARGETT, et al.,    )
    )
    Defendants.

## MEMORANDUM OPINION & ORDER

Pending before the Court is Plaintiffs' Motion for Preliminary Injunction (Doc. No. 40, "Motion"). Via the Motion, Plaintiffs have sought to enjoin Defendants, pending final resolution of Plaintiffs' claims (brought under 18 U.S.C. § 1983), from enforcing several provisions of Tennessee's electoral laws and procedures, namely:

(1) Tenn. Code Ann. § 2-6-202(c)(4), which provides: "A person who is not an employee of an election commission commits a Class A misdemeanor if such person gives an unsolicited request for application for absentee ballot to any person."

(2) Tenn. Code Ann. § 2-2-115(b)(7), which provides that those who registered to vote in Tennessee by mail must "appear in person to vote in the first election the person votes in after such registration becomes effective."[1]

(3) Tenn. Code Ann. §§ 2-6-202(g) and 2-6-204, insofar as they collectively require, as Plaintiffs put it, the "reject[ion of] absentee ballots on the basis of alleged signature

---

[1] A reference to voting "by mail" and a reference to voting "absentee" are generally interchangeable in the current context and for present purposes.

verification deficiencies without first providing notice and an opportunity to cure[.]"
(Doc. No. 39 at 34).

According to Plaintiffs, these respective aspects of Tennessee's voting rules are unconstitutional because they violate, respectively: (1) the First Amendment right to free speech and association; (2) the First Amendment right to vote; and (3) Fourteenth Amendment procedural due process and the First Amendment right to vote.[2]

This Order is another in a series of rulings being issued intermittently, as the Court is able, so that the parties will know as soon as possible, in order to begin preparing for a likely upcoming appeal, the Court's view on particular issues likely to be the subject of appellate briefing. Herein, the Court will address Plaintiffs' request (3) above, to preliminarily enjoin the enforcement of Tennessee law that permits (per Tenn. Code. Ann. § 2-6-204) election officials to reject absentee ballots based on a determination that the signature on an absentee ballot does not match the signature contained in the (purported) ballot-caster's voter registration record, as required under Tenn. Code Ann. § 2-6-202(g) for the ballot to be counted.

PROCEDURAL BACKGROUND

Plaintiffs initiated this action by filing a complaint ("original complaint") on May 1, 2020. (Doc. No. 1). Defendants filed an answer (Doc. No. 38) to the original complaint on June 11, 2020, and the next day, Plaintiffs filed an amended complaint (Doc. No. 39, "Amended Complaint"), as well as the Motion and a memorandum in support of the Motion (Doc. No. 43, "Plaintiffs' Brief"). In the Prayer for Relief in both the original complaint and the Amended Complaint, Plaintiffs requested preliminary (and permanent) injunctive relief virtually identical, for present purposes,

---

[2] As Plaintiffs make clear, they are actually invoking the First Amendment as it is incorporated into the Fourteenth Amendment (and thereby applicable to state governments).

to the relief they now request via the Motion. Plaintiffs did not actually move for preliminary injunctive relief, however, prior to filing the Motion on June 12, 2020.

Plaintiffs aptly describe the context surrounding the Motion:

On August 6, 2020, Tennessee will hold statewide primary and general elections. Three months later, on November 3, 2020, it will hold its general presidential election. Unlike any elections in modern memory, these elections will be held under the pall of an ongoing public health crisis that [had, as of the time of the filing of Plaintiffs' Brief,] already claimed the lives of over 112,000 Americans and forced immediate and dramatic changes to everyday life across the country—including in Tennessee. As a result of the pandemic, significantly more Tennesseans are expected to vote by mail this year than typically have in past elections. Most will do so for the first time.

(Plaintiffs' Brief at 4).[3]

Defendants filed a response (Doc. No. 46, "Response") in opposition to the Motion on June 26, 2020, and Plaintiffs filed a reply (Doc. No. 54, "Reply") in support of the Motion on July 7, 2020.

In the Response, Defendants asserted in pertinent part that the doctrine of laches should be applied to bar in its entirety the injunctive relief requested by Plaintiffs in the Motion. Agreeing in part, the Court issued an order (Doc. No. 55) denying the Motion (based on laches) to the extent that it sought a preliminary injunction prior to the August 6 primary election, but not to the extent that it seeks a preliminary injunction prior to the November 3 general election. Thus, the request for preliminary injunctive relief in advance of and in connection with the general election remained pending.

On August 11, 2020, the Court issued an order (Doc. No. 66) denying the Motion in part, that is, denying it insofar as it asked the Court to enjoin Tenn. Code Ann. § 2-6-202(c)(4), which, as noted above, provides: "A person who is not an employee of an election commission commits

---

[3] Herein, cited page numbers are the numbers stamped on the applicable pages by the Clerk's Office, which may differ from the page numbers placed on the document by the author/filer of the document.

a Class A misdemeanor if such person gives an unsolicited request for application for absentee ballot to any person." The other aspects of the Motion still remain pending, however.

PRELIMINARY INJUNCTION STANDARD

Preliminary injunctions are considered preventive, prohibitory, or protective measures taken pending resolution on the merits, *see Clemons v. Board of Educ. of Hillsboro, Ohio*, 228 F.2d 853, 856 (6th Cir. 1956), *cited in Lemay v. Correct Care,* No. 3:19-cv-00683, 2020 WL 4475425, at *2 (M.D. Tenn. Aug. 4, 2020), and are considered extraordinary relief. *See Detroit Newspaper Publishers Ass'n v. Detroit Typographical Union No. 18, Int'l Typographical Union*, 471 F.2d 872, 876 (6th Cir. 1972), *cited in Gentry v. Tenn. Bd. of Judicial Conduct,* No. 3:17-0020, 2017 WL 4070590, at *3 (M.D. Tenn. Sept. 6, 2017). A preliminary injunction should be granted only if the movant carries its burden of proving that the circumstances clearly demand it. *Overstreet v. Lexington–Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). In determining whether to afford such relief, the court must consider and balance four factors: (1) the likelihood of the plaintiff's success on the merits; (2) whether the plaintiff will suffer irreparable injury without the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the injunction's impact on the public interest. *Nat'l Viatical, Inc. v. Universal Settlements, Int'l, Inc.*, 716 F.3d 952, 956 (6th Cir. 2013).

Although these four factors are "factors to be balanced, not prerequisites that must be met," *Michael v. Futhey*, No. 08-3922, 2009 WL 4981688, at *17 (6th Cir. Dec. 22, 2009) (quoting *Six Clinic Holding Corp., II v. Cafcomp Sys.*, 119 F.3d 393, 400 (6th Cir. 1997)), they do not carry equal weight. Regarding the second factor, irreparable harm, "even the strongest showing on the other three factors cannot eliminate the irreparable harm requirement. That factor is indispensable: If the plaintiff isn't facing imminent and irreparable injury, there's no need to grant relief *now* as

opposed to at the end of the lawsuit." *D.T. v. Sumner Cty. Sch.*, 942 F.3d 324, 326-27 (6th Cir. 2019) (citation and internal quotation marks omitted); *see also Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964, 967 (6th Cir. 2002) ("The demonstration of some irreparable injury is a sine qua non for issuance of an injunction."). In other words, "although the *extent* of an injury may be balanced against other factors, the *existence* of an irreparable injury is mandatory." *Sumner Cty. Sch.*, 942 F.3d at 327. Thus, a district court abuses its discretion if it grants a preliminary injunction without making specific findings of irreparable injury. *Id.* And to merit a preliminary injunction, an injury must be both certain and immediate, not speculative or theoretical. *Id.*

While the absence of irreparable injury is always fatal to a motion for a preliminary injunction, "[a] finding that there is simply no likelihood of success on the merits is *usually* fatal." *Gonzalez v. Nat'l Bd. of Medical Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000) (emphasis added).

DISCUSSION

I.       The signature-verification system.

For background, the Court includes a description of the signature-verification system at issue, with the caveat that ultimately a detailed grasp of the system is not necessary to understand the Court's analysis or ruling. Defendants explain the signature-verification system (and the absentee-voting context of which it is a part) as follows:

> For an eligible voter who seeks to vote by absentee ballot, the voter's signature is evaluated, not once, but twice; because, prior to casting an absentee ballot, the voter must first submit a written request or application for such a ballot. *See* Tenn. Code Ann. § 2-6-202(a)(2) and (3). Such request or application may be made in-person, by mail, by facsimile, or by email. *See* Tenn. Code Ann. § 2-6-202(a)(3). Regardless of the manner of submission, the request or application must be signed by the voter, and that signature is subject to the first of two signature evaluations. *See* Tenn. Code Ann. § 2-6-202(b) and (d).
>
> If the signature on the request or application is determined to be inconsistent (in accordance with the process described below) with the signature on the voter's registration record, the request or application is rejected, and the applicant is

immediately notified. If the voter submitted their request or application by email, the administrator of elections may send notification of the rejection by email. Otherwise, the voter is notified in writing by mail. *See* Tenn. Code Ann. § 2-6-204(a). If, on the other hand, the signature on the request or application is determined (in accordance with the process described below) to be consistent with the signature on file, an absentee ballot—together with instructions, a ballot envelope, and a mailing envelope—is delivered to the voter by U.S. Mail. *See* Tenn. Code Ann. § 2-6-202(b) and (d).

Pursuant to Tenn. Code Ann. § 2-6-202(a)(1), an eligible voter who seeks to vote by absentee ballot may request or apply for a ballot as early as 90 days before an election, but in no event later than 7 days before the election. A request or application for an absentee ballot must be received no later than 7 days before the election. *See* Tenn. Code Ann. § 2-6-202(d)(3).

The exterior of the ballot envelope contains a "Voter's Affidavit," *see* Goins Decl., Ex. 2, which must be executed by the voter and which attests under penalty of perjury that he/she is a registered voter and that the submitted ballot has been completed by the voter him-/herself. *See* Tenn. Code Ann. §§ 2-6-202(e) and 2-6-309(b). Thereafter, voter must place the ballot in the sealed ballot envelope and mail it back to the county election commission in the pre-addressed outer envelope, so that it is received on or before Election Day. *See* Tenn. Code Ann. § 2-6-202(e).

Next, after receipt of an absentee ballot from the voter, county election officials open the outer mailing envelope, and—without opening the ballot envelope itself—the signature of the voter as it appears on the Voter's Affidavit is compared a second time to the signature of the voter on file to authenticate the validity of the ballot. *See* Tenn. Code Ann. § 2-6-202(g). If the signature on the Voter's Affidavit is determined (again, in accordance with the process described below) to be consistent with the signature on file, the ballot is accepted and placed (unopened) in the absentee ballot box to be counted on Election Day. *Id*. If, on the other hand, the signature is determined to be inconsistent with the signature on file, the ballot is rejected and notice of the rejection is mailed immediately to the voter. *See* Tenn. Code Ann. § 2-6-204(b). If time allows, a voter whose absentee ballot has been rejected can submit another absentee ballot. Alternatively, that voter could cast a provisional ballot in accordance with Tenn. Code Ann. § 2-7-112(a)(3).

For evaluation of both the request/application and the actual ballot, the signature verification process performed by county election officials is a painstaking process, and—as described below—is structured with the emphasis to *accept* a signature, rather than reject it. Training in this process is mandatory, and it consists of a 45-minute video which is supplemented with additional directives from my office.

The video, which is entitled "Signature Verification" . . . , was prepared by the Director of Elections for Oregon, and comprehensively addresses the proper

manner to conduct signature comparisons. The presenters are Ms. Summer Davis and Ms. Lydia Plukchi, who are Compliance Specialist 3s in the Elections Division of the Oregon Secretary of State and who have been with the Election Division for over 15 years. Both Ms. Davis and Ms. Plukchi received their training from Ms. Heather Carlson, a forensic handwriting expert.

The video explores the various components of a signature: line-forms and style (cursive or printed), unconscious variations from line-forms, intentional "personalization" of a signature, alignment, signature speed, "pen lifts," line quality (which can deteriorate with the age of the signer), elements of proportion, size, spacing, and slant. Beginning at time index 23:44, viewers are instructed as to "What to Look For," "What to Examine," and "Evaluating Signatures." At 29:04, the video begins to discuss whether to "Accept or Reject" a signature.

Importantly, at time index 29:54, the viewer is told "You're looking for reasons to keep the signature *in*—to *validate* the signature—rather than reasons to throw the signature *out*. . . . We're looking for *any* reason to keep a signature." Seconds later, at time index 30:29, the viewer is presented with numerous comparative examples of actual submitted versus signatures on file, and from those examples the viewer is shown that all but the most obvious of inconsistent signatures are to be regarded as acceptable.

At time index 29:28 the viewer is instructed that a signature should be reviewed by "at least two different county elections officials" before it is rejected. However, the Tennessee Coordinator of Elections has instructed county election officials that a signature on the absentee Voter's Affidavit, should *not* be rejected unless it is reviewed by *three* local election officials including the administrator.

(Doc. No. 46 at 39-42) (some citations omitted). The Court has used the term "signature-verification system" above, and it will continue to use this term; the term is intended to refer both to (a) the statutory requirement ("signature-verification requirement") that county election officials verify a match between the signature on the voter's absentee ballot and the signature in the (purported) voter's voter registration record;[4] and (b) the described procedure for signature

---

[4] Actually, even before this occurs, as Defendants note, the signature of the purported voter's application for an absentee ballot (or "request" for such an application that is treated by election officials as such an application) must be verified against the signature from the voter's voter registration record. *See* Tenn Code. Ann. § 2-6-202(d)(1). But herein, for ease of discussion, the Court's discussion will be in terms of the latter verification, as ultimately it is more consequential given when and for what purpose it is conducted. Notably, "consistency" between the signatures is the term used by Defendants here to describe what must be verified. But Tenn. Code. Ann. § 2-6-202(d)(1) refers to a requirement that the signatures be the "same," and not just "consistent," and elsewhere this code section says simply that a signature must be "verified." Tenn. Code. Ann. § 2-6-202(g). Plaintiffs seem to prefer the term "match." In any event, it seems clear that the idea is that the verifying election official must be satisfied, to the extent indicated above,

verification ("signature-verification procedure").[5] Plaintiffs do not challenge the above description of the signature-verification system. Instead, Plaintiffs make a twofold challenge to the signature-verification system as thus described, claiming that it violates Plaintiffs':[6] (i) right to procedural due process; and (ii) fundamental right to vote under the First Amendment (as applied to the states pursuant to the Fourteenth Amendment's Due Process Clause).[7] The Court will examine the merits of each challenge in turn.

    II.    <u>Plaintiffs' likelihood of success as to the procedural due process claim</u>.

In the Court's view, each side's discussion of what exactly procedural due process *is* (as opposed to what it *requires* when it is applicable) is somewhat cursory, thus limiting somewhat the effectiveness of their arguments as to whether it is has been violated in this case. In addition, in the undersigned's view, neither side adequately briefed the key issue of whether Plaintiffs have a cognizable liberty interest for purposes of the guarantee of procedural due process, without which procedural due process is not even applicable. Accordingly, the Court's description of the applicable law on this issue, and its analysis, diverges greatly from those presented by the parties. In any event, for the reasons set forth herein, the Motion is denied with respect to its request to enjoin the signature-verification system on the grounds that it violates procedural due process.

---

that the signatures are from the same person. Herein, the Court at times will refer to the statute as requiring "signature verification."

[5] Coining these two terms separately is necessary because, below, the Court cannot always refer to the signature-verification system as a whole; at times it must distinguish between a complaint about the signature-verification requirement and a complaint about the signature verification procedure. Unfortunately, Plaintiffs are not attentive to this consequential distinction.

[6] Herein, a reference to "Plaintiffs'" alleged rights or liberty interest(s) is meant to encompass the alleged rights and liberty interest(s) of the members of Organizational Plaintiffs also.

[7] These challenges are plead as specific claims in the Amended Complaint, *i.e.*, Claim III and Claim IV, respectively.

A. *The nature of the right to procedural due process.*

The Fourteenth Amendment protects an individual from deprivation of life, liberty or property without due process of law. *Bazzetta v. McGinnis*, 430 F.3d 795, 801 (6th Cir. 2005). The Supreme Court has described the guarantee of due process as follows:

> The point is straightforward: the Due Process Clause provides that certain substantive rights—life, liberty, and property—cannot be deprived except pursuant to constitutionally adequate procedures. The categories of substance and procedure are distinct. Were the rule otherwise, the Clause would be reduced to a mere tautology. "Property" cannot be defined by the procedures provided for its deprivation any more than can life or liberty. The right to due process "is conferred, not by legislative grace, but by constitutional guarantee. While the legislature may elect not to confer a property interest in [public] employment, it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards."

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985) (citations omitted), *cited in Kelley v. Shelby Cty. Bd. of Educ.,* 751 F. App'x 650, 656 (6th Cir. 2018). That is to say, due process has both a substantive component and a procedural component. What the Supreme Court noted in *Loudermill* concerning procedural due process with respect property interests (such as, in that case, public employment) applies also to liberty interests:

> Th[e] analysis as to liberty parallels the accepted [procedural] due process analysis as to property. The Court has consistently held that some kind of hearing is required at some time before a person is finally deprived of his property interests. . . .
>
> We think a person's liberty is equally protected, even when the liberty itself is a statutory creation of the State.

*See Wolff v. McDonnell*, 418 U.S. 539, 557-58 (1974).

The idea behind procedural due process—including in the context of a state-created liberty interest—is that the interest cannot be taken away arbitrarily. Instead, a state-created liberty interest can be taken away, if at all, only pursuant to procedures reasonably geared (under the circumstances) to obtaining an *accurate* determination as to whether, under applicable criteria, it

should be taken away. *See id.* at 558 ("The touchstone of due process is protection of the individual against arbitrary action of government. Since prisoners in Nebraska can only lose good-time credits if they are guilty of serious misconduct, the determination of whether such behavior has occurred becomes critical, and the minimum requirements of procedural due process appropriate for the circumstances must be observed.") (citation omitted); *id.* at 557 ("the State having created the right to good time and itself recognizing that its deprivation is a sanction authorized for major misconduct, the prisoner's interest has real substance and is sufficiently embraced within Fourteenth Amendment 'liberty' to entitle him to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated."); *Wilkinson v. Austin*, 545 U.S. 209, 225 (2005) (noting that under the applicable procedural due process test of *Mathews v. Eldridge*, 424 U.S. 319 (1976), the Court first considers the respondent-inmates' interest in avoiding an erroneous determination under the state policy at issue, *i.e.,* a placement at a "supermax" prison that is erroneous under the applicable state placement policy, and then considers the risk of an erroneous placement under the procedures then in place).

In the undersigned's view, this is what applicable Supreme Court case law tells us procedural due process is all about. As the undersigned put it decades ago, attempting to articulate concisely the important and at times seemingly nebulous distinction between procedural due process and substantive due process, "a procedural due process violation occurs when the government could deprive a person of a protectable interest under [applicable] criteria [assuming they are constitutionally acceptable], but fails to provide procedures adequate for making a sufficiently accurate determination as to whether the criteria actually apply to that person. A substantive due process violation occurs when the government deprives a person of a protectable

interest, but under unconstitutional criteria." Eli J. Richardson, *Eliminating Double-Talk from the Law of Double Jeopardy*, 22 Fla. St. U. L. Rev. 119, 163 (1994). In other words, procedural due process is not a bulwark against the deprivation of liberty or property interests *generally*; it is instead a safeguard against *erroneous* or *unjustified* deprivations of liberty or property interests, *i.e.*, deprivations that are erroneous or unjustified under applicable criteria set by laws that are not constitutionally infirm. *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) ("In procedural due process claims, the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law*."); *Carey v. Piphus,* 435 U.S. 247, 259 (1978) ("Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property").

This understanding of the distinctness of the constitutional guarantee of procedural due process will drive the Court's analysis of whether Plaintiffs are likely to prevail on their claim that such guarantee is violated by the signature-verification system.

B. *Framework for the analysis of a procedural due process claim.*

Plaintiffs set forth the following useful summary of the analysis applicable to a claim of a violation of procedural due process:

> In assessing whether a challenged state action violates due process, courts engage in a "two-step analysis," inquiring (1) whether the plaintiff has a protected liberty or property interest with which the state has interfered, *i.e.*, "whether due process applies," and (2) whether the procedures attendant upon that deprivation were constitutionally sufficient, *i.e.*, "what process is due." *See Johnson v. Morales*, 946 F.3d 911, 921 (6th Cir. 2020); *Miller v. Lorain County Bd. Of Elections*, 141 F.3d 252, 259 (6th Cir. 1998). To make that latter determination, courts apply the three-factor test announced by the United States Supreme Court in *Mathews v. Eldridge*, balancing: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the

function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail." *Johnson*, 946 F.3d at 922 (quoting *Mathews*, 424 U.S. 319, 335 (1976)).

(Doc. No. 43 at 31-32). Plaintiffs' summary is valid. Its description of the two-step inquiry is accurate. *See Bazzetta*, 430 F.3d at 801 ("[A] procedural due process analysis addresses two questions. '[T]he first asks whether there exists a liberty or property interest which has been interfered with by the State, the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.'" (quoting *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989) (citations omitted))).

Plaintiffs' summary accurately conveys that the court first must determine whether procedural due process applies, a question which turns entirely on whether the plaintiff has a cognizable liberty or property interest. This is clear from not only the cases Plaintiffs cited (*Johnson* and *Miller*), but from myriad other cases, including one cited in *Johnson*, *Morrissey v. Brewer*, 408 U.S. 471 (1972). *See Morrissey*, 408 U.S. at 481 ("Whether any procedural protections are due depends on . . . whether the nature of the interest is one within the contemplation of the 'liberty or property' language of the Fourteenth Amendment."). "'[T]hose who seek to invoke [the Fourteenth Amendment's Due Process Clause's] procedural protection must establish that one of these interests is at stake.'" *Bazzetta*, 430 F.3d at 801 (quoting *Wilkinson,* 545 U.S. at 221).

Several important principles guide the determination as to whether a plaintiff's claim actually involves a cognizable interest. "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest

created by state laws or policies[.]" *Wilkinson*, 545 U.S. at 221 (citation omitted).[8] And importantly, in analyzing whether a cognizable state-created liberty interest is involved, the court should emphasize "the nature of the deprivation," not the language of the particular state regulation that allegedly causes the deprivation. *Id.* at 222-23 (discussing *Sandin v. Conner*, 515 U.S. 472 (1995)). To be sure, there naturally would be some overlap between the two, but the court should not focus on the language of applicable regulation except insofar as it helps identify the particular deprivation it allegedly causes the plaintiff. *See, e.g., Johnson v. Wenerowicz*, No. 10-5027, 2011 WL 1399809, at *7 (E.D. Pa. Apr. 8, 2011) ("We follow *Sandin* and narrow our focus on the nature of the deprivation, which, as we have determined, is not the kind of deprivation that implicates a protected liberty interest. Therefore, we will dismiss Plaintiff's Procedural Due Process claim.").

The range of deprivations implicating a cognizable state-created liberty interests is narrow. Of course, the notion of "liberty," in addition to being very important, can be quite broad in some contexts. For example, one might (justifiably) closely associate liberty with representative democracy and representative democracy with the right to vote; ergo, one might justifiably associate liberty with the right to vote and thus say that one has a liberty interest in the right to vote. Such thinking stands to reason as a general and theoretical matter. And such thinking— including its emphasis on the fundamental nature in our democracy of the right to vote—may reflect why there is a cognizable interest in the right to vote for purposes of substantive due process, as indicated below. But as further explained below, such reckoning is simply inapplicable in the context of procedural due process claims based on state-created liberty interests; in that context, the focus is on only particular kinds of liberty. As the Fifth Circuit has explained it:

---

[8] Plaintiffs appear to assert that a liberty interest in the right to vote arises from the Constitution, but they focus more on an alleged right to vote *absentee* that purportedly was created by the State here. (Doc. No. 39 at 31; Doc. No. 43 at 32-33). The Court will construe Plaintiffs as alleging each of these potential sources of a cognizable liberty interest.

The Fourteenth Amendment's right to procedural due process guarantees citizens the protection of adequate procedures before allowing a state to deprive them of their property, liberty, or life. Liberty interests protected by the Fourteenth Amendment "may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies." *Wilkinson*[, 545 U.S. at 221] (citations omitted); *accord Wolff[,* 418 U.S. at 556–57]. The Supreme Court recognizes a narrow category of state-created liberty interests that:

> will generally be limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

*Jordan v. Fisher*, 823 F.3d 805, 810–11 (5th Cir. 2016), *as revised* (June 27, 2016) (quoting *Sandin*, 515 U.S. at 483–84); *see also Thornton v. Bonneville*, No. 2:06-CV-224, 2007 WL 80883, at *2 (W.D. Mich. Jan. 8, 2007) ("Moreover, to the extent Plaintiff attempts to raise a procedural due process claim based on state law, his allegations are inadequate. A state rule does not create a constitutional liberty interest except in narrow circumstances." (citing *Sandin,* 515 U.S. at 484)).

Moreover, as the Sixth Circuit has recognized, *Sandin* teaches that the court must assess the deprivation of a state-created interest on a particularized and plaintiff-specific basis. *Bazzetta,* 430 F.3d at 803 (citing *Jones v. Baker,* 155 F.3d at 816 (Gilman, J., concurring) (noting that *Sandin*'s principal directive is that "courts should look to see if the *particular* inmate has been deprived of a state-created interest of 'real substance'")) and *McClary v. Kelly,* 4 F. Supp. 2d 195, 199 (W.D.N.Y. 1998) ("At its core, *Sandin* instructs courts to look at the nature and extent of the particular deprivation in deciding whether a protected liberty interest is implicated.").

This means that where the plaintiff's state-created "interest has real substance and is sufficiently embraced within Fourteenth Amendment 'liberty[,]' [it] entitle[s] him to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated." *Wolff*, 418 U.S. at 557. But where

the alleged procedural due process violation is based on a state-created liberty interest, there is no such violation (and indeed the above-referenced *Mathews* test need not even be conducted) if there in fact is no state-created liberty interest. *See Wilkinson*, 545 U.S. at 225 (discussing *Sandin*).

As suggested above, however, even a plaintiff who fails to show a state-created liberty interest still may have a cognizable liberty interest arising from the Constitution itself. *See, e.g., Cyr v. Addison Rutland Supervisory Union*, 955 F. Supp. 2d 290, 296 (D. Vt. 2013). But the notion of a constitutionally created liberty interest, like the notion of a state-created liberty interest, is quite narrow. "In addition to state-created liberty interests, the Constitution itself can create cognizable liberty interests, but only if corrections officials impose restraints upon the prisoner which 'exceed [the prisoner's] sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force.'" *Bazzetta*, 430 F.3d at 803–04 (quoting *Sandin*, 515 U.S. at 484).

Absent a cognizable liberty interest from one of these two sources (the Constitution or the state), a procedural due process claim fails outright at the first step, with no need to proceed to the second step (the *Mathews* test) to determine whether more process was due. *See Morrisey*, 408 U.S. at 481 (explaining that if and when the court determines that the plaintiff has a cognizable liberty interest, it then turns to the question what process is due); *Henley v. City of Johnson City, Tenn.*, No. 2:12-CV-263, 2012 WL 3027948, at *4 (E.D. Tenn. July 24, 2012) ("'the Due Process Clause was not meant to require direct judicial review for every mere assertion of the deprivation of a (non-existent) liberty interest.'" (quoting *Barefoot v. City of Wilmington*, 37 F. App'x 626, 635 n. 5 (6th Cir. 2002))).

It bears mentioning that it is no small thing for a court to say that something is a cognizable liberty interest, such that procedural due process is applicable. It means that the claimant is entitled

to pre-deprivation procedures, post-deprivation procedures, or a combination of both, adequate under the circumstances. *See Shoemaker v. City of Howell*, 795 F.3d 553, 559 (6th Cir. 2015) (quoting *Leary v. Daeschner,* 228 F.3d 729, 742–43 (6th Cir. 2000) (citations omitted)). To the extent that pre-deprivation procedures are required, they need not always be elaborate; but depending on the circumstances, a degree of elaborateness may be necessary, with perhaps even some kind of hearing being required prior to deprivation. Indeed, though subject to exceptions, "[i]t is the general rule that procedural due process 'requires some kind of a hearing *before* the State deprives a person of liberty or property.'" *Johnson*, 946 F.3d at 921 (quoting *Zinermon*, 494 U.S. at 127).

C. *Procedural due process with respect to the right to vote.*

The Court well understands that the constitutional *right* to vote is "fundamental." But that does *not* mean that this right is a "*liberty interest*" cognizable under the Due Process Clause of the Fourteenth Amendment for purposes of a procedural due process claim. As noted above, under *Sandin*, the kinds of interests that will be deemed "liberty" interests in this context is narrow, relating only to freedom from restraint. In this context, a state-created liberty interest is an interest in freedom from restraint that "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," and a liberty interest arising from the Constitution itself is an interest in freedom from restraints that "exceed [the prisoner's] sentence in [ ] a [particularly] unexpected manner." *Bazzetta*, 430 F.3d at 803-04 (citing *Sandin*, 515 U.S. at 484).

And in fact the Sixth Circuit has made clear that a plaintiff's right to vote is not a cognizable "liberty" interest arising from the constitutional (First Amendment) right to vote, not a cognizable liberty interest arising from the Due Process Clause of the Fourteenth Amendment to the Constitution, not a cognizable state-created liberty interest, and not a cognizable liberty interest

for purposes of procedural due process, period. In *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463 (6th Cir. 2008), the plaintiffs sued Ohio state officials in the aftermath of the November 2004 general election, alleging a variety of systemic voting failures in that state, not least of which was the (alleged) fact that for one plaintiff, "the touchscreen voting machine 'jumped' from her preferred candidate to another candidate, possibly causing her vote to be counted for the wrong candidate."[9] *Id.* at 478. Based on these allegations, the plaintiffs brought claims for, *inter alia*, violation of the Equal Protection Clause, violation of substantive due process, and violation of procedural due process. The district court denied the defendants' motion to dismiss insofar as it sought dismissal of these claims. *Id.* at 466. The Sixth Circuit affirmed in part and reversed in part. *Id.* at 479. Specifically, it held that the plaintiffs had stated (in additional to a valid equal protection claim) a valid substantive due process claim (based on sufficient allegations of violations of the plaintiffs' fundamental substantive right to vote), *id.* at 478, but had not stated a valid procedural due process claim, *id.* at 479. Regarding the latter claim, the court explained:

> That Ohio's voting system impinges on the fundamental right to vote does not, however, implicate procedural due process, as alleged in count three of the amended complaint. The League contends that Ohio's voting system deprives Ohioans of "their liberty interest in voting and does so without adequate pre- or

[9] The plaintiffs also alleged the following other flaws in the election process in Ohio:

> Voters were forced to wait from two to twelve hours to vote because of inadequate allocation of voting machines. Voting machines were not allocated proportionately to the voting population, causing more severe wait times in some counties than in others. At least one polling place, voting was not completed until 4:00 a.m. on the day following election day. Long wait times caused some voters to leave their polling places without voting in order to attend school, work, or to family responsibilities or because a physical disability prevented them from standing in line. Poll workers received inadequate training, causing them to provide incorrect instructions and leading to the discounting of votes. In some counties, poll workers misdirected voters to the wrong polling place, forcing them to attempt to vote multiple times and delaying them by up to six hours. Provisional balloting was not utilized properly, causing 22% of provisional ballots cast to be discounted, with the percentage of ballots discounted reaching 39.5% in one county. Disabled voters who required assistance were turned away.

*Id.* at 477-78. The Court believes that given the nature of these allegations, and the plaintiffs' focus on the fundamental right to vote, the plaintiffs' claim is properly perceived as alleging both a liberty interest arising out of the constitution and a state-created liberty interest.

post-deprivation process." However, the League has not alleged a constitutionally protected interest. The brevity of argument in the League's brief—which subsumes procedural due process into the substantive due process analysis—reflects the lack of authority for this position. Accordingly, count three of the complaint is dismissed.

*Id.* at 479.

Though located in another circuit, a district court took its cue from *Brunner* two years ago in denying a procedural due process claim premised on the right to vote:

> Plaintiffs' procedural due process argument similarly fails. Put simply, plaintiffs have failed to make a clear showing that mistakes in the administration of an election can give rise to a procedural due process claim. For example, in *League of Women Voters of Ohio v. Brunner,* the Sixth Circuit considered a similar procedural due process claim, namely that flawed election procedures deprived voters of "their liberty interest in voting" without "adequate pre– or post-deprivation process." *Brunner*, 548 F.3d at 479. The *Brunner* court recognized that even though the voting system in that case *"impinge[d] on the fundamental right to vote,"* the system did not implicate procedural due process and plaintiffs failed to allege a constitutionally protected interest. *Id.* Plaintiffs here point to no authority actually supporting the existence of a procedural due process claim in this context of election irregularities. Indeed, the only voting cases plaintiffs cite in this section of their brief . . . both involved substantive due process and equal protection claims, not procedural due process claims. Accordingly, plaintiffs have not made the requisite clear showing that they are likely to succeed on the merits of their procedural due process claim.

*Lecky v. Virginia State Bd. of Elections*, 285 F. Supp. 3d 908, 918 (E.D. Va. 2018).

D. *Analysis*

Plaintiffs apparently claim the existence of a cognizable liberty interest that both: (1) arises from the Constitution itself; and alternatively and additionally (2) is state-created, inasmuch as Tennessee grants its citizens a statutory right to vote by mail so long as they are statutorily eligible to do so. (Doc. No. 43 at 32-33).

*Lecky* suggests the two primary problems with Plaintiffs' position here. The first is the existence of *Brunner*, precedential authority for this Court that is, at the very least, in great tension with Plaintiffs' position. Despite citing *Brunner* for more general propositions they think are

helpful to their position,[10] Plaintiffs failed to call *Brunner*'s applicable holding to the Court's attention, let alone deal with it in any way whatsoever, such as by somehow trying to distinguish it.[11]   Absent a persuasive (and indeed any) argument for distinguishing *Brunner*, the Court cannot conclude that Plaintiffs have met their burden of showing a cognizable liberty interest.

Even if Plaintiffs had attempted to distinguish *Brunner,* the attempt would have been doomed to failure. *Brunner* is quite clear that for purposes of procedural due process, a cognizable liberty interest in the right to vote does not arise from the Constitution; on this point, Plaintiffs could not possibly distinguish *Brunner* from the instant case. Thus, Plaintiffs would be relegated to distinguishing *Brunner* with respect to a "state-created rights" theory, by arguing that *Brunner* did not involve the same state-created rights involved in this case. But *Sandin* would eviscerate such argument; as discussed above, under *Sandin*, state-created interests are cognizable liberty interests only under narrow circumstances generally relating to freedom from restraint. *See Bazzetta*, 430 F.3d at 798 ("a [state-created] liberty interest arises where the state's regulations [create] 'freedom from restraint'" of a particular nature (quoting *Sandin*, 515 U.S. at 484)). Second, Plaintiffs do not sufficiently focus on the issue at hand, which is not whether the right to vote will support a substantive due process claim (or a First Amendment right-to-vote claim), but rather whether it will support a procedural due process claim. The Sixth Circuit has made crystal clear the existence and significance of this distinction. See *Brunner*, 548 F.3d at 479 ("That Ohio's voting system impinges on the fundamental right to vote [and thus supports a substantive due process claim] does not, however, implicate procedural due process[.]"). Despite its ability to

---

[10] The portion of *Brunner* Plaintiffs do cite actually does not materially help them here, because it addresses only whether the right to vote is protected by *substantive* due process. (Doc. No. 43 at 32-33 (quoting *Brunner*, 548 F.3d at 477)).

[11] The Court is constrained to say that this is disappointing. But the disappointment goes both ways; Defendants likewise did not call *Brunner*'s key holding to the Court's attention.

support a substantive due process claim, the right to vote will not support a procedural due process claim unless it is a "liberty interest" cognizable for purpose of procedural due process. And as discussed above, it simply is not, under the precedent binding on this Court.[12]

Plaintiffs cite numerous cases for the proposition that they have a cognizable liberty interest. But as with the cases cited by the plaintiffs in *Lecky*, many of Plaintiffs' case citations relate to whether the right to vote will support a claim based on *substantive* due process (or,

---

[12] One might reasonably ask why the right to vote supports a substantive due process claim when it is not recognized as a "liberty interest" for purposes of procedural due process. After all, whether substantive or procedural concerns are at issue, it is the same due process clause implicated; in either case, the clause at issue protects "life, liberty and property." And if substantive due process applies to the right to vote, that seemingly would necessarily entail that the right to vote is a cognizable liberty interest for purposes of substantive due process; that is, it seems that for a substantive due process claim based on the right to vote, the right to vote should be couched as a "liberty interest" for purposes of substantive due process. *See Goodwin v. Castille*, No. 1:CV-11-979, 2011 WL 3101776, at *1 (M.D. Pa. July 19, 2011), *aff'd*, 465 F. App'x 157 (3d Cir. 2012) ("[P]laintiffs filed a complaint alleging . . . denial of substantive due process rights, claiming a liberty interest in ballot access and a state created liberty interest in voting[.]"). And indeed, in the context of substantive due process, the right to vote has been couched as exactly that: a "liberty interest." *Moore v. Caledonia Nat. Gas Dist.*, No. CIV.A. 1:94CV44-S-D, 1995 WL 1947414, at *9 (N.D. Miss. June 19, 1995) ("The right to vote is certainly a liberty interest to which [two of the plaintiffs] . . . have a substantive due process right." (citing *Harper v. Virginia St. Bd. of Elections,* 383 U.S. 663 (1966)). The Court will not endeavor to provide a definitive answer to that question; what it really needs to do is simply apply *Brunner*. But the Court will suggest a possible explanation, if only as food for thought. The reality is that courts sometimes interpret a single phrase in multiple ways depending on the context; that is, the phrase will be construed one way in a particular context to achieve a particular result in that context, but then construed a different way in another context to achieve a different result. *See, e.g*., Eli J. Richardson, *Taking Issue with Issue Preclusion: Reinventing Collateral Estoppel*, 65 Miss. L.J. 41, 81-83 & n.163-169 (1995). And courts may do this even when the two contexts actually seem initially to be the same, as they would initially seem to be here, inasmuch as the context in which "liberty interest" is being construed is the Due Process Clause of the Fourteenth Amendment. The difference in construction of the same term in what is (at least primarily) the same context is attributable to a perceived need or desirability for a different result in the (somewhat different) second context. *See id.* That is to say, sometimes courts are less interested in pronouncing a consistent, and consistently coherent, single construction for a term than in obtaining sensible results that flow from their decisions as to the definition. So if the court believes the term needs to be construed differently in a somewhat different context to obtain a fair or otherwise sensible result, then so be it; definitional consistency may be given up in return for other perceived justice or policy-related benefits. That could be what is going on here; perhaps courts realize that it is one thing to say that there is a substantive due process or First Amendment right to vote (*i.e.*, a right to vote unless and until that right is taken away under appropriate criteria), but it is quite another to say that there is a procedural due process right to vote, (*i.e.* a right to particular procedures, presumptively including some kind of a hearing, to guarantee a reasonable amount of accuracy in determining whether a specific person's vote is eligible to be counted and should be counted under applicable criteria). The consequences, in terms of (among other things) resource allocation by state and local governments, is quite different in two contexts. And thus courts may desire different outcomes in the respective contexts, which necessarily means that the construction of "liberty interest" for purposes of the Due Process Clause must be different in the two contexts, even though it is the same word ("liberty") from the same clause being construed. To summarize, sometimes courts, to reach decisions they find sensible, need to eschew consistency (and sometimes coherence) in construing a single term across (somewhat different) contexts. *See* Eli J. Richardson, *Eliminating the Limitations of Limitations Law*, 29 Ariz. St. L.J. 1015, 1071–72 (1997). This may explain why the right to vote is a "liberty interest" for purposes of the Due Process Clause in one context but not another.

relatedly, the fundamental right to vote couched in terms of the First Amendment rather than substantive due process), not a claim based on procedural due process. In Plaintiffs' defense, a few of the cases they cite do stand for the proposition that the right to vote is a cognizable liberty interest for purposes of procedural due process. But in the undersigned's view, these cases gave inadequate (or even *no*) consideration to the distinction between substantive due process (or the substantive right to vote under the First Amendment) and procedural due process, and they in turn rely to some extent on other cases that did likewise. In addition, all of the cases Plaintiffs cite that actually do address procedural due process, and all of the cases those cases cite in turn, are (out-of-circuit) district court cases. The Court perceives not a single citation to an appellate court opinion specifically holding that the right to vote is a cognizable liberty interest for purposes of procedural due process. On its own, the Court identified a Ninth Circuit case that apparently assumed *arguendo*, without any analysis, that a procedural due process claim can be based on the right to vote, before finding that such claim failed on step two of the analysis anyway. *Lemons v. Bradbury*, 538 F.3d 1098, 1104–05 (9th Cir. 2008).[13] Obviously, for a district court within the Sixth Circuit, this kind of opinion cannot trump *Brunner*.

In summary, as touched on above, the right to vote is fundamental, but it is not a "liberty" interest for purposes of procedural due process under *Brunner* or pertinent Supreme Court case law. Accordingly, Plaintiffs' procedural due process claim very likely fails at step one, and Plaintiffs thus have no likelihood of success on this claim. And as noted above, "a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales*, 225 F. 3d at 625. At the very least, it counts heavily against Plaintiffs. *Henley*, 2012 WL 3027948, at *4 ("Plaintiffs herein have not identified a liberty or property interest necessary to establish a procedural due

---

[13] The parties do discuss *Lemons*, but only with respect to step two of the procedural due process analysis.

process claim. The statutory procedural process provided by the State is not a liberty or property interest. Accordingly, the court concludes that there is simply no likelihood that plaintiffs would prevail on the merits of this case, and this factor weighs heavily against granting any injunctive relief.").

III.    <u>Plaintiffs' likelihood of success as to the fundamental right-to-vote claim</u>.

Plaintiffs alternatively and additionally have challenged the signature-verification requirement on the grounds that it unconstitutionally burdens Plaintiffs' "fundamental right to vote." (Doc. No. 43 at 39). In their briefing, the parties devote surprisingly little attention to the merits of this particular challenge. In Plaintiffs' Brief, Plaintiffs devoted a mere two pages to it. (Doc. No. 43 at 39-41). In their Response, Defendants addressed it, if at all, only indirectly (and if indirectly, very indirectly). Correctly perceiving that to be the case, Plaintiffs in their Reply mentioned this challenge only in a footnote; therein, Plaintiffs claim that Defendants' lack of response means that "Plaintiffs should therefore succeed on that claim" and that in any event "Defendants' imposition of a severe burden on [Tennessee's statutorily created] right to vote [by mail]—by summarily rejecting absentee ballots without notice and an opportunity to cure— violates the Constitution." (Doc. No. 54 at 18 n.8).

Neither side did itself, or the Court, any favors in treating this claim with such brevity. Of necessity, the Court's analysis below goes very far beyond anything the parties presented.

A.  *The nature of Plaintiffs' claim*

The Court notes initially that the Supreme Court has explained that, there are "three kinds of § 1983 claims that may be brought against the State under the Due Process Clause of the

Fourteenth Amendment."[14] *Zinermon*, 494 U.S. at 125. One is a procedural due process claim, *i.e.*, the precise type of claim the Court has analyzed immediately above. *Id.* at 125-26. As for the other two:

> First, the Clause incorporates many of the specific protections defined in the Bill of Rights. A plaintiff may bring suit under § 1983 for state officials' violation of his rights to, *e.g.,* freedom of speech or freedom from unreasonable searches and seizures. Second, the Due Process Clause contains a substantive component that bars certain arbitrary, wrongful government actions "regardless of the fairness of the procedures used to implement them."

*Id.* (quoting *Daniels v. Williams,* 474 U.S. 327, 331 (1986)). These two kinds of challenges sometimes can seem to blend together. *See*, *e.g., Wilkins v. Cty. of Alameda*, 571 F. App'x 621, 623 n.1 (9th Cir. 2014) ("To the extent that Wilkins asserts that Defendants violated his substantive due process rights by infringing upon a deeply rooted and fundamental right, then that claim is coextensive with his fundamental right-to-vote claim and the district court properly granted summary judgment on it as well." (citation omitted)). And they do bear some similarities, particularly inasmuch as they both stand in particular contrast to a procedural due process claim; this was suggested by the Supreme Court in *Zinermon*, where it grouped and discussed them together before discussing procedural due process separately. But the two kinds of claims are distinct from one another and thus should be treated accordingly, regardless of whether any such distinction is material.

*Brunner* makes clear that a claim of a substantive violation of the fundamental right to vote can be styled as the second kind of claim, *i.e.*, a substantive due process claim. *See also Fugazi v. Padilla*, No. 2:20-CV-00970-KJM-AC, 2020 WL 2615742, at *7 (E.D. Cal. May 22, 2020) (noting, in case in which plaintiffs sought a temporary restraining order to ensure that absentee

---

[14] A claim under the Equal Protection Clause of the Fourteenth Amendment also is possible, inasmuch as "at a minimum . . . equal protection requires 'nonarbitrary treatment of voters.'" *Brunner,* 548 F.3d at 477 (quoting *Bush v. Gore,* 531 U.S. 98, 105 (2000)). But Plaintiffs have brought no equal protection claim.

ballots cast by plaintiff voters would be counted, "election cases of the type plaintiffs attempt to bring typically turn on substantive due process claims"). But cases like *Wilkins* suggest that they can be styled as the first kind of claim, *i.e.*, a violation of the fundamental right to vote encompassed within the First Amendment. Ultimately, the difference likely tends typically to be immaterial, and in the Court's view it is here. But in any event, the nature of a claim should always be properly understood by a reviewing court, and here the Court notes that Plaintiffs' Count IV Section 1983 claim is framed in terms of an alleged violation of a specific protection in the Bill of Rights, *i.e.*, the right to vote encompassed within the First Amendment. (Doc. No. 39 at 32).[15]

B. *Applicable standards*

As Plaintiffs correctly note, this instant challenge is governed by the so-called *Anderson-Burdick* framework. (Doc. No. 43 at 39). The Sixth Circuit recently described this framework and its applicability to the instant kind of constitutional challenge:[16]

> "Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; 'as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.'" *Burdick v. Takushi*, 504 U.S. 428, 433, 112 S. Ct. 2059, 119 L.Ed.2d 245 (1992) (quoting *Storer v. Brown*, 415 U.S. 724, 730, 94 S. Ct. 1274, 39 L.Ed.2d 714 (1974)). But this regulatory power is accompanied by significant risk, as laws that structure elections "inevitably affect[ ]—at least to some degree—the individual's right to vote and his right to associate with others for political ends." *Anderson v. Celebrezze*, 460 U.S. 780, 788, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983). To determine whether a state election law unduly burdens these crucial constitutional rights, we:
>
>> must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the

---

[15] In previously making a few prior passing references to this claim as one for substantive due process, the Court was being inexact and, as it now recognizes, inaccurate.

[16] As suggested, these standards are broadly applicable to challenges to election laws, and they would be applicable had Plaintiffs chosen to allege a violation of substantive due process rather than a violation of the First Amendment right to vote.

> precise interests put forward by the State as justifications for the
> burden imposed by its rule,' taking into consideration 'the extent to
> which those interests make it necessary to burden the plaintiff's
> rights.'

*Burdick*, 504 U.S. at 434, 112 S. Ct. 2059 (quoting *Anderson*, 460 U.S. at 789, 103 S. Ct. 1564). This balancing test is referred to as the *Anderson-Burdick* framework.

> Under the *Anderson-Burdick* framework, we first "determine the burden the State's regulation imposes on the plaintiffs' First Amendment rights." *Thompson v. DeWine*, 959 F.3d 804, 808 (6th Cir. 2020) (order) (per curiam). "[W]hen those rights are subjected to 'severe' restrictions," the regulation is subject to strict scrutiny and "must be 'narrowly drawn to advance a state interest of compelling importance.' " *Burdick*, 504 U.S. at 434, 112 S. Ct. 2059 (quoting *Norman v. Reed*, 502 U.S. 279, 289, 112 S. Ct. 698, 116 L.Ed.2d 711 (1992)). But when those rights are subjected only to "reasonable, nondiscriminatory restrictions," the regulation is subject to rational-basis review because "the State's important regulatory interests are generally sufficient to justify" the restriction. *Id.* (quoting *Anderson*, 460 U.S. at 788, 103 S. Ct. 1564). "For cases between these extremes, we weigh the burden imposed by the State's regulation against 'the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *Thompson*, 959 F.3d at 808 (quoting *Burdick*, 504 U.S. at 434, 112 S. Ct. 2059 (internal quotation marks omitted)).

*Hawkins v. DeWine*, No. 20-3717, 2020 WL 4435524, at *2 (6th Cir. Aug. 3, 2020).

C. *Analysis*

The Court begins by trying to tease out Plaintiffs' position as to (i) *what* exactly it is that is burdened by the signature-verification system; (ii) *how* it—whatever "it" is—is burdened by the signature-verification system; and (iii) *why* the burden is so heavy. Knowing these things is crucial to conducting the *Anderson-Burdick* analysis. *Cf. Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 205 (2008) ("Of course, we have to identify a burden before we can weigh it." (Scalia, J., concurring)).

Unfortunately Plaintiffs are not nearly as explicit about these topics as they might have been and should have been. However, the Court believes it can make the required identification, though it takes some doing.

As to the first issue, Plaintiffs clearest expression is as follows:

> Defendants do not appear to directly challenge Plaintiffs' claim that the lack of a notice and cure procedure in the signature verification process also imposes a severe burden on Organizational Plaintiffs' members' *right to vote by mail*. Plaintiffs should therefore succeed on that claim. However, to the extent that Defendants indirectly challenge the claim by arguing that Plaintiffs lack a substantive entitlement to vote by mail, the challenge fails for the reasons described above. Tennessee law confers upon *Plaintiffs a right to vote by mail*, which for some voters is their *only* available means of voting this year, in light of the pandemic. Defendants' imposition of a severe burden on *that* right to vote—by summarily rejecting absentee ballots without notice and an opportunity to cure—violates the Constitution.

(Doc. No. 54 at 18 n.8) (citations omitted) (emphasis added). So Plaintiffs are challenging the signature-verification system based on the burden it places on their right to vote *by mail* in particular, not their right to vote *generally*. This distinction bears specific mention for purpose of analytical clarity, even though ultimately it proves immaterial to the outcome of the Motion with respect to the signature-verification system.[17]

As to the second issue, in Plaintiffs' Brief, Plaintiffs asserted:

> Every election, Tennessee's error-prone signature match law summarily discounts eligible voters' validly cast ballots and deprives these voters of their right to vote. Troublingly, the deprivation occurs without giving the voter any opportunity to remedy the perceived deficiency. Such a system bears "[t]he hallmark of a severe burden"—"exclusion or virtual exclusion from the ballot."

(Doc. No. 43 at 39) (quoting *Libertarian Party of Kentucky v. Grimes*, 835 F.3d 570, 574 (6th Cir. 2016)). Here, Plaintiffs appear to be complaining primarily about the signature-verification

---

[17] The primary reason it proves immaterial in this case is that the Court declines to address any suggestion that there is no First Amendment right to vote *by mail*. It is far from clear that Defendants even intended to make this suggestion; as expressed, Defendants' point only was that there was no right to vote absentee for *procedural due process* purposes. Plaintiffs have a First Amendment right to vote generally, but that is not to say that they have a First Amendment right to vote in a particular way. *See John Doe No. 1 v. Reed*, 561 U.S. 186, 224, (2010) ("We have acknowledged the existence of a First Amendment interest in voting [citing *Burdick*], but we have never said that it includes the right to vote anonymously." (Scalia, J., concurring)) In any event, the Court herein will assume, to Plaintiffs' benefit, that Plaintiffs' First Amendment right to vote extends to the right to vote by mail—at least where, as here, the state has created a system whereby (at least for particular categories of eligible voters) voting can be done by mail.

*requirement*, while at the same time perhaps blaming the signature-verification *procedure* for being inadequate to prevent the potential mischief invited by the existence of the signature-verification requirement.

Plaintiffs then went on to assert that "[e]very absentee voter is at risk of having their ballot arbitrarily rejected based on a benign signature issue under Tennessee's unreliable system." (*Id.* at 40). And Plaintiffs then lamented that "there is nothing voters can do to safeguard their ballot from such erroneous rejections." (*Id.*). Here, Plaintiffs appear to be complaining primarily about the signature-verification procedure, accusing it of fostering arbitrary and incorrect results, while at the same time perhaps blaming the signature-verification requirement for creating the possibility of such unwarranted results in the first place. Then, in perhaps their clearest and most concise statement of how the signature-verification system (allegedly) burdens their right to vote by mail, Plaintiffs claimed in their Reply that Defendants' enforcement of the signature-verification system imposes a severe burden on the right to vote absentee "by [causing] summar[y] rejecti[on of] absentee ballots without notice and an opportunity to cure." (Doc. No. 54 at 18 n.8).

In summary, Plaintiffs claim that the signature-verification system burdens Plaintiffs' right to vote absentee by risking (and causing) summary and, in some cases, erroneous rejection of an absentee ballot "without giving the voter any opportunity to remedy" a perceived signature discrepancy. Notably, although Plaintiffs should have been much clearer about this, their claim appears to attribute this burden to each of the two aspects of the signature-verification system, assigning responsibility for the burden in part to the existence of the signature-verification requirement and in part to the signature-verification procedure implementing the signature-verification requirement.

And as to the third issue, Plaintiffs say that the burden imposed by the signature-verification requirement is severe because "the system"—meaning, apparently, what the Court has termed the signature-verification system—causes something tantamount to "exclusion or virtual exclusion from the ballot." (Doc. No. 43 at 39).

The Court can dispose of part of Plaintiffs' claim here prior to reaching the *Anderson-Burdick* test. To the extent that Plaintiffs' claim of a (substantive) violation of the fundamental right to vote is based on the signature-verification procedure, it is actually a misguided repackaging of their procedural due process claim. Any complaint about the signature-verification procedure is a complaint about its effect upon *accuracy*. The complaint is really that the signature-verification procedure is inadequate to promote a reasonably accurate determination as to whether the applicable criterion—*i.e.,* that the signature on the purported voter's absentee ballot [is the same as] [can be verified as] [matches] the signature contained in the purported voter's voter registration record. In other words, this is a complaint that the procedures to take away, under applicable criteria, a person's right to vote are not reasonably adequate to determine whether those criteria actually apply to the person. As explained above, such a complaint is one sounding exclusively in procedural due process. Plaintiffs' complaint about the signature-verification procedure thus is not properly considered in connection with their right-to-vote claim (and could not successfully support a claim of procedural due process, in light of the lack of a cognizable liberty interest in voting for purposes of procedural due process).

That leaves Plaintiffs' complaint about the signature-verification requirement. This complaint *is* properly considered in connection with Plaintiffs' claim here. Such complaint is one about allegedly unconstitutional *criteria* because that is what the signature-verification requirement is: a criterion that has to be satisfied in order for a person's right to vote absentee to

be vindicated via its being counted. In other words, Plaintiffs claim that the signature-verification requirement is an unconstitutional criterion for voting absentee. This kind of claim properly is asserted in terms of substantive due process, as indicated above. And it likewise properly is asserted in the substantive fundamental-right-to-vote challenge Plaintiffs are making here, which is not materially different from a substantive due process claim, as discussed above.

With Plaintiffs' complaint about the signature-verification system being properly cognizable here to the extent (and only to the extent) it is directed at the signature-verification requirement,[18] the question is whether Plaintiffs' claim based on this complaint ultimately has a likelihood of success. That is, are Plaintiffs' likely to succeed on their argument that the signature-verification requirement poses an unconstitutional burden on their right to vote absentee? The answer turns on application of the *Anderson-Burdick* balancing test.

The undersigned has noted on multiple occasions that multi-factor (or balancing) tests, though often having considerable desirability and merit, tend to foster outcomes that are unpredictable on the front end, given such tests' subjectivity.[19] And the test here is certainly subjective, in terms of both how the burden is characterized and how the state's countervailing interest is viewed. The undersigned cannot claim to know a factually "right" outcome on these issues. But he must make a reasoned determination on these issues, based on experience and

---

[18] Below, the Court will refer to Plaintiffs' argument here as if it was based not on the signature-verification system as a whole, but rather solely on the signature-verification requirement.

[19] Eli J. Richardson, *Eliminating the Limitations of Limitations Law*, 29 Ariz. St. L.J. 1015, 1050 (1997) (proposing a multi-factor test to resolve civil limitations issues, while conceding that when courts "apply[ ] a multi-factor test, [it is] always an unpredictable endeavor"); Eli J. Richardson, *Taking Issue with Issue Preclusion: Reinventing Collateral Estoppel*, 65 Miss. L.J. 41, 95 (1995) (proposing multi-factor test to resolve collateral estoppel issues, while conceding that its drawback is that it "would produce unpredictable resolutions of collateral estoppel issues, in that it is so flexible and calls for very subjective judicial determinations.").

applicable case law (or the lack thereof), which guide him to an outcome he has little trouble concluding is quite sound even if it is subjective.

Plaintiffs claim that the burden imposed by the signature-verification requirement is severe for purposes of the *Anderson-Burdick* test because it (supposedly) causes "exclusion or virtual exclusion from the ballot." (Doc. No. 43 at 39-40). Plaintiffs cite a case for the unexceptional proposition that such exclusion reflects a severe burden; exclusion from voting would naturally represent the most severe burden on voting possible. But Plaintiffs provide no authority whatsoever, and no discussion to support, the proposition that the signature-verification requirement in fact causes complex or virtual exclusion from the ballot. Perhaps Plaintiffs mean that when a person's absentee vote happens to be rejected (rightly or wrongly) based on the application of the signature-verification requirement, that person has been excluded from casting a ballot. Fair enough; in a particular situation, the result of the application of the signature-verification requirement will be the exclusion of the particular vote involved in that situation. But that is not to say the signature-verification requirement *as a criterion* fosters exclusion from the ballot or is designed to foster exclusion from the ballot. And the recent historical rejection rate of absentee ballots in Tennessee shows that its application almost never—*i.e.*, in only .03 percent of cases—results in exclusion of an absentee ballot from the vote count.

Moreover, as noted above, properly construed based on what Plaintiffs have asserted, Plaintiffs complaint is about the burden imposed by the signature-verification requirement on the right to vote *absentee* in particular. Even if the signature-verification requirement could be deemed to burden the right to vote absentee to the point that it fosters exclusion from voting *absentee*, that would not entail exclusion from the right to vote (given that voting in person is not affected by the signature-verification requirement). "Strict scrutiny is the standard for cases where 'the State

totally denied the electoral franchise to a particular class of residents, and there was no way in which the members of that class could have made themselves eligible to vote.'" *Mays v. LaRose*, 951 F.3d 775, 786 (6th Cir. 2020) (quoting *Rosario v. Rockefeller*, 410 U.S. 752, 758 (1973)). This is not such a case, because whatever the effect of the signature-verification requirement upon the right to vote absentee, Tennessee voters have other options, including voting in-person early and voting in-person on election day. "Because Plaintiffs are not totally denied a chance to vote by [Tennessee]'s absentee ballot [requirements], strict scrutiny is inappropriate." *Id.* at 787. Although the signature-verification requirement does represent some kind of obstacle between placing a vote and having it counted, the mere existence of such an obstacle does not mean that Plaintiffs are *excluded* from voting. *Cf. Thompson v. Dewine*, 959 F.3d 804, 810 (6th Cir. 2020) ("Moreover, just because procuring signatures is now harder . . . doesn't mean that Plaintiffs are *excluded* from the ballot.")

And the mere fact that application of a state regulation can result in a person's vote not being counted in particular cases cannot, by itself, mean that the burden on the right to vote is severe. If it did, then courts would attribute a severe burden to state regulations in case after case where they in fact they do not. For example, in *Crawford*, the plaintiffs challenged a state law requiring government-issued photo identification to vote (either on election day, or beforehand at the office of the circuit court clerk) as violative of the Fourteenth Amendment right to vote. Manifestly, application of this law in particular cases could result in a person's exclusion from voting; for example, if the person shows up at the polls on election day and does not have the required identification.[20] And yet Justice Steven's opinion (joined by two other justices)

---

[20] As the Supreme Court explained, "A voter who has photo identification but is unable to present that identification on election day may file a provisional ballot that will be counted if she brings her photo identification to the circuit court clerk's office within 10 days." *Crawford*, 553 U.S. at 185. So application of Indiana's voter-identification requirement actually would not exclude a voter from voting if the voter is able to cast and have counted a provisional

announcing the judgment of the Court[21] found that the voter-identification requirement's "application to all Indiana voters . . . 'imposes only a limited burden on voters' rights.'" *Id.* at 203 (quoting *Burdick,* 504 U.S. at 439).[22]

And in a very recent example, in *Mays*, the plaintiffs challenged an Ohio law that sets a deadline of noon, three days before election day, for any voter to request an absentee ballot; the law extended the deadline for unexpectedly hospital-confined voters but not for unexpectedly jail-confined voters, which was what the plaintiffs had become the weekend before Election Day 2018. *Mays*, 951 F.3d at 780. By that time of their arrest, the plaintiffs (or, more precisely, at least plaintiff Mays) had no way to request an absentee ballot under Ohio law, because the deadline for such a request had passed. *Id.* at 781. And as Mays was confined through Election Day, he could not vote in-person, either early or on Election Day. *Id.* at 782.

Expecting that their confinement would last through Election Day, and thus having no way to vote in person, the plaintiffs sued Ohio's Secretary of State for access to absentee ballots. *Id.* at

---

ballot under this provision. But even this provision requires photo identification, absent which the voter cannot vote even provisionally. And under Plaintiffs' own theory, the possibility of having a provisional ballot counted does not distinguish their case from the Indiana regime at issue in *Crawford*. As Defendants note, Tennessee law allows a voter whose absentee ballot has been rejected (based on, among other things, the signature-verification requirement) to cast a provisional ballot in accordance with Tenn. Code Ann. § 2-7-112(a)(3). But Plaintiffs' position nevertheless is that application of the signature-verification requirement results in exclusion, irrespective of the possibility of having a provisional ballot counted. For these reasons, despite the possible counting of a provisional ballot, *Crawford* presents a case where application of state law can result in particular cases in exclusion from voting just as Plaintiffs claim that application of the signature-verification requirement results in exclusion from voting.

[21]  A concurring opinion of Justice Scalia, joined by two other justices), opined that the burden was minimal, both as to all Indiana voters and as to the below-referenced subset of voters who allegedly were especially burdened. *Crawford*, 553 U.S. at 204 (Scalia, J., concurring). Thus, a total of six justices found both that all Indiana voters were not severely burdened and that it could not be said (based on the record) that even the special subset was severely burdened. Thus, a clear majority of the Court indicated that a person is not severely burdened by a requirement merely because application of a requirement could result in a person being excluded from voting.

[22] As to a particular subset of the class of all Indiana voters, comprised of "voters who cannot afford or obtain a birth certificate and who must make a second trip to the circuit court clerk's office after voting," Justice Stevens's opinion found that "it is not possible to quantify . . . the magnitude of the burden on this narrow class of voters." *Crawford*, 553 U.S. at 200.

780. The suit was brought on behalf of themselves and a class of similar individuals, alleging violation of equal protection based on Indiana's disparate treatment of hospital-confined and jail-confined electors, and violation of the First Amendment based on Ohio's absentee ballot request deadline as applied to unexpectedly jail-confined voters. *Id.* The trial court granted both of the plaintiffs, though not the entire class, a temporary restraining order that permitted them to vote in November 2018. Following the November 2018 election, the district court certified the class and granted summary judgment to the plaintiffs and similarly situated persons, holding that the burden Ohio's disparate treatment of hospital-confined and jail-confined voters places on the plaintiffs' right to vote was not sufficiently justified by Ohio's interest. *Id.*

The Sixth Circuit disagreed and reversed the district court's grant of summary judgment to the plaintiffs, reversed the district court's denial of summary judgment to the Ohio Secretary of State, and reversed the district court's certification of a class. *Id.* In so doing, the court found that "the burden on [the p]laintiffs' right to vote is intermediate, somewhere between slight and severe." *Id.* at 785 (internal quotation marks omitted). But as applied to an unexpectedly confined person, the application of Ohio's deadline for requesting an absentee ballot prevented the plaintiffs not only from voting absentee, but from voting *at all*. *See id.* at 782 ("So it was the State's absentee ballot request deadline and confinement of Mays that caused his inability to vote."). So the upshot is clear: the mere fact that the application of state requirements for absentee voting in a particular case prevents a person from voting (or their vote being counted) does not mean that the burden imposed by that requirement is severe.

In short, it is not only untrue that a law that imposes any burden upon the right to vote must be subject to strict scrutiny, *Burdick*, 504 U.S. at 432, it also is untrue that any law whose application could result in a voter being unable to vote (or have his or her vote counted) necessarily

imposes a severe burden so as to be subject to strict scrutiny. So the question becomes what degree of burden *is* imposed by the signature-verification requirement. To answer that question, the Court begins by noting what the nature of the burden on would-be absentee voters actually is: having previously signed a voter-registration document, they must sign the absentee ballot and then have the two signatures subjected to a comparison. Substantively, that's really it: they must provide a signature and suffer it to be compared with a former signature.

Cases like *Crawford* and *Mays* suggest that the burden is not particularly heavy. "When States impose 'reasonable nondiscriminatory restrictions' on the right to vote, courts apply rational basis review and 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Mays*, 951 F.3d at 784 (quoting *Burdick*, 504 U.S. at 434) (internal quotation marks omitted). An across-the-board requirement that every would-be absentee voter sign his or her absentee ballot and have it submitted for comparison with a signature previously provided by the voter sounds a good deal like just such a restriction. And in the only federal appellate case of which the Court is aware addressing the burden imposed by a signature-verification requirement, the court found the burden to be minimal. *See Lemons*, 538 F.3d at 1104. In a (very recent) district court case, the court found the burden "significant" and "substantial," but stopped short of calling it severe. *Frederick v. Lawson*, ---F. Supp. 3d---, 2020 WL 4882696, at *16 (S.D. Ind. Aug. 20, 2020). Although the Court respectively disagrees with *Frederick*'s analysis in many ways, *Frederick* does indicate that an argument can be made that the burden is intermediate, and thus the Court in an abundance of caution will treat the burden as intermediate—but no higher. Even in *Mays*, where the burden—which, as applied there, would have prevented the plaintiffs from voting, period—unquestionably was greater than the burden imposed by the instant signature-verification requirement, the court called the burden "intermediate," *i.e.*, "somewhere between light and

severe," *i.e.*, "moderate." *Mays*, 951 F.3d at 785. The court went no higher on the burden scale primarily because, as in the present case, the law as a general matter permitted other ways to vote beyond voting absentee. *Id.* at 786 ("Considering Ohio's absentee ballot request deadlines from the perspective of unexpectedly jail-confined electors and given the alternative voting opportunities that Ohio provides, the burden those laws place on Plaintiffs' right to vote is moderate.") The Court is confident that the burden is moderate at most.

The State therefore needs to have an interest in its signature-verification requirement that is commensurate with that moderate burden. *See id.* at 784. In other words, "the state need only demonstrate that it has legitimate interests to impose the burden that outweigh it." *Kishore v. Whitmer*, --- F.3d ---, 2020 WL 4932749, at *3 (6th Cir. Aug. 24, 2020) (internal quotation marks omitted). Here, the State does.

There is no question that the requirement is intended to promote the State's interest in the integrity of the voting process. And Tennessee "indisputably has a compelling interest in preserving the integrity of its election process." *Burson v. Freeman*, 504 U.S. 191, 199 (1992) (quoting *Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 228-29 (1989)); *see also Crawford*, 553 U.S. at 197.

And Defendants correctly note that Plaintiffs' well-founded insistence that every (lawful) vote should be counted (and count) cuts both ways. Plaintiffs' premise actually reflects the legitimacy of the State's interest here. That is, the State has a legitimate interest in ensuring that a lawful vote is not canceled out by a countervailing fraudulent vote. (Doc. No. 46 at 47 (quoting *Texas Democratic Party v. Abbott*, 961 F.3d 389, 413 (5th Cir. 2020) (Ho, J., concurring) (quoting *Gray v. Sanders*, 372 U.S. 368, 380 (1963))).

Even *Frederick*, which in the undersigned's opinion took a very pro-plaintiff view,[23] and indeed ultimately found the state's interest insufficient to justify the state's signature-verification requirement, acknowledged the strength of the state's interests:

> Regarding the State's interests, the Secretary argues that the signature verification requirement is a reasonable, nondiscriminatory restriction intended to confirm the identity of mail-in absentee voters and clearly furthers the State's interests in preventing election fraud, ensuring the orderly administration of elections, and maintaining accurate records. . . . [T]hese interests, as recognized above, are clearly compelling and significant . . .

*Frederick*, 2020 WL 4882696, at *17. And the Ninth Circuit, in the context of a challenge to a signature-verification regime (albeit one associated with signatures on a referendum petition and not on absentee ballots), has declared "important" the state's interest in detecting fraud and in the orderly administration of elections. *Lemons*, 538 F.3d at 1104. In short, the State has legitimate and strong interests in its signature-verification requirement.

At the final step of *Anderson-Burdick,* the court assesses whether the State's restrictions are constitutionally valid given the strength of its asserted interests. *Kishore*, 2020 WL 4932749, at *4. Here, as in *Kishore*, on balance, "the State's well-established and legitimate interests in administering its own elections [via, in pertinent part, the signature-verification requirement] outweigh the intermediate burden imposed on Plaintiffs." *Id.*

If there is any possible onerousness here, it is from the possibility of an erroneous failure (or refusal) to verify the signatures (as matching/coming from the same person). It is true that application of the signature-verification requirement could result in erroneous results, in that

---

[23] The undersigned respectfully believes that the analysis in *Frederick* was somewhat truncated as to the particular way in which a signature-verification requirement burdens a would-be absentee voter and that the court there unwarrantedly let concerns about *accuracy* of the application of the requirement—a procedural due process concern, as discussed herein—drive its view about the substantive constitutionality of the criteria itself. And, of course, there conceivably could have been case-specific facts in *Frederick* that would have supported an outcome in *Frederick* that is different from the outcome the Court reaches here, though the Court expresses no opinion on that possibility.

election officials could deem signatures to fail the verification process based on an erroneous belief that the signatures being compared are not from the same person. If this happens, the Court well knows, that is not a good thing, and any affected voter would understandably be upset at his or her ballot being disregarded accordingly. But his or her complaint would not be about the substance of the absentee-voting criterion represented by the signature-verification requirement, but rather about the *accuracy* of state officials' determination of whether those criteria are satisfied in that particular voter's case. That is to say, such a complaint would sound in *procedural* due process—or, to put it more precisely, would sound in procedural due process if the right to vote were recognized as a liberty interest in that context. The question on the current, fundamental-right-to-vote claim is about the *criteria*, not the risk of the criterion being applied erroneously or an erroneous result being reached as to the applicability of the criterion. And as the Court explained above, the complained-of criteria does not burden Plaintiffs' right to vote to an extent unjustified by the State's legitimate interests; thus, Plaintiffs' fundamental-right-to-vote claim is not likely to succeed on the merits.

## IV. Irreparable injury.

As noted above, a plaintiff seeking a preliminary injunction must show irreparable injury. As Defendants correctly assert, such a plaintiff must demonstrate that irreparable harm is *likely* in the absence of the requested injunction. *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 502 (1974)). Showing merely that irreparable injury to the plaintiff(s) is within the realm of possibility is not enough. And the issue is whether *the plaintiff(s)*, and not merely *someone*, would suffer irreparable injury.

Here, the Court cannot conclude that there would be a likelihood of irreparable injury absent the Court's enjoining the signature-verification system, even if Plaintiffs claims were meritorious. As Defendants have stated, with support from sworn declarations:

> Given the presumption of signature validity, very few absentee ballots are rejected in Tennessee for signature irregularity under Tenn. Code Ann. § 2-6-204(b).26 *See* Goins Decl., at ¶ 27. For the national election in November of 2016, 73,338 absentee ballots were mailed to requesting voters, and 65,235 absentee ballots were received by county election officials statewide. *Id.* at ¶ 28. Of those absentee ballots received, only 20 were rejected for signature irregularities. *Id.* And of those 20 rejected ballots, 13 were cast under the federal Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), 52 U.S.C. § 20301, *et seq.*, which permits U.S. citizens—both military and civilian—who are living abroad to vote. *Id.*

> For the national election in November of 2018, 49,421 absentee ballots were sent to voters, and 44,392 absentee ballots were received by county election officials statewide. *See* Goins Decl., at ¶ 29. Of those absentee ballots received, only 42 were rejected for signature irregularities. *Id. See also* Warren Decl., at ¶ 7 (describing fraudulent submission of a deceased voter). Of the 42 rejected ballots, 13 were cast under UOCAVA. *See* Goins Decl., at ¶ 29. *See also* Farley Decl., at ¶ 9; Phillips Decl., at ¶ 10.

> Thus, for the 109,627 absentee ballots cast in the 2016 and 2018 national elections, only 36 absentee ballots cast pursuant to Tenn. Code Ann. § 2-6-201 (i.e., .03%) [plus 26 cast under the UOCAVA] were rejected for signature irregularities. *See* Goins Decl., at ¶ 30.

(Doc. No. 46 at 42-43). As Defendants note "Plaintiffs do not challenge the constitutionality of UOCAVA, nor do they purport to be or represent UOCAVA voters." (*Id.* at 48 n.31). This means that "for the 109,627 absentee ballots cast in the 2016 and 2018 national elections, only *thirty-six* (36) *state law* absentee ballots (*i.e.*, .03%) were rejected for signature irregularities." (*Id.* (citing Goins Decl. at ¶ 30; Farley Decl. at ¶ 9; Phillips Decl. at ¶ 10)).

With these numbers, the Court cannot conclude that any deprivation, let alone erroneous deprivation, of the individual Plaintiffs' right to vote (*i.e.*, have their vote counted) is at all likely; in fact, mathematically and based on historical information, upon which the Court justifiably may

rely, it is extremely unlikely that the individual Plaintiffs will suffer such deprivation. Organizational Plaintiffs will suffer no deprivation, of course, inasmuch as organizations cannot vote. But given that collectively they reportedly have tens of thousands of members, a large percentage of whom perhaps would vote absentee in this election, history suggests that it is possible that a handful of them may have their ballots rejected; and perhaps some of them may have their ballots rejected erroneously, though this is mere speculation. Defendants assert that "[e]ven if some of the 62 absentee ballots were rejected erroneously, '[s]uch isolated discrepancies' would not demonstrate the existence of a constitutionally infirm process." (Doc. No. 46 at 48 (citing *Lemons*, 538 F.3d at 1106)). While not needing to weigh in on that particular assertion, the Court draws a related conclusion: the possibility of such isolated instances of injury to members of a large organizational plaintiff is not sufficient to show a likelihood of irreparable injury to the Organizational Plaintiffs as required.

In their Reply, Plaintiffs argue that "a low rate of absentee ballot rejections does not indicate the absence of a risk of erroneous deprivation, as Defendants argue, especially considering the low number of absentee ballots evaluated in the first instance." (Doc. No. 54 at 20). Regarding that latter portion of that sentence, the Court fails to see any support for the notion that the low rate of absentee ballot rejections is any less indicative of a low likelihood of irreparable injury absent an injunction, merely because a "low number" of absentee ballots are evaluated in the first instance.[24] Whatever the reasons, history shows that the rate of rejection (let alone the rate of erroneous rejection) in Tennessee is exceeding low.

---

[24] In fairness to Plaintiffs, they actually raised this argument in asserting the alleged need for additional procedures and not specifically to assert "irreparable injury." But the Court feels constrained to consider the argument on the issue of irreparable injury, because the lowness of the rate of rejection is relevant also to whether Plaintiffs likely would suffer irreparable injury absent an injunction.

Indeed, in a fact that Plaintiffs seem inclined to gloss over, the historical rate is much lower than the cases Plaintiff offered to the Court as comparable. As Defendants note, over the last two elections, the rate of Tennessee is .03 percent (rounding down). If rejected UOCAVA votes are included, the rate is just about .06 percent. A rate of .03 percent is an order of magnitude lower than the rejection rate in the cases offered by Plaintiffs wherein the courts were impressed, and persuaded, by low rejection rates. One involved a rate of rejection of .35 percent, and another of .43 percent (which perhaps would be lower to an unknown extent if rejections based only on mismatched signatures were counted).

As for the third case, *Self Advocacy Solutions, N.D. v. Jaeger*, 3:20-cv-00071, 2020 WL 2951012 (D. N.D. June 3, 2020), Plaintiffs would have this Court believe that it involves a similarly low rate because in the (2018) election there at issue "more than half of North Dakota's counties did not reject a single absentee ballot." (Doc. No. 54 at 20-21). The Court cannot do so. One does not have to be a geography expert to realize that North Dakota is not densely populated and that some of its counties have a very small number of voters. Open source information suggests, in fact, that "more than half" of North Dakota's (53) counties have a population of less than 5,000, with voting populations presumably substantially lower (with the number of absentee voters presumably much lower still). So this fact cited by Plaintiffs is far less significant than it would initially appear. On the other hand, while *Self Advocacy Solutions, N.D.* does not make clear the overall rejection rate for absentee ballots in North Dakota, it makes one thing clear: in the 2018 election, just in North Dakota's two largest counties 72 absentee ballots were rejected, 2020 WL 2951012, at *10, a number than exceeds the total number rejected in Tennessee in the last two elections combined. And it is a matter of public record that the population of Tennessee is very nearly nine times larger as that of North Dakota. Thus, contrary to Plaintiffs' suggestion, the Court

has no reason to believe that the North Dakota case is even remotely comparable to the present case with respect to the rejection rate of absentee ballots.[25]

So of the three cases cited by Plaintiffs as recognizing a consequential risk of significance from even low rates of rejection, none are comparable to the present case. And even if they were comparable, Plaintiffs have not specifically asserted that they specifically show a likelihood of irreparable injury absent an injunction to the signature-verification system.

In short, rejection of absentee ballots does occur in Tennessee. And presumably, sometimes the rejection of an absentee ballot is erroneous. But the record reflects an exceedingly low risk of rejection, whether proper or erroneous. So Defendants have it right when they say that "Plaintiffs have not alleged anything close to the 'actual and imminent' injury necessary to obtain a preliminary injunction." (Doc. No. 46 at 54); *see also Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006) ("To demonstrate irreparable harm, the plaintiffs must show that [absent the requested preliminary injunction], they will suffer 'actual and imminent' harm rather than harm that is speculative or unsubstantiated."). And even if Plaintiffs had adduced evidence of irreparable injury sufficient to support a finding of irreparable injury, the Court still could (and in this case would) exercise its discretion to deny preliminary injunctive relief, given that the very most that could be said for Plaintiffs' position is that there is conflicting evidence as to whether Plaintiffs would suffer irreparable injury absent an injunction. *See id.*

Thus, Plaintiffs cannot show a likelihood of irreparable injury absent a preliminary injunction, and this alone defeats the Motion for a Preliminary Injunction with respect to the request to enjoin enforcement of the signature-verification system.

---

[25] Again, the Court is not saying that Plaintiffs said that the cases are comparable with respect to irreparable injury. But they have suggested that the cases are comparable with respect to the lowness of their rejection rate, which is a factor related to the likelihood of irreparable injury to Plaintiffs.

<u>CONCLUSION</u>

One final factor cuts in Defendants' favor. "When analyzing the balance of equities, '[the Supreme] Court has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election.'" *Kishore*, 2020 WL 4932749, *4 (quoting *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (per curiam)). The Court believes that this principle applies here, at least to the extent that we may be considered to have reached the "eve" of the November general election, because to enjoin enforcement of the signature-verification system in advance of the upcoming general election would be to alter Tennessee's rules for that election.

Primarily, however, the Court relies on the lack of likelihood of (i) success for Plaintiffs on either of their two challenges to the signature-verification system, and (ii) irreparable injury should the system not be preliminarily enjoined.

Accordingly, the Motion for a Preliminary Injunction is denied insofar as it seeks a preliminary injunction as to the signature-verification system. It remains pending, and will be decided shortly, with respect to the so-called first-time voter restriction of Tenn. Code Ann. § 2-2-115(b)(7).[26]

IT IS SO ORDERED.

*Eli Richardson*

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE

---

[26] As it has before, the Court notes that it is aware of a challenge to subject-matter jurisdiction, which it would need to resolve in Plaintiffs' favor before granting Plaintiffs preliminary injunctive relief but does not need to resolve one way or the other before denying preliminary injunctive relief as it has herein.