IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| MEMPHIS A. PHILLIP RANDOLPH INSTITUTE, et al. | ) ) ) | NO. 3:20-cv-00374 |
| Plaintiffs, | ) ) | JUDGE RICHARDSON |
| v. | ) ) | |
| TRE HARGETT, et al., | ) ) | |
| Defendants. | | |

## <u>MEMORANDUM OPINION & ORDER</u>

Pending before the Court is Plaintiffs' Motion for Preliminary Injunction (Doc. No. 40, "Motion"). Via the Motion, Plaintiffs have sought to enjoin Defendants, pending final resolution of Plaintiffs' claims (brought under 18 U.S.C. § 1983), from enforcing several provisions of Tennessee's electoral laws and procedures, namely:

(1) Tenn. Code Ann. § 2-6-202(c)(4), which provides: "A person who is not an employee of an election commission commits a Class A misdemeanor if such person gives an unsolicited request for application for absentee ballot to any person."

(2) Tenn. Code Ann. § 2-2-115(b)(7), insofar as it provides that those who registered to vote in Tennessee by mail must "appear in person to vote in the first election the person votes in after such registration becomes effective."

(3) Tenn. Code Ann. §§ 2-6-202(g) and 2-6-204, insofar as they collectively require, as Plaintiffs put it, the "reject[ion of] absentee ballots on the basis of alleged signature verification deficiencies without first providing notice and an opportunity to cure[.]" (Doc. No. 39 at 34).

According to Plaintiffs, these respective aspects of Tennessee's voting rules are unconstitutional because they violate, respectively: (1) the First Amendment right to free speech and association; (2) the First Amendment right to vote; and (3) Fourteenth Amendment procedural due process and the First Amendment right to vote.[1]

This Order is the last in a series of rulings that have been issued intermittently, as the Court has been able, so that the parties would know as soon as possible, in order to begin preparing for a likely upcoming appeal, the Court's view on particular issues likely to be the subject of appellate briefing. Herein, the Court will address Plaintiffs' request (2) above—*i.e.*, to preliminarily enjoin the enforcement of Tennessee's requirement that any person who registered to vote in Tennessee by mail—or online—[2]appear to vote in person in the first election in which the person votes after such registration becomes effective. *See* Tenn. Code Ann. § 2-2-115(b)(7). Plaintiffs have referred to this requirement for short primarily as the "First-Time Voter Restriction," (Doc. No. 43 at 24-26), and the Court will do likewise, albeit without the capitalization Plaintiffs generally employ for this term. And for a person to whom the first-time voter restriction applies, the Court will use the term "first-time, mail-registered voter," with the understanding that it applies to first-time voters who registered online as well first-time voters who registered by mail.

## PROCEDURAL HISTORY IN THIS COURT

Plaintiffs initiated this action by filing a complaint ("original complaint") on May 1, 2020. (Doc. No. 1). Defendants filed an answer (Doc. No. 38) to the original complaint on June 11, 2020,

---

[1] As Plaintiffs make clear, they are actually invoking the First Amendment as it is incorporated into the Fourteenth Amendment (and thereby applicable to state governments).

[2] Although the statute textually is applicable only to first-time voters who registered "by mail," Tenn. Code Ann. § 2-2-115(b)(7), it plainly has been construed by election officials to apply also to those who registered online. For example, the State's Absentee By-Mail Ballot Application for the November 3, 2020 Election states, "If you have never voted in this county before and you registered to vote by mail or online, then you must vote IN-PERSON the first time you vote." *COVID-19 Election Information*, Tennessee Secretary of State, https://sos.tn.gov/products/elections/absentee-voting (last accessed September 8, 2020).

and the next day, Plaintiffs filed an amended complaint (Doc. No. 39, "Amended Complaint"), as well as the Motion and a memorandum in support of the Motion (Doc. No. 43, "Plaintiffs' Brief"). In the Prayer for Relief in both the original complaint and the Amended Complaint, Plaintiffs requested preliminary (and permanent) injunctive relief virtually identical, for present purposes, to the relief they now request via the Motion. Plaintiffs did not actually move for preliminary injunctive relief, however, prior to filing the Motion on June 12, 2020.

Plaintiffs aptly described the context surrounding the Motion at the time it was filed:

On August 6, 2020, Tennessee will hold statewide primary and general elections. Three months later, on November 3, 2020, it will hold its general presidential election. Unlike any elections in modern memory, these elections will be held under the pall of an ongoing public health crisis that [had, as of the time of the filing of Plaintiffs' Brief,] already claimed the lives of over 112,000 Americans and forced immediate and dramatic changes to everyday life across the country—including in Tennessee. As a result of the pandemic, significantly more Tennesseans are expected to vote by mail this year than typically have in past elections. Most will do so for the first time.

(Plaintiffs' Brief at 4).[3]

Defendants filed a response (Doc. No. 46, "Response") in opposition to the Motion on June 26, 2020, and Plaintiffs filed a reply (Doc. No. 54, "Reply") in support of the Motion on July 7, 2020.

In their Response, Defendants asserted in pertinent part that the doctrine of laches should be applied to bar in its entirety the (preliminary) injunctive relief requested by Plaintiffs in the Motion. Agreeing in part, the Court issued an order (Doc. No. 55) denying the Motion (based on laches) to the extent that it sought a preliminary injunction prior to the August 6 primary election, but not to the extent that it seeks a preliminary injunction prior to the November 3 general election.

---

[3] Herein, cited page numbers are the numbers stamped on the applicable pages by the Clerk's Office, which may differ from the page numbers placed on the document by the author/filer of the document.

Thus, the request for preliminary injunctive relief in advance of and in connection with the general election remained pending.

On August 11, 2020, the Court issued an order (Doc. No. 66) denying the Motion with respect to request (1) above, a decision to which the Court adhered in an Order (Doc. No. 73) denying Plaintiffs' motion (Doc. No. 68) to reconsider it. On August 28, 2020, the Court issued an Order (Doc. No. 77) denying the Motion with respect to request (3) above. Request (2) heretofore has remained pending but now hereby will be granted for the reasons set forth herein.

<u>PROCEDURAL HISTORY OF RELEVANT STATE COURT LITIGATION</u>

Meanwhile, relevant state-court litigation has transpired in two particular cases ("State-Court Cases") filed in Davidson County Chancery Court. Each of the State-Court Cases challenged the state's then-current construction of the eligibility requirements for absentee voting in Tenn. Code Ann. § 2-6-201(5)(C) and (D). An understanding of these cases is necessary for a proper understanding of the precise relief being requested via this particular aspect of the Motion.

As background, Tenn. Code Ann. § 2-6-201 sets forth a list of: (a) categories of voters who are lawfully permitted to vote absentee (*i.e.*, by mail);[4] and (b) categories of situations which, if applicable to a specific voter, will enable the voter to lawfully vote absentee. *See* Tenn. Code Ann. § 2-6-201 ("A registered voter in any of the following circumstances may vote absentee by mail in the procedures outlined in this part . . . ."). Collectively, these categories, and the requirement that a person (and/or the situation applicable to the person) fit into a category in order to vote absentee, will be referred to herein as the "absentee eligibility criteria."

Two of the categories of persons authorized to vote absentee are described as follows:

(5) Persons Over 60--Persons Hospitalized, Ill or Disabled.

---

[4] A reference to voting "by mail" and a reference to voting "absentee" are generally interchangeable in the current context and for present purposes.

. . .

> (C) The person is hospitalized, ill or physically disabled, and because of such condition, the person is unable to appear at the person's polling place on election day; or

> (D) The person is a caretaker of a hospitalized, ill or disabled person.

Tenn. Code Ann. § 2-6-201(5)(C) & (D).

The first of the two State-Court Cases was filed on May 8, 2020 against state-official defendants (including Tre Hargett and Mark Goins, the lead Defendants in the instant case) by plaintiffs ("Fisher plaintiffs") other than the instant Plaintiffs. The second was filed a week later against state-official defendants (including, again, Hargett and Goins), again by plaintiffs ("Lay plaintiffs") other than the instant Plaintiffs. After the Chancery Court issued the preliminary injunction described below in favor of both groups of plaintiffs, the grant of that preliminary injunction was appealed directly to the Tennessee Supreme Court. After a consolidated oral argument, the Tennessee Supreme Court filed an opinion in both cases (styled as *Fisher v. Hargett*, -- S.W.3d --, 2020 WL 4515279 (Aug. 5, 2020)), vacating the preliminary injunction—although not before the plaintiffs had extracted a significant concession from the State.

*Fisher* set forth in some detail the history of the State-Court Cases in Chancery Court. In pertinent part, it noted that the "Fisher plaintiffs alleged that the individual plaintiffs are all registered Tennessee voters who wish to vote by mail in the August 2020 and November 2020 elections due to the COVID-19 pandemic but who do not satisfy the statutory eligibility requirements for absentee voting by mail set forth in Tennessee Code Annotated section 2-6-201." *Fisher*, 2020 WL 4515279, at *2. The Fisher plaintiffs alleged that each of the three individual plaintiffs wished to vote absentee essentially because they feared—for various reasons, including medical conditions allegedly rendering certain plaintiffs especially vulnerable to COVID-19—that

appearing in person at a polling site would increase his or her personal risk (and also perhaps the risk to society as a whole) of contracting or transmitting COVID-19. *Id.* With respect to the Memphis-based organizational plaintiff, #UpTheVote901, a volunteer organization devoted to educating voters and increasing voter registration and turnout, the Fisher plaintiffs "alleged that the current statutory eligibility requirements for absentee voting by mail will unduly burden the right to vote of certain of #UpTheVote901's members and have a chilling effect on voter turnout."

*Id.* As further explained by the Tennessee Supreme Court:

> The Fisher plaintiffs sought declaratory and injunctive relief to expand access to vote-by-mail procedures to all registered Tennessee voters who wish to vote absentee during the COVID-19 pandemic. They contended that, in the midst of the COVID-19 pandemic, restricting Tennesseans' vote-by-mail access to voters over sixty years of age, or who otherwise meet one of the other absentee ballot eligibility criteria in Tennessee Code Annotated section 2-6-201, would impose impermissibly burdensome conditions on the right to vote under article I, section 5 of the Tennessee Constitution.

*Id.* at * 3.

The Fisher plaintiffs requested, among other things, preliminary and permanent injunctive relief prohibiting election administrators throughout the State from:

(a) [d]enying any written or in-person absentee ballot request for the August 2020 or November 2020 election on the basis of the applicant's not meeting one or more of the conditions enumerated in Tenn[essee] Code Ann[otated section] 2-6-201;

(b) [u]nduly delaying the review, processing, or both of any absentee-ballot request made or purporting to be made by, or lawfully on behalf of, a registered Tennessee voter;

(c) [r]ejecting any absentee ballot cast in the August 2020 or November 2020 election cycles on the basis of the voter's not meeting one or more of the conditions enumerated under Tenn[essee] Code Ann[otated section] 2-6-201; [and]

(d) [f]ailing to timely process any absentee ballot timely received by the deadlines provided under Tennessee Law.

*Fisher*, 2020 WL 4515279, at *3–4.

As for the Lay plaintiffs, who were three individuals alleging a desire and need to vote absentee similar to that alleged by the individual Fisher plaintiffs, they:

> alleged that the State had construed the statutory eligibility requirements for absentee voting by mail to mean that fear of contracting the coronavirus does not constitute illness and, therefore, does not meet the criteria to vote absentee ballot by mail in Tennessee. Instead, the Lay plaintiffs alleged that the State had construed the statute to mean that only individuals who have quarantined because of a potential exposure to COVID-19 or who have tested positive for COVID-19 are permitted to vote absentee by mail as a person who is ill. The Lay plaintiffs alleged that this construction is "plainly unreasonable." The Lay plaintiffs further alleged that the State's construction and enforcement of the statutory eligibility requirements for absentee voting by mail "severely burdens the fundamental right to vote of all eligible voters who are practicing [s]ocial [d]istancing [m]easures and/or are self-quarantining to prevent exposure to COVID-19," that this construction "will likely disenfranchise tens of thousands of Tennesseans," and that this construction will "deny the fundamental right to vote guaranteed by the Tennessee Constitution." The Lay plaintiffs asserted violations of the fundamental right to vote under article IV, section 1 and article I, section 5 of the Tennessee Constitution.

*Id.* at *4. As the Tennessee Supreme Court further explained the underlying proceedings:

> The Lay plaintiffs further asked the court to issue preliminary and permanent injunctions prohibiting the State from enforcing statutory eligibility requirements for absentee voting by mail as stated in Tennessee Code Annotated section 2-6-201:
>
> to prevent:
>
> • any eligible voter, regardless of age and physical condition;
>
> • any eligible voter who lives with an individual who is at a higher risk of complications should they contract COVID-19; and/or
>
> • any eligible voter who is at a higher risk of complications should they contract COVID-19
>
> [from] request[ing], receiv[ing], and hav[ing] counted an absentee ballot by mail at least for the 2020 election calendar and until the State's ongoing "state of emergency" is lifted and the CDC no longer advises individuals to engage in any of its recommended [s]ocial [d]istancing [m]easures . . .

*Id.* at *5. On June 4, 2020, after a hearing evidently held jointly in both of the State-Court Cases, the Chancery Court granted what it called a "Temporary Injunction to Allow Any Tennessee Registered Voter to Apply for a Ballot to Vote by Mail Due to COVID-19" ("State-Court Temporary Injunction"). *See id.* In pertinent part, the State-Court Temporary Injunction: (i) enjoined Defendants from "enforcing their [then-]current construction of the 'excuse requirement' for absentee voting stated in Tennessee Code Annotated section 2-6-201(5)(C) and (D)"; and (ii) affirmatively mandated Defendants to (a) "provide any eligible Tennessee voter, who applies to vote by mail in order to avoid transmission or contraction of COVID-19, an absentee ballot in upcoming elections during the pendency of pandemic circumstances," and (b)

> implement the construction and application of Tennessee Code Annotated section 2-6-201(5)(C) and (D) that any qualified voter who determines it is impossible or unreasonable to vote in-person at a polling place due to the COVID-19 situation shall be eligible to check the box on the absentee ballot application that, 'the person is hospitalized, ill or physically disabled and because of such condition, the person is unable to appear at the person's polling place on election day; or the person is a caretaker of a hospitalized, ill or physically disabled person,' and have that absentee voting request duly processed by the State in accordance with Tennessee law.

*Id.* at *6 (block-quoting the State-Court Temporary Injunction).

Regarding the rationale for the issuance of the State-Court Temporary Injunction, the Chancery Court summarized it as follows:

> After studying the evidence and the law, and considering argument of [c]ounsel, the [c]ourt finds that the evidence does not support the State's claims that it is impossible for it to provide expanded access to voting by mail. Respectfully, the evidence is that the assumptions the State has employed in its fiscal and resource calculations are oddly skewed and not in accordance with the methodology of its own expert and industry standards. When, however, normal industry-recognized assumptions are used, the evidence establishes that the resources are there to provide temporary expanded access to voting by mail in Tennessee during the pandemic if the State provides the leadership and motivation as other states have done. As to voter fraud, the State's own expert debunks and rejects that as a reason for not expanding access to voting by mail.

From this evidence and upon using the legal standard of *Anderson-Burdick*, the Court concludes that the State's restrictive interpretation and application of Tennessee's voting by mail law (Tennessee Code Annotated section 2-6-201), during the unique circumstances of the pandemic, constitutes an unreasonable burden on the fundamental right to vote guaranteed by the Tennessee Constitution. Accordingly[,] the Plaintiffs are entitled to issuance of a temporary injunction.

*See id.* at 5-6 (quoting from the Chancery Court's "Memorandum Order and Opinion Granting Temporary Injunction to Allow Any Tennessee Registered Voter to Apply for a Ballot to Vote by Mail Due to COVID-19").

In its Order (Doc. No. 55) denying preliminary injunctive relief in advance of the August 6 primary election, based on laches, the Court commented on the juxtaposition of this case with the State-Court Cases at that time, in light of the issuance of the State-Court Temporary Injunction:

[I]n a case filed by different plaintiffs, Davidson County Chancery Court granted a temporary injunction essentially preventing the State from enforcing (in the present COVID-19 environment) its general rule requiring in-person voting, *i.e.*, allowing absentee voting only for persons who fall into a statutorily recognized exception to that general rule. The Court's, and apparently Plaintiffs' and Defendants', understanding is that despite the broad wording of the Chancery Court's injunction, the Chancery Court does not (yet) consider the injunction to enjoin the ban on absentee voting *for first-time voters* in particular set forth in Tenn. Code Ann. § 2-2-115(b)(7). Thus, in both the Amended Complaint and the Motion, Plaintiffs focus attention on combatting the prohibition on absentee voting by first-time voters specifically. Indeed, in the Motion, Plaintiffs (prudently and helpfully) do not seek injunctive relief as to the more general prohibition (prescribed by Tenn. Code Ann. §2-6-201) on absentee voting, as that has already been enjoined (by the Chancery Court).

(Doc. No. 55 at 2 n.2).[5]

---

[5] Although the Court did not spell it out at the time, what made Plaintiffs' decision not to seek a preliminary injunction from this Court so laudably prudent was the fact that at that time they could not possibly show irreparable injury as required for the issuance of a preliminary injunction. That is because the existence of the State-Court Temporary Injunction at that time eliminated any possibility, as of that time, that Plaintiffs could possibly suffer irreparable injury from not receiving a (redundant) preliminary injunction from this Court. Alternatively, Plaintiffs could have raised and briefed in this Court a request to preliminarily enjoin enforcement of the absentee eligibility criteria, with the observation that such request could be deferred unless and until the State-Court Temporary Injunction was vacated in whole or in part; this would have enabled the Court to act promptly, based on already completed briefing, in the event the State-Court Temporary Injunction was vacated to an extent Plaintiffs found intolerable. But Plaintiffs did not do so.

Upon Defendants' appeal of the grant of the State-Court Temporary Injunction, as noted above, the Tennessee Supreme Court vacated the Chancery Court's Judgment granting the Fisher plaintiffs and Lay plaintiffs the injunction. *Fisher*, 2020 WL 4515279, at *18.

But even prior to the Tennessee Supreme Court doing so (on August 5, 2020, when it issued its opinion in *Fisher*), a significant development had occurred in those proceedings:

> At oral argument before this Court, the State conceded that, under its interpretation of Tennessee Code Annotated section 2-6-201(5)(C) and (D), persons who have underlying medical or health conditions which render them more susceptible to contracting COVID-19 or at greater risk should they contract it ("persons with special vulnerability to COVID-19"), as well as those who are caretakers for persons with special vulnerability to COVID-19, already are eligible to vote absentee by mail. We hold that injunctive relief is not necessary with respect to such plaintiffs and persons. We instruct the State to ensure that appropriate guidance, consistent with the State's acknowledged interpretation, is provided to Tennessee registered voters with respect to the eligibility of such persons to vote absentee by mail in advance of the November 2020 election.

*Id.* at *1.[6] The court further noted:

> As noted, the State has agreed that those plaintiffs and persons with special vulnerability to COVID-19 or who are caretakers of persons with special vulnerability to COVID-19 are eligible to vote absentee by mail pursuant to the statutory eligibility requirements for absentee voting by mail set forth in Tennessee Code Annotated section 2-6-201(5)(C) and (D). The State also has agreed that it has a responsibility to provide instructions to local election officials and to voters that are consistent with its expressed interpretation of Section 2-6-201(5)(C) and (D). We accept the State's concessions. *State v. Franklin*, 308 S.W.3d 799, 811 (Tenn. 2010) (citing *Barron v. Tenn. Dep't of Human Serv.*, 184 S.W.3d 219, 223 (Tenn. 2006)). We have no reason to doubt that the State will faithfully discharge its duty to implement the absentee voting statutes and will permit such persons to vote absentee by mail pursuant to the requirements, processes, and procedures set forth in those statutes. *West v. Schofield*, 460 S.W.3d 113, 131 (Tenn. 2015) (stating that public officials are "presumed to discharge their duties in good faith and in accordance with the law" (citations omitted)). We instruct the State to ensure that appropriate guidance is provided to Tennessee registered voters with respect to the eligibility requirements of such persons to vote absentee by mail in advance of the November 2020 election.[10] Accordingly, we hold that as to plaintiffs and persons with special vulnerability to COVID-19 or who are caretakers of persons with special vulnerability to COVID-19, injunctive relief is not necessary.

---

[6] The Court hereinafter will refer to such persons for short as persons "especially vulnerable" to COVID-19.

*Id.* at *7.

To the extent that the Court finds that the *rationale for* the decision in *Fisher* helpful or otherwise relevant in any way, it will so indicate below. But for now, the Court will make two points about the *scope of* the decision in *Fisher,* to help clarify the current scope of Plaintiffs' request for preliminary injunctive relief, *i.e.*, to note that the scope of the request has not changed from what it was prior to the issuance of *Fisher.*

First, just as the Chancery Court did not purport to enjoin (or otherwise address) the first-time voter restriction in issuing the State-Court Temporary Injunction, the Tennessee Supreme Court did not address the first-time voter restriction in vacating that injunction. From this, the Court gathered that it cannot safely say that the first-time voter restriction will not be applied to *all* first-time, mail-registered voters; in other words, the Court gathered that neither the State nor the Tennessee Supreme Court, in acknowledging an expansion of the absentee eligibility criteria for voters *generally*, indicated any change in the State's position that it would apply the first-time voter restriction to *all* first-time, mail-registered voters, regardless of whether they met the absentee eligibility criteria generally (as expanded based on the State's concession).

Second, the upshot of *Fisher* was that Plaintiffs effectively lost the maximal relief they had sought in their Amended Complaint and had thereafter effectively gained via the State-Court Temporary Injunction, namely the expansion of the absentee eligibility criteria to cover *all* Tennessee voters. Plaintiffs understandably did not pursue such maximal relief via the Motion after the State-Court Temporary Injunction had been issued—in between Plaintiffs' filing of the original complaint and Plaintiffs' filing of the Motion—granting just such relief in the other plaintiffs' litigation. The Court gathered that Plaintiffs, given the approach of the general election and the substantial passage of time since the filing of the Motion, likely would not seek to

effectively amend the Motion to request such maximal relief (under federal constitutional law), even after it had been denied by the Tennessee Supreme Court in *Fisher* as a matter of state constitutional law.

But to confirm its own understanding on these two points, and to otherwise ascertain the parties' views as to the effect or relevance of *Fisher* upon the instant Motion, the Court asked Plaintiffs to advise it regarding three topics, *i.e.*: (a) of any changes to the scope of the relief they are requesting via the Motion; (b) of any changes to their asserted rationale for the granting of the relief requested in the Motion; and (c) whether they requested more time to advise the Court in more detail on such matters. (Doc. No. 60). Plaintiffs advised the Court on these matters with a timely filing. Therein, Plaintiffs noted, as to topic (c), that additional time was not required. As to topic (b), Plaintiffs asserted that *Fisher* merely confirms that for voters subject to the first-time voter restriction but otherwise meeting the absentee eligibility criteria, the burden imposed on their right to vote by having to vote in person is extremely heavy. (Doc. No. 65 at 4).

As to topic (a), Plaintiffs effectively confirmed for the Court the accuracy of its understanding regarding the first of the two points mentioned above. That is, Plaintiffs confirmed their belief that the State still intended to apply the first-time voter restriction to *all* first-time, mail-registered voters, regardless of whether they met the (now-expanded) absentee eligibility criteria. (*Id*.). Defendants, for their part, said nothing to disabuse the Court of any such notion. Thus, the Court proceeds herein under the assumption that this is exactly what the State intends, meaning that the State still must justify the first-time voter restriction as it is imposed on *all* first-time, mail-registered voters with no exceptions for anyone, including persons newly deemed to meet the (expanded) absentee eligibility criteria acknowledged by the State in *Fisher.*

And Defendants, in their responsive filing on these three topics, effectively confirmed for the Court the accuracy of its understanding regarding the second of the two points mentioned above. That is, Defendants confirmed their belief that Plaintiffs still are not seeking preliminary injunctive relief with respect to the absentee eligibility criteria generally. (Doc. No. 67 at 2). Plaintiffs certainly have not said anything to indicate otherwise, and this seems prudent to the Court—given, again, the march of time towards the general election that has occurred since the filing of the Motion, not to mention the substantial and meaningful expansion of the absentee eligibility criteria that already has occurred via the State-Court Cases.

In summary, the Court has examined *Fisher* not only for its persuasive value on the substantive issues, but also for its possible effects on the scope of relief requested by Plaintiffs. And as the Court suspected, the scope has not changed. Plaintiffs—understanding that the first-time voter restriction will be enforced against all first-time, mail-registered voters regardless of whether they otherwise meet the (expanded) absentee eligibility criteria—continue to seek to preliminarily enjoin the first-time voter restrictions in their entirety and as to all first-time, mail-registered voters. Whether Plaintiffs should succeed in that venture is the precise, final question before the Court on the Motion.

<u>PRELIMINARY INJUNCTION STANDARD</u>

Preliminary injunctions are considered preventive, prohibitory, or protective measures taken pending resolution on the merits, *see Clemons v. Board of Educ. of Hillsboro, Ohio*, 228 F.2d 853, 856 (6th Cir. 1956), *cited in Lemay v. Correct Care,* No. 3:19-cv-00683, 2020 WL 4475425, at *2 (M.D. Tenn. Aug. 4, 2020), and are considered extraordinary relief. *See Detroit Newspaper Publishers Ass'n v. Detroit Typographical Union No. 18, Int'l Typographical Union*, 471 F.2d 872, 876 (6th Cir. 1972), *cited in Gentry v. Tenn. Bd. of Judicial Conduct,* No. 3:17-

0020, 2017 WL 4070590, at *3 (M.D. Tenn. Sept. 6, 2017). A preliminary injunction should be granted only if the movant carries its burden of proving that the circumstances clearly demand it. *Overstreet v. Lexington–Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002). In determining whether to afford such relief, the court must consider and balance four factors: (1) the likelihood of the plaintiff's success on the merits; (2) whether the plaintiff will suffer irreparable injury without the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the injunction's impact on the public interest. *Nat'l Viatical, Inc. v. Universal Settlements, Int'l, Inc.*, 716 F.3d 952, 956 (6th Cir. 2013).

Although these four factors are "factors to be balanced, not prerequisites that must be met," *Michael v. Futhey*, No. 08-3922, 2009 WL 4981688, at *17 (6th Cir. Dec. 22, 2009) (quoting *Six Clinic Holding Corp., II v. Cafcomp Sys.*, 119 F.3d 393, 400 (6th Cir. 1997)), they do not carry equal weight. Regarding the second factor, irreparable harm, "even the strongest showing on the other three factors cannot eliminate the irreparable harm requirement. That factor is indispensable: If the plaintiff isn't facing imminent and irreparable injury, there's no need to grant relief *now* as opposed to at the end of the lawsuit." *D.T. v. Sumner Cty. Sch.*, 942 F.3d 324, 326-27 (6th Cir. 2019) (citation and internal quotation marks omitted); *see also Patio Enclosures, Inc. v. Herbst*, 39 F. App'x 964, 967 (6th Cir. 2002) ("The demonstration of some irreparable injury is a sine qua non for issuance of an injunction."). In other words, "although the *extent* of an injury may be balanced against other factors, the *existence* of an irreparable injury is mandatory." *Sumner Cty. Sch.*, 942 F.3d at 327. Thus, a district court abuses its discretion if it grants a preliminary injunction without making specific findings of irreparable injury. *Id.* And to merit a preliminary injunction, an injury must be both certain and immediate, not speculative or theoretical. *Id.*

<u>DISCUSSION</u>

In Count V, Plaintiffs challenge Tennessee's first-time voter restriction on the basis that it (allegedly) violates the (fundamental) right to vote encompassed within the First Amendment. (Doc. No. 39 at 33). Plaintiffs' Brief presses this challenge, again asserting that the first-time voter restriction violates the First Amendment in particular. (Doc. No. 43 at 24-25). As this Court previously has explained, sometimes a challenge brought under the rubric of a specific right enumerated in the Bill of Rights, such as the First Amendment, closely resembles a challenge brought under the rubric of substantive due process. (Doc. No. 77 at 22-24). But in any event, the challenge here is based upon the First Amendment right to vote.

I.     **<u>Standing.</u>**

The Court begins by doing something it has not done, or needed to do, thus far in this case. To date, as the Court has explained, it has declined to address standing because it essentially does not need to do so unless, and until such time as, it grants substantive relief or rules on the merits (as opposed to ruling on the *likely* merits, which is what a court does when ruling on a motion for preliminary injunction). Here, however, in light of its resolution of the instant aspect of the Motion, the Court must address standing. As set forth below, the Court concludes that at least one plaintiff has standing to challenge the first-time voter restriction, and so the Court may proceed to grant (as it finds appropriate) relief on this aspect of the Motion.

Federal courts are courts of limited jurisdiction. *Doe v. Byrd*, No. 1:18-cv-00084, 2020 WL 1285428 at *3 (M.D. Tenn. Mar. 18, 2020) ("*Byrd*"). Article III of the Constitution limits the judicial power of the United States to resolution of "cases" and "controversies," and Article III standing enforces the Constitution's case-or-controversy requirement. *Nemes v. Bensinger,* No. 3:20-CV-407-CRS, 2020 WL 3402345, at *7 (W.D. Ky. June 18, 2020) (citing *Hein v. Freedom*

*From Religion Found., Inc.,* 551 U.S. 587, 597-98 (2007)).[7] In essence, the standing doctrine prompts courts to inquire whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf. *Id.* (citing *McKay v. Federspiel,* 823 F.3d 862, 866-67 (6th Cir. 2016)). Because standing is an essential component of federal subject-matter jurisdiction, the lack of standing can be raised at any time by a party or by the court. *Miller v. Hughes*, --- F. Supp. 3d ---, 2020 WL 4187911, at *4 (W.D. Tex. 2020).

Thus, standing is a threshold issue in every federal case. *Ficarelli v. Champion Petfoods USA, Inc.*, No. 3:18-cv-00361, 2018 WL 6832075, at *4 (M.D. Tenn. Dec. 28, 2018). The party invoking the court's jurisdiction bears the burden of establishing the elements of standing. *Nelson v. Warner*, No. 3:19-0898, 2020 WL 4004224, at *2 (S.D.W. Va. July 15, 2020); *PHI Air Medical, LLC v. Tenn. Dep't of Labor and Workforce Dev.,* No. 3:18-cv-0347, 2018 WL 6727111, at *3 (M.D. Tenn. Dec. 21, 2018).

Each element of standing must be supported in the same way as any other matter on which the plaintiff bears the burden of proof; *i.e.*, with the manner and degree of evidence required at the applicable stage of the litigation. *See Fair Elections Ohio v. Husted,* 770 F.3d 456, 459 (6th Cir. 2014); *Jacobson v. Florida Sec'y of State,* 957 F.3d 1193, 1201 (11th Cir. 2020) ("Because the elements of standing are not mere pleading requirements, but rather an indispensable part of the plaintiff's case, each element must be supported with the manner and degree of evidence required at the successive stages of the litigation"). Where a case is at the pleading stage, the plaintiff must

---

[7] As a result, federal courts may exercise their power only for "the determination of real, earnest, and vital controversy between individuals." *Trichell v. Midland Credit Mgmt., Inc.,* Nos. 18-14144 and 19-10120, 2020 WL 3634917, at *2 (11th Cir. July 6, 2020) (quoting *Chicago & Grand Trunk Ry. Co. v. Wellman,* 143 U.S. 339, 345 (1892)). No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies. *Id.*

clearly allege facts demonstrating each element of standing. *See Ficarelli*, 2018 WL 6832075, at

*4;[8] *Déjà Vu of Nashville, Inc. v. Metro. Gov't of Nashville,* 360 F. Supp. 3d 714, 724 (M.D. Tenn.

2019). Here, the case is still at the pleading stage but also, more relevantly here, the preliminary

injection stage.[9]

      "For a legal dispute to qualify as a genuine case or controversy, at least one plaintiff must

have standing to sue." *Nelson*, 2020 WL 4004224, at *2 (citing *Dep't of Commerce v. New York,*

139 S. Ct. 2551, 2565 (2019)); *People First of Alabama v. Merrill*, --- F. Supp. 3d ---, 2020 WL

3207824, at *6 (N.D. Ala. June 15, 2020) (explaining that if there is one plaintiff who has

demonstrated standing to assert the implicated rights as his own, the court need not consider

whether the other individual and corporate plaintiffs have standing to maintain the suit). When one

party has standing to bring a claim, the identical claims brought by other parties to the same lawsuit

are justiciable. *See Northeast Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 623 (6th Cir.

2016).

      To satisfy Article III's standing requirements, a plaintiff must show: (1) he or she has

suffered an "injury-in-fact" that is (a) concrete and particularized and (b) actual or imminent, not

conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the

defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed

---

[8] On the other hand, in response to a motion for summary judgment, a plaintiff can no longer rest on mere allegations but rather must set forth, by affidavit or other evidence, "specific facts" that the plaintiff believes should be taken as true (or at least capable of being accepted as true by the factfinder at trial) for purposes of summary judgment. *See Nelson*, 2020 WL 4004224, at *2.

[9] In deciding a motion for preliminary injunction, a court may consider the entire record, including affidavits and other hearsay evidence. *Sterling v. Deutsche Bank Nat'l Tr. Co.,* 368 F. Supp. 3d 723, 725 (S.D. N.Y. 2019); *J.S.R. by & through J.S.G. v. Sessions*, 330 F. Supp. 3d 731, 738 (D. Conn. 2018). In conducting the preliminary injunction analysis, the Court is not limited to the four corners of the complaint but rather may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is appropriate given the character and objectives of the injunctive proceeding. *Express Franchise Servs., L.P. v. Impact Outsourcing Sols., Inc.*, 244 F. Supp. 3d 1368, 1379 (N.D. Ga. 2017); *Action NC v. Strach*, 216 F. Supp. 3d 597, 629 (M.D.N.C. 2016) (explaining that district courts may look to, and indeed in appropriate circumstances rely on, hearsay or other inadmissible evidence when deciding whether a preliminary injunction is warranted).

by a favorable decision. *Byrd,* 2020 WL 1285428, at *2. The Supreme Court has emphasized that the requirement that an injury-in-fact be "concrete and particularized" encompasses two distinct requirements. *Ficarelli*, 2018 WL 6832075, at * 4 (citing *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016)). For an injury to be "particularized," it must affect the plaintiff in a personal and individual way. *Id*. To be "concrete," an injury must be *de facto;* that is, it must actually exist. *Id*. "Unless an alleged injury satisfies both requirements, it cannot give rise to standing under Article III." *Id*.

Plaintiffs seeking injunctive or declaratory relief face a higher burden; they must show actual or present harm or a significant possibility of future harm. *See Shelby Cty. Advocates for Valid Elections v. Hargett*, No. 2:18-cv-02706-TLP-dkv, 2019 WL 4394754, at *5 (W.D. Tenn. Sept. 13, 2019). When a party seeks prospective relief to prevent future injuries, they must prove that their threatened injuries are "certainly impending." *Jacobson*, 957 F.3d at 1201. An allegation of future injury may suffice if the threatened injury is certainly impending or there is a substantial risk that the harm will occur. *Nelson*, 2020 WL 4004224, at *2. Consistent with these principles, the Supreme Court has held that a plaintiff's standing to seek injunctive or declaratory relief depends on the likelihood of future harm. *Bennett v. Metro. Gov't of Nashville and Davidson Cty.,* 383 F. Supp. 3d 790, 809 (M.D. Tenn. 2019) (citing *City of Los Angeles v. Lyons,* 461 U.S. 95, 101 (1983)).

An organization may assert standing "on its own behalf, on behalf of its members or both." *Capital Area Immigrants' Rights Coalition v. Trump,* --- F. Supp. 3d ---, 2020 WL 3542481, at *6 (D.D.C. June 30, 2020) ("*Capital Area*") (quoting *Equal Rights Ctr. v. Post Props., Inc.,* 633 F. 3d 1136, 1138 (D.C. Cir. 2011)). Thus, an organization can assert standing in one or both of two ways: (1) on its own behalf because it has suffered a palpable injury as a result of the defendants'

actions ("organizational standing"); and (2) as a representative of its members who would have standing to sue individually ("associational standing"). *Shelby Cty. Advocates for Valid Elections,* 2019 WL 4394754, at *5. The Court herein focuses on associational standing.

To establish associational standing (to bring suit on behalf of its members), an association must demonstrate that: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Daunt v. Benson,* 956 F.3d 396, 417 (6th Cir. 2020); *Greater Birmingham Ministries v. Sec'y of State for Alabama,* No. 18-10151, 2020 WL 4185801, at *10 (11th Cir. July 21, 2020); *Ohio Valley Envtl. Coal. v. Bluestone Coal Corp.,* No. CV 1:19-00576, 2020 WL 4284804, at *4 (S.D.W. Va. July 27, 2020).

To show that at least one of its members would otherwise have standing to sue, an organizational plaintiff must show (1) that one of its members has an injury that is concrete and particularized and actual or imminent; (2) that the injury is fairly traceable to the challenged action of the Defendants; and (3) a likelihood that the injury will be redressed by a favorable decision. *Byrd*, 2020 WL 1285428, at *5.

Here, the Court concludes that at least one member[10] of one of the Organizational Plaintiffs, Corey Sweet, has standing to challenge the first-time voter restriction. It does so based on a Declaration of Sweet twice filed by Plaintiffs (Doc. Nos. 54-4 and 78-8). Sweet's Declaration was

---

[10] The Court is constrained to note that Plaintiffs' evidentiary showing that Sweet is a "member" of the NAACP is far from strong. Sweet avers only that he occasionally attends NAACP events, not that he is a member of NAACP. However, Defendants have not (in connection with their motion to dismiss, Doc. No. 61, filed after Sweet's Declaration was first filed) contested that he is a member. Also, Plaintiffs have expressly asserted in their briefing that Sweet is a member (Doc. No. 78 at 10 & n.12), and also more specifically that his Declaration "explain[s]" that he is a member, (*id.* at 15-16), and the Court accepts that representation. However, Plaintiffs would be well advised to draft declarations more explicit about such things, *and they should advise the Court immediately if, contrary to the Court's current understanding, Sweet is not actually a member of NAACP.*

first filed after Defendants filed their response, but Defendants have since had a motive and an opportunity to challenge Sweet's Declaration in connection with their motion to dismiss (Doc. No. 61), which is based in part on Plaintiffs' alleged lack of standing. Yet Defendants have not contradicted or impeached his Declaration in any way. For this reason, and because no factual averments in his Declaration are inherently non-credible, the Court credits the averments in Sweet's Declaration, which are summarized in substance and pertinent part in the following paragraph.

Sweet occasionally attends events of one of the Organizational Plaintiffs, the Tennessee Conference of the NAACP ("NAACP"). He registered to vote, online on Shelby County Election Commission website,[11] in late spring and, therefore, this election will be his first time to vote. He does not want to vote in person for fear of exposing himself and/or his family to COVID-19.[12] If he has to return to college (at Xavier University in Louisiana) in person, rather than taking his classes remotely from Shelby County, he cannot afford to come home to Shelby County just to vote.

The Court concludes that Sweet has sufficiently established that the first-time voter restriction is applicable to him, and thus would prevent him from voting absentee, and that he otherwise has standing to challenge the first-time voter restriction. To begin with, in general, a

---

[11] Sweet avers that this webpage informs him that first-time voters who "voted" online and have not yet voted in Shelby County must vote in person (Doc. No. 54-4 at 3). It seems clear that Sweet actually meant "registered," not "voted." The Court has checked the website, and consistent with what Sweet reported, it says, "if you registered to vote by mail or on the on-line system and you have not voted in Shelby County before, you must vote in person." *Voting Absentee*, Shelby County Election Commission, https://www.shelbyvote.com/voting-absentee (last accessed September 8, 2020). This is further confirmation of the accuracy of the Court's observation that election officials in Tennessee treat the first-time voter restriction as applicable to registrations accomplished online as well as registrations accomplished by mail.

[12] Sweet's Declaration was first submitted in advance of, and with an eye towards, the August 6 primary, and not the November 3 election. Nevertheless, the Court has no hesitation as construing it as applicable to the November 3 general election now that the August primary has passed.

voter always has standing to challenge a statute that places a requirement on the exercise of his right to vote. *See People First of Alabama*, 2020 WL 3207824, at *6.

As for the specific requirements discussed above, Plaintiffs argue (albeit not directly in connection with the Motion but rather in response to Defendants' motion to dismiss) that a requirement to vote in person during a pandemic causes an injury; they also imply that the State and the Tennessee Supreme Court have both effectively acknowledged as much. (Doc. No. 78 at 14). As discussed herein, the State agreed before the Tennessee Supreme Court that persons especially vulnerable to COVID-19, and caretakers of persons especially vulnerability to COVID-19, are eligible to vote absentee by mail. *See Fisher*, 2020 WL 4515279, at *7. But first-time, mail-registered voters—even those especially vulnerable to COVID-19 (or caretakers of such persons)—must choose between voting in person or not exercising their right to vote at all. The Court concludes that, whatever the justification for putting Sweet to this choice (something the Court discusses in detail below), by putting him to this choice the first-time voter restriction imparts upon Sweet a concrete, particularized, and imminent injury.

As for the second element of standing for Sweet, Sweet's alleged injury is directly connected to the State's enforcement of the first-time voter restriction under the circumstances presented here, so it is "fairly traceable" to the challenged action.[13] Arguing otherwise, Defendants rely only on the assertion that "[n]one of the Organizational Plaintiffs have specifically alleged the identity of a member of their organization that has or will be harmed by" the first-time voter restriction as is, according to Defendants, required for associational standing. (Doc. No. 46 at 17).

---

[13] The requirement that an injury be "fairly traceable" to a defendant's conduct does not mean that the plaintiffs must prove to an absolute certainty that the defendant's actions caused or are likely to cause the injury; rather, the plaintiffs need only show that there is a substantial likelihood that the defendant's conduct caused (or will cause) the plaintiffs' harm. *NC RSOL v. Boone,* 402 F. Supp. 3d 240, 250 (M.D.N.C. 2019); *New York v. Scalia,* --- F. Supp. 3d ---, 2020 WL 2857207, at *8 (S.D.N.Y. 2020) (noting that the "fairly traceable" standard is lower than that of proximate cause); *Isabel v. Reagan*, 394 F. Supp. 3d 966, 973 (D. Ariz. 2019) (same).

This assertion was fair enough when made, but as noted above, Plaintiffs have since identified Sweet as a specific member of Plaintiff NAACP who has been allegedly injured by the first-time voter restriction.

With regard to the third element of standing for Sweet, if the Court preliminarily enjoins enforcement of the first-time voter restriction, the injury to Sweet will be redressed, as he will be allowed to vote absentee rather than face the choice of exposing himself to COVID-19 via in-person voting or not voting at all. Thus, Plaintiffs have shown that Sweet would otherwise have standing to sue in his own right.

Next, Plaintiffs must show that the interests they seek to protect by challenging the first-time voter restriction are germane to the purpose of the Organizational Plaintiff of which Sweet is a member, *i.e.*, the NAACP. *Daunt*, 956 F.3d at 417. The Tennessee NAACP President has stated that voter engagement is, and has been since its founding, a key aspect of the organization's work. (Doc. No. 40-5 at ¶ 17). She described how the NAACP places a special emphasis on voter registration events, get-out-the-vote activities, giving rides to the polls, poll monitoring, and voter protections. (*Id.*). Protecting the rights of first-time, mail-registered voters to vote in the upcoming election appears germane to the NAACP's purpose. (*See also* Doc. No. 78-6 (explaining additional ways the NAACP operations/activities are affected by enforcement of the first-time voter restriction)).

Finally, Plaintiffs must show that nothing requires the participation of the individual members in this lawsuit. *Daunt*, 956 F.3d at 417. Because Plaintiffs seek only declaratory and injunctive relief, the individual members of the NAACP (including Sweet) are not required to participate herein.

For all of these reasons, Plaintiffs have shown that the NAACP has associational standing by virtue of the standing of its member, Mr. Sweet. To be clear, Plaintiffs have made the bare minimum showing of standing. But they have made that.

## II.   **Likelihood of success on the merits.**

With respect to the first factor of the preliminary injunction analysis, the question is whether Plaintiffs are likely to succeed on their argument that the first-time voter restriction imposes an unconstitutional burden on their First Amendment right to vote.

A. *Applicable legal framework for substantive challenge*

As Plaintiffs correctly note, their challenge to the first-time voter restriction is governed by the so-called *Anderson-Burdick* framework. (Doc. No. 43 at 39);[14]  *see Obama for Am. v. Husted*, 697 F.3d 423, 430 (6th Cir. 2012) (noting that the *Anderson-Burdick* framework applies to challenges to voting restrictions whether brought under the First Amendment or the Equal Protection Clause).

The Sixth Circuit recently described this framework and its applicability to the instant kind of constitutional challenge:[15]

> "Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; 'as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.'" *Burdick v. Takushi*, 504 U.S. 428, 433, 112 S. Ct. 2059, 119 L.Ed.2d 245 (1992) (quoting *Storer v. Brown*, 415 U.S. 724, 730, 94 S. Ct. 1274, 39 L.Ed.2d 714 (1974)). But this regulatory power is accompanied by significant risk, as laws that structure elections "inevitably affect[ ]—at least to some degree—the individual's right to vote and his right to associate with others for political ends."

---

[14] Regrettably, Defendants did not even undertake to identify for the Court the appropriate framework or standard for resolving this challenge. Instead, as discussed below, Defendants skipped this fundamental topic, and the equally fundamental step of conducting the analysis under the appropriate standard, and unwisely placed all of their eggs in the "Congress said to do it" basket, as discussed below.

[15] These standards are broadly applicable to challenges to election laws, and they would have been applicable had Plaintiffs chosen to allege a violation of substantive due process rather than a violation of the First Amendment right to vote.

*Anderson v. Celebrezze*, 460 U.S. 780, 788, 103 S. Ct. 1564, 75 L.Ed.2d 547 (1983). To determine whether a state election law unduly burdens these crucial constitutional rights, we:

> must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'

*Burdick*, 504 U.S. at 434, 112 S. Ct. 2059 (quoting *Anderson*, 460 U.S. at 789, 103 S. Ct. 1564). This balancing test is referred to as the *Anderson-Burdick* framework.

> Under the *Anderson-Burdick* framework, we first "determine the burden the State's regulation imposes on the plaintiffs' First Amendment rights." *Thompson v. DeWine*, 959 F.3d 804, 808 (6th Cir. 2020) (order) (per curiam). "[W]hen those rights are subjected to 'severe' restrictions," the regulation is subject to strict scrutiny and "must be 'narrowly drawn to advance a state interest of compelling importance.' " *Burdick*, 504 U.S. at 434, 112 S. Ct. 2059 (quoting *Norman v. Reed*, 502 U.S. 279, 289, 112 S. Ct. 698, 116 L.Ed.2d 711 (1992)). But when those rights are subjected only to "reasonable, nondiscriminatory restrictions," the regulation is subject to rational-basis review because "the State's important regulatory interests are generally sufficient to justify" the restriction. *Id.* (quoting *Anderson*, 460 U.S. at 788, 103 S. Ct. 1564). "For cases between these extremes, we weigh the burden imposed by the State's regulation against 'the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *Thompson*, 959 F.3d at 808 (quoting *Burdick*, 504 U.S. at 434, 112 S. Ct. 2059 (internal quotation marks omitted)).

*Hawkins v. DeWine*, No. 20-3717, 2020 WL 4435524, at *2 (6th Cir. Aug. 3, 2020). There are three steps to a court's analysis under *Anderson-Burdick*. First, as noted above, the court must determine the burden at issue. "The next step under *Anderson-Burdick* is to 'consider the State's justifications for the restrictions.'" *Kishore v. Whitmer*, --- F.3d ---, 2020 WL 4932749, at *3 (6th Cir. Aug. 24, 2020) (quoting *Schmitt v. LaRose*, 933 F.3d 628, 641 (6th Cir. 2019)). "'At the third step of *Anderson-Burdick* we assess whether the State's restrictions are constitutionally valid given the strength of its proffered interests.'" *Id.* at *4 (quoting *Schmitt*, 933 F.3d at 641).

As the Court previously has noted, such a framework requires the Court to make subjective characterizations about the extent of the burden and also (at least in some cases, though not so much here) [16] about the State's countervailing interests that purportedly justify such burden. (Doc. No. 77 at 29). The undersigned cannot claim to know a factually "right" designation of the degree of burden imposed by the first-time voter restriction. But he can and must make a reasoned designation, based on experience and applicable case law (or the lack thereof), which guide him to an outcome he considers quite sound even if it is subjective.

B. *Analysis*

1. *Anderson-Burdick* step one

The Court begins by determining the burden that the first-time voter restriction imposes on the Plaintiffs' First Amendment rights. To do so, the Court will initially assess Plaintiffs' position as to (i) *what* exactly it is that is burdened by the first-time voter restriction; (ii) *how* it—whatever "it" is—is burdened by the first-time voter restriction; and (iii) *why* the burden is so heavy. An understanding of these things is crucial to conducting the *Anderson-Burdick* analysis. *Cf. Crawford v. Marion Cty. Election Bd*., 553 U.S. 181, 205 (2008) ("Of course, we have to identify a burden before we can weigh it." (Scalia, J., concurring)).

In relation to the first of these three issues, in Plaintiffs' Brief, Plaintiffs argue:

This First-Time Voter Restriction imposes an unnecessary and undue burden on the right to vote for eligible absentee voters.

Voters that are eligible to vote by mail are voters that Tennessee already agrees should not be required to vote in person. . . . Especially in the context of an ongoing pandemic, the law severely burdens the First and Fourteenth Amendment-protected

---

[16] In this particular case, the characterization of the state's countervailing interest is, unusually, not very subjective. That is because, as discussed below, two of the three asserted state interests are illusory (*i.e.,* actually nonexistent) and the third is simply not served by the first-time voter restriction.

fundamental right to vote of otherwise absentee eligible first-time voters who register by mail.[17]

(Doc. No. 43 at 24-25). In their Reply, Plaintiffs repeat verbatim the first of these sentences. (Doc. No. 54 at 22). They then dispute that the burden imposed falls merely upon on the right to vote *absentee*, insisting that the burden falls on the right to vote *generally* because "first-time voters, like all Tennessee voters, should not be required to choose between their health and their right to vote[.]" (*Id.* at 23). In other words, Plaintiffs claim that in the COVID-19 era, to prevent someone from voting absentee is to prevent him or her from voting at all if he or she chooses personal health over voting.

As to the second issue, the Court perceives that Plaintiffs have asserted two ways that the first-time voter restriction burdens the right to vote. In Plaintiffs' Brief, Plaintiffs asserted, "the First-Time Voter Restriction bars new mail-in registrants (among others) from voting absentee even if they meet the State's ordinarily strict Eligibility Criteria." (Doc. No. 43 at 26). "Unlike other absentee eligible voters,[18] these first-time voters who register by mail have no alternative but

---

[17] Immediately after the text quoted here, Plaintiffs write that the first-time voter restriction also "burdens Organizational Plaintiffs' First Amendment rights by inhibiting the effectiveness of their voter registration efforts and forcing them to divert resources from other organizational priorities to educating first-time registrants of the law's requirements." (Doc. No. 43 at 25). Plaintiffs perhaps intend here to assert a First Amendment violation other than a violation of the First Amendment right to vote (of the individual Plaintiffs and of persons represented by the Organizational Plaintiffs)—such as, for example, a violation of Organizational Plaintiffs' First Amendment right to freedom of association. If so, then suffice it to say that any such assertion would not support preliminary injunctive relief here, for several reasons. First, Plaintiffs did not allege in the Amended Complaint any such violation; rather Count V was premised solely on the alleged violation of individuals' (including Organizational Plaintiffs' members') fundamental right to vote. (Doc. No. 39 at 33). Second, Plaintiffs' briefing simply did not follow up on this point; in particular, Plaintiffs set forth no analysis of why, under the *Anderson-Burdick* framework or otherwise, any alleged burden on the Organizational Plaintiffs' rights (as distinguished from individuals' right to vote) was such that it renders the first-time voter restriction unconstitutional.

[18] At the time Plaintiffs wrote this, the State-Court Temporary Injunction was in effect and entailed that *all* eligible Tennessee voters, other than those who were first-time, mail-registered voters, would be eligible to vote by mail. After *Fisher*'s vacatur of that injunction as being unwarranted under state constitutional law, only *some* Tennessee voters are eligible to vote by mail (albeit more than were eligible prior to the filing of the State-Court Cases). This conceivably could change someday, depending on the eventual resolution of the federal constitutional claim set forth in Count I of the Amended Complaint. That claim is not implicated by the instant Motion, and the Court expresses no opinion on it at this juncture.

to risk exposure to COVID-19 in order to vote." (*Id.*). Elsewhere, Plaintiffs repeat and/or elaborate on these points, but the manner in which the first-time voter restriction allegedly imposes a burden is clear: it (1) forces first-time, mail-registered voters to vote in person; (2) thereby subjecting them to a risk of exposure to COVID-19.

As to the third issue, Plaintiffs assert several reasons why the burden imposed by the first-time voter restriction is severe. According to them, the burden is severe not merely because voting in person is an inconvenience, but rather because the first-time voter restriction (i) leaves first-time, mail-registered voters "few alternate means of access to the ballot";[19] and (ii) presents for such voters the Hobson's choice of either voting in person or not voting at all, *i.e.*, forces first-time, mail-registered voters to choose between their health and their right to vote.[20]

On this issue, the Court finds cogent the analysis of the Tennessee Supreme Court in *Fisher*. As indicated above, *Fisher* dealt with claims based only on alleged violations of the Tennessee state constitution, not the U.S. Constitution. Nevertheless, consistent with the Chancery Court's approach, the Tennessee Supreme Court assumed without deciding that the *Anderson-Burdick* framework was applicable to the plaintiffs' claims. *Fisher*, 2020 WL 4515279, at *12-13. That is to say, the court "borrowed" this federal constitutional standard for purposes of a state constitutional analysis.

Of course, the Tennessee Supreme Court's opinion is not binding on this Court. And the court was, the undersigned realizes, applying the *Anderson-Burdick* framework to address exclusively state constitutional claims, meaning that its analysis of the burden conceivably might

---

[19] *See* Doc. No. 43 at 27 (quoting *Citizens for Legislative Choice v. Miller*, 144 F.3d 916, 921 (6th Cir. 1998)).

[20] *See* Doc. No. 43 at 27; Doc. No. 54 at 23.

not translate well to claims based on the federal constitution, which does not necessarily protect individuals' right to the full extent that the Tennessee state constitution does. But the Court finds that the court's analysis actually does translates well to the instant context of an alleged violation of the federal constitution (*i.e.*, First Amendment); in its discussion of the burden, *Fisher* cited a good deal of federal case law and omitted any suggestion that it was viewing the burden from a state constitution-specific perspective.

So *Fisher* is applicable here as persuasive authority to the extent that it addresses the same issue presented here, *i.e*., the nature and extent of the burden imposed on voters by a state-law requirement to vote in-person. There are differences, though; *Fisher* (a) involved a challenge to the *absentee eligibility criteria* (as allegedly being too narrow in excluding some registered voters) and not to the *first-time voter restriction*; (b) featured a concession by the State that the eligibility criteria for absentee voting would be expanded for the upcoming election to include persons especially vulnerable to COVID-19; and therefore (c) addressed the burden on the right to vote only of persons not especially vulnerable to COVID-19 (and not otherwise fitting within the eligibility criteria). Given the State's apparent intention to enforce the first-time voter restriction against all first-time, mail-registered voters, the burden in this case (for affected voters including those especially vulnerable to COVID-19) may be qualitatively different than it was for the affected voters in *Fisher*.

The Court is mindful of these differences and will account for them in its analysis. But to the extent that *Fisher* is applicable despite these differences, the Court embraces *Fisher* as being persuasive because it is well-reasoned on the issue of burden.[21]

_____

[21] *Fisher* also includes an informative discussion, quoted here at least in part, of the state-law basis of the Tennessee executive branch's general authority to impose burdens (to a degree) in order to reasonably regulate elections.

In *Fisher*, the plaintiffs urged strict scrutiny, albeit while appearing to accept that the intermediate level of review applied by the trial court could well be appropriate, and the defendants by contrast contended that only rational basis review was warranted. 2020 WL 4515279, at *12, 13. Ultimately disagreeing with each side, the court explained:

> In order to determine the appropriate standard of constitutional review under the *Anderson-Burdick* framework, we first must determine the extent of the burden on the right to vote. The State's contention that only rational basis review is appropriate is founded on its view that the plaintiffs' constitutional challenge addresses only the "privilege" to vote absentee and not the fundamental right to vote.
>
> It is beyond question that the right to vote is a "precious" and "fundamental" right. *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670, 86 S. Ct. 1079, 16 L.Ed.2d 169 (1966). Even the most basic of other rights are "illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17, 84 S. Ct. 526, 11 L.Ed.2d 481 (1964). This fundamental right is expressly guaranteed under the Tennessee Constitution. *See* Tenn. Const. art. I, § 5; art. IV, § 1.
>
> The State correctly points out, however, that the right to vote in any particular manner is not absolute. *See Burdick*[, 504 U.S. at] 433, []; *Mays*[ *v. LaRose*, 951 F.3d 775, 784 (6th Cir. 2020)], 951 F.3d at 783. The Tennessee Constitution also expressly grants the Legislature the authority to promulgate laws to "secure the freedom of elections and the purity of the ballot box." Tenn. Const. art. IV, § 1. We previously have noted that pursuant to this express grant, " '[t]he authority of the Tennessee Legislature to control the conduct of elections held in this State is manifest.'" *City of Memphis* [*v. Hargett*, 414 S.W.3d 88, 103 (Tenn. 2013)](citation omitted). The Legislature has exercised this authority and has provided by statute several alternative methods of voting. These include in-person voting, Tenn. Code Ann. §§ 2-3-101 et seq.; in-person early voting, Tenn. Code Ann. §§ 2-6-101 et seq.; and absentee voting by mail, Tenn. Code Ann. §§ 2-6-201 et seq.[14] The statutes make clear that in-person voting is the default and favored method of voting. Absentee voting by mail, like in-person early voting, is an exception, and absentee voting is limited in its availability to only certain categories of qualified registered voters. *See* Tenn. Code Ann. § 2-6-101(a) (2014) ("The purpose of this chapter is to provide a means for qualified voters to cast their votes when they would otherwise be unable to vote"); *Id.* § 2-6-201 (setting forth the limited categories of registered voters eligible to vote absentee by mail). This has led the Court in the past to refer to voting absentee by mail as a "privilege." *Hilliard v. Park*, 212 Tenn. 588, 370 S.W.2d 829, 833–34 (1963), *overruled in part on other grounds by Southall v. Billings*, 213 Tenn. 280, 375 S.W.2d 844, 852 (1963). The State places great reliance on this characterization of absentee voting by mail in support of its argument that the plaintiffs' constitutional challenge seeks to

vindicate only a privilege to vote absentee by mail and not the fundamental right to vote, such that only rational basis review is warranted in these cases.

The State also places great reliance on the decision of the United States Supreme Court in *McDonald v. Bd. of Election Comm'rs of Chicago*, 394 U.S. 802, 89 S. Ct. 1404, 1408, 22 L.Ed.2d 739 (1969). In *McDonald*, the Court addressed a federal constitutional challenge to Illinois' absentee voting statute. In determining that the appropriate level of constitutional review was rational basis review, the Court concluded as follows:

> [T]here is nothing in the record to indicate that the Illinois statutory scheme has an impact on appellants' ability to exercise the fundamental right to vote. It is thus not the right to vote that is at stake here but a claimed right to receive absentee ballots. Despite appellants' claim to the contrary, the absentee statutes, which are designed to make voting more available to some groups who cannot easily get to the polls, do not themselves deny appellants the exercise of the franchise.

*Id.*

The State's reliance on this Court's prior characterization and on *McDonald*, however, is misplaced. Characterizing absentee voting by mail as a "privilege" begs the question of whether, under some circumstances, limitations on this lawful method of voting can amount to a burden on the right to vote itself. The answer to that question must be yes. If it were not, even when the right to vote is unavailable through any other means, deprivation of absentee voting by mail would nevertheless be deemed not to burden the fundamental right to vote itself.

We find support for this view in a recent decision of the United States District Court for South Carolina. In *Thomas v. Andino*, No. 3:20-cv-01552-JMC, —— F.Supp.3d ——, 2020 WL 2617329 (D. S.C. May 25, 2020), the plaintiffs challenged certain South Carolina absentee ballot voting laws as violating the fundamental right to vote under the First and Fourteenth Amendments to the United States Constitution due to the COVID-19 pandemic. Among the laws the plaintiffs challenged, and as to which they sought preliminary injunctive relief "due to alleged vulnerabilities to COVID-19," was that setting forth witness requirements. *Id.* at *1.[15] The court applied the *Anderson-Burdick* analytical framework in determining the appropriate level of constitutional review for purposes of evaluating the plaintiffs' likelihood of success on the merits. *Id.* at *17. In so doing, the *Thomas* court was confronted with the same contention which the State makes in this case; namely, that the plaintiffs' constitutional challenge applied only to a privilege and not a protected right and so was not entitled to constitutional review. *Id.* (footnote omitted). The court rejected this contention:

Inherent in the rule is that the challenge only applies to protected rights. Thomas/Middleton Plaintiffs and Defendants vigorously debate whether absentee voting is a right or a privilege.

Defendants are correct that under South Carolina law, absentee voting is a "privilege," not a right to vote itself. However, while this court agrees that the right to an absentee ballot is not guaranteed by the First Amendment, that does not mean that absentee voting is *per se* unprotected under the First Amendment.

*Id.* at \*\*17–18 (footnote omitted) (citations omitted). The court went on to find that the "privilege" to vote absentee "so intimately [a]ffects the fundamental right to vote" as to require the court to determine that the plaintiffs' challenge is to be examined under a "normative constitutional rights framework." *Id.* at \*18*; see also Obama for America*, 697 F.3d at 430-31 (rejecting the state's reliance on *McDonald* and noting that "Plaintiffs did not need to show that they were legally prohibited from voting, but only that 'burdened voters have few alternative means of access to the ballot' " (citation omitted)); *Mays*, 951 F.3d at 783 ("So while States can regulate elections, they must be careful not to unduly burden the right to vote when doing so."). In this time of an unprecedented pandemic, we agree with this analysis and also will use normative constitutional analysis to evaluate the plaintiffs' constitutional challenge to statutes limiting access to absentee voting by mail.

The category of plaintiffs at issue consists of persons who neither have special vulnerability to COVID-19 nor are caretakers for persons with special vulnerability to COVID-19. Even with no special vulnerability to COVID-19, it is understandable that some voters in this category may wish to vote by mail. As emphasized by the State in the recent Tennessee Attorney General's Opinion, "the health effects of the disease can be severe, including serious damage to the lungs and other internal organs, and death" and because "there is currently no vaccine, cure, or proven effective treatment for COVID-19, the best way to prevent illness is to avoid being exposed to the virus." Op. Tenn. Att'y Gen. No. 20-14 at \*\*2–3 (July 24, 2020) (footnotes omitted) (citations omitted).

However, the risk to this category of voters is significantly less than the risk to voters with special vulnerability to COVID-19 or voters who are caretakers for persons with special vulnerability to COVID-19. "The hallmark of a severe burden is exclusion or virtual exclusion" from voting. *See Libertarian Party of Ky. v. Grimes*, 835 F.3d 570, 574 (6th Cir. 2016). We cannot say that in-person voting is foreclosed for these plaintiffs, or that they are excluded or virtually excluded from voting. The State's Plan for in-person voting includes detailed measures for their protection and the protection of the poll workers, including social distancing, screening questions for poll workers before entry into the polling places, plexiglass shields for check-in procedures, mandatory masks and gloves for poll workers and recommended masks for voters, single use pens for voters to use to sign poll books,

single use styluses for voters to use to ensure touchless voting, and frequent and regular sanitation of surfaces.

Having carefully reviewed the record in these cases, and upon consideration of the hardships of the COVID-19 pandemic, the State's response to the pandemic, Tennessee's current absentee ballot access laws, and the State's measures thus far with respect to voting in the upcoming August and November elections, we cannot say that the burden on the right to vote of this category of plaintiffs is severe. Rather, the burden is best characterized as moderate.

*Id.* at *13-16.

In short, for the reasons explained lucidly by the Tennessee Supreme Court, the Court agrees that the burden, during the pendency of the COVID-19 pandemic, upon voting rights of a law that requires in-person voting for those not especially vulnerable to COVID-19 (or those caring for them) is not severe, but rather is moderate.[22]

Cases like *Mays* suggest that the burden is not severe. In *Mays*, the court called the burden —which, as applied there, would have absolutely prevented the plaintiffs from voting, as this Court previously has explained (Doc. No. 77 at 32)—"intermediate," *i.e.*, "somewhere between slight and severe," *i.e.*, "moderate." *Mays*, 951 F.3d at 784-85. The court went no higher on the burden scale primarily because, as in the present case, the law as a general matter permitted other ways to vote beyond voting absentee. *Id.* at 786 ("Considering Ohio's absentee ballot request deadlines from the perspective of unexpectedly jail-confined electors and given the alternative voting

---

[22] Among other aspects of *Fisher*'s reasoning the Court finds persuasive, *Fisher*'s rejection of the purported significance of the asserted distinction between a "right" to vote absentee and a "privilege" to vote absentee was, in the Court's view, spot on. That is to say limitations on eligibility to vote *absentee* may indicate a burden on the right to vote *generally*, even if such eligibility is viewed as a "privilege" and not a "right."

In a prior order, the Court declined to address any suggestion that there is no First Amendment right to vote, for any purposes at all, *by mail* in particular. (Doc. No. 77 at 26 n.17). The Court was well aware that *McDonald* supports such a suggestion, but the Court simply did not need to opine on that matter. The Court likewise does not need to do so here. Instead, it need only reiterate what *Fisher* indicated: a restriction on the ability to vote absentee, even if voting absentee is not a matter of right, can (perhaps especially during a pandemic) impact the right to vote generally (which *is* a matter of right for eligible voters).

opportunities that Ohio provides, the burden those laws place on Plaintiffs' right to vote is moderate."). The Court is confident that the burden here is moderate at most.

Defendants have not argued in favor of the standard lower than moderate—*i.e.*, rational basis review—or indeed any standard at all with respect to this claim. Defendants did cite *McDonald v. Bd. of Election Comm'rs of Chicago*, 394 U.S. 802 (1969), but not in order to assert rational basis review for this claim. One can imagine Defendants wishing they had cited *McDonald*, as did the defendants in *Obama for America*, for the proposition that "rational basis is the appropriate standard when a state denies absentee ballots to some citizens and not others." *Obama for Am.,* 697 F.3d at 430. But the Sixth Circuit in *Obama for America* opined that "the *McDonald* plaintiffs failed to make out a claim for heightened scrutiny because they had presented no evidence to support their allegation that they were being prevented from voting." *Id.* And where there is such evidence, *McDonald* is simply inapplicable. *See id.* Moreover, the concept of voters "*being prevented from voting*" by a law was construed very broadly in *Obama for America*—so broadly that it included (non-military) Ohio voters being *prevented* from in-person early voting in the last three days before election day by Ohio's deadline for in-person early voting, despite the fact that such voters had available other days to vote early in-person and other options to vote besides doing so early in person. 697 F.3d at 431. In other words, just as strict scrutiny does not apply unless there is *virtual exclusion from* voting, *McDonald* does not apply if there is *prevention of* voting—including prevention of voting in merely one manner (time and place) among several, if that manner is one that the voter as a practical manner would have to employ in order to vote at

all.[23] This may sound like an extremely broad take on *McDonald*'s concept of being "prevented" from voting, but the Court simply cannot construe *Obama for America* any other way.

And the Court construes the record here as including evidence of exactly that. The record suggests that at least some first-time, mail-registered voters are currently prevented from voting in the manner (*i.e.*, by mail) in which they must vote, as a practical matter, in order to vote at all, given their COVID-19-related concerns that remove voting in person as a viable option. *Obama for America* also states that "when a plaintiff alleges that a state has burdened voting rights through the disparate treatment of voters, we review the claim using the 'flexible standard'" announced in *Anderson-Burdick. Id.* at 429. That is what Plaintiffs have alleged here; despite not bringing an equal protection claim, they have alleged that first-time, mail-registered voters are treated disparately from other voters, in being automatically required to vote in person. In short, *Obama for America* would likely doom the applicability of *McDonald* here. Moreover, a potential *McDonald*-based argument would have faced the initial (arguably, but not necessarily, merely technical) issue that *McDonald* dealt with an alleged equal protection violation, which Plaintiffs here certainly have not raised in form even if they have in substance.[24] For these reasons, and for the reasons discussed in *Fisher*, and absent any countervailing argument from Defendants, the Court declines to impose rational basis review.

---

[23] For reasons the undersigned does not fully grasp after having reviewed the district court and court of appeals decisions in *Obama for America*, each of these courts seemed to accept that if Ohio law denied these voters the opportunity to vote in person the final three days before the election, then they would not (and effectively could not) vote. This is a strong indication that the Sixth Circuit there was interpreting very broadly that notion of voters "being prevented" by a law from voting.

[24] Technically, Plaintiffs' claim is a violation of the First Amendment right to vote, not a violation of the Equal Protection Clause. In substance, however, they are complaining not only that first-time, mail-registered voters' First Amendment right to vote is being infringed (a First Amendment claim, obviously) but also that the infringement is being visited solely upon first-time, mail-registered voters and not any other category of voter (a complaint sounding in equal protection principles).

Importantly, the Court is assessing the burden imposed by the first-time voter restriction, and the State's justification(s) for it, with respect to first-time, mail-registered voters *in general* because this is the particular assessment called for by Plaintiffs' request. That is, Plaintiffs have asked for the first-time voter restriction to be enjoined in its entirety and as to all first-time, mail-registered voters—and not as to merely some subset thereof, such as especially vulnerable first-time, mail-registered voters.

Assuming without deciding that the Court would have discretion to consider *sua sponte* a narrower injunction in this case, it declines to do so. First, just as a plaintiff is master of its own complaint, *Roddy v. Grand Trunk W. R.R. Inc.*, 395 F.3d 318, 322 (6th Cir. 2005), the Court is inclined to view a plaintiff as master of its own request for a preliminary injunction. Here, Plaintiffs from the beginning were seeking to enjoin the first-time voter restriction as to *all* first-time, mail-registered voters. At no time did they make an alternative request for such an injunction as to only first-time, mail-registered voters who were especially vulnerable to COVID-19. Plaintiffs' focus unquestionably was on the risk from in-person voting to *everyone and anyone*, and they did not signal out especially vulnerable persons as particularly burdened; to the extent Plaintiffs claimed a heavy burden on any particular group(s), those groups were young persons, students, and immigrants. Then, when asked by the Court whether, in light of *Fisher*, there were any changes to the scope of the relief they are requesting via the Motion, (Doc. No. 60 at 1), Plaintiffs responded in pertinent part that "the *Fisher* opinion does not affect the nature of the relief Plaintiffs' seek— *i.e.*, an injunction of the first-time voter restriction for otherwise absentee eligible first-time voters." (Doc. No. 65 at 4). So, given the opportunity to change the scope of their request for an injunction as to the first-time voter restriction based on *Fisher*'s distinction between especially

vulnerable voters and other voters, Plaintiffs declined to do so and instead reiterated the requested scope as previously stated.

In short, for whatever reason,[25] Plaintiffs have always taken an all-or-nothing approach with respect to the first-time voter restriction. Plaintiffs are allowed to choose this approach, and the Court will honor that choice, and consider the burden on first-time, mail-registered voters without regard to whether they are especially vulnerable. And for the reasons explained in *Fisher*, the burden on such members of such group in general is not severe.

Arguing otherwise, Plaintiffs contend that the first-time voter restriction (as it relates to all first-time, mail-registered voters) should be deemed to impose a severe burden on the right to vote, particularly during the ongoing pandemic. Plaintiffs start by stating that "[n]othing about being a first-time voter makes the right to vote any less protected." (Doc. No. 43 at 26). This is a fair point, but one ultimately unhelpful to Plaintiffs. The Court in no way has discounted the protection afforded by the right to vote—or the degree of burden placed on such right by the first-time voter restriction—due to the fact that such restriction affects only first-time voters. To the contrary, the Court is relying on cases (including *Fisher*) that do not single out first-time voters in any way, let alone suggest that burdens on them should be deemed less severe merely because they are first-time voters.

Plaintiffs next write, "Punishing voters with additional burdens as they seek to participate in our democracy for the first time is likely to chill speech among voters that have not yet developed meaningful voting habits." (*Id*.). Plaintiffs imply here that the burden consists (at least

---

[25] The Court need not speculate on the nature of the reason(s), but it does note that perhaps this all-or-nothing approach reflects that Plaintiffs laudably had the courage of their convictions. That is to say, they may have taken the position that suggesting a possible compromise (*i.e.,* an injunction with respect to some but not all first-time, mail-registered voters) would be unprincipled in light of Plaintiffs' ardent belief that the first-time voter restriction should not be imposed on *any* first-time, mail-registered voter.

in part) as a "chill" on "speech" of certain (inexperienced) voters, and that the burden is worse than it otherwise would be because it serves to "punish." The problems with such implications are numerous. To begin with, the issue here relates to the burden on voting in particular, not "chillable" speech more generally. In addition, even if the word "voting" were substituted for "speech" in Plaintiffs' sentence quoted above, the Court has not been pointed to any reason or evidence supporting the existence of a connection between (a) having to vote in person as a first-time, mail-registered voter in particular and (b) being "chilled" in voting. For all the Court knows, a typical voter in these categories would be far less chilled by going to the local precinct and voting in person than by having to deal with the potentially somewhat daunting process of completing multiple forms, at least one mailing, and one or two more other communications (by email and/or mail) that one must complete in order to vote by mail in Tennessee. Finally, Plaintiffs provide no justification whatsoever for referring to the first-time voter restriction—whether or not it is burdensome, stupid, and/or a manifestation of lousy policy—as "punishing voters." Plaintiffs hardly enhance their credibility when—in an apparent attempt to make a burden seem worse than it otherwise would seem—they casually lob in an unsupported accusation that what the State is doing is "punishment."

Plaintiffs then state, "Thus, even in ordinary times, the First-Time Voter Restriction poses substantial obstacles for eligible absentee voters, who, by the nature of their eligibility to vote absentee, are burdened by any requirement that they cast their ballot in person." (*Id.*). Here, Plaintiffs have done nothing more than dub the applicable burden "substantial"; they do not suggest that the burden is severe, let alone support such a suggestion.

Plaintiffs then rely on a description of the perils of COVID-19 and the risk of contracting it from a trip to the polling station. The Court certainly understands the risk (without purporting to

know how great it is) and why first-time, mail-registered voters would prefer not to have to go to the polls to vote. But the fact that they may have to do so because of the first-time voter restriction, and that if they do so they will face some risk, does not necessarily mean that such restriction imposes a burden that is "severe." As noted elsewhere herein, it is in fact not severe, because these circumstances (being put to such a choice) do not amount to exclusion or virtual exclusion from voting. This is particularly true when the circumstances tending to prevent someone from choosing to vote in the manner they are allowed are created not by the State, but by natural circumstances such as the COVID-19 pandemic. The State, of course, could have amended its laws in response to those circumstances in order to avoid putting first-time, mail-registered voters to this choice. But the fact that the State has not done so does not mean that it is chargeable with having imposed a severe, rather than moderate, burden on such voters.

*Texas Democratic Party v. Abbott*, 961 F.3d 289, 407 (5th Cir. 2020) is instructive here. As its name suggests, that case involved Texas law, under which members of certain groups, but not everyone, were permitted to vote (early) by mail. *Id.* at 402. Since Texas has not made everyone eligible to vote by mail, Texas implemented a variety of measures to protect those going to the polls to vote in-person in the face of COVID-19 (called "the Virus" by the Fifth Circuit).[26] The Texas Attorney General announced that under his construction of the "plain language" of the applicable state statute,

> fear of contracting [the Virus] unaccompanied by a qualifying sickness or physical condition does not constitute a disability under the Texas Election Code for purposes of receiving a ballot by mail. Accordingly, public officials shall not advise voters who lack a qualifying sickness or physical condition to vote by mail in response to [the Virus].

[26] The measures included "social distancing, such as protective masks for election workers, plentiful cleaning wipes and hand sanitizer, cotton swabs for contacting touch screens, and floor decals inside the polling places that show where voters should stand." *Texas Democratic Party*, 961 F.3d at 402.

*Id.* at 395. Thereafter, the plaintiffs filed suit, claiming in pertinent part that "Texas's rules for voting by mail (1) discriminate by age in violation of equal protection and the Twenty-Sixth Amendment; [and] (2) restrict political speech under the First Amendment . . . ." *Id.* The plaintiffs sought "a declaration to such effect and an injunction preventing the state officials from enforcing Texas's vote-by-mail rules as written." *Id.* The district court granted the plaintiffs a preliminary injunction mandating that "'[a]ny eligible Texas voter who seeks to vote by mail in order to avoid transmission of [the Virus]'—which, as the district court itself recognizes, would effectively be *every* Texas voter—'can apply for, receive, and cast an absentee ballot in upcoming elections during the pendency of pandemic circumstances.'"[27] *Id.* In so doing, the district court concluded "that strict scrutiny applies, because section 82.003 [of the Texas Election Code] supposedly places a severe burden on the plaintiffs' right to vote, as voters who trek to the polls risk exposure to the Virus."[28] *Id.* at 402. The Fifth Circuit reversed. Although its analysis is not identical to this Court's here—especially since the Fifth Circuit found *McDonald* applicable such that rational-basis scrutiny applied—the following observation is persuasive in the present case:

> The Virus, to be sure, increases the risks of interacting in public. But, under *McDonald*, a state's refusal to provide a mail-in ballot does not violate equal protection unless—again—the state has "in fact absolutely prohibited"[30] the plaintiff from voting.[31] Texas permits the plaintiffs to vote in person; that is the exact opposite of "absolutely prohibit[ing]" them from doing so.

*Id.* at 404. Even though the instant case does not involve the application of *McDonald* or a claim styled as one for violation of equal protection, it does involve the same operative distinction between a restriction that results in an absolute (or virtually absolute) exclusion from voting and

---

[27] Although the district court's rationale for so doing is not material to the Court's discussion, it is worth noting that the Fifth Circuit was obviously and substantially displeased with the district court's reasoning, or lack thereof.

[28] That section provides, "A qualified voter is eligible for early voting by mail if the voter is 65 years of age or older on election day." Tex. Elec. Code § 82.003.

one that does not. And in this circuit, as in the Fifth Circuit, the latter kind of restriction is *not* deemed to impose a severe burden, even if it may (unlike in *Texas Democratic Party*), be deemed to impose an intermediate burden.

Offering purported additional support for the Court to declare the burden severe, Plaintiffs also argue:

> Moreover, the pool of first-time voters is disproportionately composed of classes of people more likely to face higher barriers to participation in the democratic process. These groups include young voters, students, and immigrants who recently became naturalized citizens. Not only is the pool thus much larger than that in [*Obama for America*], but the *Anderson-Burdick* standard is heightened because the restrictions fall unevenly across groups of voters. *See Burdick*, 504 U.S. at 434 (limiting lower scrutiny to nondiscriminatory restrictions).

(Doc. No. 43 at 26).

There are numerous problems with this argument. To begin with, the barrier at issue here is not the "barrier to participation in the democratic process" but rather the barrier to *voting*, a far more discrete and specific activity. So Plaintiffs' broad claim, as stated, misses the mark. The Court instead must assess the claim as it relates to voting in particular, and it finds such claim is flawed, for several reasons. Although the Court understands why someone might claim/believe/assume that these groups "face higher barriers to" voting, Plaintiffs here cite no support whatsoever that they actually do. Plaintiffs do not explain what barriers to voting are faced disproportionately by voting-eligible "young voters" *as a group*, or "immigrants" *as a group* in particular, and the Court is loath to speculate about such matters—or about the possibility of, for example, harassment of members of such groups in connection with their efforts to vote. Perhaps the idea is something like, "young voters and immigrants are less likely to figure out how to vote

due to their inexperience with the process."[29] The Court understands such thinking but notes that such a problem is caused by *inexperience*—which can be faced by older, non-immigrant Americans who have seldom or never voted in the past for whatever reason—and not by being young or being an immigrant. But in any event, Plaintiffs simply have not supported, with explanation or citation of evidence, the argument here that there are barriers to *voting* faced disproportionately by (voting-eligible) young people and immigrants *as* young people and immigrants.[30] Nor have Plaintiffs done anything to explain how significant any such increased burden may be.

Plaintiffs also rely fairly heavily upon the Sixth Circuit's decision in *Obama for America*, but to no avail. That case involved an Ohio statute that set, for non-military but not military voters, a deadline for early voting of 6:00 p.m. the Friday before election day. *Obama for Am.*, 697 F.3d at 425. On appeal from the district court's grant of a preliminary injunction enjoining the Ohio law, the Sixth Circuit affirmed. In so doing, it found the burden to be moderate (somewhere between "severe" and "slight"). *Id.* at 423. Plaintiffs assert three purported reasons why the first-time voter restriction imposes a burden far more severe than the burden imposed by the Ohio law at issue in *Obama for America*. (Doc. No. 43 at 29).

First, they note that first-time, mail-registered voters "will have *no alternative* but to vote in person in . . . November."[31] (*Id.*). But Plaintiffs miss the point. It is precisely the existence of

---

[29] Relatedly, perhaps the idea as to students is something like, "students tend to be young, and thus in the same boat as 'young voters' and also may face confusion and logistical challenges in voting based on being at school and away from home at the time of the election."

[30] By contrast, the Court recognizes that Plaintiffs have provided evidentiary support for a different disproportionality that is not implicated by this particular argument, *i.e.*, the disproportionate effect of COVID-19 on Black and Latinx individuals. (Doc. No. 43 at 6 n.4).

[31] The Court cannot confirm that this is accurate. Although neither party addressed this issue, the Court notes that the first-time voter requirement is a requirement to "appear in person to vote." As *Fisher* notes, Tennessee allows in-

this alternative that means that strict scrutiny does not apply. "The hallmark of a severe burden is exclusion or virtual exclusion" from voting. *Libertarian Party of Ky. v. Grimes*, 835 F.3d 570, 574 (6th Cir. 2016). As the Tennessee Supreme Court said about the Fisher plaintiffs and Lay plaintiffs, the Court cannot say that in-person voting is foreclosed for Plaintiffs or for first-time, mail-registered voters. In particular, the Court cannot say that the clearly available alternative to vote on election day should somehow be deemed an illusory alternative because some may be dissuaded from exercising this alternative due to fears about COVID-19.[32]

To the extent that Plaintiffs would respond that for some especially vulnerable first-time, mail-registered voters, voting in person is a crummy option, the Court is sympathetic. But just because the first-time voter restriction places this subset of first-time, mail-registered voters on the horns of dilemma, it does not thereby impose a severe burden. The mere existence of perceived harshness in this Tennessee law does not by itself supports "the notion that Plaintiffs have a severe burden placed upon them by the current [Tennessee] election law[.]" *Griffin v. Roupas*, No. 02 C 5270, 2003 WL 22232839, at *8 (N.D. Ill. Sept. 22, 2003), *aff'd*, 385 F.3d 1128 (7th Cir. 2004).

---

person early voting, which can be accomplished between five and twenty days prior to the election. *See* Tenn. Code Ann. § 2-6-101(a)(1). So the Court does not see why first-time, mail-registered voters could not satisfy the first-time voter requirement by voting in person *early* prior to November. If so, the burden of the first-time voter restriction would be greatly reduced because such voters—despite the existence of the first-time voter requirement—would have many more opportunities than just the November 3 election date to vote, and thus would have (1) an opportunity to ensure that a vote is cast despite the inability to cast an absentee ballot and any potential inability to vote in person on election day; and (2) choices as to when and where to vote, and thus an opportunity to choose a time and location to vote with relatively little congestion and thus less risk from COVID-19.

[32] The availability of this alternative actually puts Tennessee's first-time, mail-registered voters in much better shape than "thousands" of the voters at issue in *Obama for America*, in which there was evidence of record that "thousands of voters who would have voted during those three days will not be able to exercise their right to cast a vote in person." 697 F.3d at 431. That is to say, the evidence there supported a finding that a large number of persons would be prevented from voting, at all, by the Ohio law. Here, Plaintiffs have pointed to no evidence that a large number of voters would not exercise the (quite typical) option of voting in person due to concerns over COVID-19; if anything, they offer only conjecture that COVID-19 would prevent voters from going to the polls. To be sure, the Court accepts that this will occur in some cases. But the Court can only speculate as to *how many* voters would truly pass up going to the polls due specifically to fear of COVID-19 despite the State's considerable planning efforts to make voting safe, (Doc. No. 40-2 at 48-129; Doc. No. 46-1 at 2-3), and not for some other reason, such as relative apathy or other commitments on election day. In sum, the record in *Obama for America* was far more developed as to the *large number* of persons who would be prevented from voting by the law being challenged.

The Court further notes that restrictions on absentee voting naturally place many voters on the horns of a significant dilemma having nothing to do with COVID-19; surely many people ineligible to vote absentee over the years have had to choose between, for example, voting in-person on election day and being out of town for something very important on election day. And yet the existence of such difficult quandaries has never, as far as the Court can tell, been deemed to justify strict scrutiny of a law limiting absentee voting. In any event, Plaintiffs simply have not done their part to explain why the special conundrum faced by this subset means that strict scrutiny is appropriate for the first-time voter restriction as it applies generally.

Thus, to the extent that Plaintiffs' point is that the inability to vote absentee always naturally tends to prevent a certain number of people from voting—irrespective of concerns about COVID-19—because they just cannot make it to the polls to vote in person, this observation cannot justify strict scrutiny. If strict scrutiny was warranted based on the simple reality that precluding certain people from voting absentee might naturally prevent some of them from voting *at all* because they are unable to vote in-person,[33] then strict scrutiny would always be applied to laws limiting (through, for example, eligibility criteria or deadlines) the ability to vote absentee. And that simply is not the case. *See*, *e.g.*, *Mays*, 951 F.3d at 785 (deeming "intermediate" the burden imposed by the application of Ohio's deadline for requesting an absentee ballot, which as applied prevented the plaintiffs not only from voting absentee, but from voting at all).

Plaintiffs next argue that "the *Anderson-Burdick* standard is heightened because the restrictions fall unevenly across groups of voters." (Doc. No. 43 at 29). This claim is simply too terse to be very helpful. In context, Plaintiffs appear to mean that the standard as to the first-time

---

[33] Notably, in Tennessee, there is an alternative to voting by mail or in person on election day: in person early voting. This fact would undercut any argument that restrictions on absentee voting impose a severe burden because voters may be unable to vote in person on election day in particular.

voter restriction is higher than the standard declared in *Obama for America* because it imposes restrictions (or burdens) that fall "unevenly [upon certain] groups of voters" (such as young voters, students, and immigrants), unlike the Ohio law at issue in *Obama for America*. But as discussed above, Plaintiffs have not adequately argued or pointed to evidence supporting the theory that the burdens (or restrictions) fall unevenly upon certain groups. And the Ohio law at issue *did* fall unevenly across groups of voters; the district court found that it disproportionately impacted persons with lower incomes and less education because they were more likely to be early voters (and thus impacted by the early voting deadline). *Obama for Am.*, 697 F.3d at 431.

Finally, Plaintiffs argue that "the pool"—apparently meaning the collective group of young persons, students and immigrants eligible to vote in Tennessee—is "much larger than that in [*Obama for America*]." (Doc. No. 43 at 29). This bald assertion gets Plaintiffs nowhere, because (1) the Court frankly cannot even tell what "pool" from *Obama for America* Plaintiffs are using as the comparator, and (2) Plaintiffs here offer no explanation or evidentiary support whatsoever for it.

So despite everything Plaintiffs can throw at the issue, the Court concludes that the burden imposed by the first-time voter restriction during the pendency of the COVID-19 pandemic that forms the context of the instant Motion, is moderate rather than severe. The Court has undertaken considerable (and some might even say excessive) effort in explaining this conclusion. But it does so not because this conclusion is outcome determinative—which in fact it is not—but rather because it is important to reach a sound conclusion on this issue in any event.

2.  *Anderson-Burdick* step two

The Court next considers the State's justification(s) for the first-time voter restriction. The State needs to have an interest in such restriction that is commensurate with the moderate burden

it imposes. "[T]he state need only demonstrate that it has legitimate interests to impose the burden that outweigh it." *Kishore*, 2020 WL 4932749, at *3 (citing *Thompson*, 959 F.3d at 811) (internal quotation marks omitted). So the Court in this step identifies the State's asserted interests and determines which of these are legitimate and then, in step three, determines whether the legitimate interest(s) outweigh the burden imposed by the restriction. Here, Defendants describe the State's interest in the following passage:

> [The first-time voter requirement does] nothing more than implement Congress's intent as reflected in both the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20505(c) and Section 303(b) of the Help America Vote Act of 2002, Pub.L. 107-252 (codified at 52 U.S.C. § 21083). The NVRA was enacted by Congress in 1993 "to establish procedures that will increase the number of eligible citizens who register to vote in elections for federal office." 52 U.S.C. § 20501. Section 20505(c) of the NVRA provides that "a State may by law require a person to vote in person if—(A) the person was registered to vote in a jurisdiction by mail; and (B) the person has not previously voted in that jurisdiction."

> The Help American Vote Act ("HAVA") is bipartisan legislation enacted by Congress in response to the controversy surrounding the 2000 U.S. Presidential election. 52 U.S.C. §§ 20901–21145. . . . The legislative history reflects that "[a] principal concern of Congress addressed in this bill is the abuse of mail registration cards, created by Congress as part of the National Voter Registration Act" and that "[t]o address this [concern], we created an identification requirement for first-time voters who register by mail." 148 Cong. Rec. S10488-02, S10489-89, 2002 WL 31317844. Accordingly, in addition to the provisions of Section 20505(c) of the NVRA, Section 21803(b) of HAVA requires the State, "in a uniform and nondiscriminatory manner" to require an individual who registered to vote by mail and who has not previously voted in an election for federal office in that state to meet the following requirements:

> > (i) in the case of an individual who votes in person—

> > > (I) presents to the appropriate State or local election official a current and valid photo identification; or

> > > (II) presents to the appropriate State or local election official a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of the voter; or

> > (ii) in the case of an individual who votes by mail, submits with the ballot—

<blockquote>
(I)       a copy of a current and valid photo identification; or

(II)     a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of the voter.
</blockquote>

52 U.S.C. § 21083(b)(2).

This provision of HAVA is intended to "work alongside the National Voter Registration Act," and more importantly, it reflects "the intent of Congress that voters who register by mail show identification." 148 Cong. Rec.at S10490. The first-time voter requirements of Tenn. Code Ann. § 2-2-115(7) were enacted in order to comply with Section 20505(c) of the NVRA and Section 21083(b) of the NVRA [sic] in a "uniform and nondiscriminatory" manner.

(Doc. No. 46 at 23-24).

So according to Defendants, having first-time, mail-registered voters vote in person "implement[s] Congress's intention" as reflected in 52 U.S.C. § 20505(c) ("NVRA Section 20505(c)") and 52 U.S.C. § 21083 ("HAVA Section 21083"). This, and "nothing more," is the State's interest in the first-time voter restriction, according to Defendants' initial statement regarding the matter. But later in the passage, Defendants state that the first-time voter restriction serves to "comply" with these two sections and to effectuate "the intent of Congress that voters who register by mail show identification." So, generously construed, Defendant's Response asserts three state interests: (1) complying with NVRA Section 20505(c) and HAVA Section 21083; (2) effectuating congressional intent that states impose a first-time voter restriction and (3) effectuating congressional intent that first-time, mail-registered voters show identification. As explained below, the Court finds that each of the first two purported state interests is not legitimate, because it is illusory in that the first-time voter restriction is necessary neither to comply with these two federal statutes nor to otherwise effectuate any congressional intent manifested in these statutes. The third interest, on the other hand, is legitimate.

Regarding the first asserted state interest, Plaintiffs correctly note that the text of neither NVRA Section 20505(c) nor HAVA Section 21083 indicates that it requires "compliance" via the first-time voter restriction. That is to say, the text of neither statute requires implementation of the first-time voter restriction, and thus Tennessee would not be out of "compliance" with those statutes by not having such restriction. In the text of NVRA Section 20505(c), Congress patently did not *require* that states implement a first-time voter restriction; rather, the text indicated in essence a mere lack of opposition to, or at most acceptance of the possibility of, states implementing a first-time voter restriction. As for the text of HAVA Section 21083, as discussed more fully below, it does require the presentation of certain forms of identification for first-time voters, but it expressly contemplates that such presentation could be included with a mail-in ballot rather than at the time of in-person voting. Defendants' assertion that the first-time voter restriction is required for compliance with these statutes is not supported by their text and indeed is merely conclusory. In sum, implementation of a first-time voter restriction (though perfectly *consistent with* and *contemplated by* NVRA Section 20505(c)) is not necessary to *comply* with NVRA Section 20505(c).

Plaintiffs direct most if not all of their argument at this first alleged state interest, and for the most part stop at this point of the analysis. But the Court continues on to address the second and third asserted state interests.

Regarding the second, Defendants have asserted that the first-time voter restriction carries out congressional intent that states implement a first-time voter restriction. The Court will assume *arguendo* that such an assertion, if valid, could suffice to support the first-time voter restriction even if neither NVRA Section 20505(c) and HAVA Section 21083 *required* states to implement a first-time voter restriction; theoretically, Congress could intend (*i.e.*, hope or prefer) for states to

do something without requiring that they do it, and perhaps a statute that does what Congress intended (but did not require) could pass intermediate scrutiny on the grounds that it merely implements such congressional intent. Even if so, however, that would not help Defendants, because they have not shown congressional intent that states implement a first-time voter restriction. The text of the statute not only shows that such restriction was not congressionally required (as discussed above), but also does not reflect that such restriction was affirmatively intended. The text shows only congressional acquiescence in—but not a congressional preference for or encouragement of—a first-time voter restriction.

Beyond the off-base and conclusory references to congressional intent, and the (unsupportive) text of NVRA Section 20505(c) and HAVA Section 21083, Defendants have offered nothing to show that Congress required or even intended that states impose a first-time voter restriction. Defendants did not, for example, argue that the legislative history of these statutes suggested such congressional mandate or intent. On his own the undersigned personally reviewed the legislative history of each statute in some detail and detected no sign of affirmative congressional insistence upon, or preference or aspirations for, the implementation by states of a first-time voter requirement. But in any event, Defendants have not shown anything of the sort, whether in the statutes' text, the statutes' legislative history, or otherwise.

In short, the State's first and second asserted interests are illusory, as they are premised upon a non-existent congressional requirement and non-existence congressional intent, respectively.

Moreover, even if Congress had intended, or even required, states to impose a first-time voter restriction, a state's desire to satisfy Congress would not automatically be legitimate. Of course, any federal statute conceivably could be unconstitutional, either on its face or as applied;

that is to say, any particular congressional requirement could be unconstitutional. Relatedly, if Congress intends (without requiring) states to do something, what it intends conceivably could be unconstitutional; that is to say, any particular congressionally-intended measure could be unconstitutional. For this reason, a state law can be unconstitutional even if it was enacted merely to satisfy a congressional requirement or preference. A state's interest in passing a law to satisfy Congress may always be *understandable*, but whether it is *legitimate* depends on whether Congress was requiring or intending something unconstitutional. Here, Defendants did virtually nothing to satisfy the Court as to the legitimacy of the State's interest in satisfying the *particular* congressional requirements or preferences Defendants (incorrectly) claimed existed in this case.

A stark example will serve to illustrate this point. Imagine a dystopian Congress (and president) enacting a law overtly encouraging (or even requiring) states to prohibit citizens of a particular gender from voting at all. Suppose that an unprincipled state government responds immediately by enacting a law to precisely this effect. In that case, it may be that the state government passed the law to accede to Congress's mandates or wishes. Nevertheless, the law surely would be violative of the First Amendment (and Equal Protection Clause), even if the state was acting merely to satisfy Congress's mandates or wishes. In that case, the state does not have a legitimate interest in enacting the law even if it is what Congress required or wanted; the state's interest can hardly be deemed legitimate if it is merely to implement a congressional requirement that the state do something unconstitutional. So it is not enough for a state simply to say "Congress made me do it" or "Congress wanted me to do it." That is really all that Defendants have claimed here, and it would not be enough even if the claim were true (which it is not). Defendants instead needed to provide some (not to say a particularly fulsome) explanation as to why accommodating

the particular alleged (though actually non-existent) congressional mandate(s) or desire(s) in this case was a legitimate thing to do.

The third asserted state interest, fulfilling "the intent of Congress that voters who register by mail show identification," is not illusory. The text of HAVA Section 21083 clearly evidences such congressional intent. And the Court has no trouble concluding that a state's interest in fulfilling congressional intent is legitimate where, as here, what Congress intends is unexceptional.[34] But it is important to keep in mind *what* congressional intent is implicated here: the intent that first-time, mail-registered voters generally provide identification the first time they vote in the state of registration. It is one thing to intend that voters show identification, and it is quite another to intend that voters vote in person. HAVA Section 21083 reflects only the former intent and in fact, as discussed elsewhere herein, contemplates the showing of identification by in-person *or* by-mail voting. So Defendants here may have made an accurate reference to congressional intent, but not to congressional intent *that first-time, mail-registered voters vote in person*—an intent the State could not possibly have a legitimate interest in satisfying, because it does not exist.

All three asserted state interests here are in the nature of complying with, and effectuating the congressional intent behind, NVRA Section 20205(c) and HAVA Section 21083. Had Defendants invested a little more effort into justifying this first-time voter restriction, they might have asserted independent state interests unrelated to merely satisfying Congress. They could have asserted, for example, that prevention of voter fraud justifies having first-time, mail-registered

---

[34] The Court does not deny that voter-identification requirements are a reasonable policy prescription to prevent voter fraud or otherwise run an election in an orderly fashion; in this sense, what Congress intends is unexceptional.

voters appear in person to vote in order to show the voter identification that they are generally[35] required by HAVA Section 21083 to provide *either* in person *or* with a mail-in ballot.[36] In other words, even though HAVA Section 21083 itself takes no position as to whether a state should require first-time, mail-registered voters to appear with their identification documents *in person* to vote, Defendants could have asserted that the State independently has an interest in combatting voter fraud and that this interest is furthered by just such a requirement. Defendants might have claimed, for example, that voter identification documents can better be scrutinized for authenticity when presented in person, by a voter physically present to answer for them, rather than by mail. Tennessee "indisputably has a compelling interest in preserving the integrity of its election process." *Burson v. Freeman*, 504 U.S. 191, 199 (1992) (quoting *Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 228-29 (1989)); *see also Crawford*, 553 U.S. at 197. And Defendants could have tried to claim that the first-time voter restriction helps preserve the integrity of the voting process by somehow contributing to the detection of voter fraud. But Defendants did not make, let alone support, such a claim. So just as the first-time voter restriction does not serve

---

[35] As discussed in another footnote herein, there are exceptions to this general requirement, prescribed by 52 U.S.C. § 21083(b)(3).

[36] Plaintiffs rely appropriately on the fact that HAVA Section 21083 generally contemplates a state allowing first-time, mail-registered voters to vote either in person or by mail. But Plaintiffs actually appear to sell their position short when they say that "under the HAVA, first-time mail registrants are required to vote in person *only if (1)* they did not submit their driver's license number or last four digits of their social security number, and (2) the election officials cannot use that information to match the voter with existing identification records." (Doc. No. 54 at 23 (citing 52 U.S.C. § 21083(b)). In the Court's view, what 52 U.S.C. § 21083(b) actually entails is something very different and, if anything, beneficial to Plaintiffs' position. With respect to criteria (1) and (2) specified by Plaintiffs as noted above, what 52 U.S.C. § 21083(b) actually seems to provide is that a first-time, mail-registered voter is excused from showing the *forms of identification generally mandated by* 52 U.S.C. § 21083(b)(2)—whether he or she votes in person or by mail—under three scenarios, including the scenario where criteria (1) and (2) are both satisfied. In other words, under U.S.C. § 21083(b), these two criteria are used not to determine whether a first-time, mail-registered voter must vote in person, but rather to determine whether he or she is excused from showing the particular forms of identification he or she otherwise would have to provide in order to vote, whether or not he or she was voting in person. This interpretation of HAVA Section 21083(b) serves only to highlight the broader point that HAVA Section 21083—whatever its requirements for providing identification when voting in person or by mail—does not require first-time, mail-registered voters to vote in person.

the interest of satisfying Congress's intent, it has not been shown (or even alleged) to serve the interest of combatting voter fraud.

In a segment of their Response not dealing with the first-time voter restriction, Defendants correctly note that Plaintiffs' well-founded insistence that every (lawful) vote should be counted (and count) cuts both ways. That is, the State has a legitimate interest in ensuring that a lawful vote is not canceled out by a countervailing fraudulent vote. (Doc. No. 46 at 47 (quoting *Texas Democratic Party*, 961 F.3d at 413 (Ho, J., concurring))). But as noted, Defendants have not shown, or even asserted, that the first-time voter restriction serves the interest of preventing fraudulent votes.[37]

### 3. *Anderson-Burdick* step three

At the final step of *Anderson-Burdick,* the Court assesses whether the State's restrictions are constitutionally valid given the strength of its asserted interests. *Kishore*, 2020 WL 4932749, at *4. To do so, the Court weighs the "character and magnitude of the asserted injury" against the "precise interests put forward by [Defendants] . . . taking into consideration the extent to which those interests make it *necessary* to burden the plaintiff's rights." *Obama for Am.*, 697 F.3d at 433 (quoting *Burdick*, 504 U.S. at 434).[38] As the Court has concluded above, under *Anderson-Burdick*, for the first-time voter restriction, Defendants must show one or more legitimate state interests sufficient in the Court's view to counterbalance the moderate burden it imposes upon voting rights.

---

[37] Even if Defendants had made this assertion, they would have encountered difficulties at step three of the *Anderson-Burdick* analysis, because they have not explained how requiring first-time, mail-registered voters to submit the required identification in person when voting helps prevent fraudulent voting to any greater extent than requiring the submission of such identification with mailed-in ballots.

[38] *Obama for America* did not mention, or expressly follow, the three-step approach set forth in *Kishore*, which the Court believes it is well advised to follow. But in context, it is clear that what *Obama for America* is referring to here comes into play at the final of the three steps described by *Kishore*.

The Court finds that the State's asserted interests are not sufficient, even though, as discussed above, the Court is employing a standard less demanding for the State than the one urged by Plaintiffs. Unlike in *Kishore*, it cannot be said here that the State has "well-established and legitimate interests in administering its own elections [via, in pertinent part, the first-time voter restriction, that] outweigh the intermediate burden imposed on Plaintiffs." *Kishore*, 2020 WL 4932749, at *4. That is not because the undersigned has denigrated or undervalued the State's policy interests based on his own personal policy preferences. Rather, it is because, as explained above, the State asserts two policy interests that are simply illusory, as they are predicated on the existence of a congressional requirement, and congressional intent, that simply do not exist.

That leaves the third interest that the State has asserted (albeit only obliquely), *i.e.*, the interest in effectuating congressional intent that first-time, mail-registered voters show identification. Although this interest is legitimate, the Court must "tak[e] into consideration the extent to which th[at] interest[ ]make[s] it necessary to burden the plaintiff's rights." *Thompson*, 959 F.3d at 808 (quoting *Burdick*, 504 U.S. at 434, 112 S. Ct. 2059 (internal quotation marks omitted)). And that interest does not make it at all necessary to burden first-time, mail-registered voters with the first-time voting restriction. Such a voter conceivably could show identification by providing it with his or her mailed-in ballots, as HAVA Section 21083 expressly contemplates. The state's legitimate interest in making voters show identification naturally makes it necessary for the state to impose burdens associated with voters providing identification to election officials. But that interest, at least as far as the current record shows, does not make it necessary or even helpful to impose the burden associated with forcing voters to show up in person to vote (and provide the identification required to vote).

Finally, the Court notes that even if it had determined that it should apply rational basis scrutiny, based on the current record the first-time voter restriction would fail it. As discussed, Defendants have asserted only one legitimate state interest, and Defendants have not shown *any* rational connection between it and the first-time voter restriction. That is to say, there is no connection between (a) effectuating congressional intent that first-time, mail-registered voters show identification either in person or with mailed-in ballots; and (b) requiring that such voters appear in person to vote (and show their identification), to the exclusion of the congressionally-approved alternative of providing identification with a mailed-in ballot.

The Court emphasizes that it has not denigrated or undervalued the State's policy interests based on the undersigned's personal policy preferences. Along these lines, the undersigned notes that his personal opinions on election laws and procedures simply have no proper bearing on his resolution of the constitutional claims presented. As the Tennessee Supreme Court observed:

> [The State's] policy choices will be judged by history and by the citizens of Tennessee. We, however, properly may not and will not judge the relative merits of them, regardless of our own views. To do so would be to exceed the proper scope of our role as jurists.

*Fisher*, 2020 WL 4515279, at *18.

What the state jurists said in *Fisher* applies to also to federal district judges. "It [i]s not for the district judge to disparage T[ennessee]'s response to [COVID-19] and constitutionalize his favored version of the [e]lection [c]ode." *Texas Democratic Party*, 961 F.3d at 408. And the Court likewise recognizes that "[t]he policy merits of [Tennessee's] voting procedures were not before the district court, even though the Virus has raised the stakes."). *Id.* What *is* before the Court, it fully realizes, is the constitutionality of the first-time voter restriction.

Here, the Court has not overstepped its role. Rather, it is has merely recognized that (i) the State's first two asserted interests are illusory, as they are predicated on the existence of a

congressional requirement, and congressional intent, that simply do not exist; and (ii) the State's third asserted interest simply is not advanced at all by the first-time voter restriction. The undersigned's personal policy preferences have nothing to do with his conclusions in this regard.

"When a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits often will be the determinative factor." *Obama for Am.*, 697 F.3d at 436. Here, application of the applicable *Anderson-Burdick* framework, in light of the current record, indicates that it is likely that Plaintiffs will prevail on their claim that the first-time voter requirement violates the First Amendment right to vote. Thus, this vital factor cuts in favor of Plaintiffs.

## III.  **Irreparable injury**.

As noted above, a plaintiff seeking a preliminary injunction must show irreparable injury. As Defendants correctly assert, such a plaintiff must demonstrate that irreparable harm is *likely* in the absence of the requested injunction. *City of Los Angeles*, 461 U.S. at 103 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 502 (1974)). Showing merely that irreparable injury to the plaintiff(s) is within the realm of possibility is not enough.

Plaintiffs argue that the first-time voter requirement will cause irreparable harm because such requirement denies Plaintiffs their fundamental right to vote. (Doc. No. 43 at 38-40). In support, Plaintiffs cite numerous cases for the well-established proposition that restrictions on constitutional rights, including the right to vote, constitute irreparable injury. (*Id*. at 38 (collecting cases)).

Indeed, "[w]hen constitutional rights are threatened or impaired, irreparable injury is presumed," especially in circumstances where monetary damages cannot make the plaintiff whole. *Obama for Am.*, 697 F.3d at 436 (citing *ACLU of Ky. v. McCreary Cnty*., 354 F.3d 438, 445 (6th

Cir. 2003)); *see also Brindley v. City of Memphis, Tenn*., 934 F.3d 461, 472 (6th Cir. 2019). "A restriction on the fundamental right to vote therefore constitutes irreparable injury." *Obama for Am*., 697 F.3d at 436 (citing *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986)). The Court determined above that Plaintiffs are likely to succeed on the merits of their claim that the first-time voter requirement violates their First Amendment right to vote. Accordingly, irreparable injury under these circumstances is presumed. *See Michigan State A. Philip Randolph Inst. v. Johnson*, 209 F. Supp. 3d 935, 954 (E.D. Mich. 2016) ("The case at bar deals with the right to vote, and thus this factor is presumed satisfied." (citation omitted)). Therefore, Plaintiffs have met their burden to demonstrate that irreparable harm is likely in the absence of the requested injunction enjoining the first-time voter restriction.

IV.    **Other factors.**

The Court also examines the final two factors, namely (a) whether granting the injunction will cause substantial harm to others; and (b) the requested injunction's likely impact on the public interest. The Court concludes that the requested injunction would favorably impact the public interest because as discussed above, it would serve to prevent what, based on the current record, likely would be a violation of the First Amendment right to vote enjoyed by the American citizenry. And the requested injunction would not harm or negatively impact any particular person(s).

The Court recognizes that enjoining a state election law at this juncture could otherwise be deemed to cause some harm or negative impact to the State, and thus the public it serves. Late changes in election law can impair the orderliness of an election and also result in an increased draw on already scarce public resources. "When analyzing the balance of equities, '[the Supreme] Court has repeatedly emphasized that lower federal courts should ordinarily not alter the election

rules on the eve of an election.'" *Kishore*, 2020 WL 4932749, at *4 (quoting *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (per curiam)). The Court believes that this principle applies here, at least to the extent that we may be considered to have reached the "eve" of the November general election, because to enjoin enforcement of the first-time voter restriction in advance of the upcoming general election would be to alter Tennessee's rules for that election. But the negative impact would be substantially attenuated by the apparent fact that: (1) allowing first-time, mail-registered voters to be treated just like other voters under the eligibility criteria likely would not require the State to change its procedures, but rather require the State merely to apply its procedures for absentee voting to a slightly larger pool of voters;[39] and (2) a considerable (if not exactly over-abundant) amount of time still exists for election officials in Tennessee to adjust to this change and manage its consequences.

In any event, although such concerns are real, they are counterbalanced by the positive effects to be provided by likely vindication of citizens' rights via the preliminary injunction. And most importantly, these concerns are outweighed by (i) the likelihood of success for Plaintiffs on their First Amendment challenge to the first-time voter restriction, and (ii) the corresponding likelihood of irreparable injury should such restriction not be preliminarily enjoined.

CONCLUSION

Accordingly, the Motion for a Preliminary Injunction is hereby granted insofar as it seeks a preliminary injunction with respect to the so-called first-time voter restriction of Tenn. Code Ann. § 2-2-115(b)(7).

---

[39] Based on the record to date, the pool would not be much larger. According to Plaintiffs, who are not contradicted on this by Defendants, in the last election cycle (which reasonably can be considered a fairly good indicator of what to expect in this election cycle), over twenty percent of all new registrations were completed by mail, amounting to over 128,000 new registrations. (Doc. No. 43 at 27). In absolute terms, 128,000 voters may sound like a lot, but it is a tiny fraction of the overall pool of registered Tennessee voters.

This concludes the Court's resolution of all requested preliminary injunctive relief sought by the Motion. The Court feels constrained at this time to address head-on the proverbial elephant in the room. An observer could be forgiven for taking the cynical view that voting-rights litigation—particularly if filed in the months preceding the consequential 2020 general election— is really just politics by other means. As to any such perception, the undersigned would not presume to speak for the parties, but he can speak for himself, and wishes to do so with some emphasis. The undersigned views this case, including the Motion, as a legal and not political matter, period. The questions he decides are decided based on the facts as he sees them and the law as he construes it. He is not concerned about how his decisions could aid one side or the other on the political front. Instead, he seeks only to issue decisions that are correct and evenhanded— and justifiably perceived as being correct and evenhanded.

In undertaking its proper mission with respect to the Motion, the Court has concluded, based on the record to date and applicable precedent as the Court believes it should be construed, that Plaintiffs are entitled to the preliminary relief they sought in the request numbered (2) above, but that all other preliminary relief sought should be denied.

Thus, for the reasons set forth herein, and in Doc. Nos. 55, 66, 73 and 77, the Motion (Doc. No. 40) is denied in part and granted in part. As indicated, it is granted with respect to Tenn. Code Ann. § 2-2-115(b)(7) (in advance of the November 3 general election though obviously not the August 6 primary) and denied in all other respects.

An appropriate preliminary injunction will be issued.

IT IS SO ORDERED.

*Eli Richardson*

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE